MARC T.G. DWORSKY (SBN 157413)
Marc.Dworsky@mto.com
KATHLEEN M. MCDOWELL (SBN 115976)
Kathleen.McDowell@mto.com
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, 25th floor
Los Angeles, CA  90071-1560
Telephone:     (213) 683-9100
Facsimile:     (213) 687-3702

DAVID H. FRY (SBN 189276)
David.Fry@mto.com
JENNY H. HONG (SBN 251751)
Jenny.Hong@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street,  27th floor
San Francisco, CA 94105-2907
Telephone:     (415) 512-4000
Facsimile:     (415) 512-4077

Attorneys for Defendants
WELLS FARGO DEFENDANTS AND THE
INDIVIDUAL DEFENDANTS

[Additional Counsel Listed on Signature Page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE WELLS FARGO MORTGAGE-BACKED CERTIFICATES LITIGATION | Civil Action No. 09-01376 (SI) |
| | **CONSOLIDATED CLASS ACTION ECF** |
| | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF WELLS FARGO DEFENDANTS' AND INDIVIDUAL DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT** |
| | DATE:     January 29, 2010<br>TIME:     9:00 a.m.<br>CTRM:    10 |

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................ 1

II.    ALLEGATIONS OF THE CONSOLIDATED COMPLAINT AND FACTS
     SUBJECT TO JUDICIAL NOTICE................................................................... 4

    A.    Structure of Mortgage-Backed Securities ............................................... 4

    B.    Disclosures Made In Connection With Mortgage-Backed Securities...................... 5

    C.    The Mortgage Business and the Particular Practices Alleged by Plaintiffs
       Were the Subject of Intense Public Scrutiny More than One Year Prior to
       the Filing of the Complaint ....................................................................... 7

    D.    Plaintiffs File this Action ........................................................................ 8

III.   ARGUMENT ...................................................................................................... 9

    A.    The Standard for Motions to Dismiss Under *Twombly*.............................. 9

    B.    Plaintiffs Have Not Adequately Alleged Any False or Misleading
       Statements ............................................................................................... 10

       1.    Plaintiffs Have Not Adequately Plead Falsity with Respect to Wells
          Fargo's Underwriting Guidelines................................................... 10

           a.    The Disclosure Materials Say that Exceptions Are Made ........... 10

           b.    Plaintiffs Fail to Tie Their Allegations to the Loans in the
               Pools Underlying the Certificates ................................................. 11

           c.    Plaintiffs Fail to Allege How Deviations from the
               Underwriting Standards Could Have Been Materially
               Misleading in Light of the Disclosures that Were Made .............. 12

           d.    Plaintiffs' Confidential Witness Allegations Add Nothing .......... 14

       2.    Plaintiffs Fail to Allege Falsity Regarding Other Originators' Loans ...... 15

       3.    Plaintiffs' Allegations of Inflated Appraisals Fail to State a Claim.......... 16

       4.    The Allegations Concerning Ratings Do Not State A Claim.................... 17

    C.    The Claims Asserted in the Complaint Are Time-Barred..................................... 18

       1.    Under the 1933 Act, Claims Are Time-Barred If Plaintiffs Were on
          Inquiry Notice more than One Year Prior to Filing................................. 18

       2.    Plaintiffs Were on Notice of the Issues Raised in the Complaint
          More than a Year Prior to Filing Suit...................................................... 18

           a.    Plaintiffs Were on Notice of Alleged Rating Issues .................... 18

           b.    Plaintiffs Were on Notice of Allegedly Inflated Appraisals ......... 19

           c.    Plaintiffs Were on Notice of Exceptions to Wells Fargo's
               Underwriting Standards ............................................................... 21

**TABLE OF CONTENTS**
**(continued)**

Page

          d.    Plaintiffs Were on Notice of Other Originators' Underwriting Practices ................................................... 22

          e.    Plaintiffs Were on Notice That the Certificates Posed Greater Risks Than They Did When They Were Issued ............... 22

   D.   Plaintiffs Lack Standing to Assert Claims As to Most of the Securities At Issue in the Complaint ......................................................................... 23

          1.    The Named Plaintiffs Lack Standing to Assert Section 12(a)(2) Claims Regarding Any Security They Did Not Purchase as Part of an Initial Offering .................................................................. 23

          2.    The Named Plaintiffs Lack Section 11 Standing to Assert Claims Regarding Any Security They Did Not Purchase ..................................... 23

   E.   Plaintiffs' Section 15 Claims Must Be Dismissed For Failure to Plead a Primary Violation of Section 11 or Section 12(a)(2) ........................................... 25

IV.    CONCLUSION ......................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

## FEDERAL CASES

*Ashcroft v. Iqbal*,
129 S. Ct. 1937 (2009) ............................................................................. 9, 11, 17

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) .......................................................................................... *passim*

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002) ........................................................................... 10

*DeBenedictis v. Merrill Lynch & Co. Inc.*,
492 F.3d 209 (3d Cir. 2007) ............................................................................. 19

*Gooley v. Mobil Oil Corp.*,
851 F.2d 513 (1st Cir. 1988) ........................................................................... 16

*Guenther v. Cooper Life Scis., Inc.*,
759 F. Supp. 1437 (N.D. Cal. 1990) ......................................................... 23, 24

*Gustafson v. Alloyd Co.*,
513 U.S. 561 (1995) ...................................................................................... 4, 23

*Hertzberg v. Dignity Partners, Inc.*,
191 F.3d 1076 (9th Cir. 1999) .................................................................. 23-24, 25

*In re Cosi, Inc. Sec. Litig.*,
379 F. Supp. 2d 580 (S.D.N.Y. 2005) ............................................................. 23

*In re Countrywide Fin. Corp. Sec. Litig.*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008) ..................................................... 24-25

*In re DDI Corp. Sec. Litig.*,
2005 WL 3090882 (C.D. Cal. July 21, 2005). ............................................... 23

*In re Fuwei Films Sec. Litig.*,
634 F. Supp. 2d 419 (S.D.N.Y 2009) .............................................................. 23

*In re Global Crossing, Ltd. Sec. Litig.*,
313 F. Supp. 2d 189 (S.D.N.Y. 2003) ............................................................ 24

*In re Iasia Works, Inc. Sec. Litig.*,
2002 WL 1034041 (N.D. Cal. May 15, 2002) ................................................ 11

*In re Levi Strauss & Co. Sec. Litig.*,
527 F. Supp. 2d 965 (N.D. Cal. 2007) ......................................................... 4, 23

*In re Novagold Res. Inc. Sec. Litig.*,
629 F. Supp. 2d 272 (S.D.N.Y. 2009) ............................................................ 20

*In re PMI Group, Inc. Sec. Litig.*,
2009 WL 1916934 (N.D. Cal. Jul. 1, 2009) ................................................... 14

*In re Salomon Smith Barney Mut. Fund Fees Litig.*,
441 F. Supp. 2d 579 (S.D.N.Y. 2006) ............................................................ 24

*In re Shoretel Inc., Sec. Litig.*,
2009 WL 2588881 (N.D. Cal. Aug. 19, 2009) ............................................... 11

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*In re Stac Elecs. Sec. Litig.*,
   89 F.3d 1399 (9th Cir. 1996)............................................................................................ 11

*In re Wash. Mut., Inc. Sec. Litig.*,
   __ F.R.D. __, 2009 WL 1393679 (W.D. Wash. May 15, 2009)..................................... 10, 24

*In re Wash. Mut., Inc. Sec. Litig.*,
   Case No. 08-md-01919-MJP, slip op. (W.D. Wash. Oct. 27, 2009)..................................... 23

*Moss v. U.S. Secret Serv.*,
   572 F.3d 962 (9th Cir. 2009)............................................................................................ 9

*Nenni v. Dean Witter Reynolds, Inc.*,
   1999 WL 34801540 (D. Mass. Sept. 29, 1999) ............................................................... 24

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*,
   __ F. Supp. 2d __, 2009 WL 3149775 (D. Mass. Sept. 30, 2009)................................. *passim*

*Pyramid Holdings, Inc. v Inverness Med. Innovations, Inc.*,
   639 F. Supp. 2d 120 (D. Mass. 2009) ............................................................................. 14

*Ronconi v. Larkin*,
   253 F.3d 423 (9th Cir. 2001)............................................................................................ 17

*Rubke v. Capitol Bancorp Ltd.*,
   460 F. Supp. 2d 1124 (N.D. Cal. 2006) ............................................................................ 25

*Rubke v. Capitol Bancorp Ltd.*,
   551 F.3d 1156 (9th Cir. 2009)............................................................................................ 10

