**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| IN RE WELLS FARGO MORTGAGE-<br>BACKED CERTIFICATES LITIGATION | No. C 09-01376 SI<br><br>**ORDER GRANTING IN PART AND<br>DENYING IN PART DEFENDANTS'<br>MOTIONS TO DISMISS** |
| _____/ | |

On March 19, 2010, the Court heard oral argument on defendants' motions to dismiss the complaint. Having considered the arguments of the parties and the papers submitted, and for good cause shown, the Court hereby rules as follows.

**BACKGROUND**

**I.      Background on Mortgage-Pass Through Certificates**

These consolidated cases are brought by purchasers of mortgage pass-through certificates ("Certificates"), securities that entitle the holder to receive payments based on the principal and interest payments made by borrowers in an underlying pool of mortgage loans. Consol. Complaint ¶¶ 3, 40.

Certificates are created and sold to investors by the following process. First, a depositor acquires an inventory of mortgage loans that were either originated by the depositor or purchased from other loan originators. *Id.* ¶ 41. The depositor then securitizes the pool of loans so that rights to the loan revenues can be sold to investors. *Id.* ¶ 42. At this stage, the offerings are divided into grades, each of which carries a different level of risk and reward. The least risky loans are given a "AAA" rating, a grade that signifies the highest-quality investment. *Id.* ¶ 42. After the offerings are rated, the depositor passes the

Certificates to various underwriters, who sell the Certificates to investors. *Id.* ¶ 43.

In this case, Wells Fargo Bank[1] originated or purchased the pooled mortgages that backed the Certificates and acted as custodian and servicer of the loans. *Id.* ¶¶ 3, 15-16. Defendants McGraw-Hill Companies, Moody's Investors Service, Inc., and Fitch, Inc. (collectively, the "Rating Agency Defendants") were responsible for rating the Certificates based on the credit quality of the pooled mortgages. *Id.* ¶ 4. Defendants Goldman Sachs & Co., Morgan Stanley & Co., JP Morgan Securities, Inc., and others (collectively, the "Underwriter Defendants") sold the Certificates to investors. *Id.* ¶ 17.

The Certificates at issue in this case were issued pursuant to Registration Statements filed with the Securities and Exchange Commission ("SEC") on July 29, 2005, October 20, 2005, and September 27, 2006. *Id.* ¶ 53. These Registration Statements were later accompanied by Prospectuses explaining the general structure of the investments, as well as Prospectus Supplements that contained detailed descriptions of the mortgage pools underlying the Certificates. *Id.* ¶¶ 55-56. Wells Fargo issued the Certificates pursuant to the Registration Statements and accompanying documents (collectively, "Offering Documents"), and the Underwriting Defendants sold the Certificates to investors, including plaintiffs. *Id.* ¶ 45, 58.

## II.    Alleged Misstatements and Omissions

Plaintiffs bring suit under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77l(a)(2), and 77o. Plaintiffs allege that the Offering Documents contained numerous false and misleading statements and omissions. First, plaintiffs state that the documents misstated Wells Fargo's underwriting process and loan standards. According to plaintiffs, Wells Fargo often extended loans to borrowers who did not meet its creditworthiness standards, resulting in a low-quality mortgage pool. *Id.* at ¶¶ 70, 76. Plaintiffs cite statements by several confidential witnesses ("CWs") who assert that Wells Fargo placed "intense pressure" on its loan officers to close loans, including by coaching borrowers to provide qualifying income information, accepting blatantly implausible or falsified income information, and lowering its standards near the end of the calendar year. *Id.* ¶¶ 83-88. Plaintiffs allege

---

[1] Wells Fargo Bank, its parent company Wells Fargo & Co., and the individual defendants will be collectively referred to as the "Wells Fargo Defendants."

**United States District Court**
For the Northern District of California

1   that the third-party loan originators disregarded Wells Fargo's stated underwriting standards "in order

2   to approve as many mortgages as possible." *Id.* ¶ 94.

3       Second, plaintiffs allege that the Offering Documents falsely stated the appraisal value of the

4   underlying mortgaged properties. *Id.* ¶ 96.  The Offering Documents stated that the amount of a

5   mortgage would not exceed 95% of the appraised value of the home. *Id.* ¶ 100.  However, according

6   to plaintiffs, appraisal values  were inflated to hide the fact that the value of the mortgages often

7   exceeded the true value of the properties. *Id.* ¶ 101.  One of plaintiff's CWs states that approximately

8   70% of the loans he signed off on while working as a Wells Fargo underwriter involved mortgages

9   worth more than 95% of the home's value. *Id.* ¶ 108.

10      Third, in connection with their foregoing contention regarding the appraisal value of the

11  underlying mortgaged properties, plaintiffs allege that the Offering Documents misstated the investment

12  quality of the Certificates.  Plaintiffs allege that, regardless of the credit quality of each mortgage pool,

13  the rating for each Certificate was artificially set at AAA – the rating signifying the highest investment

14  quality and lowest risk. *Id.* ¶ 112.  Plaintiffs allege that, due to the low quality of some of the underlying

15  mortgages, the Certificates were actually "far riskier than other investments with the same ratings." *Id.*

16  ¶ 115.  According to plaintiffs, the SEC issued a report in July 2008 which identified numerous

17  problems with securities ratings, including that rating agencies may "have an interest in generating

18  business from the firms that seek the rating, which could conflict with providing ratings of integrity."

19  *Id.* ¶ 118.