*Twinde v. Threshold Pharms. Inc.*,
   2008 WL 2740457 (N.D. Cal. July 11, 2008) .................................................................. 25

*Yourish v. Cal. Amplifier*,
   191 F.3d 983 (9th Cir. 1999).............................................................................................. 2

**FEDERAL STATUTES**

15 U.S.C.
   § 77(k) ............................................................................................................................. 10
   § 77(l)(a)(2) ..................................................................................................................... 10
   § 77(m) ....................................................................................................................... 18, 25

**FEDERAL REGULATIONS**

17 C.F.R. § 229.512(a)(2) ..................................................................................................... 25

17 C.F.R. § 230.436(g)(1)..................................................................................................... 18

**FEDERAL ADMINISTRATIVE MATERIALS**

*Disclosure of Security Ratings in Registration Statements*, SEC Release No. 33-6336,
   46 Fed. Reg. 42024 (Aug. 18, 1981)................................................................................. 18

I.    **INTRODUCTION**

Since the summer of 2007, our nation has seen the most serious economic downturn since the Great Depression, a doubling of unemployment, and a more than 30% decline in home prices. Unremarkably, rating agencies have concluded that securities backed by home mortgages pose a greater risk of default today than they did before this economic calamity. The secondary market for these securities has dried up. As night follows day, class action litigation followed these events. This case is one of more than 20 similar class actions that have been brought against issuers and underwriters of mortgage-backed securities ("MBS") and currently pending around the country. Illustrating the cynicism of this lawsuit, large parts of the Consolidated Class Action Complaint ("Complaint") are plagiarized verbatim (or nearly verbatim) from complaints that Plaintiffs' counsel have filed against other issuers of MBS.

A plagiarized complaint is not the only indication of an indiscriminate—sue first, ask questions later—approach to litigation. Unlike nearly all the other pending cases, this action does *not* involve subprime mortgages. The average FICO score for the borrowers for these loans ranges between 725 and 755, far above the 620 level that typically distinguishes subprime. Even when focusing on prime loans, moreover, Wells Fargo's pools of mortgages have outperformed those of nearly all other major issuers. A recent S&P report on jumbo prime residential MBS issued in 2005, 2006, and 2007 indicates that Wells Fargo's rates of loss, delinquencies, and foreclosures are well below the industry average for all three years. RJN Ex. 31 at 3-5. Looking at cumulative losses for MBS issued in 2006 and 2007—the years at issue here, Wells Fargo's rate of loss is more than a third lower than the average for 2006 MBS (0.80% compared to 1.24%) and almost exactly half the average for 2007 MBS (0.46% compared to 0.90%). *Id.* In short, even a cursory investigation of the facts shows that this suit concerns some of the best performing pools of loans made to the highest quality borrowers in the market, and yet the claims are exactly the same as those made against subprime lenders with far higher levels of loss.

This motion does not, of course, turn on whether Plaintiffs' allegations are true or false. Rather, Plaintiffs' apparent willingness to sue any issuer of MBS without regard to the distinctions among them serves merely to reinforce the Supreme Court's instruction in *Bell*

1   *Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007), that a plaintiff must allege facts that are not

2   simply "consistent with" liability, but ones that "plausibly suggest[]" liability.  Particularly

3   where—as in the antitrust and securities areas—discovery will impose a massive, asymmetrical

4   financial burden on the defendants, *id.* at 559, a plaintiff's complaint must be carefully scrutinized

5   to ensure that it actually alleges facts that, if true, would plausibly establish liability.

6        The Complaint fails to meet the *Twombly* standard.  Most fundamentally, the Complaint

7   fails adequately to allege any materially false statements or omissions.  The Complaint makes

8   sweeping accusations that the incredibly detailed disclosures made regarding the pools of

9   mortgages were misleading because (a) Wells Fargo Bank, N.A. ("Wells Fargo") (or other loan

10  originators whose mortgages were included in the pools) did not follow Wells Fargo's stated

11  underwriting guidelines; (b) the appraisals on the underlying properties overstated their value;

12  and (c) the ratings for the MBS were based on "outdated assumptions, relaxed ratings criteria, and

13  inaccurate loan information."  Cplt. ¶ 6.  These conclusory allegations are insufficient and, when

14  considered in light of the disclosures that were made, insupportable.  *Plumbers' Union Local No.*

15  *12 Pension Fund v. Nomura Asset Acceptance Corp.*, __ F. Supp. 2d __, 2009 WL 3149775, at

16  *5-6 (D. Mass. Sept. 30, 2009).  Moreover, the allegations concerning ratings amount to

17  inactionable 20/20 hindsight.  Just as parallel conduct is not indicative of antitrust liability,

18  *Twombly*, 550 U.S. at 557, adverse business developments do not suggest that earlier, more

19  optimistic statements were false in the securities context.  *Yourish v. Cal. Amplifier*, 191 F.3d

20  983, 997 (9th Cir. 1999) ("It is clearly insufficient for plaintiffs to say that a later, sobering

21  revelation makes an earlier, cheerier statement a falsehood.") (internal quotations omitted).

22       Plaintiffs seek to bolster their conclusory accusations with allegations from unnamed

23  sources, the so-called "confidential witnesses."  These "CW" allegations are also inadequate to

24  support the Complaint.  Among other deficiencies, the CW allegations:

25       ▪   Fail to make any connection between the alleged practices and the mortgages
             packaged in the Certificates, as opposed to other loans made by Wells Fargo and
26           packaged in other MBS or sold to Fannie Mae, Freddie Mac, or Ginnie Mae;

27       ▪   Fail to provide any foundation for the conclusion that these practices were
             sufficiently widespread to have affected a material number of loans; and
28

- 2 -

▪        Describe many practices, such as rewarding the most productive employees, that provide no support whatsoever for the allegations of wrongdoing.

Even if Plaintiffs' generalized allegations *were* sufficient to state a claim, their claims would be time-barred.  This action was filed on March 27, 2009.  The Securities Act of 1933 ("1933 Act") imposes a one-year limitations period from the date on which a plaintiff is on inquiry notice of the claim.  Here, the "facts" that supposedly rendered the disclosure statements false were notoriously well known prior to March 2008.

*First*, as the Complaint itself states, allegations that appraisers were inflating home valuations in response to pressure from mortgage brokers and others were commonplace long before March 2008.  The Complaint itself cites a 2007 study indicating that 90% of appraisers reported being pressured to inflate home valuations.  Cplt. ¶ 105.  That study was widely reported in the mainstream media.  *See*, *e.g.*, RJN Exs. 21, 22, 29.  The Complaint also quotes from the congressional testimony of Alan Hummel, a representative of the appraisal industry, regarding these practices.  Cplt. ¶ 104.  The Complaint fails to note that this testimony also dates to 2007.  Many other media reports regarding widespread inflation of appraisals also predate March 2008.

*Second*, to the extent Plaintiffs claim that the Certificates were given higher ratings than they should have been (with no more than hindsight to commend that inference), they were on notice no later than December 2007, when the Certificates began to be downgraded or placed on "Ratings Watch Negative."  RJN Exs. 10, 11.  More of the Certificates were downgraded in January 2008.  RJN Ex. 12.

*And third*, Plaintiffs' accusations respecting alleged noncompliance with Wells Fargo's underwriting guidelines reflect an apparent failure to read the disclosure documents at issue, which:  expressly informed investors that Wells Fargo made exceptions to its underwriting guidelines; expressly stated that the pools of mortgages might contain a substantial amount of mortgages from other originators who did not follow those guidelines and whose own standards "*may differ significantly from*" and "*are less stringent than*" Wells Fargo's own underwriting standards; and expressly disclosed specific data concerning the very factors that Plaintiffs claim constituted the exceptions—limited documentation, loan-to-value ("LTV") ratios, and debt-to-

income ("DTI") ratios.  In other words, if Plaintiffs genuinely harbored misconceptions about underwriting guidelines, the disclosure documents themselves provided all the information necessary to put them on notice of those misconceptions.

The Complaint suffers from the additional deficiency that Plaintiffs lack standing with respect to the vast majority of their purported claims.  They have not alleged standing to assert a § 12(a)(2) claim with respect to *any* security.  A plaintiff has standing under § 12(a)(2) only if he or she was the original purchaser of the security in the initial offering.  *In re Levi Strauss & Co. Sec. Litig.*, 527 F. Supp. 2d 965, 983 (N.D. Cal. 2007); *see also Gustafson v. Alloyd Co.*, 513 U.S. 561, 571, 577-78 (1995).  Plaintiffs do not claim to have done so (and could not claim that all members of the putative class did so).  Accordingly, the § 12(a)(2) claim must be dismissed.