20      In early 2009, Plaintiffs instituted two actions against defendants: *General Retirement System*

21  *of the City of Detroit v. The Wells Fargo Mortgage Backed Securities*, No. 09-1376 SI, and *New Orleans*

22  *Employees' Retirement System v. Wells Fargo Asset Securities Corporation*, No. 09-1620 SI.  By order

23  dated July16, 2009, the Court consolidated these actions into the present case, *In Re Wells Fargo*

24  *Mortgage-Back Certificates Litigation*, No. 09-1376 SI, and designated lead plaintiffs and lead class

25  counsel. *See* July 16, 2009 Order (Docket No. 124).

26      Presently before the Court are separate motions to dismiss the complaint brought by the Wells

27  Fargo Defendants, Rating Agency Defendants, and Underwriter Defendants.

28

United States District Court
For the Northern District of California

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted.  To survive a motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  This "facial plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009).  In deciding whether the plaintiff has stated a claim, the Court must assume the plaintiff's allegations are true and draw all reasonable inferences in the plaintiff's favor. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).  However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

**DISCUSSION**

Defendants move to dismiss the complaint on numerous and partly overlapping grounds.  In the order the Court will address them, defendants' arguments are as follows.  First, the Wells Fargo Defendants and Underwriter Defendants move to dismiss for lack of standing.  Second, the Wells Fargo Defendants move to dismiss on statute of limitations grounds.  Third, the Rating Agency Defendants move to dismiss on the ground they are not subject to liability under the Securities Act.  Finally, all three groups of defendants move to dismiss on the ground plaintiffs have failed to allege any actionable misstatements or omissions.

**I.      Standing**

**A.      Section 11 Claim**

Section 11 of the Securities Act of 1933 imposes liability on issuers, underwriters, and other participants in a public securities offering for any material misstatement of fact or material omission in the registration statement.  15 U.S.C. § 77k.  To have standing to bring suit under Section 11, a plaintiff must have purchased a security "actually issued in the offering for which the plaintiff claims there was a false or otherwise misleading registration statement." *Guenther v. Cooper Life Scis., Inc.*, 759 F.

4

1  Supp. 1437, 1439 (N.D. Cal. 1990) (citation omitted).  "The burden of tracing shares to a particular

2  public offering rests with plaintiffs." *Id.*

3  　　　The named plaintiffs in this action bring suit on behalf of a putative class of persons who

4  purchased securities through fifty-four public offerings.  Complaint ¶ 45.  The named plaintiffs have

5  only alleged, however, that they actually purchased securities issued in connection with seventeen of

6  these challenged offerings.  *Id.* ¶ 128.  The Wells Fargo and Underwriter Defendants contend that the

7  named plaintiffs lack standing to bring suit on behalf of those who purchased securities through the

8  remaining thirty-seven offerings.

9  　　　To establish constitutional standing, a plaintiff must demonstrate that it has personally suffered

10  an injury in fact that is fairly traceable to a defendant's alleged misconduct and is likely to be redressed

11  by a decision in the plaintiff's favor.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992).

12  "Standing is a threshold inquiry and is particularly important in securities litigation, where strict

13  application of standing principles is needed to avoid vexatious litigation and abusive discovery."

14  *Forsythe v. Sun Life Fin., Inc.*, 417 F. Supp. 2d 100, 118 (D. Mass. 2006) (citing *Warth v. Seldin*, 422

15  U.S. 490, 498 (1975)).  In a class action, the lead plaintiffs must show that they personally have been

16  injured, "not that injury has been suffered by other, unidentified members of the class to which they

17  belong and which they purport to represent."  *Warth*, 422 U.S. at 502.

18  　　　Other courts considering class action complaints under Section 11 have overwhelmingly held

19  that the lead plaintiffs named in the complaint lack standing to challenge any offering through which

20  no lead plaintiff actually purchased a security.  *See, e.g.*, *Plumbers' Union No. 12 Local Pension Fund*

21  *v. Nomura Asset Acceptance Corp.*, 658 F. Supp. 2d 299, 303 (D. Mass. 2009) ("[T]he named plaintiffs

22  are incompetent to allege an injury caused by the purchase of Certificates that they themselves never

23  purchased."); *In re Wash. Mut., Inc. Sec., Derivative & ERISA Litig.*, 259 F.R.D. 490, 504 (W.D. Wash.

24  2009); *In re Salomon Smith Barney Mutual Fund Fees Litig.*, 441 F. Supp. 2d 579, 607 (S.D.N.Y. 2006);

25  *Ong ex rel. Ong IRA v. Sears, Roebuck & Co.*, 388 F. Supp. 2d 871, 890-91 (N.D. Ill. 2004).

26  　　　Plaintiffs seek to circumvent this rule by asserting that all fifty-four of the challenged offerings

27  stem from common Registration Statements.  Plaintiffs' own allegations, however, establish that each

28  offering was associated with a separate Prospectus and Prospectus Supplement.  *See* Complaint ¶¶ 45,

*United States District Court*
For the Northern District of California

55-56. Under applicable regulations, where an offering is made pursuant to a common Registration Statement, but with an amended Prospectus, "each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein." 17 C.F.R. § 229.512(a)(2). Although plaintiffs have alleged that the Prospectuses and Prospectus Supplements contained some similar false statements or omissions, the case law is clear that a named plaintiff has standing under Section 11 only as to the documents that governed his own purchase of securities. *Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1080 (9th Cir. 1999). Therefore, plaintiffs cannot gain standing purely as a result of the common Registration Statements.