Plaintiffs also lack standing under § 11 for most of the securities purportedly at issue. While § 11 does not require that the plaintiff purchase in the initial offering, it is necessary that the security be traceable to that offering.  Here, the Plaintiffs did not purchase any of the securities offered in most of the offerings referenced in the Complaint.

Finally, Plaintiffs' "control person" claims under § 15 should be dismissed because Plaintiffs have failed to plead the underlying substantive violations.

## II.    ALLEGATIONS OF THE CONSOLIDATED COMPLAINT AND FACTS SUBJECT TO JUDICIAL NOTICE

### A.    Structure of Mortgage-Backed Securities

This case concerns mortgages entered into between home buyers and financial institutions, most commonly Wells Fargo or its affiliates, but sometimes other institutions.  Cplt. ¶¶ 41, 68.  The banks issuing the mortgages are referred to as the "originators."  *Id.* at ¶ 3.  Wells Fargo Asset Securities Corporation, as the "Depositor," aggregated the mortgages and bundled them into "pools."  *Id.* at ¶¶ 15, 42.  Each pool typically contained hundreds or thousands of mortgages.  *See, e.g.*, RJN Ex. 4 at A-1; RJN Ex. 5 at A-1.  Certificates represent claims on the principal and interest payments made by the borrowers in a particular pool of mortgages (Cplt. ¶40)—they grant no rights to income from other pools or from the business of Wells Fargo itself. For a given pool, a number of different Certificates would be issued.  *Id.* at ¶ 42.  There might be

ten or more levels (or "tranches") of Certificates for a given pool.  *Id.* at ¶¶ 42, 113.  The different

tranches are distinguished by the priority of their claim to principal and interest paid on the pool

of mortgages and the resulting difference in the interest rate paid.  *Id.*; RJN Ex. 1 at S-9, S-10.

The most senior Certificates have the right to be paid before all of the more junior levels and,

accordingly, are paid lower rates of interest due to the lower risk.  Cplt. ¶ 42; RJN Ex. 1 at S-11,

S-12.  The sale of the Certificates was conditioned upon them receiving certain bond ratings from

the rating agencies.  Cplt. ¶ 111.

### B.   <u>Disclosures Made In Connection With Mortgage-Backed Securities</u>

The Certificates were registered under three "shelf" registration statements, filed on July

29, 2005, October 20, 2005, and September 27, 2006.  Cplt. ¶ 53.  Many separate offerings, each

relating to a different pool of mortgages, were made pursuant to each registration statement.  *Id.*

at ¶ 45 & pp. 12-15.  For each offering, a Prospectus and Prospectus Supplement were issued.  *Id.*

at ¶¶ 55-56.  The same Prospectus might be used for a number of offerings, but each offering had

a unique Prospectus Supplement that contained detailed information concerning the particular

mortgages involved in that offering.  *Id.* at ¶ 56.

Appendix A to each Prospectus Supplement provided extensive data about the loans in the

pool underlying that offering, including:

- The range, breakdown, and weighted average FICO score for the borrowers;

- The range, breakdown, and weighted average LTV ratio for the loans;

- The range, breakdown, and weighted average DTI ratio for the borrowers;

- The range, breakdown, and weighted average principal amount of the loans; and

- A breakdown of the number of loans originated by Wells Fargo affiliates versus those originated by others.

*See, e.g.*, RJN Ex. 2.

Appendix A also provided a breakdown of the required documentation level for the loan

applications into the following categories: full documentation; income verification; asset

verification (broken out into those where the borrower chose this option and those where the risk

1  model indicated further documentation was not needed); and no documentation (again, broken out

2  by whether the model indicated this approach or the borrower chose it).  *Id.* at A-3.  Each of those

3  categories is explained in the Prospectus Supplement.  RJN Ex. 1 at S-42, S-43.

4        Each Prospectus Supplement stated that the loans were "generally" originated in

5  accordance with the underwriting standards described in the accompanying Prospectus.  RJN Ex.

6  1 at S-44; Cplt. ¶ 71.  Each also said, in the very next sentence, that "[i]n certain instances,

7  exceptions to the Underwriting Standards may have been granted by Wells Fargo Bank."  *Id.*

8        The Prospectuses disclosed that the loans in the pools may come from a number of

9  sources, including referrals from mortgage brokers.  RJN Ex. 1 at 31.  They also noted that Wells

10  Fargo acquired loans from other, unaffiliated lenders.  *Id.*  Some of the loans acquired from others

11  "may have been originated by the seller or another third party according to underwriting

12  standards that may have varied materially from Wells Fargo Bank's underwriting standards."  *Id.*

13  at 32.  The Prospectuses indicated that those other underwriting standards would be disclosed

14  only if the mortgages constitute 20% or more of the pool.  *Id.*  In other words, investors were told

15  that up to 20% of the pool could be from lenders whose underwriting standards were materially

16  worse than Wells Fargo's without any disclosure of the standards that were used.

17        The Prospectuses also included a discussion of other risk factors relevant to the

18  Certificates.  *See*, *e.g.*, RJN Ex. 1 at 11-22.  Among other things, they warned that:

19  
20  
21  
22  > An investment in securities such as the certificates, which generally represent
> interests in pools of residential mortgage loans, may be affected by a decline in
> real estate values and changes in the mortgagor's financial condition.  There is no
> assurance that the values of the mortgaged properties securing the mortgage loans
> underlying any series of certificates have remained or will remain at their levels
> on the dates of origination of the related mortgage loans.

23  
24  
25  >     If the residential real estate market should experience an overall decline in
> property values such that the outstanding balances of the mortgage loans
> contained in a particular trust estate and any secondary financing on the
> mortgaged properties, become equal to or greater than the value of the mortgaged
> properties, delinquencies, foreclosures and losses could be higher than those now
> generally experienced in the mortgage lending industry . . . .

26  RJN Ex. 1 at 13.  And that is precisely what happened.

27  

28

C.   **The Mortgage Business and the Particular Practices Alleged by Plaintiffs Were the Subject of Intense Public Scrutiny More than One Year Prior to the Filing of the Complaint.**

The collapse of the housing market and its consequences for the rest of the economy arguably has been the most prominent news story of the last two years.  Improbably, the phrase "mortgage-backed securities" has become ubiquitous.[1]  Public discussion of widespread disregard of traditional underwriting standards, inflated appraisals, and questionable bond ratings—the central allegations of the Complaint—raged long before the subprime housing market collapsed and has continued ever since.  For example:

June 19, 2005     *Chicago Tribune* reports on Congressional inquiry into inflated appraisals, RJN Ex. 13;

July 27, 2005     *Wall Street Journal* reports that Wells Fargo is loosening its lending standards in some markets, including raising the permissible DTI ratio, RJN Ex. 14;

July 30, 2005     *Washington Post* reports on problems with low documentation ("low-doc") or no documentation ("no-doc") mortgages, calling them "liar loans," RJN Ex. 15;

Nov. 20, 2005     *Wall Street Journal* reports that "low-doc" and "no-doc" loans allow borrowers to exaggerate their financial strength, RJN Ex. 16;

July 22, 2006     *Wall Street Journal* reports on inflated appraisals and their impact in a declining housing market, RJN Ex. 17;

Aug. 22, 2006     *Wall Street Journal* reports that "stated income" mortgages "raise red flags" because borrowers can "cheat," RJN Ex. 18;

Aug. 27, 2006     *New York Times* reports on a study showing that 90 percent of "stated income" borrowers overstate their income by at least five percent, RJN Ex. 19;

Oct. 19, 2006     *Wall Street Journal* reports that mortgage delinquencies are rising due to loosening of lending standards, RJN Ex. 20;

March 18, 2007    *San Francisco Chronicle* reports on study showing that 90% of appraisers feel pressure to inflate home valuations, RJN Ex. 21;

April 21, 2007    *Washington Post* reports that the four largest appraiser trade groups are seeking legislation to prevent lenders from pressuring them to inflate appraisals, RJN Ex. 22;

---

[1] A Westlaw search of the New York Times alone turns up 280 articles using the phrase "mortgage-backed securities" between January 1, 2007 and March 27, 2008 (one year prior to the filing of this action).

| | | |
|---|---|---|
| May 16, 2007 | *Financial Times* reports that bond ratings are "the subject of growing anxiety," in part because assumptions underlying ratings for MBS "might have been flawed," RJN Ex. 23; |
| June 27, 2007 | Alan Hummel, head of the Appraisal Institute, testifies before Congress regarding the pressure on appraisers to inflate valuations, RJN Ex. 6, Cplt. ¶ 104; |
| Aug. 17, 2007 | *New York Times* reports that "[r]ating agencies' models for creditworthiness [of MBS] may be outdated," RJN Ex. 25; |
| Aug. 27, 2007 | *Wall Street Journal* reports that rating agencies may have a "heightened conflict" in rating MBS and other structured finance securities, RJN Ex. 26; |
| Aug. 30, 2007 | Bloomberg News comments that Moody's statement that it is "updating its methodology" with respect to MBS "really means . . . that its historical models say absolutely nothing about how the future might turn out," RJN Ex. 27; |
| Sept. 2007 | Portfolio.com comments that "[t]he ratings that were ultimately assigned [to MBS] proved too generous" and says that the damage is moving from the subprime market into the rest of the housing market, RJN Ex. 28; |
| Oct. 2, 2007 | *San Jose Mercury News* reports that appraisers say they "routinely" feel pressure to inflate appraisals, RJN Ex. 29. |

Following this extensive press coverage, some of the Certificates were downgraded in December 2007.  RJN Exs. 10, 11.  At the same time, more than two dozen tranches were designated "Rating Watch Negative," indicating the possibility of future downgrades.  *Id.*  More of the Certificates were downgraded or put on "Rating Watch Negative" in January 2008.  RJN Ex. 12.