Plaintiffs further contend that the Court should defer the standing inquiry until the class certification stage. The Ninth Circuit has stated in clear terms, however, that standing "is a jurisdictional element that must be satisfied prior to class certification." *LaDuke v. Nelson*, 762 F.2d 1318, 1325 (9th Cir. 1985). Contrary to plaintiffs' assertion, the fact that the lead plaintiffs in this case purchased Certificates through less than one-third of the offerings they seek to challenge concerns the lead plaintiffs' standing, not their fitness as class representatives under Federal Rule of Civil Procedure 23's typicality analysis.

Much of the case law on which plaintiffs rely in support of their deferred standing argument is distinguishable. For example, in several district court decisions cited by plaintiffs, there was no dispute that the lead plaintiffs had individual standing; rather, the dispute concerned whether the lead plaintiffs could bring suit on behalf of a class of persons who suffered different injuries stemming from the same conduct by the defendants. The courts held that remaining questions concerning the similarity of the named plaintiffs' injuries to those of absent class members should be resolved at the class certification stage. *See In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1003-04 (N.D. Cal. 2008) ("[A] lead plaintiff with some injuries in fact has established standing for purposes of Article III; once the general standing requirement is satisfied, any additional questions related to particular injuries are relevant only in the context of class certification under Federal Rule of Civil Procedure 23."); *In re Grand Theft Auto Video Game Consumer Litig.*, No. 06-1739, 2006 WL 3039993, at *3 (S.D.N.Y. Oct. 25, 2006) ("Defendants do not challenge the Named Plaintiffs' standing to bring claims against Defendants. . . . The relevant question, therefore, is not whether the Named Plaintiffs have standing to sue Defendants

1    – they most certainly do – but whether their injuries are sufficiently similar to those of the purported

2    Class to justify the prosecution of a nationwide class action."). These cases did not address whether

3    plaintiffs in a class action may bring suit on behalf of persons who have purchased securities through

4    different offerings stemming from distinct offering documents.

5    In addition, although plaintiffs do not cite the Supreme Court's decisions in *Ortiz v. Fibreboard*

6    *Corporation*, 527 U.S. 815 (1999) and *Amchem Products v. Windsor*, 521 U.S. 591 (1997), plaintiffs'

7    argument is presumably based on these cases, as plaintiffs cite numerous district court decisions which

8    relied on the *Ortiz* and *Amchem* rulings. In both cases, the Supreme Court held that courts may evaluate

9    class certification issues before Article III standing issues if the former are "logically antecedent" to the

10   latter. *Ortiz*, 527 U.S. at 831; *Amchem*, 521 U.S. at 613. The Court does not find these decisions to be

11   dispositive in the present case. Both *Ortiz* and *Amchem* concerned global settlements in asbestos-related

12   litigation, a factual scenario that is highly distinct from a securities fraud action. Indeed, other courts

13   have cautioned against extending the *Ortiz/Amchem* rule beyond its factual context. *See, e.g.*, *In re*

14   *AllianceBerstein Mut. Fund Excessive Fee Litig.*, No. 04-4885, 2005 WL 2677753, at *9 (S.D.N.Y. Oct.

15   19, 2005) ("[T]he [Supreme] Court has stressed that this exception should only be applied when a court

16   is confronted with an extremely complex case defying customary judicial administration."). Moreover,

17   neither the Supreme Court nor the Ninth Circuit has held that the *Ortiz/Amchem* rule applies in cases

18   like the present one. Accordingly, the Court is not inclined in the present context to depart from the

19   principle that a lead plaintiff cannot prosecute a class action based on claims he could not advance

20   individually.

21   Plaintiffs' Section 11 claims challenging the thirty-seven offerings through which they did not

22   purchase securities are DISMISSED. Plaintiffs are granted leave to amend to designate additional

23   named plaintiffs who purchased securities through those offerings.

24

25   **B.      Section 12(a)(2) Claim**

26   The Wells Fargo and Underwriter Defendants also assert that plaintiffs lack standing to bring

27   claims under Section 12(a)(2). Section 12(a)(2) provides that any person who "offers or sells" a security

28   by means of a prospectus containing a materially false statement or material omission shall be liable to

1 any "person purchasing such security from him." 15 U.S.C. § 77l(a)(2). Unlike Section 11, which

2 permits an action by a plaintiff who has purchased a security that is merely "traceable to" the challenged

3 misstatement or omission, Section 12(a)(2) requires a plaintiff to plead and prove that it purchased a

4 security directly from the issuer as part of the initial offering, rather than in the secondary market. *See*

5 *Hertzberg*, 191 F.3d at 1081 ("Section 12 . . . permits suit against a seller of a security by prospectus

6 only by 'the person purchasing such security *from him*,' thus specifying that a plaintiff must have

7 purchased the security directly from the issuer of the prospectus") (quoting 15 U.S.C. § 77l(a)(2))

8 (emphasis added). Defendants contend that plaintiffs lack standing under Section 12(a)(2) because

9 plaintiffs have not alleged that they purchased directly pursuant to the Prospectuses.

10 Plaintiffs' Section 12(a)(2) claim is stated against Wells Fargo and Underwriters Goldman

11 Sachs, Bear Stearns, Deutsche Bank, UBS, Credit Suisse, and Citigroup. Plaintiffs allege that they

12 "purchased *or otherwise acquired* Certificates pursuant *and/or traceable* to the defective Prospectuses."