**D.      Plaintiffs File this Action.**

A wave of litigation has followed the dramatic events in the housing market.  At least 20 cases have been filed against issuers of MBS.  The complaints in these actions vary little in substance—accusing all of the defendants of the same alleged wrongs.  Plaintiffs' counsel in this action developed their own form in two other actions and copied large portions of the Complaint nearly verbatim from those complaints.[2]

---

[2] *Compare* Cplt. ¶¶ 5-7, 40-44, 46-51, 96, 99, 102, 104-105, 115, 116, 117, 121, 122-124 to RJN Ex. 8 ¶¶ 7-9, 37-41, 45-50, 139, 141, 145, 146-147, 161, 163, 164, 165, 167-168 and to RJN Ex. 9 ¶¶ 5-7, 24-28, 30-35, 112, 114, 120, 121-122, 141, 147, 143, 146, 148-150.

The initial complaint in these consolidated actions was filed on March 27, 2009. Lead plaintiffs were appointed by order dated July 16, 2009. Dkt. No. 124. The Complaint was filed on August 31, 2009. Dkt. No. 133. The Complaint asserts claims under §§ 11, 12(a)(2), and 15 of the 1933 Act.

## III. ARGUMENT

### A. The Standard for Motions to Dismiss Under *Twombly*

Over the past two years, the Supreme Court has eliminated much of the ambiguity that once surrounded the plaintiff's pleading burden under Rule 8. A plaintiff must allege "enough *facts* to state a claim to relief that is *plausible* on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56, 570 (2007) (emphasis added); *see also Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009). A plaintiff must establish the elements of each claim through factual allegations sufficient "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. A complaint asserting allegations that are merely *consistent* with liability is insufficient because "'it stops short of the line between possibility and plausibility of entitlement to relief.'" *Moss*, 572 F.3d at 969 (quoting *Twombly*, 550 U.S. at 557). Moreover, courts are required to disregard legal conclusions in the complaint, as "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. . . . '[including] legal conclusion[s] couched as [] factual allegation[s].'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009) (citation omitted); *see also Moss*, 572 F.3d at 969.

Moreover, careful scrutiny at the motion to dismiss stage is required because the "practical significance" of permitting "a largely groundless claim" to go forward is "to take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value." *Twombly*, 550 U.S. at 557-58 (internal quotations omitted). Only "by taking care to require" sufficiently detailed and plausible allegations can the courts "hope to avoid the potentially enormous expense of discovery in cases with no reasonably founded hope that the discovery process will reveal relevant evidence" of wrongdoing. *Id.* at 559 (internal quotations omitted).

Here, Plaintiffs have not met their burden under Rule 8.

1

**B.**       **Plaintiffs Have Not Adequately Alleged Any False or Misleading Statements.**

2       Both Section 11 and Section 12(a)(2) require a plaintiff to plead a material

3   misrepresentation or the omission of a material fact necessary to make the statements that were

4   made not misleading.  15 U.S.C. §§ 77(k), 77(l)(a)(2).  The omission of even a material fact is not

5   actionable unless the plaintiff can show that some statement actually made was misleading to

6   investors due to the omission of that fact.  *See*, *e.g.*, *Brody v. Transitional Hosps. Corp.*, 280 F.3d

7   997, 1006 (9th Cir. 2002) (analogous language in Securities Exchange Act of 1934 "prohibit[s]

8   *only* misleading and untrue statements, not statements that are incomplete") (emphasis in

9   original); *see also Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1162 (9th Cir. 2009) (rejecting

10   securities fraud complaint that failed to show why omission rendered statements misleading).

11   The Complaint makes various vague generalizations regarding falsity that are insufficient to state

12   a claim as a matter of law and, in some cases, are specifically and directly refuted by the

13   disclosure materials themselves.[3]

14           **1.**       **Plaintiffs Have Not Adequately Plead Falsity with Respect to Wells Fargo's Underwriting Guidelines.**

15               **a.**       **The Disclosure Materials Say that Exceptions Are Made.**

16       The first category of falsity alleged in the Complaint is that "Wells Fargo and its affiliates

17   had not followed the stated underwriting standards when issuing loans to borrowers."  Cplt. ¶ 6;

18   *see also id.* at ¶¶ 67, 70.  As Plaintiffs concede, however, the disclosure materials expressly

19   conditioned the statement regarding the underwriting standards by saying the standards were

20   "generally" applied, as opposed to simply saying they were applied or that they were "always" or

21   "consistently" applied.  *Id.* at ¶ 71.  More importantly, as Plaintiffs also concede, the very next

22   sentence in the disclosure materials states that "[i]n certain instances, exceptions to the

23   Underwriting Standards may have been granted by Wells Fargo Bank."  *Id.*; *see also* RJN Ex. 1 at

24

---

25   [3] Plaintiffs engage in what some courts have termed "puzzle pleading" whereby they block quote
    large sections of the disclosure materials and then assert that those sections are false or

26   misleading for myriad "reasons" that may or may not relate to the matters discussed in the quote.
    *See*, *e.g.*, Cplt. ¶¶ 73-91.  Plaintiffs' counsel have been taken to task for this approach in the past.

27   *In re Wash. Mut., Inc. Sec. Litig.*, __ F.R.D. __, 2009 WL 1393679 at *11 (W.D. Wash. May 15,
    2009).  Defendants will address these allegations as coherently and completely as can be

28   accomplished within the page limitations imposed by the Local Rules.

S-44.  Dismissal is appropriate when the disclosure documents themselves contradict the

allegations of falsity.  *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399 (9th Cir. 1996); *see In re Iasia*

*Works, Inc. Sec. Litig.*, 2002 WL 1034041, at *7 (N.D. Cal. May 15, 2002).

Plaintiffs attempt to avoid this problem by asserting that Wells Fargo "systematically"

failed to follow the underwriting guidelines and allowed "pervasive" exceptions.  Plaintiffs never

explain what they mean by these terms (which are notably ambiguous with respect to the

frequency of the alleged exceptions), much less offer any specific allegations that would support

them.[4]  These are exactly the type of conclusory allegations that the Supreme Court said were

insufficient in *Iqbal*.  129 S. Ct. at 1951 (allegations that defendant was "principal architect" of

policy, or "knew of, condoned, and willfully and maliciously agreed to" mistreatment are

conclusory and therefore insufficient); *see also In re Shoretel Inc., Sec. Litig.*, 2009 WL 2588881,

at *5 (N.D. Cal. Aug. 19, 2009) (allegation that issuer was "utterly unable to monitor its own

financials" is too conclusory to state a claim).

> **b.      Plaintiffs Fail to Tie Their Allegations to the Loans in the Pools Underlying the Certificates.**

The generality of Plaintiffs' allegations poses another problem that is characteristic of

their claims; they are not directed at the loans in these pools.  Quite apart from Plaintiffs' utter

failure to allege facts supporting their hypotheses regarding the loan origination practices of

Wells Fargo, Plaintiffs do not even attempt to allege facts showing that the loans at issue *here*

were affected in a material way (or at all) by those alleged practices.  For instance, they claim that

CW2 said that 25-30% of "the loans" had exceptions, without specifying what loans he or she

was referencing.  Cplt. ¶ 85.  Plaintiffs also quote from Wells Fargo's 2007 Annual Report to the

effect that Wells Fargo concluded it had been too lenient in its loan terms, (Cplt. ¶ 91), but they

do not claim that this comment pertained to even one of the loans in even one of these pools.