13 Complaint ¶ 152 (emphasis added). As defendants point out, other courts have dismissed Section

14 12(a)(2) allegations stated in precisely such terms. *See, e.g.*, *Plumbers' Union*, 658 F. Supp. 2d at 305

15 ("Here, plaintiffs allege that they 'acquired' securities 'pursuant and/or traceable to' the registration

16 statements and prospectus supplements. . . . If plaintiffs did in fact purchase the Certificates directly

17 from the defendants, they should have said so. An evasive circumlocution does not suffice as a

18 substitute."); *In re Prestige Brands Holding, Inc.*, No. 05-06924, 2006 WL 2147719, at *9 (S.D.N.Y.

19 July 10, 2006) ("[T]o the extent that shareholders allege, as here, merely that they bought shares

20 'traceable to' or 'in connection with' an [initial public offering], they lack standing, and the Complaint

21 is to that extent dismissed."). Accordingly, plaintiffs' Section 12(a)(2) claim is DISMISSED with leave

22 to amend to allege facts properly giving rise to standing.

23

## II.    Statute of Limitations

25 The Wells Fargo Defendants move to dismiss plaintiffs' claims on the ground they are time-

26 barred. The Securities Act provides that "[n]o action shall be maintained to enforce any liability created

27 under [Section 11 or 12(a)(2)] unless brought within one year after the discovery of the untrue statement

28 or the omission, or after such discovery should have been made by the exercise of reasonable diligence."

8

1   15 U.S.C. § 77m.  Plaintiffs filed their complaint on March 27, 2009; therefore, their claims must have

2   accrued no earlier than March 27, 2008 to be timely.  Defendants' primary contention is that plaintiffs

3   were put on inquiry notice of the basis of their claims well before March 27, 2008 by a series of news

4   articles discussing the mortgage crisis and the propriety of mortgage-backed securities, and by the fact

5   that the rating agencies began downgrading the Certificates to a lower rating starting in December 2007.

6   For the reasons stated below, the Court finds defendants' arguments unpersuasive.

7          First, defendants submit evidence of a number of newspaper articles and other public statements

8   (e.g., congressional testimony) calling into question the validity of securities ratings and highlighting

9   the potential conflict of interest among rating agencies.[2]  These articles reported, among other things,

10  that "[m]ortgage lenders . . . have grown much less demanding about the amount of proof borrowers

11  must provide about their earnings and assets," Nov. 20, 2005 article in *Wall Street Journal*, Ex. 16 to

12  Wells Fargo RJN, at 1; that mortgage lenders were relying on inflated home appraisals, Apr. 21, 2007

13  article in *Washington Post*, Ex. 22 to Wells Fargo RJN; that some commentators "worry about the

14  potential for conflicts of interest, given that investment banks rather than investors pay for ratings," May

15  16, 2007 article in *Financial Times*, Ex. 23 to Wells Fargo RJN, at 1; that the downgrading of

16  certificates "suggest[s] the assumptions underlying the ratings might have been flawed," *id.* at 2; and

17  that "[r]atings agencies' models for creditworthiness may be outdated given new developments in

18  financial markets," Aug. 17, 2007 article in *New York Times*, Ex. 25 to Wells Fargo RJN, at 1.

19  Defendants argue that these articles should have put plaintiffs on notice of the alleged problems with

20  the Certificates they purchased.

21         In the Court's view, however, the question of whether this press coverage was sufficient to put

22  a reasonable investor on notice of his claims, *see Kreek v. Wells Fargo & Co.*, 652 F. Supp. 2d 1053,

23  1059-60 (N.D. Cal. 2009), is a factual question not appropriate for resolution on a motion to dismiss.

24  Ninth Circuit precedent states that because "the question of notice of fraud is for the trier of fact, the

25  party seeking summary disposition has an extremely difficult burden to show that there exists no issue

26

27         [2] The Court grants defendants' request for judicial notice of these articles and documents for
    the purpose of determining inquiry notice.  "Courts may take judicial notice of publications introduced
    to indicate what was in the public realm at the time, not whether the contents of those articles were in
28  fact true." *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010).

United States District Court
For the Northern District of California

1   of material fact regarding notice." *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1309-10 (9th Cir. 1982).

2   Applying this rule at the pleading stage, another court in this district has held that a securities fraud

3   complaint should be dismissed on statute of limitations grounds only if notice to the plaintiff is the

4   "inference most naturally derived" from the allegations in the complaint. *In re Charles Schwab Corp.*

5   *Sec. Litig.*, 257 F.R.D. 534, 557 (N.D. Cal. 2009).  In this case, the inference urged by defendants is not

6   necessarily the most natural one; indeed, the news articles themselves give rise to competing inferences.

7   As plaintiffs point out, several of the news articles cited by defendants contain assurances from banks

8   and rating agencies as to the quality of mortgage-backed securities.  *See, e.g.*, July 27, 2005 article in

9   *Wall Street Journal*, Ex. 14 to Wells Fargo RJN, at 1 ("A Wells Fargo spokesman says the company .

10  . . consistently monitors economic conditions in its major markets and will at times 'modify our lending

11  guidelines in a specific market.'  He added, 'On a national basis, we have made no substantive changes

12  to our lending policies and practices.'"); May 16, 2007 article in *Financial Times*, at 5 (Standard &

13  Poor's executive stated, "Banks come to us with a proposed transaction and we explain how it might

14  be rated under our criteria.  In many cases, the transaction is then restructured by the bank in order to

15  meet our criteria.  There's nothing sinister about this process.").  The Court cannot conclude that this

16  press coverage put plaintiffs on notice of their claims as a matter of law.