This point is not hair-splitting.  According to Mortgage Daily, a trade website, Wells

Fargo originated $272 billion in home loans in 2007 alone—and that was a decline from the prior

---

[4]  As discussed in further detail below, Plaintiffs' "confidential witness" allegations fail to support these conclusory statements and are also insufficient to state a claim.

year.[5]  This case, which covers two years of MBS packaging loans originated by Wells Fargo and others, involves only $67.5 billion worth of loans.  Cplt. ¶ 3.  Not only do these securities involve only a small fraction of the loans originated by Wells Fargo overall, but the loans in these pools are not necessarily a representative sample.  The Prospectuses state that these loans are classified as "*prime*" by Wells Fargo.[6]  RJN Ex. 1 at 29.  Wells Fargo originated sub-prime loans, but they are not included in these pools.  Separate securities were issued packaging those loans (these securities were called "Wells Fargo Home Equity Asset-Backed Securities," distinguishing them from the "Wells Fargo Mortgage-Backed Securities" at issue here).  Under *Twombly*, the Court cannot simply assume that Plaintiffs can show what they have not alleged—that the loans included in the pools involved in this case were affected by the allegedly "systematic" or "pervasive" exceptions to underwriting guidelines.  Plaintiffs are entitled to a presumption that their fact-based, non-conclusory allegations are true, but they are not entitled to have the Court treat the Complaint as if it made allegations that it does not make.

<table>
<tr><td>c.</td><td>**Plaintiffs Fail to Allege How Deviations from the Underwriting Standards Could Have Been Materially Misleading in Light of the Disclosures that Were Made.**</td></tr>
</table>

Plaintiffs' falsity allegations fail for the additional reason that they do not, and cannot, show how an investor could have been misled by the supposed exceptions.  The description of the underwriting standards in the Prospectus is largely procedural, explaining, for instance, that a "Mortgage Score" is determined based on computer models and used to categorize the risk posed and determine the level of underwriting authority required.  Cplt. ¶ 73.  It does not say what score requires heightened underwriting authority.  The disclosure also says things like "[i]n general, borrowers applying for loans must demonstrate that the ratio of their total monthly debt to their monthly gross income does not exceed a certain maximum level."  RJN Ex. 1 at 34.  It does not, however, say what those guidelines are.  Indeed, the description of the underwriting guidelines

---

[5] Available at http://www.reuters.com/article/pressRelease/idUS109525+28-Jan-2008+PRN20080128.

[6] One of the 54 offerings at issue, Wells Fargo Alternative Trust Loan 2007-PA1 Trust, involves "Alt-A" loans.

provides virtually none of the hard numbers—the credit scores, DTI ratios, LTV ratios, additional resource levels, etc. that determine who will receive a mortgage and who will not.

Plaintiffs do not claim that Wells Fargo failed to follow the procedures described in the Prospectuses, much less specify how that might have occurred.  They do not suggest, for instance, that Wells Fargo failed to calculate a "Mortgage Score" for some borrowers.  Rather, in their CW allegations (the infirmities of which are discussed further below), they claim that Wells Fargo did not apply (albeit in unspecified ways) its established criteria for things like DTI or LTV ratios.  *See*, *e.g.*, Cplt. ¶¶ 85, 89.  Those criteria were not, however, disclosed in the Prospectus or Prospectus Supplement.[7]  Because investors were not told what those standards were, it could not have been misleading for Wells Fargo to deviate from them (particularly given that the prospectus expressly stated that exceptions were made).

Moreover, while the disclosure materials did not set forth those numeric criteria, they did disclose a tremendous amount of data concerning the loans that were included in each pool.  Appendix A to the Prospectus Supplement was filled with detailed information concerning the loans, such as both averages and breakdowns of DTI ratios, LTV ratios, FICO scores, principal amounts, etc.  *See, e.g.*, RJN Exs. 2-5.  For the 2007 AR-4 pool, for instance, an investor would know that the weighted average FICO score was 739 and the weighted average LTV was 74.95%.  RJN Ex. 5 at A-1, A-2.  In addition, Appendix A revealed that only 2 of the 750 borrowers had FICO scores below 650 and 292 had FICO scores between 750 and 800.  *Id.* at A-6.  It also indicated that 25.80% of borrowers had a DTI ratio between 40% and 45% and 70.34% would have their interest rate adjust for the first time in 58 months.  *Id.* at A-5, A-6.  Other than their claim that the appraised values were overstated, which is addressed below, Plaintiffs make no claim that any of this Appendix A information—which is what would actually inform an investor's view of the riskiness of the portfolio—was misstated.

---

[7] The one numerical guide that is included is a statement that the loans "will not generally have had at origination a Loan-to-Value Ratio in excess of 95%."  RJN Ex. 1 at 34.  This statement did not affect the "total mix" of information (and therefore is not material) because Appendix A gave a breakdown of the LTV ratios of all of the loans in each pool, so an investor was able to tell exactly how many loans had an LTV greater than 95% (or, for that matter, 75% or 85%).  *See* RJN Ex. 2 at A-4.

1    **d.    Plaintiffs' Confidential Witness Allegations Add Nothing.**

2    Even if Plaintiffs' CW allegations were credited, they fail to overcome the issues outlined

3    above, and they suffer from additional problems.  A basic problem with all of the CW allegations

4    is that they fail to provide any foundation for extrapolating the purported experience of these

5    individuals to the company as a whole or, at least, to enough loans to be material.  *Pyramid*

6    *Holdings, Inc. v Inverness Med. Innovations, Inc.*, 639 F. Supp. 2d 120, 128 (D. Mass. 2009)

7    (finding that plaintiff "must provide more than 'tales from the trenches' from a score of former

8    [company] employees" and dismissing section 11 and 12 claims under Rule 8(a) standard); *In re*

9    *PMI Group, Inc. Sec. Lit.*, 2009 WL 1916934, at *9 (N.D. Cal. Jul. 1, 2009) (securities fraud

10   "complaint does not explain how [confidential witness] would have personal knowledge of what

11   was 'widely recognized'").

12   In addition, a number of the CW allegations do not even purport to show that Wells Fargo

13   made exceptions to its underwriting guidelines.  *E.g.*, Cplt. ¶ 86 (Wells Fargo as a "loan

14   producing machine"); ¶ 87 (loans made within the guidelines but "finagling" the guidelines); ¶ 88

15   (discussion of other originators' practices); ¶ 90 (Wells Fargo offered more aggressive products

16   over time).  CW 5 said that exceptions were made for a variety of factors, (*id.* at ¶ 89), but that

17   cannot have made the Prospectus misleading when it disclosed that exceptions were made and did

18   not place a limit on what those exceptions might be.  CW 6 said that Wells Fargo started offering

19   "no-doc" loans, (*id.* at ¶ 90), and CW 1 said that Wells Fargo was approving so many stated

20   income loans that it felt like her prior subprime lending job (*id.* at ¶ 84.).[8]  The Prospectus

21   Supplements not only disclosed that these types of low documentation loans were made, they

22   specified how many of each type were included in each pool.  *See, e.g.*, RJN Ex. 2 at A-3.  CW 7

23   supposedly claims that 70% of the loans he worked with had LTV ratios greater than 95%.  The

24   disclosure materials did not claim that Wells Fargo does not issue such loans, only that, generally,

25

26   _____

     [8] Plaintiffs engage in sleight-of-hand with respect to CW 1.  They quote a newspaper's
     description of practices at another lender where CW 1 claims to have previously worked.  Cplt.
27   ¶ 82.  They then quote CW 1 as saying that Wells Fargo Home Mortgage "was doing 'the same
     things'" as that lender.  *Id.* ¶ 83.  They pointedly do not quote CW 1 saying that the "same things"
28   that Wells Fargo was supposedly doing were the things described in the newspaper article.

the loans in these pools did not have an LTV exceeding that level.  A Prospectus Supplement for Wells Fargo's securitization of its *sub-prime* loans (which are *not* part of this case) shows that a significant number of those loans did have LTV ratios in excess of 95%.  *See* RJN Ex. 7 at A-5.

### 2.    Plaintiffs Fail to Allege Falsity Regarding Other Originators' Loans.

Plaintiffs claim that the disclosure materials were misleading because they failed to disclose that other originators did not comply with their own underwriting guidelines.  Cplt. ¶ 92.  The underwriting standards of these other originators are not described in the disclosure materials and Plaintiffs do not claim that they are.  Moreover, as Plaintiffs themselves allege, the disclosure materials expressly stated that the underwriting standards of the other originators whose loans were included in the pools "*may differ significantly from*" and in fact "*are less stringent than*" Wells Fargo's own standards.  *Id.* (emphasis added).  Plaintiffs do not explain how the statement that some undisclosed originators used underwriting standards that are not described, but which in fact are less stringent than Wells Fargo's standards, could possibly have misled them.