17          Defendants next contend that plaintiffs were placed on inquiry notice by the fact that the Rating

18  Agencies began downgrading the Certificates in December 2007 and January 2008.  Plaintiffs counter

19  that they were not placed on notice of their ratings-related claims until the Certificates were downgraded

20  to a below-investment-grade ratings (i.e., below an "A" grade) in May 2008.  Plaintiffs argue that the

21  prior downgrades, from "AAA" to "AA" or from "AA" to "A," were merely "minor" downgrades that

22  did not put them on notice of any problems with the ratings of their Certificates.  As stated above, the

23  parties' competing contentions present a factual dispute that must be resolved by the trier of fact.  In

24  addition, the Court is not persuaded that the "most reasonable inference" to be drawn from the

25  December 2007 downgrades is that the Offering Documents contained actionable misstatements or

26  omissions.  An equally reasonable inference plaintiffs could have drawn as a result of the downgrading

27  is that the securities changed in some way that did not implicate the validity of the initial rating, for

28  example as a result of an actual change in the circumstances of the borrower.  At oral argument, counsel

**United States District Court**
For the Northern District of California

10

1   for Wells Fargo went so far as to state that the downgrades "had nothing to do with" the propriety of

2   the initial ratings.  In light of that admission, defendants cannot plausibly claim that the downgrades

3   should have put plaintiffs on notice of their claims.

4        Defendants' motion to dismiss the complaint on statute of limitations grounds is DENIED.

5

6   **III.    Rating Agency Defendants' Liability**

7        **A.    Section 11 Liability**

8        The Rating Agency Defendants move to dismiss the Section 11 claims asserted against them on

9   the ground they are not subject to liability under Section 11.  Section 11 sets forth an exhaustive list of

10  persons and entities who may be held liable, and rating agencies are not included in this list.  *See* 15

11  U.S.C. § 77k(a).  Plaintiffs thus seek to hold the Rating Agency Defendants liable for violations of

12  Section 11 on the theory that they qualify as "underwriters."  *Id.* § 77k(a)(5).  The Securities Act defines

13  the term "underwriter" as follows:

14      The term "underwriter" means any person who has purchased from an issuer with a view
        to, or offers or sells for an issuer in connection with, the distribution of any security, or
15      participates or has a direct or indirect participation in any such undertaking, or
        participates or has a participation in the direct or indirect underwriting of any such
16      undertaking[.]

17  *Id.* § 77b(a)(11).  Plaintiffs do not claim that the Rating Agency Defendants actually offered or sold any

18  of the Certificates at issue.  Rather, plaintiffs contend that the Rating Agencies may be held liable as

19  underwriters because they were involved in multiple steps necessary to the distribution of the

20  Certificates, including structuring the Certificates, assigning credit ratings, and participating in drafting

21  the Prospectus Supplements.  Plaintiffs' explanation of the process of structuring and selling mortgage-

22  backed securities, however, nowhere describes the Rating Agencies as undertaking activities related to

23  the distribution or sale of the Certificates.  Complaint ¶¶ 43, 61-65.

24        Under these circumstances, permitting the Rating Agency Defendants to be sued as underwriters

25  would conflict with the statutory definition of the term "underwriter" on its face.  Even assuming

26  plaintiffs have adequately alleged that the Rating Agency Defendants' actions were necessary to the

27  formulation and structuring of the Certificates, that alone is not sufficient to expose the Rating Agencies

28  to liability as "underwriters."  The statutory definition makes clear that an underwriter's "participation"

11

**United States District Court**
For the Northern District of California

1   must be *related to the underwriting* of the securities at issue.  Numerous cases support this reading of

2   the statute.  *See, e.g.*, *S.E.C. v. Kern*, 425 F.3d 143, 152 (2d Cir. 2005) (an underwriter is "any person

3   who is engaged in steps necessary *to the distribution of security issues*") (emphasis added) (internal

4   quotation marks and citation omitted); *Special Situations Fund, III, L.P. v. Cocchiola*, No. 02-3099,

5   2007 WL 2261557, at *5 (D.N.J. Aug. 3, 2007) ("Nor must a party actually sell shares to the public to

6   be an underwriter under the Securities Act, mere participation *in an offering* is enough.") (emphasis

7   added) (internal quotation marks and citations omitted); *In re Lehman Bros. Sec. & ERISA Litig.*, No.

8   09-2017, 2010 WL 337997, at *3 (S.D.N.Y. Feb. 1, 2010) ("The Rating Agencies' alleged activities may

9   well have had a good deal to do with the composition and characteristics of the pools of mortgage loans

10  and the credit enhancements of the Certificates that ultimately were sold.  But there is nothing in the

11  complaint to suggest that they participated in the relevant undertaking – that of purchasing the securities

12  here at issue, the Certificates – from the issuer with a view to their resale.  The Section 11 claim

13  therefore is insufficient in law.") (internal quotation marks and citation omitted).

14       Based on the plain language of the statute, the Court must conclude that the Rating Agency

15  Defendants' participation in the creation and structuring of securities, no matter how extensive, cannot

16  give rise to underwriter liability.  Plaintiffs' Section 11 claims against the Rating Agency Defendants

17  are therefore DISMISSED with prejudice.