Plaintiffs' failure to specify that the practices they allege affected any of the loans in any of these pools is even more glaring with respect to other originators' loans than with Wells Fargo's loans.  Other than American Home Mortgage, they do not even claim that loans from any of the "many originators industry-wide" that were allegedly failing to comply with their underwriting standards were included in the pools.  As to American Home, they claim not that the company violated its guidelines, but that it changed its guidelines.  Cplt. ¶ 94.  Plaintiffs contend that American Home's guidelines were rendered "essentially meaningless," but fail to explain how that could have made the statement that other lender's guidelines "may differ significantly from" and be "less stringent than" Wells Fargo's standards misleading.  They state that many American Home mortgages were low-doc or no-doc loans, but Appendix A to the Prospectus Supplement told investors exactly how many low-doc and no-doc loans were included in each pool, (*see*, *e.g.*, RJN Ex. 2 at A-3), so that could not have misled them.  Finally, Plaintiffs do not say anything about the particular American Home loans that were included in these pools and whether or not they met the standards of American Home or, for that matter, Wells Fargo.

- 15 -

### 3.      Plaintiffs' Allegations of Inflated Appraisals Fail to State a Claim.

Plaintiffs' allegations concerning inflated appraisals fail to state a claim because they do not tie this alleged practice to the loans underlying these securities.  The Complaint principally makes broad generalizations regarding the industry.  Cplt. ¶¶ 101, 102, 104, 105.  These cannot be sufficient to state a claim because they are not directed at the loans at issue here.  *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, __ F. Supp. 2d __, 2009 WL 3149775, at *6 (D. Mass. Sept. 30, 2009) ("*Plumbers' Union*").  "That questionable appraisal practices were a common problem in the industry as a whole, without more, tells nothing about the Trust's underlying loans.  'To permit a plaintiff, on such a skimpy foundation, to drag a defendant past the pleading threshold would be to invite litigation by hunch and to open [defendants] to the most unrestrained of fishing expeditions.'"  *Id.* (quoting *Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 515 (1st Cir. 1988).)

To the extent the Complaint attempts to speak to Wells Fargo's practices, it cites several alleged "confidential witnesses," but these are also inadequate to establish a claim.  First, as noted earlier, the Complaint does not allege facts establishing that the statements of these witnesses have a foundation sufficient to support their generalizations concerning Wells Fargo's practices.  None of Plaintiffs' confidential witnesses is alleged to have been an appraiser.  None is alleged to have been in a position to know what practices were applied outside of their specific offices.  No explanation is given of how any of the confidential witnesses would have known if an appraiser gave an appraisal that was inaccurate.  Finally, none of the confidential witnesses actually says that the appraisers used by Wells Fargo lacked independence.

Second, the confidential witnesses do not address the question whether the particular loans at issue here were affected by the practices they describe.  CW 1 is quoted as saying that "appraisals were very inflated," but the Complaint does not say if CW 1 is talking about appraisals used for Wells Fargo mortgages (much less the mortgages included in these pools), rather than other mortgages in the market.  Cplt. ¶ 107.  The only other confidential witness purportedly supporting Plaintiffs' claims concerning appraisals, CW 7, does not appear to have said anything about appraisals at all.  Cplt. ¶ 108.

1   In short, Plaintiffs' allegations amount to nothing more than a conclusory allegation that

2   appraisals, affecting some unspecified loans, were inflated.  As a matter of law, that is insufficient

3   under *Twombly* and *Iqbal*.

4   **4.     The Allegations Concerning Ratings Do Not State A Claim.**

5   Plaintiffs' claims regarding the statements in the Prospectus Supplements concerning

6   ratings given to the Certificates suffer from several defects.  Most fundamentally, Plaintiffs do not

7   allege how what was said was false.  In another example of "puzzle pleading," Plaintiffs quote

8   language from the Prospectus Supplements and then recite a litany of alleged problems with the

9   ratings without ever connecting those purported problems to any of the statements made in the

10  disclosures.  Cplt. ¶¶ 111 (quoting disclosures), 112-124 (reciting purported issues).

11  Among the issues cited by Plaintiffs is that the ratings were "already understood" and the

12  Certificates would not have been distributed had they not received the pre-determined ratings.

13  Cplt. ¶ 112.  As Plaintiffs concede, however, the disclosure materials explicitly say that the

14  Certificates would not issue if the predicted ratings were not achieved.  Cplt. ¶ 113.  Accordingly,

15  that fact could not render the disclosures misleading.  Moreover, that an issuer could predict what

16  rating the agencies would give to a particular security does not mean the agencies were failing to

17  do their job, it simply means the issuer had seen ratings on enough securities to believe it could

18  meet those criteria with respect to an anticipated pool.

19  Plaintiffs also claim that the ratings assigned to the Certificates were "unjustifiably high"

20  and "based on . . . faulty assumptions" (Cplt. ¶ 115), but this amounts to nothing more than

21  inactionable "fraud by hindsight."  *Ronconi v. Larkin*, 253 F.3d 423, 430 n.12 (9th Cir. 2001).

22  The fact that, in retrospect, some of the pools may not have performed as well as predicted does

23  not mean the ratings were wrong in the first instance, particularly in view of the extraordinary

24  economic decline that has occurred in the interim.  Virtually identical allegations were rejected on

25  this ground in the *Plumbers' Union* case.  2009 WL 3149775, at *8 ("None of the purported

26  comments made by S&P and Moody's employees in the wake of the collapse of the sub-prime

27  mortgage market (in 2007) support the inference that the ratings were compromised as of the

28  dates (in 2005 and 2006) when the registration statements and prospectus supplements became

- 17 -

1   effective."). Plaintiffs' allegation that the SEC found fault with how the rating agencies handled

2   subprime MBS, (Cplt. ¶¶ 116-120), quite apart from saying nothing about the pools at issue here,

3   is not just hindsight, but second-hand hindsight. None of these allegations amounts to a claim

4   that the agencies acted in bad faith or even that they lacked a reasonable basis for the ratings.

5          Finally, Plaintiffs once again fail to tie their allegations to the Certificates at issue here.

6   For instance, they quote a former employee of Standard & Poor's to the effect that the use of

7   "out-dated" rating models resulted in "the failure to capture changes in performance of the new

8   non-prime products." Cplt. ¶ 122. Plaintiffs nowhere allege, however, that the mortgages here

9   were "non-prime," and indeed they were not. RJN Ex. 1 at 29. Plaintiffs simply do not allege

10  that the rating agencies' models were inadequate with respect to the mortgages that were actually

11  included in these pools.[9]

12  **C.    The Claims Asserted in the Complaint Are Time-Barred.**

13       **1.    Under the 1933 Act, Claims Are Time-Barred If Plaintiffs Were on
              Inquiry Notice More than One Year Prior to Filing.**

14         Claims under the 1933 Act are governed by a two-prong statute of limitations. 15 U.S.C.

15  § 77(m). All claims are barred when three years have passed since either (a) "the security was

16  bona fide offered to the public," for § 11 or 12(a)(1) claims, or (b) "the sale" of the security, for

17  § 12(a)(2) claims. Claims are also barred if brought more than one year after the claim was

18  discovered or should have been discovered "by the exercise of reasonable diligence." *Id.*

19       **2.    Plaintiffs Were on Notice of the Issues Raised in the Complaint More
              than a Year Prior to Filing Suit.**

20       **a.    Plaintiffs Were on Notice of Alleged Rating Issues.**

21         Plaintiffs were on notice of the specific issues they raise concerning MBS ratings.[10]

22  Plaintiffs complain, for instance, that the ratings were "pre-determined," in the sense that the

23

24  ───────────────

    [9] Plaintiffs' Section 11 claims with respect to the ratings fail for the additional reason that the

25  ratings are not part of the registration statement. 17 C.F.R. § 230.436(g)(1). This rule exists for
    the very reason to prevent ratings from forming the basis for a Section 11 claim. Disclosure of

26  Security Ratings in Registration Statements, SEC Release No. 33-6336, 46 Fed. Reg. 42024
    (Aug. 18, 1981).

27  [10] Defendants do not concede that Plaintiffs' allegations of wrongdoing have merit—indeed,
    Defendants deny them. A claim need not have merit, however, for a plaintiff to be on inquiry

28  notice of it.

Certificates would not have been issued unless they were assigned certain ratings by the ratings agencies. Cplt. ¶ 112. That fact, however, was disclosed in each of the Prospectus Supplements, *id.* at ¶ 113, all of which were issued more than a year prior to the filing of this action. *Id.* at ¶ 45. *DeBenedictis v. Merrill Lynch & Co. Inc.*, 492 F.3d 209, 216 (3d Cir. 2007) (information in Registration Statement put plaintiff on inquiry notice).