18

19       **B.       Section 15 Liability**

20       Plaintiffs also seek to hold the Rating Agency Defendants liable under Section 15 of the

21  Securities Act.  Section 15 provides joint and several liability for "[e]very person who, by or through

22  stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or

23  understanding with one or more other persons by or through stock ownership, agency, or otherwise,

24  controls any person liable" under Section 11 or Section 12.  15 U.S.C. § 77o.  To state a claim for

25  "control person" liability, a plaintiff must plead (1) a primary violation of Section 11 or Section 12 and

26  (2) "that the alleged controlling person possessed, directly or indirectly, the power to direct or cause the

27  direction of the management and policies of the individual allegedly liable for the primary violation."

28  *In re Splash Tech. Holdings, Inc. Sec. Litig.*, No. 99-0109, 2000 WL 1727405, at *15 (N.D. Cal. Sept.

1   29, 2000); *see also* 17 C.F.R. § 230.405 (defining "control" as "the possession, direct or indirect, of the

2   power to direct or cause the direction of the management and policies of a person, whether through the

3   ownership of voting securities, by contract, or otherwise").

4         Plaintiffs assert that the Rating Agency Defendants acted as "control persons" within the

5   meaning of the statute in the following ways: (1) "the Master Servicer was not allowed to resign from

6   its duties unless it received a letter from each relevant Rating Agency stating that the resignation would

7   not result in a downgrade of the Certificates"; (2) "the trust accounts Wells Fargo Bank established in

8   connection with each series of Certificates" had to be held at a bank that met the Rating Agencies' credit

9   requirements; (3) "[t]he Rating Agencies had the ability to exercise, and did exercise, control over the

10  amount of insurance coverage a servicer was required to hold in order to insulate itself against certain

11  losses"; (4) the Rating Agencies had to approve servicing institutions proposed by Wells Fargo; and (5)

12  the Rating Agencies could approve amendment of the Pooling and Servicing Agreements by stating in

13  writing that amendment would not result in downgrading or withdrawal of the ratings assigned to a

14  Certificate.  Complaint ¶¶ 62-66.

15        Even assuming that plaintiffs can plead a primary violation of Section 11 with respect to the

16  seventeen offerings in which they purchased Certificates, plaintiffs' control person theory of liability

17  overlaps substantially with the theory by which plaintiffs seek to hold the Rating Agency Defendants

18  directly liable under Section 11, and must fail for similar reasons.  Aside from the conclusory statement

19  that the Rating Agencies "exercise[d] substantial control over many parties to the securitization process,

20  including the Depositor," Complaint ¶ 61, plaintiffs have not established that the Rating Agency

21  Defendants had any sort of general "power to direct or cause the direction of the management and

22  policies" of the originators and underwriters – the primary parties to the creation and issuance of the

23  Certificates. *See* 17 C.F.R. § 230.405.  The fact that the Rating Agencies were able to influence certain

24  portions of the transactions at issue is insufficient to plead a control person theory. *See Paracor Fin.,*

25  *Inc. v. Gen. Elec. Cap. Corp.*, 96 F.3d 1151, 1162 (9th Cir. 1996) (definition of control person "must

26  revolve around the 'management and policies' of the corporation, not around discrete transactions").

27  The fact that the "AAA" grades assigned by the Rating Agencies were necessary to the creation of the

28  Certificates is similarly insufficient. *See In re Stratosphere Corp. Sec. Litig.*, 1 F. Supp. 2d 1096, 1122

United States District Court
For the Northern District of California

1  (D. Nev. 1998) ("Plaintiffs have merely alleged that 'but for' the Underwriters' participation, the Stock

2  Offering could not have been accomplished. This type of proximate causation is not a sufficient basis

3  for 'control person' liability, which requires the exercise of actual power or influence over a

4  company."). Plaintiffs' Section 15 claims against the Rating Agency Defendants are therefore

5  DISMISSED with prejudice.

6

7  **IV.    Failure to State a Claim**

8  The sole claims surviving the preceding analysis are the Section 11 and Section 15 claims

9  asserted against the Wells Fargo Defendants and the Underwriter Defendants in connection with the

10  seventeen offerings plaintiffs have standing to challenge. The Court must therefore assess whether

11  plaintiffs' allegations are sufficient to state claims under Section 11 and Section 15.

12

13  **A.    Section 11 Claims**

14  Defendants argue that plaintiffs have failed to identify any actionable misstatements or omissions

15  in support of their Section 11 claim. To state a claim under Section 11, a plaintiff must plead: (1) that

16  the registration statement at issue contained a misstatement or omission; and (2) that the misstatement

17  or omission was material, "that is, it would have misled a reasonable investor about the nature of his or

18  her investment." *Kaplan v. Rose*, 49 F.3d 1363, 1371 (9th Cir. 1994). Defendants contend that

19  plaintiffs' allegations are insufficient under Section 11 because they fail to adequately plead falsity and

20  are not sufficiently tied to the specific Certificates at issue in this case.

21  Plaintiffs allege three primary categories of misstatements and omissions. The first category

22  concerns allegedly untrue statements and omissions regarding the underwriting practices of Wells Fargo

23  and the third-party loan originators. According to the complaint, each Prospectus provided the

24  following information regarding underwriting practices:

25      The underwriting standards that guide the determination [whether to award the loan]
        represent a balancing of several factors that may affect the ultimate recovery of the loan
26      amount . . . . Wells Fargo Bank's guidelines for underwriting may vary according to the
        nature of the borrower or the type of loan, since differing characteristics may be
27      perceived as presenting different levels of risk. . . .