Plaintiffs also assert that the ratings "were based on insufficient information and faulty assumptions concerning how many underlying mortgages were likely to default." Cplt. ¶ 115. Nearly two years before this case was filed, the *Financial Times* reported that higher than expected mortgage defaults suggested that the "assumptions underlying [the agencies'] ratings might have been flawed." RJN Ex. 23. A few months later, the *New York Times* said that "[r]atings agencies' models for creditworthiness may be outdated" (RJN Ex. 25), and Bloomberg News reported that Moody's was changing its methodology for rating MBS, and commented that the company's "historical models say absolutely nothing about how the future might turn out" (RJN Ex. 27).

Plaintiffs also contend that the rating agencies may have a conflict of interest that is "exacerbated" in the context of structured finance products, such as MBS. Cplt. ¶ 118. The *Financial Times* said almost exactly the same thing in May 2007: "The potential for conflicts of interest in the agencies' 'issuer pays' model has drawn fire before, but the scale of their dependence on investment banks for structured finance gives them a significant incentive to look kindly on the products they are rating, critics say." RJN Ex. 23. The *Economist* echoed the concern later that month. RJN Ex. 24 ("The big agencies bill the issuer, not the investor. This leaves them conflicted . . .. The biggest concern is structured finance.").

### b. Plaintiffs Were on Notice of Allegedly Inflated Appraisals.

Plaintiffs claim that the disclosure materials were misleading because the appraisals obtained in connection with the issuance of the mortgages were inflated. Cplt. ¶ 101. The Complaint itself notes that a 2007 survey of appraisers found that 90% reported being pressured to inflate appraisals. Cplt. ¶ 105. It also quotes from the *2007* congressional testimony of Alan Hummel, then Chair of the Appraisal Institute, on this subject. *Id.* at ¶ 104; RJN Ex. 6 (copy of

1   testimony).  The press reported on these issues extensively, including the survey results.  *See*,

2   *e.g.*, RJN Exs. 17, 21, 22, 29.

3        Plaintiffs cannot avoid this problem by contending that these press reports did not concern

4   Wells Fargo specifically.  First, the Complaint itself states that others, such as mortgage brokers,

5   may have exerted pressure on the appraisers.  Cplt. ¶ 101.  The disclosure materials expressly

6   advise investors that some of the loans in the pools were referred by mortgage brokers.  RJN Ex.

7   1 at 31.  Accordingly, articles discussing mortgage brokers pressuring appraisers were sufficient

8   to put Plaintiffs on notice of the issue.

9        Second, appraisal values are based on comparable sales, so even if an investor was certain

10  that every mortgage in these pools, from every source, had been appraised by the most

11  conscientious appraiser possible, reports of widespread inflation of appraisals by others would

12  still have put the investor on notice of potential risks in these Certificates.  If some properties in a

13  neighborhood are being appraised at an inflated value, the inflated sales prices of those homes

14  will have the effect of increasing the appraisal value of other homes.  Plaintiffs chose to avoid the

15  heightened pleading standards for fraud (Cplt. ¶ 2), but that means that they were on notice when

16  a reasonable investor had information sufficient to suggest that the disclosure materials were

17  inaccurate—there is no need to have information suggesting that the alleged inaccuracy stemmed

18  from fraud, or that defendants had any complicity in the inaccuracy.  *In re Novagold Res. Inc.*

19  *Sec. Litig.*, 629 F. Supp. 2d 272, 288 (S.D.N.Y. 2009).  Here, the hypothesized inaccuracy—the

20  failure to disclose that the appraisals overstated the value of the underlying properties (and

21  thereby understated LTV ratios)—would not have depended on any conduct by Wells Fargo at

22  all, widespread inflation of appraisals by others would be sufficient.[11]

23

---

24  [11] The Complaint inadvertently highlights how this issue should have been apparent to investors.
    Plaintiffs quote a confidential witness saying that an appraisal of $800,000 for a house that sold

25  "a few years ago" at $300,000 "is just crazy."  Cplt. ¶ 107.  If this be madness, any investor
    paying attention—and certainly the sophisticated institutional investors who purchased the

26  Certificates—would have been aware of such housing price increases, which regularly were front-
    page news in California newspapers.  The Case-Schiller Home Price Index, which addresses

27  existing home sales, showed a near tripling of home prices in both Los Angeles and Miami
    between 2000 and 2007.  RJN Ex. 32.  Prices more than doubled during that period in a variety of

28  markets, including San Diego, Phoenix, San Francisco, Tampa, Las Vegas, and New York.  *Id.*

1

**c.   Plaintiffs Were on Notice of Exceptions to Wells Fargo's Underwriting Standards.**

2

3        Plaintiffs claim that the Prospectus Supplements were misleading because they stated that

4    the mortgages "will have been underwritten either to the Sponsor's standards as set forth herein,

5    or to such other standards set forth in the applicable Prospectus Supplement," when, in fact,

6    "Wells Fargo extended loans that did not comply with its underwriting standards in order to

7    increase loan volume regardless of the borrower's ability to meet its obligations."  Cplt. ¶ 70; *see*

8    *also id.* ¶ 89 (confidential witness allegations that exceptions were made respecting many

9    different aspects of loan applications).  As Plaintiffs admit, however, the Prospectus Supplements

themselves advised investors that Wells Fargo made such exceptions.  *Id.* at ¶ 71.

10       When Plaintiffs deign to offer specifics regarding the alleged ways in which Wells Fargo

11   supposedly deviated from its standards, it is apparent that they were on inquiry notice of this

12   claim.  They assert that Wells Fargo made exceptions for LTV and DTI ratios, but Appendix A to

13   the prospectus supplements gave the breakdown of LTV and DTI ratios in every pool, (*see, e.g.*,

14   RJN Exs. 2-5)—so investors were on notice of the extent to which LTV and DTI ratios outside

15   the norm were being permitted.[12]

16       Plaintiffs also claim that many people were being given "stated income" or other kinds of

17   low-doc and no-doc loans.  Cplt. ¶¶ 85, 90.  Press reports in the *Wall Street Journal* and

18   elsewhere highlighted the risk that such loans would permit borrowers to misrepresent their

19   financial strength.  RJN Exs. 15, 16, 18, 19.  It was a simple thing to connect those stories to the

20   Certificates because Appendix A to every Prospectus Supplement indicated how many loans with

21   reduced documentation were included in the pool.  *See, e.g.*, RJN Ex. 2 at A-3; *see also*

22   *Plumbers' Union*, 2009 WL 3149775, at * 6 (where offering materials disclosed that most loans

23   "had been originated under limited documentation programs . . . Plaintiffs' argument that they

24   were not on notice of the originator's 'soft' underwriting practices begs credulity").  Accordingly,

25   investors were on notice of that issue as well.

26

27
_____
[12] The prospectuses also state explicitly that "Wells Fargo permits debt-to-income ratios to exceed
28   guidelines when the applicant has documented compensating factors."  *See, e.g.*, RJN Ex. 1 at 34.

One of Plaintiffs' confidential witnesses described a program of "following the guidelines but also finagling the guidelines if it meant getting the loan approved." Cplt. ¶ 87. The Prospectuses themselves disclosed that, as of 2005 (*i.e.*, the time frame at issue here) Wells Fargo had initiated a program "designed to encourage its mortgage loan underwriting staff to prudently, but more aggressively, utilize the underwriting discretion already granted to them." *Id.* at ¶ 75. Setting aside Plaintiffs' disparaging characterization, investors were plainly on notice of the program.

### d.   Plaintiffs Were on Notice of Other Originators' Underwriting Practices.

Finally, Plaintiffs contend that the disclosure materials are false with respect to other originators' underwriting practices because, although the Prospectus Supplements state that those other originators' underwriting guidelines may differ significantly from Wells Fargo's guidelines, they do not disclose that the other originators may have ignored their guidelines. Cplt. ¶¶ 92-93. The one other originator singled out by Plaintiffs is American Home Mortgage.[13] *Id.* ¶ 94. The problematic practices of other originators, and American Home in particular, were well known more than a year before this case was filed. American Home was one of a number of originators that went bankrupt in 2007. RJN Ex. 30.