28      Wells Fargo Bank supplements the mortgage loan underwriting process with . . . .

14

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1
2
3
> scoring systems [that] assist Wells Fargo Bank in the mortgage loan approval process by providing consistent, objective measures of borrower credit and certain loan attributes. Such objective measures are then used to evaluate loan applications and assign each application a "Mortgage Score."

4
5
6
> . . . . Borrowers who have a satisfactory Mortgage Score . . . are generally subject to streamlined credit review (which relies on the scoring process for various elements of the underwriting assessments). Such borrowers may also be eligible for a reduced documentation program and are generally permitted a greater latitude in the application of borrower debt-to-income ratios.

7   Complaint ¶ 73. In addition, the Appendices to the Prospectus Supplements disclosed the respective

8   numbers of loans made with full documentation, limited documentation, and no documentation. *See*

9   App. A to Feb. 23, 2006 Prospectus Supplement, Ex. 2 to Wells Fargo RJN, at A-3.[3]  With respect to

10  the underwriting guidelines of third-party loan originators, the Prospectus Supplements stated:

11
12
> Wells Fargo Bank may also acquire mortgage loans in negotiated transactions under which the mortgage loans may have been originated by the seller or another third party according to underwriting standards that may have varied materially from Wells Fargo Bank's underwriting standards.

13  Complaint ¶ 74.

14      Defendants assert that because the Offering Documents disclosed the variable nature of Wells

15  Fargo's underwriting practices, plaintiffs cannot plausibly claim that they were misled as to the fact that

16  Wells Fargo and the third-party originators generated a number of loans that did not meet the stated

17  underwriting practices. Defendants seem to misunderstand the nature of plaintiffs' allegations.

18  Plaintiffs acknowledge by their citations to the Offering Documents' language that these documents

19  disclosed the fact that underwriting guidelines may change according to the characteristics of a

20  particular borrower. Plaintiffs' allegation is that the Offering Documents failed to disclose that variance

21  from the stated standards was essentially defendants' norm. In other words, plaintiffs allege that the

22  Offering Documents were misleading as to the *extent* to which Wells Fargo and the third-party

23  originators deviated from their guidelines. *See* Complaint ¶¶ 76-77. In the Court's view, plaintiffs have

24  identified an actionable category of misstatements.

25      Defendants argue that plaintiffs' allegations are insufficient to state a claim because plaintiffs

26

27
28
---
[3] The Court grants Wells Fargo's request for judicial notice of this and other Offering Documents, as they have been incorporated by reference into the complaint. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

1    have not tied any inconsistent underwriting conduct to the specific Certificates at issue in this case.  To

2    plead that defendants' stated underwriting guidelines were at odds with the reality of their practice,

3    plaintiffs rely heavily on the statements of confidential witnesses who assert, among other things, that

4    Wells Fargo placed "intense pressure" on its loan officers to close loans, including by coaching

5    borrowers to provide qualifying income information, accepting implausible or falsified income

6    information, and lowering its standards near the end of the calendar year.  Complaint ¶¶ 83-88.

7    Defendants argue that these allegations are insufficient because they are not linked to the specific types

8    of prime mortgages that were packaged into the securities at issue in this case.  However, plaintiffs have

9    alleged that the challenged conduct infected the entire underwriting process, including with respect to

10   prime loans.  *See* Complaint ¶ 76 (defendants failed to disclose that Wells Fargo "*systematically* did not

11   follow its stated underwriting standards") (emphasis added); ¶ 84 ("According to CW 1, Wells Fargo

12   was approving so many stated income loans that it felt the same as CW 1's previous subprime lending

13   job").  In the Court's view, plaintiffs' allegations with respect to defendants' underwriting practices are

14   sufficiently specific to state a claim.

15         The second category of misstatements and omissions identified by plaintiffs concerns the

16   appraisal value and loan-to-value ratio of the underlying mortgaged properties.  According to plaintiffs,

17   the Prospectuses stated that "Mortgage Loans will not generally have had at origination a Loan-to-Value

18   Ratio in excess of 95%."  Complaint ¶ 100.  Plaintiffs allege that this statement was misleading because

19   the calculation of the home's value was frequently based on an inflated appraisal.  *Id.* ¶ 107.  Plaintiffs

20   allege, in other words, that the true loan-to-value ratio frequently exceeded 100% because the homes

21   were actually worth far less than their stated appraisal value.  *Id.* ¶ 100.

22         Plaintiffs again support their allegations primarily with statements from confidential witnesses.

23   *Id.* ¶ 103 ("CW 2 confirmed that, at Wells Fargo Home Mortgage, representatives constantly pushed the

24   appraisers they worked with to inflate the value of the real estate underlying the mortgage loans"); ¶ 107

25   ("CW 1 remarked that 'appraisals were very inflated,' and observed that the retail officers 'always

26   managed to get the value they wanted'"); ¶ 108 (CW 7, a former Senior Underwriter with Wells Fargo

27   Home Mortgage, "estimated that 70% of the loans CW7 worked with had an LTV over 95%").

28   Plaintiffs additionally cite to a 2007 survey which "found that 90% of appraisers reported that mortgage

*United States District Court*
For the Northern District of California

16

**United States District Court**
For the Northern District of California

1   brokers and others pressured them to raise property valuations to enable deals to go through," and to

2   congressional testimony in which Alan Hummel, Chair of the Appraisal Institute, stated that loan

3   appraisers had "experience[d] systemic problems of coercion." *Id.* ¶ 104-05. Plaintiffs' allegations

4   concerning the allegedly improper appraisal practices are sufficiently specific to state a claim with

5   respect to the securities at issue in this case. In particular, plaintiffs have alleged that Wells Fargo's

6   practices permitted the pervasive and systematic use of inflated appraisals, affecting all types of

7   mortgages. Plaintiff need not allege anything further in order to state a claim.