### e.   Plaintiffs Were on Notice That the Certificates Posed Greater Risks Than They Did When They Were Issued.

Plaintiffs maintain that they "purchased Certificates that were far riskier than represented and that were not of the 'best quality,' or even 'medium credit quality,' and were not equivalent to other investments with the same credit ratings . . . . The credit rating agencies have now downgraded nearly all of the Certificates." Cplt. ¶ 7. The credit rating agencies began downgrading the Certificates, however, in December 2007 and January 2008. RJN Ex. 10-12. Some were also placed on credit watch status at that time. *Id.* While these changes did not extend to all of the pools or even all tranches for any one pool, it necessarily signaled that the agencies' original assessment of the risk associated with the pools had changed.

---

[13] Plaintiffs fail to allege that any other originator whose loans were included in the pools at issue failed to follow its stated guidelines.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**D.**     **Plaintiffs Lack Standing to Assert Claims As to Most of the Securities At Issue in the Complaint.**

**1.**     **The Named Plaintiffs Lack Standing to Assert Section 12(a)(2) Claims Regarding Any Security They Did Not Purchase as Part of an Initial Offering.**

Section 12(a)(2) of the 1933 Act imposes liability on "sellers" of securities for untrue statements appearing in the "Prospectus" used to sell the securities.  Because liability is limited to those sales made by means of the Prospectus, a plaintiff must have purchased the securities as part of the initial offering—not in the secondary market.  *In re Levi Strauss & Co. Sec. Litig.*, 527 F. Supp. 2d 965, 983 (N.D. Cal. 2007); *In re Wash. Mut., Inc. Sec. Litig.*, Case No. 08-md-01919-MJP, *slip op.* at 37 (W.D. Wash. Oct. 27, 2009); *see also Gustafson v. Alloyd*, 513 U.S. 561, 571, 577-78 (1995) (suggesting that Section 12(a)(2) applies "exclusively" to public offerings and that it is "not plausible" that Congress intended it to apply to secondary market transactions).

Plaintiffs do not allege that they purchased the Certificates in their initial offerings. Rather, they state either that they purchased them pursuant to the allegedly misleading Prospectuses *or* that their purchases are "traceable" to the Prospectuses. Cplt. ¶ 152.  A plaintiff may have standing under *§ 11* where the securities are "traceable" to a public offering, but the ability to trace is insufficient for *§ 12(a)(2)* standing.  *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 445 (S.D.N.Y 2009).  Courts have repeatedly dismissed § 12(a)(2) claims for lack of standing where the plaintiff made precisely the same allegation that is made here.  *See*, *e.g.*, *id.*; *In re Cosi, Inc. Sec. Litig.*, 379 F. Supp 2d 580, 589 (S.D.N.Y. 2005); *In re DDI Corp. Sec. Litig.*, 2005 WL 3090882, at * 17 (C.D. Cal. July 21, 2005).

Because they have not alleged that they purchased in the initial offering of the Certificates, Plaintiffs' Section 12(a)(2) claim must be dismissed in its entirety.

**2.**     **The Named Plaintiffs Lack Section 11 Standing to Assert Claims Regarding Any Security They Did Not Purchase.**

Section 11, unlike Section 12(a)(2), does not require a purchase in the initial offering of the security—the security's being traceable to the offering is sufficient.  *See*, *e.g.*, *Guenther v. Cooper Life Scis., Inc.*, 759 F. Supp. 1437, 1439 (N.D. Cal. 1990); *see also Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1080 & n.4 (9th Cir. 1999).  Section 11 does require, however, the

- 23 -

1    plaintiff to have purchased securities "actually issued in the offering for which the plaintiff claims

2    there was a false or otherwise misleading registration statement." *Guenther*, 759 F. Supp. at

3    1439.

4         Here, Plaintiffs purport to assert claims with respect to 54 different offerings. Cplt. ¶ 45

5    & pp. 12-15. Of those, however, they purchased Certificates from only 17 offerings. Cplt. ¶ 128

6    & pp. 42-44. For the remaining 37 offerings, there is *no* Plaintiff who purchased Certificates.

7    Plaintiffs cannot assert claims on behalf of those who purchased Certificates issued in connection

8    with those other offerings. *In re Wash. Mut., Inc. Sec. Litig.*, ___ F.R.D. __, 2009 WL 1393679,

9    at *14 (W.D. Wash. May 15, 2009); *In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189,

10   207 (S.D.N.Y. 2003) ("at least one named plaintiff must be a member of that class-that is, a

11   named plaintiff must have purchased shares traceable to the challenged offering").

12        This issue has commonly arisen in cases involving mutual fund shares. A particular

13   mutual fund company will manage a variety of funds. Each fund issues its own shares, but the

14   mutual fund company takes some action (*e.g.*, imposes a fee structure) common to all of the

15   funds. The courts have routinely rejected efforts by investors who purchased shares in some of

16   the funds to bring suit on behalf of investors in other funds within the fund family. *See, e.g.*, *In re*

17   *Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d 579, 607 (S.D.N.Y. 2006); *Nenni*

18   *v. Dean Witter Reynolds, Inc.*, 1999 WL 34801540, at *2 (D. Mass. Sept. 29, 1999).

19        The one court to address this issue in connection with claims made by purchasers of MBS,

20   the court followed the overwhelming weight of authority and found a named class plaintiff can

21   sue only on behalf of persons who purchased in the same offering. *Plumbers' Union*, 2009 WL

22   3149775, at *3-4. In a case not brought by purchasers of MBS, but still involving a shelf

23   registration statement and a series of Prospectus Supplements, Judge Pfaelzer took a novel

24   approach and concluded that a named class plaintiff could represent purchasers in different

25   offerings, if (i) the offerings were all made pursuant to the same shelf registration statement

26   (albeit with different Prospectus Supplements); and (ii) the plaintiff alleged that the shelf

27   registration statement itself contained misrepresentations. *In re Countrywide Fin. Corp. Sec.*

28   *Litig.*, 588 F. Supp. 2d 1132, 1166 (C.D. Cal. 2008). To reach its result, however, the

- 24 -

1   *Countrywide* opinion had to disregard SEC regulations stating that each Prospectus Supplement,

2   combined with the shelf registration statement, must be treated as a "new registration statement

3   relating to the securities offered therein." 17 C.F.R. § 229.512(a)(2).  Because § 11 standing

4   requires that the plaintiff "purchased a security under that, rather than some other, registration

5   statement," *Hertzberg*, 191 F.3d at 1080, the consequence of the SEC regulation is that there is no

6   standing to assert claims on behalf of persons who purchased in a different offering in the

7   series.[14]

8         **E.**     **Plaintiffs' Section 15 Claims Must Be Dismissed For Failure to Plead a**
                **Primary Violation of Section 11 or Section 12(a)(2).**

9        Because, among other things, the Complaint fails adequately to plead a primary violation

10  of Section 11 or Section 12(a)(2), the "control person" claim under Section 15 must be dismissed.

11  *Twinde v. Threshold Pharms. Inc.*, 2008 WL 2740457, at *16 (N.D. Cal. July 11, 2008); *Rubke v.*

12  *Capitol Bancorp Ltd.*, 460 F. Supp. 2d 1124, 1151 (N.D. Cal. 2006).

13  **IV.**    **CONCLUSION**

14       For the foregoing reasons, the Consolidated Complaint should be dismissed with

15  prejudice.

16  DATED: October 30, 2009          MUNGER, TOLLES & OLSON LLP

17                                            MARC T.G. DWORSKY
                                          KATHLEEN M. MCDOWELL

18                                            DAVID H. FRY
                                          JENNY H. HONG

19

20                                          By:         */s/ David H. Fry*

21                                                    DAVID H. FRY

22                                          Attorneys for Defendants
                                        WELLS FARGO DEFENDANTS AND THE

23                                          INDIVIDUAL DEFENDANTS

24

25

---

26  [14] The *Countrywide* court also appears not to have appreciated the implications of its ruling.  The statute of repose under Section 13 runs from the first public offering of "the security."  15 U.S.C.

27  § 77m.  Under the *Countrywide* construction of the statute, "the security" is any security offered under the allegedly false shelf registration statement.  Here, that would mean that claims concerning 35 of the 54 offerings at issue would be barred by the statute of repose because the

28  first offerings under the applicable shelf registrations were in 2005. Cplt. pp. 12-14.

MEMO OF POINTS &AUTH. ISO MOT. TO DISMISS
OF WELLS FARGO DEFTS AND INDIVIDUAL DEFTS
CASE NO. 09-1376-SI

1  DATED: October 30, 2009

WELLS FARGO & CO.
Office of General Counsel
MAC A0194-266
45 Fremont Street, 26th floor
San Francisco, CA  94105
Telephone:     (415) 396-4425
Facsimile:      (415) 975-7864
tojacob@wellsfargo.com


By:                    /s/ Thomas O. Jacob
                        THOMAS O. JACOB

Attorney for Defendants
WELLS FARGO DEFENDANTS