8          The third and final category of misstatements identified in the complaint concerns the high

9   investment rating awarded to each of the Certificates. According to plaintiffs, the Prospectus

10  Supplements made the following disclosures regarding the rating process of defendant Moody's:

11          The ratings of Moody's on mortgage pass-through certificates address the likelihood of
            the receipt by certificateholders of all distributions of principal and interest to which
12          such certificateholders are entitled. Moody's rating opinions address the structural, legal
            and issuer aspects associated with the certificates, including the nature of the underlying
13          mortgage loans and the credit quality of the credit support provider, if any.

14  Complaint ¶ 111. The disclosures regarding the practices of the other rating agencies were nearly

15  identical. *Id.* Plaintiffs allege that contrary to the statements in the Prospectus Supplements, however,

16  "The assigned ratings were not the result of the Ratings Agencies' independent analysis and

17  conclusion," but rather were predetermined by Wells Fargo. *Id.* ¶ 112. Plaintiffs allege that the "AAA"

18  ratings assigned to the Certificates were "unjustifiably high and did not represent the true risk of the

19  Certificates" because they were "based on insufficient information and faulty assumptions concerning

20  how many underlying mortgages were likely to default." *Id.* ¶ 115.

21          In support of their allegation that the Offering Documents' statements regarding the rating

22  process constitute actionable misstatements, plaintiffs point to certain external evidence, including an

23  SEC Summary Report stating that rating agencies had failed to disclose relevant rating criteria,

24  implement written procedures for rating mortgage-backed securities, document specific steps in the

25  rating process, implement procedures for identifying errors in ratings or assessing compliance with

26  rating standards, or document rating agency decisions. *Id.* ¶ 117. Plaintiffs also quote statements by

27  executives of defendants Moody's and Standard & Poor's in which the executives admitted that they

28  were aware at the time the subject ratings were made that the agencies' rating models were outdated.

*Id.* ¶¶ 122-24. *See id.* ¶ 122-23 (S&P's Managing Director stated that S&P developed but failed to implement a more thorough ratings process as early as 2004, and that "had these models been implemented [the rating agencies] would have had an earlier warning about the performance of many of the new products that subsequently lead to such substantial losses"); ¶ 124 (Moody's Managing Director stated "that the rating agencies 'did not update their models or their thinking' during the period of deterioration in credit standards"). In the Court's view, these allegations, particularly the statements from Moody's and S&P's executives, are sufficient to establish an actionable misstatement with respect to the rating process.

Having concluded that plaintiffs have sufficiently stated a claim with respect to each of the three misstatements or omissions identified in the complaint, the Court DENIES defendants' motion to dismiss plaintiffs' Section 11 claims. In permitting these claims to go forward, the Court holds only that the allegations in the complaint – taken as true as they must be at this stage – are sufficiently specific to survive defendants' motions to dismiss. To the extent defendants suggest that the allegations are inaccurate with respect to prime mortgages and the top-rated securities at issue in this case, defendants may come forward with evidence to that effect at the summary judgment stage.

### B.     Section 15 Claims

Plaintiffs also assert Section 15 claims against Wells Fargo Bank and the individual Wells Fargo Defendants on a "control person" theory of liability. As stated above, Section 15 provides joint and several liability for persons who control anyone liable for violations of Section 11 or Section 12. 15 U.S.C. § 77o. To state a claim for control person liability, a plaintiff must plead (1) a primary violation of Section 11 or Section 12 and (2) "that the alleged controlling person possessed, directly or indirectly, the power to direct or cause the direction of the management and policies of the individual allegedly liable for the primary violation." *In re Splash*, 2000 WL 1727405, at \*15.

The Court has already concluded that plaintiffs have pled a primary violation of Section 11 with respect to the seventeen offerings they have standing to challenge. Accordingly, the only question remaining is whether plaintiffs have adequately pled control. There can be no dispute that plaintiffs have adequately alleged that both Wells Fargo Bank and the individual defendants managed and directed

the activities of Wells Fargo Asset Securities Corporation, the Depositor which sponsored the Certificates. *See* Complaint ¶¶ 16, 35-39, 157 ("Each of the Individual Defendants and Wells Fargo Bank had the power and influence, and exercised that power and influence, to cause the Depositor to engage in violations of the Securities Act."). The Wells Fargo Defendants do not contest that they acted as control persons within the meaning of the statute. Defendants' motion to dismiss the Section 15 claims is therefore DENIED.

# CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby GRANTS the Rating Agency Defendants' motion to dismiss without leave to amend. (Docket No. 157). The Court GRANTS in part and DENIES in part the Underwriter Defendants' and the Wells Fargo Defendants' motions to dismiss (Docket No. 160, 161). Plaintiffs are granted leave to amend their claims against the Underwriter Defendants and Wells Fargo Defendants and must file their amended complaint no later than **May 7, 2010.**

**IT IS SO ORDERED.**

Dated: April 22, 2010

SUSAN ILLSTON
United States District Judge

19