1   BERNSTEIN LITOWITZ BERGER
        & GROSSMANN LLP
2   DAVID R. STICKNEY  (Bar No. 188574)
    TIMOTHY A. DeLANGE  (Bar No. 190768)
3   MATTHEW P. JUBENVILLE  (Bar No. 228464)
    12481 High Bluff Drive, Suite 300
4   San Diego, CA 92130
    Tel:    (858) 793-0070
5   Fax:    (858) 793-0323
    davids@blbglaw.com
6   timothyd@blbglaw.com
    matthewj@blbglaw.com
7
    *Attorneys for Lead Plaintiffs Alameda*
8   *County Employees' Retirement*
    *Association, Government of Guam*
9   *Retirement Fund, New Orleans*
    *Employees' Retirement System and*
10  *Louisiana Sheriffs' Pension and Relief*
    *Fund*
11

12                    UNITED STATES DISTRICT COURT

13       NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION

14
    IN RE WELLS FARGO MORTGAGE-          Civil Action No. 09-cv-01376-SI
15  BACKED CERTIFICATES
    LITIGATION                           CONSOLIDATED CLASS ACTION
16                                       ECF

17                                       AMENDED CONSOLIDATED CLASS ACTION
                                         COMPLAINT FOR VIOLATIONS OF §§ 11,
18                                       12(a)(2) AND 15 OF THE SECURITIES ACT OF
                                         1933
19

20

21

22

23

24

25

26

27

28

# <u>TABLE OF CONTENTS</u>

Page

I.    SUMMARY OF THE ACTION ................................................................. 1

II.   JURISDICTION AND VENUE ................................................................ 4

III.  THE PARTIES .......................................................................................... 4

    A.    Lead Plaintiffs .............................................................................. 4

    B.    Additional Named Plaintiffs ........................................................ 6

    C.    Defendants .................................................................................... 7

IV.   FACTUAL BACKGROUND .................................................................. 11

    A.    The Mechanics Of Structuring Mortgage Pass-Through
          Certificates ................................................................................. 11

    B.    Assessing The Quality Of Mortgage Pass-Through
          Certificates ................................................................................. 14

    C.    The Wells Fargo Certificate Offerings ...................................... 15

V.    THE OFFERING DOCUMENTS CONTAINED MATERIAL
     MISSTATEMENTS AND OMISSIONS REGARDING WELLS
     FARGO UNDERWRITING STANDARDS .......................................... 17

    A.    Wells Fargo Bank's Underwriting Standards ............................ 19

    B.    Additional Originator's Underwriting Practices ....................... 25

VI.   THE OFFERING DOCUMENTS MISSTATED THE TRUE LTV
     RATIOS ASSOCIATED WITH THE UNDERLYING
     MORTGAGES .......................................................................................... 27

VII.  THE RATINGS SET FORTH IN THE OFFERING
     DOCUMENTS MISSTATED THE QUALITY OF THE
     CERTIFICATES ..................................................................................... 30

VIII. EACH OFFERING DOCUMENT CONTAINED UNTRUE
     STATEMENTS AND MATERIAL OMISSIONS .............................. 35

IX.   THE PERFORMANCE AND VALUE OF THE CERTIFICATES ....... 37

X.    CLASS ACTION ALLEGATIONS ....................................................... 40

FIRST CAUSE OF ACTION  For Violation of Section 11 of the
    Securities Act (Against The Individual Defendants, the Depositor,
    and the Underwriters) ........................................................................... 41

SECOND CAUSE OF ACTION  For Violation of Section 12(a)(2) of the
    Securities Act (Against the Depositor and Goldman Sachs,
    Deutsche Bank, UBS, Credit Suisse and RBS)......................................................43

THIRD CAUSE OF ACTION  For Violation of Section 15 of the
    Securities Act (Against the Individual Defendants and Wells Fargo
    Bank)..................................................................................................................45

RELIEF REQUESTED..................................................................................................45

1   Plaintiffs, as defined below in paragraph 1, allege the following upon personal knowledge as to

2 themselves and their own acts and upon information and belief as to all other matters.  Plaintiffs'

3 information and belief is based on the investigation of their counsel.  The investigation included, for

4 example: (i) review and analysis of the offering materials for the Certificates; (ii) interviews of former

5 Wells Fargo employees with first-hand knowledge of the events alleged herein; (iii) examination of

6 Wells Fargo's SEC filings, press releases and other public statements; (iv) review and analysis of court

7 filings including in *Wells Fargo Bank, N.A. v. Quicken Loans, Inc.*, 2:08-cv-12408 (E.D. Mich. 2008)

8 and *Sound Appraisal and Savage Appraisal Services, Inc. v. Wells Fargo Bank, N.A.*, 09-CV-01630

9 CW (N.D. Cal. 2009); (v) review and analysis of media reports, congressional testimony and additional

10 material; and (vi) analysis of the United States Securities and Exchange Commission's *Summary Report*

11 *of Issues Identified in the Commission Staff's Examinations of Select Credit Rating Agencies* and

12 additional documents cited herein.  Many of the facts related to Plaintiffs' allegations are known only

13 by the Defendants named herein, or are exclusively within their custody or control.  Plaintiffs believe

14 that substantial additional evidentiary support for the allegations set forth below will be developed after

15 a reasonable opportunity for discovery.

16 I.  SUMMARY OF THE ACTION

17   1.  New Orleans Employees' Retirement System, Louisiana Sheriffs' Pension & Relief

18 Fund, Government of Guam Retirement Fund, and Alameda County Employees' Retirement

19 Association (collectively, "Lead Plaintiffs"), along with the additional named plaintiffs identified

20 below at ¶¶16-20 (collectively, "Plaintiffs"), bring this securities class action on behalf of themselves

21 and all persons or entities (the "Class") who purchased or otherwise acquired mortgage pass-through

22 certificates ("Certificates") pursuant or traceable to Wells Fargo Asset Securities Corporation's July 29,

23 2005 Registration Statement, as amended ("July 2005 Registration Statement"); October 20, 2005

24 Registration Statement, as amended ("October 2005 Registration Statement"); or September 27, 2006

25

26

27

28

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF §§ 11, 12(a)(2) AND 15 OF THE SECURITIES ACT OF 1933

Registration Statement, as amended (September 2006 Registration Statement"), and the accompanying prospectuses and prospectus supplements.[1]

2.      Plaintiffs assert claims for violations of Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o.  Accordingly, this action involves solely strict liability and negligence claims brought pursuant to the Securities Act.  The Complaint does not allege fraud on the part of any Defendant.

3.      This action arises from the sale of over $36 billion in mortgage pass-through certificates pursuant to three registration statements.  Mortgage pass-through certificates are securities entitling the holder to income payments from pools of mortgage loans and/or mortgage-backed securities ("MBS").  Fundamentally, the value for pass-through certificates depends on the ability of borrowers to repay the principal and interest on the underlying loans and the adequacy of the collateral in the event of default.  The Certificates were supported by pools of mortgage loans that Wells Fargo Bank, N.A. ("Wells Fargo Bank") or its affiliates originated or purchased.  The loan pools for certain Certificates also included mortgage loans originated by third-party originators, including American Home Mortgage, Inc.

4.      Rating agencies played an important role in the sale of the securities to investors.  Credit rating agencies were supposed to evaluate and report on the risk associated with investment alternatives.  Moody's, a division of Moody's Corp., McGraw-Hill Companies, through its division, Standard & Poor's ("S&P"), and Fitch, Inc. ("Fitch") provided ratings for the Certificates.  These ratings, which were expressly included in each of the Prospectus Supplements, determined, in part, the price at which these Certificates were offered to Plaintiffs and the Class.  Moody's highest investment rating is "Aaa."  S&P's highest rating is "AAA."  Fitch's highest rating is "AAA."  These ratings signify the highest investment-grade, and are considered to be of the "best quality," and carry the smallest degree of investment risk.  Ratings of "AA," "A," and "BBB" represent high credit quality, upper-medium credit quality and medium credit quality, respectively.  Any instrument rated lower than

---

[1]  The July 2005 Registration Statement, October 2005 Registration Statement and September 2006 Registration Statements are collectively referred to as the "Registration Statements."  The Registration Statements, Prospectuses and each of the respective Prospectus Supplements are collectively referred to herein as the "Offering Documents."

BBB is considered below investment-grade.  Based on the rating agencies' purported analysis of the loan pools, the certificates received high ratings, including "triple-A," categorizing them as the highest quality of investment-grade securities.  As alleged below, however, Defendants misrepresented the quality of the loans in the loan pools and gave unjustifiably high ratings to the Certificates.

5.     The Offering Documents contained untrue statements of material fact, or omitted to state material facts necessary to make the statements therein not misleading, regarding: (1) the underwriting standards purportedly used in connection with the origination of the underlying mortgages; (2) the maximum loan-to-value ratios used to qualify borrowers; (3) the appraisals of the properties underlying the mortgages; and (4) the ratings of the Certificates.

6.     The true facts which were omitted from the Offering Documents were:

- Wells Fargo Bank and its affiliates had not followed the stated underwriting standards when issuing loans to borrowers;

- The additional originators had not followed the stated underwriting standards;

- The underlying mortgages were based on appraisals that overstated the value of the underlying properties; and

- The ratings stated in the Prospectus Supplements were based on outdated assumptions, relaxed ratings criteria, and inaccurate loan information.

7.     As a result of these untrue statements and omissions in the Offering Documents, Plaintiffs and the Class purchased Certificates that were far riskier than represented and that were not of the "best quality," or even "medium credit quality," and were not equivalent to other investments with the same credit ratings.  Contrary to representations in the Offering Documents, the Certificates exposed purchasers to increased risk with respect to absolute cash flow and the timing of payments. The credit rating agencies have now downgraded nearly all of the Certificates.  Many of the Certificates represented to be investment-grade instruments in the Offering Documents have been downgraded to below investment-grade instruments.  The Certificates, therefore, are no longer marketable near the prices paid by Plaintiffs and the Class.

II.    JURISDICTION AND VENUE

8.     The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o.  This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v and 28 U.S.C. § 1331.

9.     Venue is proper in this District pursuant to Section 22 of the Securities Act and 28 U.S.C. § 1391(b) and (c).  Many of the acts and conduct complained of herein occurred in substantial part in this District.  Defendant Wells Fargo Bank maintains its principal offices at 420 Montgomery Street, San Francisco, California.  In addition, Defendants conduct business in this District.

10.    In connection with the acts and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications.

III.   THE PARTIES

A.     Lead Plaintiffs

11.    Lead Plaintiff the Alameda County Employees' Retirement Association ("ACERA") is a defined benefit pension plan which provides retirement, disability, and death benefits to the employees, retirees, and former employees of the County of Alameda, California.  The system has over 19,000 active, deferred and retired members and maintains assets of over $3.8 billion.  ACERA acquired Wells Fargo Certificates pursuant and/or traceable to the Offering Documents, as reflected in its Certification, which is attached as Exhibit C-4 to the Corrected Declaration Of David R. Stickney In Support Of The Motion Of The Public Funds For Appointment As Lead Plaintiffs And Approval Of Their Selection Of Lead Counsel, filed June 3, 2009 ("Stickney Decl.").

12.    Lead Plaintiff Government of Guam Retirement Fund ("Guam") is a defined benefit pension plan and provides annuities and other benefits to its members who complete a prescribed number of years in government service.  Guam maintains over $1.6 billion in net assets held in trust for

pension benefits.  Guam acquired Wells Fargo Certificates pursuant and/or traceable to the Offering Documents, as reflected in its Certification, which is attached as Exhibit C-3 to the Stickney Decl.

13.  Lead Plaintiff Louisiana Sheriffs' Pension & Relief Fund ("Louisiana Sheriffs") is a multi-employer, defined benefit retirement plan providing retirement, disability and death benefits to the sheriffs and their deputies in all 64 parishes in Louisiana.  Louisiana Sheriffs acquired Wells Fargo Certificates pursuant and/or traceable to the Offering Documents, as reflected in its Certification, which is attached as Exhibit C-2 to the Stickney Decl.

14.  Lead Plaintiff New Orleans Employees' Retirement System ("New Orleans") is a defined benefit pension plan created under the laws of the State of Louisiana, and provides retirement, death, and disability benefits to all officers and employees of the City of New Orleans.  New Orleans maintains over $350 million in assets for its beneficiaries.  New Orleans acquired Wells Fargo Certificates pursuant and/or traceable to the Offering Documents, as reflected in its Certification, which is attached as Exhibit C-1 to the Stickney Decl.

15.  Lead Plaintiffs purchased the following Certificates directly from the listed Underwriter:

| Trust | Pro. Supp. Date | Plaintiff | Purchase Date | Purchased From |
|-------|-----------------|-----------|---------------|----------------|
| 2007-11 | 07/31/07 | Alameda | 08/21/07 | Goldman Sachs |
| 2007-11 | 07/31/07 | Alameda | 08/22/07 | Goldman Sachs |
| 2007-11 | 07/31/07 | Alameda | 03/07/08 | Goldman Sachs |
| 2006-AR1 | 02/24/06 | Guam | 02/23/06 | Goldman Sachs |
| 2006-3 | 02/27/06 | Guam | 05/24/06 | UBS |
| 2006-6 | 04/27/06 | Guam | 06/20/06 | UBS |
| 2006-AR17 | 09/26/06 | Guam | 09/08/06 | Deutsche Bank |
| 2006-AR10 | 06/29/06 | Guam | 10/23/06 | Deutsche Bank |
| 2006-AR17 | 09/26/06 | Guam | 03/18/08 | Deutsche Bank |
| 2006-1 | 02/27/06 | Louisiana | 02/09/06 | Credit Suisse |
| 2006-1 | 02/27/06 | Louisiana | 02/13/06 | Credit Suisse |
| 2006-AR5 | 03/23/06 | Louisiana | 03/03/06 | Goldman Sachs |
| 2006-2 | 02/27/06 | Louisiana | 03/24/06 | RBS |
| 2006-4 | 03/30/06 | Louisiana | 04/10/06 | RBS |
| 2006-AR10 | 06/29/06 | Louisiana | 07/27/06 | Deutsche Bank |
| 2006-AR10 | 06/29/06 | Louisiana | 10/03/06 | Deutsche Bank |
| 2006-AR12 | 08/25/06 | Louisiana | 10/24/06 | Credit Suisse |
| 2006-AR14 | 09/28/06 | Louisiana | 01/03/07 | UBS |

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF §§ 11, 12(a)(2) AND 15 OF THE SECURITIES ACT OF 1933

| 2006-AR8 | 04/27/06 | New Orleans | 04/13/06 | Credit Suisse |
| 2006-3 | 02/27/06 | New Orleans | 05/24/06 | UBS |
| 2006-6 | 04/27/06 | New Orleans | 06/20/06 | UBS |
| 2006-AR11 | 07/27/06 | New Orleans | 07/27/06 | Deutsche Bank |
| 2006-AR10 | 06/29/06 | New Orleans | 07/28/06 | Deutsche Bank |
| 2006-AR17 | 09/26/06 | New Orleans | 09/08/06 | Deutsche Bank |
| 2006-AR10 | 06/29/06 | New Orleans | 10/30/06 | Deutsche Bank |

B.    Additional Named Plaintiffs

16.    Plaintiff the Vermont Pension Investment Committee ("Vermont") is a State of Vermont Government entity that holds the combined investment assets of the State Teachers' Retirement System of Vermont, the Vermont State Employees' Retirement System and the Vermont Municipal Employees' Retirement System.   Vermont acquired Certificates pursuant and/or traceable to the Offering Documents, as reflected in the attached certification.

17.    Plaintiff the Public Employees' Retirement System of Mississippi ("MissPERS") is a governmental defined benefit pension plan qualified under Section 401(a) of the Internal Revenue Code, and is the retirement system for nearly all non-federal public employees in the State of Mississippi.   Established by the Mississippi Legislature in 1952, MissPERS provides benefits to over 75,000 retirees, and future benefits to more than 250,000 current and former public employees. MissPERS acquired Certificates pursuant and/or traceable to the Offering Documents, as reflected in the attached certification.

18.    Plaintiff the Policemen's Annuity & Benefit Fund of the City of Chicago ("PABF Chicago") was established in 1921 with the mission of providing retirement benefits to the members of the Chicago Police Department and their spouses.   PABF acquired Certificates pursuant and/or traceable to the Offering Documents, as reflected in the attached certification.

19.    Plaintiff the Southeastern Pennsylvania Transportation Authority ("SEPTA") is the nation's fifth largest public transportation system and maintains a pension fund with approximately $900 million in assets under management.   SEPTA acquired Certificates pursuant and/or traceable to

the Offering Documents, as reflected in the attached certification.  SEPTA purchased Wells Fargo Mortgage Backed Securities 2007-13 Trust Certificates directly from Deutsche Bank Securities, Inc.

20.     Plaintiff the Plumbers & Steamfitters Local 60 Pension Plan ("Local 60") is a pension benefit plan established by Plumbers and Steamfitters Local 60 and employers in an industry affecting commerce, whose employees are members of the Union, for the purpose of providing pension benefits to the employees.  Local 60 acquired Certificates pursuant and/or traceable to the Offering Documents, as reflected in the attached certification.

C.     Defendants

21.     Defendant Wells Fargo Asset Securities Corporation (the "Depositor") served in the role of "depositor" in the securitization of the Issuing Trusts, and was the "Issuer" of the Certificates within the meaning of Section 2(a)(4) of the Securities Act, 15 U.S.C. § 77b(a)(4).  The Depositor is a direct and wholly owned subsidiary of Wells Fargo Bank.

22.     Defendant Wells Fargo Bank, N.A. (previously defined as "Wells Fargo Bank") is the parent and at all times the controlling entity of the Depositor.  Wells Fargo Bank is the "sponsor" for the offerings.  As the sponsor, Wells Fargo Bank originated or purchased mortgage loans underlying the offerings.  Wells Fargo Bank served as the custodian, master servicer, paying agent and servicer for the offerings.  As the master servicer, Wells Fargo Bank calculated the distributions and other information regarding the Certificates in accordance with the pooling and servicing agreement.  In addition, as the master servicer, Wells Fargo Bank filed monthly reports on Form 10-D with the SEC on behalf of the issuing trusts and is responsible for the preparation of tax returns on behalf of the issuing trusts.  Wells Fargo Bank maintains its principal offices located at 420 Montgomery Street, San Francisco, California 94163.

23.     Defendant Goldman, Sachs & Co. ("Goldman Sachs") is a Delaware corporation with its principal place of business located at 200 West Street, New York, New York 10013.  Goldman Sachs is an investment banking firm.  Goldman Sachs acted as an "Underwriter" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11).  As an underwriter, Goldman Sachs participated in the drafting and dissemination of the Prospectus Supplements pursuant to which the Certificates

1   were sold to Plaintiffs and other Class members.  Goldman Sachs acted as an underwriter for certain

2   Certificates, as reflected in the chart at ¶43.

3        24.     Defendant Bear, Stearns & Co. Inc. ("Bear Stearns") is an investment banking firm

4   formerly located at 383 Madison Avenue, New York, New York 10017.  Bear Stearns acted as an

5   "Underwriter" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11).  As

6   an underwriter, Bear Stearns participated in the drafting and dissemination of the Prospectus

7   Supplements pursuant to which the Certificates were sold to Plaintiffs and other Class members.  Bear

8   Stearns acted as an underwriter for certain Certificates, as reflected in the chart at ¶43.  Defendant J.P.

9   Morgan Securities, Inc. ("J.P. Morgan"), is the successor-in-interest to Bear Stearns.

10        25.     Defendant Deutsche Bank Securities, Inc. ("Deutsche Bank") is a Delaware corporation

11   with its principal place of business located at 60 Broad Street, New York, New York 10019.  Deutsche

12   Bank is an investment banking firm.  Deutsche Bank acted as an "Underwriter" of the Certificates

13   within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11).  As an underwriter, Deutsche Bank

14   participated in the drafting and dissemination of the Prospectus Supplements pursuant to which the

15   Certificates were sold to Plaintiffs and other Class members.  Deutsche Bank acted as an underwriter

16   for certain Certificates, as reflected in the chart at ¶43.

17        26.     Defendant UBS Securities, LLC ("UBS") is a Delaware limited liability company with

18   its principal place of business located at 677 Washington Blvd., Stamford, Connecticut 06901.  UBS is

19   an investment banking firm.  UBS acted as an "Underwriter" of the Certificates within the meaning of

20   the Securities Act, 15 U.S.C. § 77b(a)(11).  As an underwriter, UBS participated in the drafting and

21   dissemination of the Prospectus Supplements pursuant to which the Certificates were sold to Plaintiffs

22   and other Class members.  UBS acted as an underwriter for certain Certificates, as reflected in the chart

23   at ¶43.

24        27.     Defendant Credit Suisse Securities (USA), LLC ("Credit Suisse"), formerly Credit

25   Suisse First Boston, LLC, is a Delaware limited liability company with its principal place of business

26   located at 11 Madison Avenue, New York, New York 10010.  Credit Suisse is an investment banking

27   firm.  Credit Suisse acted as an "Underwriter" of the Certificates within the meaning of the Securities

28

Act, 15 U.S.C. § 77b(a)(11).   As an underwriter, Credit Suisse participated in the drafting and dissemination of the Prospectus Supplements pursuant to which the Certificates were sold to Plaintiffs and other Class members.   Credit Suisse acted as an underwriter for certain Certificates, as reflected in the chart at ¶43.

28.   Defendant RBS Securities, Inc. ("RBS"), formerly known as Greenwich Capital Markets, Inc., is a Delaware corporation with its principal place of business located at 600 Washington Boulevard, Stamford, Connecticut 06901.   RBS is an investment banking firm.   RBS acted as an "Underwriter" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11).   As an underwriter, RBS participated in the drafting and dissemination of the Prospectus Supplements pursuant to which the Certificates were sold to Plaintiffs and other Class members.   RBS acted as an underwriter for certain Certificates, as reflected in the chart at ¶43.

29.   Defendant Banc of America Securities, LLC ("BAS") is a Delaware limited liability company with its principal place of business located at 100 Tryon Street, Charlotte, North Carolina 28255.   BAS acted as an "Underwriter" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11).   As an underwriter, BAS participated in the drafting and dissemination of the Prospectus Supplements pursuant to which the Certificates were sold to Plaintiffs and other Class members.   BAS acted as an underwriter for certain Certificates, as reflected in the chart at ¶43.

30.   Defendant Citigroup Global Markets, Inc. ("Citi") is a New York corporation with its principal place of business located at 388 Greenwich Street, New York, New York 10013.   Citi is an investment banking firm.   Citi acted as an "Underwriter" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11).   As an underwriter, Citi participated in the drafting and dissemination of the Prospectus Supplements pursuant to which the Certificates were sold to Plaintiffs and other Class members.   Citi acted as an underwriter for certain Certificates, as reflected in the chart at ¶43.

31.   Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill") is a Delaware corporation with its principal place of business located at 250 Vesey Street, 4 World Financial Center, New York, New York 10080.   Merrill is a wholly owned subsidiary of Merrill Lynch

& Co., Inc. Merrill acted as an "Underwriter" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11).  As an underwriter, Merrill participated in the drafting and dissemination of the Prospectus Supplements pursuant to which the Certificates were sold to Plaintiffs and other Class members.  Merrill acted as an underwriter for certain Certificates, as reflected in the chart at ¶43.

32.     Goldman Sachs, Bear Stearns, Deutsche Bank, UBS, Credit Suisse, RBS, BAS, Citi and Merrill are collectively referred to herein as the "Underwriters."

33.     Defendant David Moskowitz ("Moskowitz") was, during the relevant period, a Director, the President, Chief Executive Officer (Principal Executive Officer) and Secretary of the Depositor. Moskowitz also formerly served as General Counsel for the Depositor.   Moskowitz signed the July 2005 Registration Statement, the October 2005 Registration Statement and the September 2006 Registration Statement.

34.     Defendant Franklin Codel ("Codel") was, during the relevant period, the Executive Vice President, Chief Financial Officer (Principal Financial Officer) and Chief Accounting Officer of the Depositor.  Codel signed the October 2005 Registration Statement and the September 2006 Registration Statement.

35.     Defendant Douglas K. Johnson ("Johnson") was, during the relevant period, a Director of the Depositor.  Johnson signed the July 2005 Registration Statement, the October 2005 Registration Statement and the September 2006 Registration Statement.

36.     Defendant Thomas Neary ("Neary") was, at all times during the relevant period, a Director and an Executive Vice President of the Depositor.  Neary also held the position of Head of Mortgage Capital Markets for Wells Fargo & Company.  Neary signed the July 2005 Registration Statement, the October 2005 Registration Statement and the September 2006 Registration Statement.

37.     Defendants Moskowitz, Codel, Johnson and Neary are collectively referred to herein as the "Individual Defendants."

IV.     FACTUAL BACKGROUND

      A.     The Mechanics Of Structuring Mortgage Pass-Through Certificates

      38.     Mortgage pass-through certificates are securities in which the holder's interest represents an equity interest in the "issuing trust."  The pass-through certificates entitle the holder to income payments from pools of mortgage loans and/or MBS.  Although the structure and underlying collateral of the mortgages and MBS vary, the basic principle is the same.

      39.     First, a "depositor" acquires an inventory of loans from a "sponsor"/"seller," who either originated the loans or acquired the loans from other loan originators, in exchange for cash.  The type of loans in the inventory may vary, including conventional, fixed or adjustable rate mortgage loans (or mortgage participations), secured by first liens, junior liens, or a combination of first and junior liens, with various lifetimes to maturity.  The depositor then transfers, or deposits, the acquired pool of loans to the issuing trust entity.

      40.     The depositor then securitizes the pool of loans so that the rights to the cash-flows from the inventory can be sold to investors.  The securitization transactions are structured such that the risk of loss is divided among different levels of investment, or "tranches."  Tranches are related MBS offered as part of the same pass-through certificate offering, each with a different level of risk and reward.  Any losses to the underlying loans, due to default, delinquency or otherwise, are applied in reverse order of seniority.  As such, the most senior tranches of pass-through certificates are often rated as the best quality, or "AAA."  Junior tranches, which usually obtain lower ratings, ranging from "AA" to "BBB-," are less insulated from risk, but offer greater potential returns.

      41.     By working together, the underwriters, the depositor, and the rating agencies are able to ensure that each particular mortgage pass-through certificate tranche will receive a pre-determined rating by pre-determined rating agencies at the time of offering.  Once the tranches are established, the issuing trust passes the certificates back to the depositor, who then passes the certificates to one or more underwriters.  The underwriters offer the various certificates to investors, in exchange for cash that will be passed back to the depositor, minus any fees owed to the underwriters.



42.     Each purchased or acquired certificate represents an equity interest in the issuing trust and the right to future payments of principal and interest on the underlying loans.  Those payments are collected by the loan servicer and distributed, through the issuing trust, to investors at regular distribution intervals throughout the life of the loans.  Mortgage pass-through certificates must be offered to the public pursuant to a registration statement and prospectus in accordance with the provisions of the Securities Act.

43.     The Issuing Trusts, were created and structured by the Depositor to issue billions of dollars worth of Certificates pursuant to the Registration Statements.  For each offering, Wells Fargo Asset Securities Corporation served as the "depositor" and Wells Fargo Bank served as the "sponsor." The following chart identifies (1) each Issuing Trust; (2) the Registration Statement and Prospectus Supplement dates pursuant to which the Certificates were issued and sold; (3) the stated value of the Certificates issued; and (4) the Underwriter(s).

| Issuing Trust | Registration Statement | Prospectus Supplement Date | Principal Amount | Underwriter(s) |
|---|---|---|---|---|
| Wells Fargo Mortgage Backed Securities 2006-AR1 Trust | July 2005 | 2/24/2006 | $850,233,563 | Goldman Sachs |
| Wells Fargo Mortgage Backed Securities 2006-2 Trust | July 2005 | 2/27/2006 | $1,410,383,491 | RBS |
| Wells Fargo Mortgage Backed Securities 2006-1 Trust | July 2005 | 2/27/2006 | $450,447,670 | Credit Suisse/ Citigroup |
| Wells Fargo Mortgage Backed Securities 2006-3 Trust | October 2005 | 2/27/2006 | $945,143,634 | Citigroup/ UBS |
| Wells Fargo Mortgage Backed Securities 2006-AR2 Trust | October 2005 | 2/27/2006 | $4,177,015,534 | Lehman |
| Wells Fargo Mortgage Backed Securities 2006-AR4 Trust | October 2005 | 3/22/2006 | $1,197,886,870 | Bear Stearns |

| Issuing Trust | Registration Statement | Prospectus Supplement Date | Principal Amount | Underwriter(s) |
|---|---|---|---|---|
| Wells Fargo Mortgage Backed Securities 2006-AR5 Trust | October 2005 | 3/23/2006 | $1,190,485,738 | Goldman Sachs |
| Wells Fargo Mortgage Backed Securities 2006-4 Trust | October 2005 | 3/30/2006 | $953,944,124 | RBS |
| Wells Fargo Mortgage Backed Securities 2006-AR6 Trust | October 2005 | 3/30/2006 | $1,783,716,655 | Bear Stearns |
| Wells Fargo Mortgage Backed Securities 2006-6 Trust | October 2005 | 4/27/2006 | $1,099,170,858 | UBS |
| Wells Fargo Mortgage Backed Securities 2006-AR8 Trust | October 2005 | 4/27/2006 | $1,487,893,242 | Credit Suisse |
| Wells Fargo Mortgage Backed Securities 2006-7 Trust | October 2005 | 5/26/2006 | $423,287,172 | RBS/UBS |
| Wells Fargo Mortgage Backed Securities 2006-AR10 Trust | October 2005 | 6/29/2006 | $2,942,525,599 | Deutsche Bank |
| Wells Fargo Mortgage Backed Securities 2006-AR11 Trust | October 2005 | 7/27/2006 | $792,251,260 | Deutsche Bank |
| Wells Fargo Mortgage Backed Securities 2006-10 Trust | October 2005 | 7/31/2006 | $825,873,877 | Credit Suisse |
| Wells Fargo Mortgage Backed Securities 2006-AR12 Trust | October 2005 | 8/25/2006 | $1,449,247,012 | Credit Suisse |
| Wells Fargo Mortgage Backed Securities 2006-AR16 Trust | October 2005 | 9/21/2006 | $500,564,197 | Citigroup |
| Wells Fargo Mortgage Backed Securities 2006-AR17 Trust | October 2005 | 9/26/2006 | $696,102,523 | Deutsche Bank |
| Wells Fargo Mortgage Backed Securities 2006-AR14 Trust | October 2005 | 9/28/2006 | $2,000,504,205 | UBS |
| Wells Fargo Mortgage Backed Securities 2006-AR19 Trust | October 2005 | 11/21/2006 | $800,545,723 | Deutsche Bank |
| Wells Fargo Mortgage Backed Securities 2006-18 Trust | September 2006 | 11/27/2006 | $2,500,285,314 | Citigroup/UBS |
| Wells Fargo Mortgage Backed Securities 2006-20 Trust | September 2006 | 11/28/2006 | $200,260,196 | Merrill Lynch/ Banc of America |
| Wells Fargo Alternative Loan 2007-PA1 Trust | September 2006 | 2/26/2007 | $723,520,492 | Merrill Lynch & Co. |

13
AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF §§ 11, 12(a)(2) AND 15 OF THE SECURITIES ACT OF 1933

| Issuing Trust | Registration Statement | Prospectus Supplement Date | Principal Amount | Underwriter(s) |
|---|---|---|---|---|
| Wells Fargo Mortgage Backed Securities 2007-10 Trust | September 2006 | 6/29/2007 | $1,700,746,270 | UBS |
| Wells Fargo Mortgage Backed Securities 2007-11 Trust | September 2006 | 7/31/2007 | $3,954,809,375 | Goldman Sachs/ Lehman |
| Wells Fargo Mortgage Backed Securities 2007-13 Trust | September 2006 | 8/27/2007 | $500,014,779 | Deutsche Bank |
| Wells Fargo Mortgage Backed Securities 2007-AR4 Trust | September 2006 | 8/28/2007 | $421,914,996 | Lehman |

B.      Assessing The Quality Of
        Mortgage Pass-Through Certificates

44.     The fundamental basis upon which certificates are valued is the ability of the borrowers to repay the principal and interest on the underlying loans and the adequacy of the collateral.  Thus, proper loan underwriting is critical to assessing the borrowers' ability to repay the loans, and a necessary consideration when purchasing and pooling loans.  If the loans pooled in the MBS were to suffer defaults and delinquencies in excess of the assumptions built into the certificate payment structure, certificate owners would suffer loss because the cash flow from the certificates would necessarily diminish.

45.     Likewise, independent and accurate appraisals of the collateralized real estate are essential to ensure that the mortgage or home equity loan can be satisfied in the event of a default and foreclosure on a particular property.  An accurate appraisal is necessary to determine the likely price at which the foreclosed property can be sold and, thus, the amount of money available to pass through to certificate holders.

46.     An accurate appraisal is also critical to calculating the loan-to-value ("LTV") ratio, which is a financial metric commonly used to evaluate the price and risk of MBS and mortgage pass-through certificates.  The LTV ratio expresses the amount of mortgage or loan as a percentage of the appraised value of the collateral property.  For example, if a borrower seeks to borrow $90,000 to purchase a home worth $100,000, the LTV ratio is equal to $90,000 divided by $100,000, or 90%.  If,

however, the appraised value of the house has been artificially inflated to $100,000 from $90,000, the real LTV ratio would be 100% ($90,000 divided by $90,000).

47.     From an investor's perspective, a high LTV ratio represents a greater risk of default on the loan.  First, borrowers with a small equity position in the underlying property have "less to lose" in the event of a default.  Second, even a slight drop in housing prices might cause a loan with a high LTV ratio to exceed the value of the underlying collateral, which might cause the borrower to default and would prevent the issuing trust from recouping its expected return in the case of foreclosure and subsequent sale of the property.

48.     Consequently, the LTV ratios of the loans underlying mortgage pass-through certificates are important to investors' assessment of the value of such certificates.  Indeed, prospectuses typically provide information regarding the LTV ratios, and even guarantee certain LTV ratio limits for the loans that will support the certificates.

49.     The underwriting standards and appraisals of the pooled loans are critically important considerations when setting assumptions and parameters for each certificate tranche.  The assumed amount of expected payments of principal and interest will necessarily affect the total available funds and potential yield to investors.

50.     Traditionally, rating agencies published ratings that were supposed to reflect an unbiased assessment of risk associated with a particular investment instrument.  The rating of any particular MBS was critical to its issuance because of regulations requiring many institutional investors, such as banks, mutual funds, and public pension funds, to hold only "investment grade" bonds and securitized interests.  Many MBS – including mortgage pass-through certificates – were specifically promoted to institutional investors.

C.     The Wells Fargo Certificate Offerings

51.     On July 29, 2005, the Depositor filed with the Securities and Exchange Commission ("SEC") on Form S-3 a Registration Statement under the Securities Act of 1933.  On August 31, 2005, the Depositor filed a Form S-3/A related to the same offering where Defendants indicated their intention to sell $28 billion in mortgage pass-through certificates.  On October 20, 2005, the Depositor

filed with the SEC on Form S-3 a Registration Statement under the Securities Act.  On January 31, 2006, the Depositor filed a Form S-3/A related to the same offering where Defendants indicated their intention to sell $15 billion in mortgage pass-through certificates.  On September 27, 2006, the Depositor filed with the SEC on Form S-3 a Registration Statement under the Securities Act.  On October 11, 2006, the Depositor filed a Form S-3/A related to the same offering where Defendants indicated their intention to sell $20 billion in mortgage pass-through certificates.

52.     The Certificates for all offerings would be issued pursuant to the Registration Statements and an accompanying prospectus, generally explaining the structure of the Issuing Trusts and providing an overview of the Certificates.  The Registration Statements were prepared by the Depositor and the Underwriter Defendants, and signed by the Individual Defendants.

53.     The Prospectuses, filed on February 21, 2006, March 20, 2006, April 19, 2006, May 25, 2006, June 27, 2006, August 24, 2006, September 20, 2006, October 23, 2006, August 27, 2007, June 25, 2007, February 26, 2007, April 25, 2007, May 25, 2007, and July 26, 2007, provided that the Issuing Trusts would offer a series of Certificates representing beneficial ownership interests in the related Issuing Trusts and that the assets of each trust would generally consist of a pool or pools of fixed or adjustable interest rate mortgage loans secured by a first lien on a one- to four-family residential property.

54.     Subsequently, the Prospectus Supplements were filed with the SEC containing a detailed description of the mortgage pools underlying the Certificates.  The respective Prospectus Supplements provided the specific terms of the particular Certificate series offering.  Each Prospectus Supplement included tabular data concerning the loans underlying the Certificates, including (but not limited to) the type of loans, the number of loans, the mortgage rate and net mortgage rate, the aggregate scheduled principal balance of the loans, the weighted average original combined LTV ratio, and the geographic concentration of the mortgaged properties.

55.     In the Prospectuses and each of the respective Prospectus Supplements, Wells Fargo Asset Securities Corporation was identified as the depositor for each of the Certificate offerings.  The Registration Statements, and each of the respective Prospectus Supplements, identified Wells Fargo

Bank as the "Sponsor" and "Master Servicer" of the Certificates.  Further, the Prospectus Supplements stated that the underlying mortgages "were selected by the Sponsor from the Sponsor's production of" mortgage loans.  According to the Registration Statements, Prospectuses and Prospectus Supplements, the underlying mortgage loans "were originated by Wells Fargo Bank or its affiliates or purchased from other mortgage lenders."

56.     The Underwriters sold the Certificates pursuant to the Prospectus Supplements.  The Registration Statements incorporated by reference the subsequently filed Prospectuses and Prospectus Supplements.  As a condition of the issuance of the Certificates, the rating agencies provided pre-determined investment-grade ratings, as represented in the Prospectus Supplements.

V.     THE OFFERING DOCUMENTS CONTAINED MATERIAL MISSTATEMENTS AND OMISSIONS REGARDING WELLS FARGO UNDERWRITING STANDARDS

57.     The Offering Documents contained material statements regarding, *inter alia*, (i) Wells Fargo Bank's underwriting process and standards by which the loans held by the respective Issuing Trusts were originated; (ii) the underwriting process and standards of certain third-party originators; (iii) representations concerning the value of the underlying real estate securing the loans pooled in the respective Issuing Trusts, in terms of LTV averages and the appraisal standards by which such real estate values were measured; and (iv) the credit ratings of the Certificates.

58.     The Offering Documents emphasized the underwriting standards used to originate the underlying mortgage loans.  Although the percentages vary among the Issuing Trusts, the Prospectus Supplements state that the majority of the mortgage loans were originated by Wells Fargo Bank or its affiliates.  For example, the Wells Fargo Mortgage Backed Securities 2006-AR1 Trust Prospectus Supplement states that "[t]he mortgage loans were originated by Wells Fargo Bank or its affiliates or purchased from other mortgage lenders.  No originator or group of affiliated originators, apart from the Sponsor or its affiliates, has originated or is expected to originate 10% or more (by aggregate unpaid principal balance as of the Cut-Off Date) of the mortgage pool."

59.     Where more than 10% of the loans were originated by any particular loan originator, the Prospectus Supplement is supposed to identify that originator and the approximate percentage of the

underlying loans originated by that originator.  For example, the Wells Fargo Mortgage Backed Securities 2007-10 Trust Prospectus Supplement states that "[i]t is expected that as of the Cut-Off Date, one of the other originators, American Home Mortgage Corporation, will have accounted for approximately 11.72% of the Group I Mortgage Loans (by aggregate unpaid principal balance as of the Cut-Off Date), approximately 13.62% of the Group II Mortgage Loans (by aggregate unpaid principal balance as of the Cut-Off Date) and approximately 12.03% of all of the Mortgage Loans (by aggregate unpaid principal balance as of the Cut-Off Date)."

60.     The Prospectus Supplements represented that the mortgage loans underlying the Certificates "will have been underwritten either to the Sponsor's standards as set forth herein, or to such other standards set forth in the applicable prospectus supplement."[2]  Each Prospectus Supplement specifically referred to its corresponding Prospectus, which set forth Wells Fargo Bank's underwriting standards and stated that its standards are applied to evaluate the applicant's credit standing and ability to repay the loan.  Contrary to these representations, as set forth below, Wells Fargo extended loans that did not comply with its underwriting standards in order to increase loan volume regardless of the borrower's ability to meet its obligations.  Wells Fargo Bank, as the Sponsor, selected these loans from its production of loans for securitization and sale as Certificates to Plaintiffs and the Class.

61.     The Prospectus Supplements represented that the mortgage loans underlying the Certificates "were generally originated in conformity with the underwriting standards described in the prospectus under the heading 'The Sponsor's Mortgage Loan Programs – Mortgage Loan Underwriting' (the "Underwriting Standards").  In certain instances, exceptions to the Underwriting Standards may have been granted by Wells Fargo Bank."  As represented in the Prospectuses, the Sponsor's "underwriting standards are applied by or on behalf of Wells Fargo Bank to evaluate the applicant's credit standing and ability to repay the loan, as well as the value and adequacy of the mortgaged property as collateral."

62.     The representations regarding the underwriting standards utilized by Wells Fargo Bank, it affiliates, and the third-party originators were untrue and omitted material facts.  Indeed, as detailed

---

[2]  The Prospectus Supplements for each Issuing Trust used the same or substantially similar language.

1  below, Wells Fargo Bank and the third-party originators systematically disregarded their stated

2  underwriting standards.

3      A.    Wells Fargo Bank's Underwriting Standards

4      63.    The Prospectuses and Prospectus Supplements misrepresented and omitted material

5  facts regarding the underwriting practices of Wells Fargo Bank and its affiliates.  Specifically, each

6  Prospectus stated:

***Wells Fargo Bank's underwriting standards are applied by or on behalf of Wells Fargo Bank to evaluate the applicant's credit standing and ability to repay the loan, as well as the value and adequacy of the mortgaged properties collateral.*** The underwriting standards that guide the determination represent a balancing of several factors that may affect the ultimate recovery of the loan amount, including, among others, the amount of the loan, the ratio of the loan amount to the property value (*i.e.*, the lower of the appraised value of the mortgaged property and the purchase price), the borrower's means of support and the borrower's credit history.  Wells Fargo Bank's guidelines for underwriting may vary according to the nature of the borrower or the type of loan, since differing characteristics may be perceived as presenting different levels of risk. With respect to certain Mortgage Loans, the originators of such loans may have contracted with unaffiliated third parties to perform the underwriting process. Except as described below, the Mortgage Loans will be underwritten by or on behalf of Wells Fargo Bank generally in accordance with the standards and procedures described herein.

Wells Fargo Bank supplements the mortgage loan underwriting process with either its own proprietary scoring system or scoring systems developed by third parties such as Freddie Mac's Loan Prospector, Fannie Mae's Desktop Underwriter or scoring systems developed by private mortgage insurance companies.  These scoring systems assist Wells Fargo Bank in the mortgage loan approval process by providing consistent, objective measures of borrower credit and certain loan attributes.  Such objective measures are then used to evaluate loan applications and assign each application a "Mortgage Score."

The portion of the Mortgage Score related to borrower credit history is generally based on computer models developed by a third party.  These models evaluate information available from three major credit reporting bureaus regarding historical patterns of consumer credit behavior in relation to default experience for similar types of borrower profiles.  A particular borrower's credit patterns are then considered in order to derive a "FICO Score" which indicates a level of default probability over a two-year period.

The Mortgage Score is used to determine the type of underwriting process and which level of underwriter will review the loan file.  For transactions which are determined to be low-risk transactions, based upon the Mortgage Score and other parameters (including the mortgage loan production source), the lowest underwriting authority is generally required.  For moderate and higher risk transactions, higher level underwriters and a full review of the mortgage file are generally required.  Borrowers who have a satisfactory Mortgage Score (based upon the mortgage loan production source) are generally subject to streamlined

credit review (which relies on the scoring process for various elements of the underwriting assessments). Such borrowers may also be eligible for a reduced documentation program and are generally permitted a greater latitude in the application of borrower debt-to-income ratios.

64. Each of the Prospectus Supplements identified loan originators that accounted for greater than 10% of the loans in the mortgage pools underlying the Certificates, if applicable. In addition, the Prospectuses provided representations regarding the underwriting standards utilized by correspondent lenders. Specifically, with respect to mortgage loans from correspondent lenders each Prospectus stated:

In order to qualify for participation in Wells Fargo Bank's mortgage loan purchase programs, lending institutions must (i) meet and maintain certain net worth and other financial standards, (ii) demonstrate experience in originating residential mortgage loans, (iii) meet and maintain certain operational standards, (iv) evaluate each loan offered to Wells Fargo Bank for consistency with Wells Fargo Bank's underwriting guidelines or the standards of a pool insurer and represent that each loan was underwritten in accordance with Wells Fargo Bank standards or the standards of a pool insurer and (v) utilize the services of qualified appraisers.

The contractual arrangements with Correspondents may involve the commitment by Wells Fargo Bank to accept delivery of a certain dollar amount of mortgage loans over a period of time. This commitment may be satisfied either by delivery of mortgage loans one at a time or in multiples as aggregated by the Correspondent. The contractual arrangements with Correspondents may also involve the delegation of all underwriting functions to such Correspondents ("Delegated Underwriting"), which will result in Wells Fargo Bank not performing any underwriting functions prior to acquisition of the loan but instead relying on such Correspondent's representations and, in the case of bulk purchase acquisitions from such Correspondents, Wells Fargo Bank's post-purchase reviews of samplings of mortgage loans acquired from such Correspondents regarding the Correspondent's compliance with Wells Fargo Bank's underwriting standards. In all instances, however, acceptance by Wells Fargo Bank is contingent upon the loans being found to satisfy Wells Fargo Bank's program standards or the standards of a pool insurer. Wells Fargo Bank may also acquire mortgage loans in negotiated transactions under which the mortgage loans may have been originated by the seller or another third party according to underwriting standards that may have varied materially from Wells Fargo Bank's underwriting standards. To the extent that 20% or more of the aggregate principal balance of the Mortgage Loans in a Trust Estate are underwritten by a Correspondent whose underwriting standards vary materially from Wells Fargo Bank's underwriting standards, the applicable prospectus supplement will describe such underwriting standards for such Mortgage Loans.

65.     The October 2005 Registration Statement and the September 2006 Registration Statement set forth that Wells Fargo Bank expanded its *Underwriter Discretion* policy as follows in mid-2005:

> Underwriter Discretion.   During the second calendar quarter of 2005, **Wells Fargo Bank initiated a program designed to encourage its mortgage loan underwriting staff to prudently, but more aggressively, utilize the underwriting discretion already granted to them under Wells Fargo Bank's underwriting guidelines and policies.**  This initiative was viewed by management as necessary and desirable to make prudent loans available to customers where such loans may have been denied in the past because of underwriter hesitancy to maximize the use of their ability to consider compensating factors as permitted by the underwriting guidelines.   There can be no assurance that the successful implementation of this initiative will not result in an increase in the incidence of delinquencies and foreclosures, or the severity of losses, among mortgage loans underwritten in accordance with the updated philosophy, as compared to mortgage loans underwritten prior to the commencement of the initiative.

66.     The above statements were materially false and misleading when made because they failed to disclose that Wells Fargo Bank: (i) systematically did not follow its stated underwriting standards and that the underwriting standards actually utilized failed to conform to Wells Fargo Bank's underwriting standards; (ii) allowed pervasive exceptions to its stated underwriting standards in order to generate increased loan volume; and (iii) that "credit risk" and "quality control" were materially disregarded in favor of generating sufficient loan volume as alleged herein and as set forth below.

67.     While the Offering Documents represented that Wells Fargo Bank and its affiliates' underwriting of mortgages was designed to evaluate a prospective borrower's credit standing and ability to repay the loan, as well as the value and adequacy of the mortgaged property as collateral. Wells Fargo Bank originated as many mortgage loans as possible without regard to the ability of the borrower to repay such mortgages.

68.     By way of background, the traditional mortgage model (before 1994) involved a bank originating a loan to the borrower/homeowner and retaining the credit (default) risk.  As such, under the traditional model, the loan originator had a financial incentive to ensure that (1) the borrower had the financial wherewithal and ability to repay the promissory note, and (2) the underlying property had sufficient value to enable the originator to recover its principal and interest in the event that the borrower defaulted on the promissory note.

69.     With the advent of securitization, the traditional model gave way to the "originate to distribute" model, in which banks essentially sell the mortgages and transfer credit risk to investors through mortgage-backed securities.  Securitization meant that those originating mortgages were no longer required to hold them to maturity.  By selling the mortgages to investors, the originators obtained funds, enabling them to issue more loans and generate transaction fees.  This increased the originators' focus on processing mortgage transactions rather than ensuring their credit quality.

70.     Loan fees and sales revenue became the originator's primary profit mechanism, making the sheer quantity of loans issued more important than the quality of any particular loan.  As loan origination quantities increased, loan originators failed to follow their stated underwriting and appraisal standards, and other methods of risk assessment.

71.     Wall Street banks, including Wells Fargo, entered into the high-margin business of packaging mortgages and selling them to investors as MBS, including mortgage pass-through certificates.  As is now evident, far too much of the lending during that time was neither responsible nor prudent.  As U.S. housing prices subsequently declined, the delinquency rate for such mortgages soared.

72.     Confidential Witness 1 ("CW1") is a former employee at Wells Fargo Home Mortgage who was employed as an Underwriter in Riverside, California from July 2005 through December 2006 and as a Wholesale Underwriter in Huntington Beach, California from March 2009 through June 2009. Prior to working at Wells Fargo Home Mortgage, CW1 worked at subprime lender Argent Mortgage Company, LLC.  According to a December 7, 2008, article in the *Miami Herald*, Argent employees actively assisted mortgage brokers in falsifying borrowers' financial information.  According to an Argent vice president, "the accuracy of loan applications was not a priority."  The *Miami Herald* examined the applications for 129 loans funded by Argent in Florida and "found at least 103 that contained false and misleading information" and "red flags: non-existent employers, grossly inflated salaries and sudden, drastic increases in the borrower's net worth."

73.     Upon CW1's arrival at Wells Fargo Home Mortgage, CW1 was "shocked" that Wells Fargo Home Mortgage was doing "the same things" as Argent.  CW1 noted that the "pressure from

loan officers" to close loans was "intense." Individuals that were "high producers" were treated favorably: "Anything they said went. Anytime an underwriter would overturn one of their loans, it would come back approved by a manager." "The high producers that everyone wanted to make happy, caused a lot of bad loans to go through." CW1 added, "[t]here was a lot of coercion between loan officers and underwriters."

74.     According to CW1, Wells Fargo was approving so many stated income loans that it felt the same as CW1's previous subprime lending job. CW1 remarked that "[t]he loan officers were stretching the truth. They would say [to the borrower], 'You need to make this much.' So of course, the borrower would say, 'Ok, I make that much.'"

75.     According to CW2, a former employee at Wells Fargo Home Mortgage in San Bernardino, California, Wells Fargo Home Mortgage made "tons" of exceptions to its underwriting guidelines. CW2 was employed as an Underwriter from January 2002 through May 2005 and as a Senior Underwriter from May 2005 until April 2006. CW2 estimated that 25-30% of the loans had exceptions, most commonly for LTV and the debt-to-income ratio ("DTI") ratio of the borrower. During CW2's tenure with Wells Fargo Home Mortgage, the frequency and type of exceptions "got more and more ridiculous." For example, Wells Fargo Home Mortgage would loosen underwriting standards toward the end of the year in order to meet the origination goals. CW2 stated that "if it got to be around December, they'd relax the guidelines to get more exceptions." CW2 also noted that Wells Fargo Home Mortgage began to extend stated income loans to "everyone," including, in one instance, a landscaper claiming to have $15,000 in income per month. CW2 added that "[w]e didn't always feel the [stated] income was reasonable for the stated job" and that "it got to the point where you could have a 620 FICO and get a stated loan."

76.     CW2 also described Wells Fargo Home Mortgage as a "loan-producing machine," and noted that there was pressure from management to close as many loans as possible, independent of their quality or lack thereof: "[Managers] always said we didn't have to approve loans we didn't want to approve, but if you didn't do them you wouldn't be around very long. We knew what we had to do to keep our jobs." CW2 remarked that "[s]ometimes it felt like I was in sales, because they wanted

1    production, period."

2        77.    According to CW3, a former Mortgage Specialist and Pricing/Pipeline Administrator for

3    Wells Fargo Home Mortgage in Frederick, Maryland from February 2002 through November 2006,

4    when CW3 left the Company, they had just begun implementing a program called "courageous

5    underwriting," which CW3 described as "following the guidelines but also finagling the guidelines if it

6    meant getting the loan approved."  "They wanted us to do anything we could to get loans closed.  That

7    was the bottom line."  CW3's managers would "push [CW3] to push the loans through, especially if it

8    was a time when our numbers weren't quite meeting our goals.  They they'd look at things with a little

9    less scrutiny."  CW3 also noted that Wells Fargo relaxed the qualifying test for obtaining underwriting

10   authority, which ensured that more loans would close.  CW3 stated that the test was "engineered" by

11   Wells Fargo "so it was easy to pass."   According to CW3, if a test-taker answered any question

12   incorrectly, he/she could simply log out and then log back in and start again an "unlimited" number of

13   times.

14       78.    From 1995 through 2004, CW4, a former Wells Fargo Home Mortgage employee who

15   was employed as a Quality Compliance Manager I in San Bernardino, California from 1995 through

16   1998, Loss Mitigation Supervisor from 1999 through 2004, and an REO Supervisor from July 2006

17   through May 2008, worked with third-party originators, and noted that some of the information in the

18   loans was "blatantly falsified."  CW4 noted that there were a lot of exceptions made to the underwriting

19   guidelines and that some loan originators "said they verified employment and income, but after

20   reverification we found out it was wrong, and they hadn't."  Exceptions were made for bank statements

21   as well.  "I remember some bank statements were falsified."  CW4 said there was no indication these

22   practices stopped after 2004.

23       79.    CW5, a former Wells Fargo Home Mortgage employee who worked as a Senior

24   Mortgage Loan Underwriter in Rancho Bernardo, California from November 2001 through June 2003,

25   and a Home Mortgage Consultant in Newport Coast, California from June 2003 through March 2008,

26   stated that exceptions to the underwriting guidelines were made for "loan amounts, LTV, income,

27   pretty much anything and everything – anything you could find to get a loan approved."

28

80.     CW6 is a former employee at Wells Fargo Home Mortgage in Denver, Colorado and Springfield, Illinois.  CW6 was employed as a Wholesale Alternative Lending Operations Manager from 2003 through 2005 and as a Site Manager in retail underwriting from 2005 through 2007.  According to CW6, Wells Fargo Home Mortgage developed riskier products over the course of his employment.  The company went "from ultra-conservative, to trying to keep up with the market."  Around 2006, CW6 noted that Wells Fargo Home Mortgage began to offer "more and more types of products," including no-doc loans, which were the "most aggressive."

81.     In its Annual Report for 2007, filed on February 29, 2008, Wells Fargo Bank acknowledged that it made mistakes through too lenient loan terms and took on too much risk in its home equity loans:

> Our risk management performance in 2007 was not perfect.  We made some mistakes. ***We took on too much risk — and did not price sufficiently for it — in the home equity loans we purchased through indirect channels such as mortgage brokers, bankers and other mortgage companies.  Too many of our home equity loans had "loan-to-value" ratios that were too high*** — the ratio of loans to the fair market value of the property. Sometimes we did not require full documentation for these home equity loans we purchased from brokers because these were prime borrowers who had high credit scores with lower expected risk of default.
>
> *            *            *            *
>
> We should not have offered such lenient loan terms through indirect channels, and ***we made the mistake of taking on too much risk.  We should have known better.***

B.     <u>Additional Originator's Underwriting Practices</u>

82.     The Prospectuses and Prospectus Supplements misrepresented and omitted material facts regarding the underwriting practices of Wells Fargo Bank and its affiliates.  For example, with respect to loans originated by third parties, the Wells Fargo Mortgage Backed Securities 2007-10 Trust Prospectus Supplement stated:

> Approximately 8.38% of the Group I Mortgage Loans (by aggregate unpaid principal balance as of the Cut-Off Date) and 10.14% of the Group II Mortgage Loans (by aggregate unpaid principal balance as of the Cut-Off Date) were originated in conformity with the underwriting standards of certain third party originators.  These underwriting standards may differ significantly from the Underwriting Standards and are less stringent than the Underwriting Standards in areas including reserve requirements, number of financed properties, cash-out limits, property type, escrow holdbacks, bankruptcy or foreclosure requirements, temporary buydowns and documentation requirements.  In addition, such Mortgage Loans may be on Cooperatives located in regions where the Sponsor does not underwrite similar mortgage loans for Cooperatives.

83.     These purported statements were untrue and omitted material facts because many originators industry-wide failed to follow their stated underwriting guidelines.  As detailed above, with the advent of securitization, banks began "originating to distribute."  Since those originating mortgages were no longer required to hold them to maturity, originators focused on processing mortgage transactions rather than ensuring their credit quality.  Loan fees and sales revenue became the originator's primary profit mechanism, making the sheer quantity of loans issued more important than the quality of any particular loan.  As loan origination quantities increased, loan originators failed to follow their stated underwriting and appraisal standards, and other methods of risk assessment.  As is now evident, far too much of the lending during that time was neither responsible nor prudent.

84.     For example, American Home Mortgage, Inc., ("American Home") one of the originators of loans in five trusts, greatly reduced and/or eliminated its underwriting standards in order to approve as many mortgages as possible.  An internal American Home "Credit Update" presentation dated from October 2005 set forth revised credit factors which made clear that American Home's underwriting guidelines were to be either relaxed substantially or essentially rendered meaningless, in order to allow American Home to make loans to high-risk borrowers.  Specifically, the Credit Update sets forth the previous "interpretation" of the underwriting guidelines under a heading entitled "What we observed in [our] prior history" alongside the new "interpretation" under a heading entitled "Where We Are Now."  These new "guideline interpretations" included:

- Not requiring verification of income sources on stated income loans;
- Reducing the time that need have passed since the borrower was in bankruptcy or credit counseling;
- Reducing the required documentation for self-employed borrowers; and
- Broadening the acceptable use of second and third loans to cover the full property value.

85.     Indeed, an internal American Home e-mail sent on November 2, 2006, from Steve Somerman, an American Home Senior Vice President of Product and Sales Support in California and co-creator of American Home's "Choice Point Loans" program, to loan officers nationwide, stated that American Home would make a loan to virtually any borrower, regardless of the borrower's ability to

verify income, assets or even employment.  That e-mail specifically encouraged loan officers to make a variety of loans that were inherently risky and extremely susceptible to delinquencies and default, including (1) stated income loans, where both the income and assets of the borrower were taken as stated on the credit application without verification; (2) "NINA" or No Income, No Asset loans, which allowed for loans to be made without any disclosure of the borrower's income or assets; and (3) "No Doc" loans, which allowed loans to be made to borrowers who did not disclose their income, assets or employment history.  On April 30, 2007, American Home filed for bankruptcy.

## VI.  THE OFFERING DOCUMENTS MISSTATED THE TRUE LTV RATIOS ASSOCIATED WITH THE UNDERLYING MORTGAGES

86.    The Offering Documents represented that the underlying mortgaged properties would provide adequate security for the mortgage loans, based in part on the appraised value of the properties securing the securitized mortgage loans.  The adequacy of the mortgaged properties as security for repayment of the loans will have generally been determined by appraisals.

87.    With respect to Loan-to-Value Ratios, the Prospectuses stated:

Mortgage Loans will not generally have had at origination a Loan-to-Value Ratio in excess of 95%.  However, if so specified in the applicable prospectus supplement, Mortgage Loans that had Loan-to-Value Ratios at origination in excess of 95% may be included in the related Trust Estate.  The "**Loan-to-Value**" is the ratio, expressed as a percentage, of the principal amount of the Mortgage Loan at origination to the lesser of (i) the appraised value of the related Mortgaged Property, as established by an appraisal obtained by the originator generally no more than four months prior to origination (or, with respect to newly constructed properties, no more than twelve months prior to origination), or (ii) the sale price for such property.  In some instances, the Loan-to-Value Ratio may be based on an appraisal that was obtained by the originator more than four months prior to origination, provided that (i) an appraisal update is obtained and (ii) the original appraisal was obtained no more than twelve months prior to origination.  For the purpose of calculating the Loan-to-Value Ratio of any Mortgage Loan that is the result of the refinancing (including refinancing for "equity take out" purposes) of an existing mortgage loan, the appraised value of the related Mortgaged Property is generally determined by reference to an appraisal obtained in connection with the origination of the replacement loan.  In connection with certain of its mortgage originations, Wells Fargo Bank currently obtains appraisals through Value Information Technology, LLC (doing business as RELS Valuation), an entity jointly owned by an affiliate of Wells Fargo Bank and an unaffiliated third party.

88.    The Uniform Standards of Professional Appraisal Practice ("USPAP"), as adopted by the Appraisal Standards Board of the Appraisal Foundation, represents the generally accepted and recognized standards of appraisal practice.

89.     With respect to real estate appraisals, USPAP requires, *inter alia*:

An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests.

In appraisal practice, an appraiser must not perform as an advocate for any party or issue.

An appraiser must not accept an assignment that includes the reporting of predetermined opinions and conclusions.

\* \* \*

It is unethical for an appraiser to accept an assignment, or to have a compensation arrangement for an assignment, that is contingent on any of the following:

1.      the reporting of a predetermined result (*e.g.*, opinion of value);

2.      a direction in assignment results that favor the cause of the client;

3.      the amount of a value opinion;

4.      the attainment of a stipulated result; or

5.      the occurrence of a subsequent event directly related to the appraiser's opinions and specific to the assignment's purpose.

90.     The Prospectuses provide information regarding the Combined LTV of the loans underlying the Certificates.  LTV data is provided in the Prospectus Supplements, in association with various loan groupings, including by loan type and documentation level, property type and geographical location.  The Prospectuses state that "Mortgage Loans will not generally have had at origination a Loan-to-Value Ratio in excess of 95%."  This statement was untrue because the appraisals used to determine the adequacy of the mortgaged property for security for the repayment of the related mortgage loans were not made in accordance with pre-established appraisal procedures and in conformity with USPAP.  In addition, the above statement was materially false and misleading when made because the actual LTV ratio for a number of mortgage loans would have exceeded 100% if the underlying properties were appraised in accordance with USPAP.

91.     The representations regarding appraisals and loan-to-value ratios were materially false and misleading in that they omitted to state that the appraisals were inaccurate: (i) due to a lack of controls by the parties originating the loans; and (ii) because the appraisers were not independent from

the brokers such that the lenders and/or their agents, such as mortgage brokers, exerted pressure on appraisers to come back with pre-determined, preconceived, inflated and false appraisal values.

92.    For instance, in retail or in-house mortgage loan originations, many lenders allowed the sales personnel or account executives to order and control the appraisals.  These sales personnel were typically on a commission-only pay structure and were therefore motivated to close as many loans as possible.  These sales personnel and account executives would pressure appraisers to appraise properties at artificially high levels or they would not be hired again.

93.    CW2 confirmed that, at Wells Fargo Home Mortgage, representatives constantly pushed the appraisers they worked with to inflate the value of the real estate underlying the mortgage loans. "Everyone is pushing on the appraisers, and if you [the appraiser] don't perform they don't come back to you."

94.    Such lack of independence was noted by Alan Hummel, Chair of the Appraisal Institute, in his testimony before the Senate Committee on Banking.  Hummel noted this dynamic created a "terrible conflict of interest" by which appraisers "experience[d] systemic problems of coercion" and would be "ordered to doctor their reports" or else they would never "see work from these parties again" and were "placed on exclusionary or 'do-not-use' lists."  Too often, this pressure succeeded in generating artificially high appraisals and appraisals being done on a "drive-by" basis by which appraisers issued their appraisal without reasonable bases for doing so.

95.    A 2007 survey of 1,200 appraisers conducted by October Research Corp. – a firm in Richfield, Ohio that publishes Valuation Review – found that 90% of appraisers reported that mortgage brokers and others pressured them to raise property valuations to enable deals to go through.  This figure was nearly double the findings of a similar study conducted just three years earlier.  The 2007 study also "found that 75% of appraisers reported 'negative ramifications' if they did not cooperate, alter their appraisal, and provide a higher valuation."  Adding to these problems was the fact that lenders, for originations completed by mortgage brokers, generally lacked knowledge of the accuracy of the appraisals since they were typically located far from the actual property and knew very little about the general area where the property was located.

96.     Wells Fargo and RELS Valuation, an appraisal entity jointly owned by an affiliate of Wells Fargo Bank, are the subject of investigation and litigation over the illegal practice of pressuring and intimidating appraisers into using techniques that produce appraisals meeting Wells Fargo's objectives even when the use of such techniques is improper and violates industry standards.  *See Sound Appraisal and Savage Appraisal Services, Inc. v. Wells Fargo Bank, N.A.*, 09-CV-01630 CW (N.D. Cal. 2009).

97.     As a result, loans at Wells Fargo Home Mortgage were frequently based on inflated appraisals stating that the home securing the loan was worth more than it really was.  CW1 remarked that "appraisals were very inflated," and observed that the retail officers "always managed to get the value they wanted."  CW1 noted that with average LTVs hovering between 80% and 90%, "an $800,000 appraised value on a house that was [valued at] $300,000 a few years ago is just crazy."

98.     CW7 is a former Senior Underwriter who was employed at Wells Fargo Home Mortgage in Carlsbad, CA from 2002 until March 2009.  CW7 estimated that 70% of the loans CW7 worked with had an LTV over 95%.  "For a while it was ridiculous, I'd sign [off on loans] and just sweat.  I thought, 'This just ain't right.'"

99.     As a result of this conduct, the appraised value of properties that secured the loans underlying the Certificates was inflated.  Accordingly, the representations regarding appraisals and loan-to-value ratios were materially false and misleading.

VII.     THE RATINGS SET FORTH IN THE OFFERING
         DOCUMENTS MISSTATED THE QUALITY OF THE CERTIFICATES

100.     As stated in the Prospectus Supplements, the ratings "address the likelihood of the receipt by certificateholders of all distributions of principal and interest to which such certificateholders are entitled . . . .  [R]ating opinions address the structural, legal and issuer aspects associated with the certificates, including the nature of the underlying mortgage loans and the credit quality of the credit support provider, if any."

101.     Each Prospectus Supplement stated that it was "a condition to the issuance of the Offered Certificates" that they receive certain, specified ratings from the rating agencies.  It also

contained representations regarding the nature of the ratings, and the role of the rating agencies in the ratings process.  For example,

> The ratings of Moody's on mortgage pass-through certificates address the likelihood of the receipt by certificateholders of all distributions of principal and interest to which such certificateholders are entitled. Moody's rating opinions address the structural, legal and issuer aspects associated with the certificates, including the nature of the underlying mortgage loans and the credit quality of the credit support provider, if any.

> *       *       *       *

> The ratings of S&P on mortgage pass-through certificates address the likelihood of the receipt by certificateholders of timely payments of interest and the ultimate return of principal. S&P's ratings take into consideration the credit quality of the mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make payments required under the certificates.

> *       *       *       *

> The ratings of Fitch on mortgage pass-through certificates address the likelihood of the receipt by certificateholders of all distributions to which such certificateholders are entitled.  Fitch's rating opinions address the structural and legal aspects associated with the certificates, including the nature of the underlying mortgage loans.

102.    The assigned ratings were not the result of the ratings agencies' independent analysis and conclusion.   Rather, the ratings were pre-determined and, for virtually all tranches of the Certificates, were investment-grade. CW8, a former Corporate Trust Relationship Manager II who was employed at Wells Fargo Home Mortgage in Frederick, Maryland, from November 2005 until September 2008, confirmed that the ratings assigned to each securitization were "already understood" prior to the rating agencies' analysis of the underlying loan pools.  If the rating agencies did not assign the specific, pre-determined ratings to the Certificates, they would not have been distributed to investors.

103.    Each Prospectus Supplement explicitly stated that the issuance of the Certificates was conditioned on the assignment of particular, investment-grade ratings, and listed the ratings in tabular format.  For example, the Wells Fargo Mortgage Backed Securities 2006-AR1 Trust Prospectus

Supplement ("AR1 Supplement") included the following chart identifying each Series 2006-AR1 Certificate rating:

**THE SERIES 2006-AR1 CERTIFICATES**

| Class | Initial Principal Balance[1] | Pass-Through Rate | Principal Types[2] | Interest Type[2] | Initial Rating of Offered Certificates[3] | | Original Form[4] | Minimum Denomination | Incremental Denomination[5] | Final Scheduled Distribution Date[6] |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | S&P | Moody's | | | | |
| **Offered Certificates** | | | | | | | | | | |
| Class I-A-1 | $137,420,000 | (7) | Senior, Pass-Through | Variable Rate | AAA | Aaa | BE | $25,000 | $1,000 | March 25, 2036 |
| Class I-A-R | $100 | (7) | Senior, Sequential Pay | Variable Rate | AAA | None | D | $100 | N/A | March 25, 2036 |
| Class II-A-1 | $96,469,000 | (8) | Super Senior, Pass-Through | Variable Rate | AAA | Aaa | BE | $25,000 | $1,000 | March 25, 2036 |
| Class II-A-2 | $317,343,000 | (8) | Super Senior, Sequential Pay | Variable Rate | AAA | Aaa | BE | $25,000 | $1,000 | March 25, 2036 |
| Class II-A-3 | $22,484,000 | (8) | Super Senior, Sequential Pay | Variable Rate | AAA | Aaa | BE | $25,000 | $1,000 | March 25, 2036 |
| Class II-A-4 | $72,453,000 | (8) | Super Senior, Sequential Pay | Variable Rate | AAA | Aaa | BE | $25,000 | $1,000 | March 25, 2036 |
| Class II-A-5 | $137,426,000 | (8) | Super Senior, Sequential Pay | Variable Rate | AAA | Aaa | BE | $25,000 | $1,000 | March 25, 2036 |
| Class II-A-6 | $31,780,000 | (8) | Super Senior Support, Pass-Through | Variable Rate | AAA | Aaa | BE | $100,000 | $1,000 | March 25, 2036 |
| Class B-1 | $14,879,000 | (9) | Subordinated | Variable Rate | AA | Aa2 | BE | $100,000 | $1,000 | March 25, 2036 |
| Class B-2 | $7,227,000 | (9) | Subordinated | Variable Rate | A | A2 | BE | $100,000 | $1,000 | March 25, 2036 |
| Class B-3 | $4,250,000 | (9) | Subordinated | Variable Rate | BBB | Baa1 | BE | $100,000 | $1,000 | March 25, 2036 |
| **Non-Offered Certificates** | | | | | | | | | | |
| Class B-4 | $3,826,000 | (9) | Subordinated | Variable Rate | N/A | N/A | N/A | N/A | N/A | March 25, 2036 |
| Class B-5 | $2,550,000 | (9) | Subordinated | Variable Rate | N/A | N/A | N/A | N/A | N/A | March 25, 2036 |
| Class B-6 | $2,126,463 | (9) | Subordinated | Variable Rate | N/A | N/A | N/A | N/A | N/A | March 25, 2036 |

104.    For those Certificates initially rated "A" or higher, Moody's, S&P and Fitch maintained an "A" rating or higher until, at the earliest, May 20, 2008.  In fact, for those Certificates initially rated "AAA," Moody's, S&P and Fitch maintained investment-grade ratings until, at the earliest, December 16, 2008.

105.    The ratings which the rating agencies assigned to the Certificates were unjustifiably high and did not represent the true risk of the Certificates, as they were based on insufficient information and faulty assumptions concerning how many underlying mortgages were likely to default.  As a result, the Certificates were secured by assets that had a much greater risk profile than represented.  Accordingly, the Certificates, despite the fact that they were assigned investment grade ratings by the rating agencies were far riskier than other investments with the same ratings.

106.    Consequently, on June 11, 2008, the SEC proposed new rules that would, *inter alia*, prohibit rating agencies from issuing ratings on a structured product, including mortgage pass-through certificates, unless information on the assets underlying the product was made available; prohibit credit rating agencies from structuring the same products they rate; and require the public disclosure of the information used by credit rating agencies in determining a rating on a structured product, including information on the underlying assets.

107.    In addition, on July 8, 2008, the SEC issued a Summary Report of Issues Identified in the Commission Staff's Examinations of Select Credit Rating Agencies ("Summary Report").   The SEC's Summary Report found flaws in the rating agencies' procedures with respect to rating MBS products, including:

- Relevant ratings criteria were not disclosed;

- None of the rating agencies examined had specific written procedures for rating RMBS and CDOs;

- The rating agencies did not always document significant steps in the rating process – including the rationale for deviations from their models and for rating committee actions and decisions – and they did not always document significant participants in the ratings process;

- Rating agencies do not appear to have specific policies and procedures to identify or address errors in their models or methodologies;

- The rationale for deviations from the model or out-of-model adjustments was not always documented in deal records.  As a result, in its review of rating files, the Staff could not always reconstruct the process used to arrive at the rating and identify the factors that led to the ultimate rating; and

- There was a lack of documentation of rating agency committee actions and decisions.

108.    Further, the SEC concluded that the conflicts of interest created from the issuer pays model – that rating agencies "have an interest in generating business from the firms that seek the rating, which could conflict with providing ratings of integrity" – *"may be exacerbated for a number of reasons"* when the rating agencies rated structured finance products, particularly RMBS and related-CDOs.  For example, the SEC noted that:

the arranger is often the primary designer of the deal and as such, has more flexibility to adjust the deal structure to obtain a desired credit rating as compared to arrangers of non-structured asset classes. As well, arrangers that underwrite RMBS and CDO offerings have substantial influence over the choice of rating agencies hired to rate the deals.

109.    The SEC further noted that there were only a limited number of investment banks who performed the underwriting function in many of the MBS which the rating agencies rated:

there is a high concentration in the firms conducting the underwriting function.  Based on data provided by the three rating agencies examined, the Staff reviewed a sample of 642 deals.   While 22 different arrangers underwrote subprime RMBS deals, *12 arrangers accounted for 80% of the deals, in both number and dollar volume*…In addition, 12 of

the largest 13 RMBS underwriters were also the 12 largest CDO underwriters, further concentrating the underwriting function, as well as the sources of the rating agencies' revenue stream.

110.   The SEC found that the rating agencies failed to frequently update their models with new data.  "Based on discussions with the rating agencies examined and documents provided by them, it appears that the parameters of the models were re-estimated by executing the model with new data *infrequently*."

111.   Furthermore, with respect to the rating agencies' lack of established procedures, including documentation for particular ratings, the SEC's Summary Report stated that the rating agencies' actions "make it difficult for the rating agencies' internal compliance staff or internal audit staff to assess compliance with the firms' policies and procedures when conducting reviews of rating agency activities."  Summary Report at 19.

112.   Frank Raiter, the former Managing Director and Head of Residential Mortgage Backed Securities Ratings at S&P, stated that credit rating modeling was not updated on a timely basis, despite the fact that by early 2004, S&P had developed, but never implemented, a ratings model that considered nearly 10 million loans and "covered the full spectrum of new mortgage products, particularly in the Alt-A and fixed/floating payment type categories."   According to Mr. Raiter, a "consequence of continuing to use out-dated versions of the rating model was the failure to capture changes in performance of the new non-prime products.  As a result, expected loss estimates no longer provided the equity necessary to support the AAA bonds.  This, in turn, generated the unprecedented number of AAA downgrades and subsequent collapse of prices in the RMBS market."

113.   Mr. Raiter stated that "had these models been implemented we would have had an earlier warning about the performance of many of the new products that subsequently lead to such substantial losses.  That, in turn, should have caused the loss estimates mentioned above to increase and could have thus caused some of these products to be withdrawn from the market . . . ."

114.   Before the same Congressional Committee in October 2008, Jerome Fons, a former Managing Director of Credit Policy at Moody's, stated that the rating agencies "did not update their models or their thinking" during the period of deterioration in credit standards.  On October 22, 2008,

in testimony before the United States House of Representatives, Committee on Oversight and Government Reform, Deven Sharma, the President of S&P, stated that "many of the forecasts we used in our ratings analysis of certain structured finance securities have not been borne out."

VIII.   EACH OFFERING DOCUMENT CONTAINED
        <u>UNTRUE STATEMENTS AND MATERIAL OMISSIONS</u>

115.    The Registration Statements all shared common parts that were untrue and omitted material facts.  Specifically, each Registration Statement contained a form Prospectus which contained untrue statements and omissions regarding Wells Fargo Bank's Underwriting Standards.  Each Registration Statement stated "Wells Fargo Bank Underwriting" as set forth above, including the untrue statement and omission that "Wells Fargo Bank's underwriting standards are applied by or on behalf of Wells Fargo Bank to evaluate the applicant's credit standing and ability to repay the loan, as well as the value and adequacy of the mortgaged property as collateral."

116.    Likewise, each Registration Statement contained a form Prospectus Supplement with identical untrue statements and omissions regarding the Underwriting Standards for the pool of loans. Each Registration Statement falsely represented, as detailed above, that "[t]he Mortgage Loans were generally originated in conformity with the underwriting standards described in the prospectus under the heading "The Sponsor's Mortgage Loan Programs – Mortgage Loan Underwriting – Wells Fargo Bank Underwriting" (the "Underwriting Standards")."

117.    Each Prospectus Supplement contained identical, or substantially similar, language.  As summarized by page number in the Table of False Statements below, each Prospectus Supplement contained similar untrue statements of material fact, or omissions regarding: (1) the underwriting standards of Wells Fargo Bank; (2) the underwriting standards of additional originators; (3) the loan-to-value ratios and appraisals of the properties; and (4) the ratings of the Certificates.

| Table of Untrue Statements | | | | |
|---|---|---|---|---|
| | **(1) Well Fargo Bank's Underwriting Standards** | **(2) Additional Originator's Underwriting Standards** | **(3) LTV Ratios And Appraisals** | **(4) Ratings Of The Certificates** |
| Wells Fargo Mortgage Backed Securities 2006-AR1 Trust | S-42 | | S-41 | S-5 |
| Wells Fargo Mortgage Backed Securities 2006-2 Trust | S-55-56 | | S-54-55 | S-5-7 |
| Wells Fargo Mortgage Backed Securities 2006-1 Trust | S-36 | | S-35-36 | S-4 |
| Wells Fargo Mortgage Backed Securities 2006-3 Trust | S-41 | S-39 | S-40-41 | S-4 |
| Wells Fargo Mortgage Backed Securities 2006-AR2 Trust | S-45 | | S-43-44 | S-5 |
| Wells Fargo Mortgage Backed Securities 2006-AR4 Trust | S-43 | | S-42-43 | S-6 |
| Wells Fargo Mortgage Backed Securities 2006-AR5 Trust | S-43 | | S-42-43 | S-6 |
| Wells Fargo Mortgage Backed Securities 2006-4 Trust | S-52 | S-49 | S-50-51 | S-6-7 |
| Wells Fargo Mortgage Backed Securities 2006-AR6 Trust | S-47 | | S-45-46 | S-6 |
| Wells Fargo Mortgage Backed Securities 2006-6 Trust | S-52-53 | | S-51-52 | S-6-7 |
| Wells Fargo Mortgage Backed Securities 2006-AR8 Trust | S-44 | | S-42-43 | S-6 |
| Wells Fargo Mortgage Backed Securities 2006-7 Trust | S-47 | | S-45-46 | S-5 |
| Wells Fargo Mortgage Backed Securities 2006-AR10 Trust | S-45 | | S-44-45 | S-6 |
| Wells Fargo Mortgage Backed Securities 2006-AR11 Trust | S-43 | | S-41-42 | S-5-6 |
| Wells Fargo Mortgage Backed Securities 2006-10 Trust | S-51-52 | | S-50-51 | S-6-7 |
| Wells Fargo Mortgage Backed Securities 2006-AR12 Trust | S-43-44 | | S-42-43 | S-6 |
| Wells Fargo Mortgage Backed Securities 2006-AR16 Trust | S-40-41 | | S-39-40 | S-6 |

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF §§ 11, 12(a)(2) AND 15 OF THE SECURITIES ACT OF 1933

| Table of Untrue Statements | | | | |
|---|---|---|---|---|
| | **(1) Well Fargo Bank's Underwriting Standards** | **(2) Additional Originator's Underwriting Standards** | **(3) LTV Ratios And Appraisals** | **(4) Ratings Of The Certificates** |
| Wells Fargo Mortgage Backed Securities 2006-AR17 Trust | S-42 | | S-39-40 | S-6 |
| Wells Fargo Mortgage Backed Securities 2006-AR14 Trust | S-50-51 | | S-49-50 | S-6 |
| Wells Fargo Mortgage Backed Securities 2006-AR19 Trust | S-47 | | S-45-46 | S-6-7 |
| Wells Fargo Mortgage Backed Securities 2006-18 Trust | S-37-38 | | S-36-37 | S-5 |
| Wells Fargo Mortgage Backed Securities 2006-20 Trust | S-36 | | S-35-36 | S-5 |
| Wells Fargo Alternative Loan 2007-PA1 Trust | S-46-47 | | S-45-46 | S-6-7 |
| Wells Fargo Mortgage Backed Securities 2007-10 Trust | S-65-66 | S-62, 65 | S-63-64 | S-6-9 |
| Wells Fargo Mortgage Backed Securities 2007-11 Trust | S-57-58 | | S-56-57 | S-6-11 |
| Wells Fargo Mortgage Backed Securities 2007-13 Trust | S-43 | S-43 | S-41-42 | S-6 |
| Wells Fargo Mortgage Backed Securities 2007-AR4 Trust | S-41 | | S-40-41 | S-6 |

## IX.   THE PERFORMANCE AND VALUE OF THE CERTIFICATES

118.   The ratings on virtually all of the Certificates within each of the Issuing Trusts have since been downgraded.  As reflected in the chart below, which reflects the Trusts in which the Plaintiffs purchased interests, virtually all of the Certificates that were originally rated "AAA" have been downgraded below investment grade.

| NEW ORLEANS EMPLOYEES' RETIREMENT SYSTEM | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Tranche | Initial Rating | | | First Downgrade | | | Current Rating | | |
| | Moody's | S&P | Fitch | Moody's | S&P | Fitch | Moody's | S&P | Fitch |
| WFMBS 2006-AR2 2A5 | | AAA | AAA | | 07/01/09 | 09/10/09 | | BB | CCC |
| WFMBS 2006-3 A1 | Aaa | | AAA | 12/16/08 | | 09/10/09 | B2 | | BB |
| WFMBS 2006-AR8 3A2 | | AAA | AAA | | 07/01/09 | 09/10/09 | | BB | B |

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF §§ 11, 12(a)(2) AND 15 OF THE SECURITIES ACT OF 1933

| Tranche | Moody's | S&P | Fitch | Moody's | S&P | Fitch | Moody's | S&P | Fitch |
|---|---|---|---|---|---|---|---|---|---|
| WFMBS 2006-AR10 5A1 | | AAA | AAA | | 07/01/09 | 09/10/09 | | CCC | CCC |
| WFMBS 2006-AR10 5A6 | | AAA | AAA | | 07/01/09 | 09/10/09 | | CCC | CCC |
| WFMBS 2006-6 1A3 | Aaa | | AAA | 12/16/08 | | 09/10/09 | B3 | | B |
| WFMBS 2006-AR11 A6 | | AAA | AAA | | 07/01/09 | 09/10/09 | | BB | B |
| WFMBS 2006-AR17 A1 | | AAA | AAA | | 06/22/09 | 09/10/09 | | CCC | CC |

### GOVERNMENT OF GUAM RETIREMENT FUND

| Tranche | Initial Rating | | | First Downgrade | | | Current Rating | | |
|---|---|---|---|---|---|---|---|---|---|
| | Moody's | S&P | Fitch | Moody's | S&P | Fitch | Moody's | S&P | Fitch |
| WFMBS 2006-AR1 2A5 | Aaa | AAA | | 11/24/08 | 02/22/10 | | B3 | AA | |
| WFMBS 2006-AR17 A1 | | AAA | AAA | | 06/22/09 | 09/10/09 | | CCC | CC |
| WFMBS 2006-AR10 5A6 | | AAA | AAA | | 07/01/09 | 09/10/09 | | CCC | CCC |
| WFMBS 2006-6 1A3 | Aaa | | AAA | 12/16/08 | | 09/10/09 | B3 | | B |
| WFMBS 2006-3 A1 | Aaa | | AAA | 12/16/08 | | 09/10/09 | B2 | | BB |
| WFMBS 2006-AR2 2A5 | | AAA | AAA | | 07/01/09 | 09/10/09 | | BB | CCC |

### LOUISIANA SHERIFFS' PENSION AND RELIEF FUND

| Tranche | Initial Rating | | | First Downgrade | | | Current Rating | | |
|---|---|---|---|---|---|---|---|---|---|
| | Moody's | S&P | Fitch | Moody's | S&P | Fitch | Moody's | S&P | Fitch |
| WFMBS 2006-AR2 2A3 | | AAA | AAA | | 07/01/09 | 09/10/09 | | A | BB |
| WFMBS 2006-1 A3 | Aaa | | AAA | 04/23/09 | | 09/10/09 | B2 | | BBB |
| WFMBS 2006-AR6 7A1 | Aaa | | AAA | 04/28/09 | | 09/10/09 | B1 | | AA |
| WFMBS 2006-AR10 5A3 | | AAA | AAA | | 07/01/09 | 09/10/09 | | CCC | CCC |
| WFMBS 2006-2 3A1 | Aaa | | AAA | 12/16/08 | | 09/10/09 | B1 | | BBB |
| WFMBS 2006-AR4 2A1 | | AAA | AAA | | 8/7/2009 | 09/10/09 | | A- | BB |
| WFMBS 2006-AR4 1A1 | | AAA | AAA | | 8/7/2009 | 09/10/09 | | BBB- | B |
| WFMBS 2006-AR10 5A1 | | AAA | AAA | | 07/01/09 | 09/10/09 | | CCC | CCC |
| WFMBS 2006-AR14 2A4 | Aa1 | | AAA | 11/24/08 | | 04/06/09 | C | | C |
| WFMBS 2006-AR5 2A1 | Aaa | | AAA | 11/24/08 | | 09/10/09 | Caa2 | | CCC |
| WFMBS 2006-AR12 1A2 | Aa1 | | AAA | 11/24/08 | | 09/10/09 | C | | C |
| WFMBS 2006-4 2A3 | Aa1 | | AAA | 12/16/08 | | 09/10/09 | Ca | | CCC |
| WFMBS 2006-4 1A8 | Aaa | AAA | AAA | 12/16/08 | 07/01/09 | 09/10/09 | B1 | AA- | BBB |

### ALAMEDA COUNTY EMPLOYEES' RETIREMENT ASSOCIATION

| Tranche | Initial Rating | | | First Downgrade | | | Current Rating | | |
|---|---|---|---|---|---|---|---|---|---|
| | Moody's | S&P | Fitch | Moody's | S&P | Fitch | Moody's | S&P | Fitch |
| WFMBS 2007-11 A36 | Aaa | | AAA | 12/16/08 | | 04/08/09 | Caa1 | | CCC |
| WFMBS 2007-11 A88 | Aaa | | AAA | 12/16/08 | | 04/08/09 | B2 | | B |

### VERMONT PENSION INVESTMENT COMMITTEE

| Tranche | Initial Rating | | | First Downgrade | | | Current Rating | | |
|---|---|---|---|---|---|---|---|---|---|
| | Moody's | S&P | Fitch | Moody's | S&P | Fitch | Moody's | S&P | Fitch |
| WFMBS 2006-4 1A8 | Aaa | AAA | AAA | 12/16/08 | 07/01/09 | 09/10/09 | B1 | AA- | BBB |

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF §§ 11, 12(a)(2) AND 15 OF THE SECURITIES ACT OF 1933

| WFMBS 2006-4 2A3 | Aa1 | | AAA | 12/16/08 | | 09/10/09 | Ca | | CCC |
| WFMBS 2006-1 A3 | Aaa | | AAA | 04/23/09 | | 09/10/09 | B2 | | BBB |
| WFMBS 2006-AR1 2A2 | Aaa | AAA | | 11/24/08 | 02/22/10 | | B2 | AA | |
| WFMBS 2006-2 3A1 | Aaa | | AAA | 12/16/08 | | 09/10/09 | B1 | | BBB |
| WFMBS 2006-AR4 1A1 | | AAA | AAA | | 08/07/09 | 09/10/09 | | BBB- | B |
| WFMBS 2006-AR4 2A1 | | AAA | AAA | | 08/07/09 | 09/10/09 | | A- | BB |
| WFMBS 2006-AR4 2A6 | | AAA | AAA | | 08/07/09 | 09/10/09 | | B- | CCC |
| WFMBS 2006-AR6 7A1 | Aaa | | AAA | 04/28/09 | | 09/10/09 | B1 | | AA |
| WFMBS 2006-AR10 5A1 | | AAA | AAA | | 07/01/09 | 09/10/09 | | CCC | CCC |
| WFMBS 2006-AR11 A7 | | AAA | AAA | | 07/01/09 | 09/10/09 | | CCC | CC |
| WFMBS 2006-AR12 1A2 | Aa1 | | AAA | 11/24/08 | | 09/10/09 | C | | C |
| WFMBS 2006-AR12 2A2 | Aa1 | | AAA | 11/24/08 | | 09/10/09 | C | | CCC |
| WFMBS 2007-11 A36 | Aaa | | AAA | 12/16/08 | | 09/10/09 | Caa1 | | CCC |
| WFMBS 2007-11 A88 | Aaa | | AAA | 12/16/08 | | 09/10/09 | B2 | | B |
| WFMBS 2007-11 A96 | Aaa | | AAA | 12/16/08 | | 09/10/09 | B3 | | CCC |
| WFMBS 2006-AR19 A1 | Aaa | AAA | AAA | 04/28/09 | 09/15/09 | 09/10/09 | Caa1 | CCC | B |
| WFMBS 2006-7 2A1 | Aaa | | AAA | 12/16/08 | | 09/10/09 | Caa1 | | CCC |

| SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Tranche | Initial Rating | | | First Downgrade | | | Current Rating | | |
| | Moody's | S&P | Fitch | Moody's | S&P | Fitch | Moody's | S&P | Fitch |
| WFMBS 2007-13 A9 | | AAA | AAA | | 02/23/09 | 09/10/09 | | CCC | CCC |

| PUBLIC EMPLOYEES' RETIREMENT SYSTEM OF MISSISSIPPI | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Tranche | Initial Rating | | | First Downgrade | | | Current Rating | | |
| | Moody's | S&P | Fitch | Moody's | S&P | Fitch | Moody's | S&P | Fitch |
| WFMBS 2006-AR16 A1 | Aaa | | AAA | 11/24/08 | | 09/10/09 | Caa2 | | CCC |
| WFMBS 2007-AR4 A1 | | AAA | AAA | | 02/23/09 | 04/08/09 | | CCC | C |
| WFMBS 2007-10 1A1 | Aaa | | AAA | 12/16/08 | | 09/10/09 | B2 | | CCC |
| WFMBS 2006-3 A1 | Aaa | | AAA | 12/16/08 | | 09/10/09 | B2 | | BB |
| WFMBS 2006-6 1A3 | Aaa | | AAA | 12/16/08 | | 09/10/09 | B3 | | B |
| WFMBS 2006-AR10 5A1 | | AAA | AAA | | 07/01/09 | 09/10/09 | | CCC | CCC |
| WFMBS 2006-AR10 5A6 | | AAA | AAA | | 07/01/09 | 09/10/09 | | CCC | CCC |
| WFMBS 2006-AR11 A6 | | AAA | AAA | | 07/01/09 | 09/10/09 | | BB | B |
| WFMBS 2006-AR17 A1 | | AAA | AAA | | 06/22/09 | 09/10/09 | | CCC | CC |
| WFMBS 2006-AR2 2A5 | | AAA | AAA | | 07/01/09 | 09/10/09 | | BB | CCC |

| POLICEMEN'S ANNUITY & BENEFIT FUND OF THE CITY OF CHICAGO | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Tranche | Initial Rating | | | First Downgrade | | | Current Rating | | |
| | Moody's | S&P | Fitch | Moody's | S&P | Fitch | Moody's | S&P | Fitch |
| WFMBS 2006-10 A19 | Aaa | | AAA | 12/16/08 | | 09/10/09 | B3 | | BBB |
| WFMBS 2006-18 B1 | | | AA | | | 08/05/08 | | | C |
| WFMBS 2006-20 A1 | Aaa | | AAA | 04/23/09 | | 09/10/09 | Ba3 | | AAA |

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF §§ 11, 12(a)(2) AND 15 OF THE SECURITIES ACT OF 1933

| | Moody's | S&P | Fitch | Moody's | S&P | Fitch | Moody's | S&P | Fitch |
|---|---|---|---|---|---|---|---|---|---|
| WFMBS 2007-10 1A1 | Aaa | | AAA | 12/16/08 | | 09/10/09 | B2 | | CCC |
| WFMBS 2007-AR4 A1 | | AAA | AAA | | 02/23/09 | 04/08/09 | | CCC | C |

| PLUMBERS & STEAMFITTERS LOCAL 60 PENSION PLAN | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Tranche | Initial Rating | | | First Downgrade | | | Current Rating | | |
| | Moody's | S&P | Fitch | Moody's | S&P | Fitch | Moody's | S&P | Fitch |
| WFALT 2007-PA1 A4 | Aaa | | AAA | 08/05/08 | | 12/16/08 | Caa2 | | C |

±indicates negative watch
Source: Bloomberg

X.   CLASS ACTION ALLEGATIONS

119.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), individually and on behalf of themselves and all persons or entities (the "Class") who purchased or otherwise acquired mortgage pass-through certificates pursuant or traceable to Wells Fargo Asset Securities Corporation's July 29, 2005 Registration Statement, October 20, 2005 Registration Statement, or September 27, 2006 Registration Statement, and the accompanying prospectuses and prospectus supplements.

120.   This action is properly maintainable as a class action for the following reasons:

a)   The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through discovery, Plaintiffs believe that there are thousands of members of the proposed Class, who may be identified from records maintained by the Defendants and/or may be notified of this action using the form of notice customarily used in securities class actions.

b)   Plaintiffs are committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature.  Plaintiffs' claims are typical of the claims of the other members of the Class and Plaintiffs have the same interests as the other members of the Class.  Accordingly, Plaintiffs are adequately representative of the Class and will fairly and adequately protect the interests of the Class.

c)   The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the

Class, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

d)  A class action is superior to all other methods for a fair and efficient adjudication of this controversy.  There will be no difficulty in the management of this action as a class action.  Furthermore, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.

121.    There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual class member.  The common questions include, *inter alia*, the following:

a)  Whether Defendants violated the Securities Act;

b)  Whether statements made by Defendants to the investing public in the Registration Statements, Prospectuses and Prospectus Supplements omitted and misrepresented material facts about the mortgages underlying the Issuing Trusts; and

c)  The extent and proper measure of the damages sustained by the members of the Class.

<u>FIRST CAUSE OF ACTION</u>

<u>For Violation of Section 11 of the Securities Act</u>
(Against The Individual Defendants, the Depositor, and the Underwriters)

122.    Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein, to the extent that such allegations do not sound in fraud.

123.    This Cause of Action is brought pursuant to Section 11 of the Securities Act, on behalf of Plaintiffs and the Class, against the Individual Defendants, the Depositor and the Underwriters.  This Cause of Action is predicated upon Defendants' strict liability for making false and misleading statements in the Offering Documents.

124. The Registration Statements for the Certificate offerings were materially misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

125. The Individual Defendants, the Depositor and the Underwriters are strictly liable to Plaintiffs and the Class for making the misstatements and omissions in issuing the Certificates.

126. The Individual Defendants each signed the Registration Statements.

127. The Underwriters each acted as an underwriter in the sale of Certificates issued by the Issuing Trusts, directly and indirectly participated in the distribution of the Certificates, and directly and indirectly participated in drafting and disseminating the Offering Documents for the Certificates. The Underwriters were underwriters for the respective Issuing Trusts, as reflected in the chart, *infra* at ¶43.

128. The Individual Defendants, the Depositor and the Underwriters owed to the Plaintiffs and other Class members the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

129. The Individual Defendants, the Depositor and the Underwriters knew, or in the exercise of reasonable care should have known, of the material misstatements and omissions contained in or omitted from the Offering Documents as set forth herein.

130. Each of the Individual Defendants, the Depositor and the Underwriters failed to possess a reasonable basis for believing, and failed to make a reasonable investigation to ensure, that statements contained in the Offering Documents were true and/or that there was no omission of material facts necessary to make the statements contained therein not misleading.

131. The Individual Defendants, the Depositor and the Underwriters issued and disseminated, caused to be issued or disseminated, and participated in the issuance and dissemination of material statements to the investing public which were contained in the Prospectuses, which made false and misleading statements and/or misrepresented or failed to disclose material facts, as set forth above.

132.    By reason of the conduct alleged herein, each of the Individual Defendants, the Depositor and the Underwriters violated Section 11 of the Securities Act, and is liable to Plaintiffs and the Class.

133.    Plaintiffs and other Class members acquired Certificates pursuant and/or traceable to the Registration Statements.  At the time Plaintiffs and Class members obtained their Certificates, they did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

134.    Plaintiffs and other Class members have sustained damages as a result of the wrongful conduct alleged and the violations of the Individual Defendants, the Depositor and the Underwriters.

135.    By virtue of the foregoing, Plaintiffs and other Class members are entitled to damages, jointly and severally from each of the Individual Defendants, the Depositor and the Underwriters, as set forth in Section 11 of the Securities Act.

136.    This action is brought within one year after the discovery of the untrue statements and omissions contained in the Offering Documents and within three years of the Certificates being offered to the public.  Despite the exercise of reasonable diligence, Plaintiffs could not have reasonably discovered the untrue statements and omissions in the Offering Documents at an earlier time.

<u>SECOND CAUSE OF ACTION</u>

<u>For Violation of Section 12(a)(2) of the Securities Act</u>
(Against the Depositor and Goldman Sachs, Deutsche Bank,
UBS, Credit Suisse and RBS)

137.    Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

138.    This Cause of Action is brought pursuant to Section 12(a)(2) of the Securities Act, on behalf of Plaintiffs and the Class, against the Depositor and the above-named Underwriters.

139.    The Depositor promoted and sold Certificates pursuant to the defective Prospectuses for its own financial gain.  The Prospectuses contained untrue statements of material fact, omitted to state facts necessary to make statements not misleading, and concealed and failed to disclose material facts.

140. By means of the Prospectuses, the Depositor and the Underwriters named herein sold the Certificates to Plaintiffs and the Class in return for proceeds in excess of $36 billion. The Depositor's actions of solicitation consisted primarily of the preparation and dissemination of the Prospectuses.

141. The Depositor and the Underwriters named herein owed to Plaintiffs and the other Class members who purchased Certificates pursuant to the Prospectuses a duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses, to ensure that such statements were true and that there was no omission of material fact necessary to make the statements contained therein not misleading. The Depositor and the Underwriters named herein knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the Prospectuses, as set forth herein.

142. Plaintiffs and other Class members purchased or otherwise acquired Certificates pursuant to the defective Prospectuses. Plaintiffs and other Class members purchased their Certificates directly from the Underwriters named herein, as reflected in ¶¶15, 19. Plaintiffs did not know, and in the exercise of reasonable diligence could not have known, of the misrepresentations and omissions contained in the Prospectuses.

143. By reason of the conduct alleged herein, the Depositor and the Underwriters named herein violated Section 12(a)(2) of the Securities Act, and are liable to Plaintiffs and other Class members who purchased Certificates pursuant to the Prospectuses.

144. Plaintiffs and other Class members were damaged by the Depositor and the Underwriters' wrongful conduct. Those Class members who have retained their Certificates have the right to rescind and recover the consideration paid for their Certificates, as set forth in Section 12(a)(2) of the Securities Act. Those Class members who have sold their Certificates are entitled to rescissory damages, as set forth in Section 12(a)(2) of the Securities Act.

145. This action is brought within one year after the discovery of the untrue statements and omissions contained in the Prospectuses and within three years of when the Certificates were sold to the public. Despite the exercise of reasonable diligence, Plaintiffs could not have reasonably discovered the untrue statements and omissions in the Offering Documents at an earlier time.

1

2

3

### THIRD CAUSE OF ACTION

For Violation of Section 15 of the Securities Act
(Against the Individual Defendants and Wells Fargo Bank)

4      146.   Plaintiffs repeat and reallege each and every allegation above as if set forth in full

5   herein.

6      147.   This Cause of Action is brought against the Individual Defendants and Wells Fargo

7   Bank as controlling persons, pursuant to Section 15 of the Securities Act.   Each of the Individual

8   Defendants and Wells Fargo Bank, by virtue of its control, ownership, offices, directorship, and

9   specific acts, was at the time of the wrongs alleged herein a controlling person of the Depositor within

10  the meaning of Section 15 of the Securities Act.   Each of the Individual Defendants and Wells Fargo

11  Bank had the power and influence, and exercised that power and influence, to cause the Depositor to

12  engage in violations of the Securities Act, as described herein.   The Individual Defendants' and Wells

13  Fargo Bank's control, ownership and position made them privy to, and provided them with actual

14  knowledge of, the material facts concealed from Plaintiffs and other Class members.

15     148.   By virtue of the wrongful conduct alleged herein, the Individual Defendants and Wells

16  Fargo Bank are liable to Plaintiffs and other Class members for their sustained damages.

17   RELIEF REQUESTED

18     **WHEREFORE,** Plaintiffs pray for relief and judgment, as follows:

19     (a)   Declaring this action properly maintainable as a class action and certifying Plaintiffs as

20  Class representatives;

21     (b)   Awarding compensatory and/or rescissionary damages in favor of Plaintiffs and other

22  Class members against all Defendants, jointly and severally, for all damages sustained as a result of

23  Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

24     (c)   Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this

25  action, including counsel fees and expert fees; and

26     (d)   Such other relief as the Court may deem just and proper.

27

28

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims so triable.

Dated: May 28, 2010

BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP


_/s/ David R. Stickney_
DAVID R. STICKNEY

DAVID R. STICKNEY (Bar No. 188574)
TIMOTHY A. DeLANGE (Bar No. 190768)
MATTHEW P. JUBENVILLE (Bar No. 228464)
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:    (858) 793-0070
Fax:    (858) 793-0323
davids@blbglaw.com
timothyd@blbglaw.com
matthewj@blbglaw.com

_Counsel for Lead Plaintiffs and the Class and
Plaintiffs Public Employees' Retirement System of
Mississippi and Vermont Pension Investment
Committee_

KLAUSNER & KAUFMAN, P.A.
ROBERT D. KLAUSNER
STUART A. KAUFMAN
10059 Northwest 1st Court
Plantation, FL 33324
Tel:    (954) 916-1202
Fax:    (954) 916-1232

_Additional Counsel for Lead Plaintiff Louisiana
Sheriffs' Pension and Relief Fund_

COHEN MILSTEIN SELLERS & TOLL PLLC
CAROL V. GILDEN
190 South LaSalle Street, Suite 1705
Chicago, Illinois 60603
Tel:    (312) 357-0370
Fax:    (312) 357-0369
        -and-
STEVEN J. TOLL
1100 New York Avenue, NW
Suite 500 West
Washington, DC 20005
Tel:    (202) 408-4600
Fax:    (202) 408-4699

*Counsel for Plaintiff the Policemen's Annuity and Benefit Fund of the City of Chicago*

CHIMICLES & TIKELLIS LLP
KIMBERLY DONALDSON SMITH
361 West Lancaster Avenue
Haverford, PA  19041
Tel:    (610) 642-8500
Fax:    (610) 649-3633

*Counsel for Plaintiff Southeastern Pennsylvania Transportation Authority*

LABATON SUCHAROW LLP
CHRISTOPHER J. KELLER
140 Broadway
New York, New York 10005
Tel:    (212) 907-0700
Fax:    (212) 818-0477

*Counsel for Plaintiff Plumbers & Steamfitters Local 60 Pension Plan*

# EXHIBIT 1

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, William E. Griffin, on behalf of the Vermont Pension Investment Committee ("Vermont") , hereby certify, as to the claims asserted under the federal securities laws, that:

1.   I am Legal Counsel for Vermont. I have reviewed the Amended Consolidated Class Action Complaint in this matter and authorized its filing.

2.   Vermont did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3.   Vermont is willing to serve as a lead plaintiff and representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary. Vermont fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class.

4.   Vermont's transactions in the Wells Fargo Mortgage-Backed Securities that are the subject of this action are set forth in the chart attached hereto.

5.   Vermont has sought to serve and was appointed as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

*In re Societe Generale Securities Litigation*, No. 08-cv-02495 (S.D.N.Y.)

6.   Vermont has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for lead plaintiff or was not appointed lead plaintiff:

*Maine State Retirement System v. Countrywide Financial Corporation et al,*
No. 10-cv-00302 (C.D. Cal.)

7.      Vermont will not accept any payment for serving as a representative party on behalf of the Class beyond Vermont's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.   Executed this 26th day of May, 2010.

William E. Griffin
*Legal Counsel to the Vermont Pension Investment Committee*

**Vermont Pension Investment Committee**
Transactions in Wells Fargo Mortgage-Backed Securities

**Wells Fargo Mortgage-Backed Securities 2006-4 1A8**

Cusip # 94983BAH2

| Transaction | Date | Face Amount | Par Value |
|---|---|---|---|
| Purchase | 4/10/2006 | 125,000.00 | 99.7188 |

**Wells Fargo Mortgage-Backed Securities 2006-4 2A3**

Cusip # 94983BAU3

| Transaction | Date | Face Amount | Par Value |
|---|---|---|---|
| Purchase | 1/18/2007 | 715,597.34 | 98.2344 |

**Wells Fargo Mortgage-Backed Securities 2006-1 A3**

Cusip # 94983FAC4

| Transaction | Date | Face Amount | Par Value |
|---|---|---|---|
| Purchase | 2/9/2006 | 250,000.00 | 97.7188 |
| Purchase | 2/13/2006 | 125,000.00 | 97.5938 |
| Purchase | 7/27/2006 | 43,307.27 | 96.3125 |
| Sale | 8/7/2008 | (303,404.24) | 94.4844 |

**Wells Fargo Mortgage-Backed Securities 2006-AR1 2A2**

Cusip # 94983JAD4

| Transaction | Date | Face Amount | Par Value |
|---|---|---|---|
| Purchase | 11/6/2009 | 1,206,541.35 | 91.6250 |

**Wells Fargo Mortgage-Backed Securities  2006-2 3A1**

Cusip # 94983LBB2

| Transaction | Date | Face Amount | Par Value |
|---|---|---|---|
| Purchase | 3/24/2006 | 474,879.50 | 98.3047 |
| Purchase | 7/27/2006 | 83,778.95 | 96.8711 |

**Wells Fargo Mortgage-Backed Securities 2006-AR4 1A1**

Cusip # 94983PAA6

| Transaction | Date | Face Amount | Par Value |
|---|---|---|---|
| Purchase | 2/22/2006 | 625,000.00 | 100.1875 |
| Purchase | 7/27/2006 | 107,365.35 | 98.9922 |
| Purchase | 12/19/2008 | 882,672.57 | 61.6250 |

**Wells Fargo Mortgage-Backed Securities 2006-AR4 2A1**

Cusip # 94983PAC2

| Transaction | Date | Face Amount | Par Value |
|---|---|---|---|
| Purchase | 3/16/2006 | 935,000.00 | 99.8281 |
| Purchase | 7/27/2006 | 159,810.01 | 98.4531 |
| Purchase | 12/12/2007 | 2,253,730.75 | 96.6250 |
| Sale | 12/14/2007 | (1,170,285.88) | 97.5625 |
| Sale | 7/30/2008 | (1,864,773.10) | 75.0000 |

003076

**Wells Fargo Mortgage-Backed Securities 2006-AR4 2A6**

Cusip # 94983PAH1

| Transaction | Date | Face Amount | Par Value |
|---|---|---|---|
| Purchase | 3/5/2008 | 3,567,841.16 | 58.0000 |

**Wells Fargo Mortgage-Backed Securities 2006-AR6 7A1**

Cusip # 94983TAN0

| Transaction | Date | Face Amount | Par Value |
|---|---|---|---|
| Purchase | 1/31/2007 | 3,346,502.89 | 97.7930 |
| Sale | 3/28/2008 | (824,389.83) | 90.0000 |
| Sale | 7/29/2008 | (2,263,603.13) | 81.0000 |

**Wells Fargo Mortgage-Backed Securities 2006-AR10 5A1**

Cusip # 94983YAK5

| Transaction | Date | Face Amount | Par Value |
|---|---|---|---|
| Purchase | 7/27/2006 | 1,841,415.50 | 99.1719 |
| Sale | 3/28/2008 | (509,491.36) | 94.5000 |
| Sale | 7/29/2008 | (899,541.47) | 70.0000 |
| Purchase | 12/19/2008 | 297,919.57 | 53.5000 |

**Wells Fargo Mortgage-Backed Securities 2006-AR11 A7**

Cusip # 94984CAG1

| Transaction | Date | Face Amount | Par Value |
|---|---|---|---|
| Purchase | 10/25/2006 | 2,110,254.21 | 98.8047 |
| Sale | 7/30/2008 | (1,532,378.26) | 60.0000 |
| Purchase | 7/30/2008 | 152,528.39 | 60.1875 |
| Sale | 10/28/2009 | (123,230.11) | 32.0000 |

**Wells Fargo Mortgage-Backed Securities 2006-AR12 1A2**

Cusip # 94984GAB3

| Transaction | Date | Face Amount | Par Value |
|---|---|---|---|
| Purchase | 10/24/2006 | 1,160,535.28 | 100.1406 |

**Wells Fargo Mortgage-Backed Securities 2006-AR12 2A2**

Cusip # 94984GAE7

| Transaction | Date | Face Amount | Par Value |
|---|---|---|---|
| Purchase | 8/25/2006 | 1,683,832.49 | 100.2969 |

**Wells Fargo Mortgage-Backed Securities 2007-11 A36**

Cusip # 94985WBM2

| Transaction | Date | Face Amount | Par Value |
|---|---|---|---|
| Purchase | 8/21/2007 | 1,150,000.00 | 97.2422 |
| Purchase | 8/22/2007 | 770,000.00 | 97.1602 |
| Purchase | 10/14/2009 | 390,000.00 | 81.0625 |
| Purchase | 10/2/2009 | 135,000.00 | 81.2725 |

**Wells Fargo Mortgage-Backed Securities 2007-11 A88**

Cusip # 94985WDR9

| Transaction | Date | Face Amount | Par Value |
|---|---|---|---|
| Purchase | 3/7/2008 | 981,803.12 | 91.5000 |
| Purchase | 10/19/2009 | 655,370.45 | 84.8125 |

**Wells Fargo Mortgage-Backed Securities 2007-11 A96**

Cusip # 94985WDZ1

| Transaction | Date | Face Amount | Par Value |
|---|---|---|---|
| Purchase | 8/11/2009 | 395,103.17 | 85.1250 |

**Wells Fargo Mortgage-Backed Securities 2006-AR19 A1**

Cusip # 949789AA9

| Transaction | Date | Face Amount | Par Value |
|---|---|---|---|
| Purchase | 11/21/2006 | 4,600,000.00 | 99.5062 |
| Sale | 3/28/2008 | (812,199.48) | 90.0000 |
| Sale | 7/29/2008 | (2,613,108.77) | 75.1250 |

**Wells Fargo Mortgage-Backed Securities 2006-7 2A1**

Cusip # 94982XAD4

| Transaction | Date | Face Amount | Par Value |
|---|---|---|---|
| Purchase | 5/10/2006 | 2,987,247.00 | 98.0938 |
| Purchase | 5/12/2006 | 1,787,369.46 | 97.7656 |
| Purchase | 7/27/2006 | 34,819.94 | 98.0313 |
| Sale | 3/28/2008 | (997,546.81) | 96.0000 |
| Sale | 8/28/2008 | (2,268,673.37) | 77.5000 |
| Sale | 9/25/2008 | (563.63) | 100.0000 |

# EXHIBIT 2

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, George W. Neville, on behalf of the Public Employees' Retirement System of Mississippi ("MPERS"), hereby certify, as to the claims asserted under the federal securities laws, that:

1.   I am a Special Assistant Attorney General in the Office of the Attorney General of the State of Mississippi. I have reviewed the Amended Consolidated Class Action Complaint and authorized its filing.

2.   MPERS did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3.   MPERS is willing to serve as a lead plaintiff and representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary. MPERS fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class.

4.   MPERS' transactions in the Wells Fargo Mortgage-Backed Securities that are the subject of this action are set forth in the chart attached hereto.

5.   MPERS has sought to serve and was appointed as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

*In re Semtech Corp. Securities Litigation,* No. 07-cv-7114 (C.D. Cal.)
*In re Ambac Financial Group, Inc. Securities Litigation,* No. 08-cv-411 (S.D.N.Y)
*In re Schering-Plough Corporation/Enhance Securities Litigation,* No. 08-cv-397 (D.N.J.)
*In re Maxim Integrated Products Inc. Securities Litigation,* No. 08-cv-832 (N.D. Cal.)
*Iron Workers Local No.25 Pension Fund, et al. v. Credit-Based Asset Servicing and Securitization LLC, et al.,* No. 08-cv-10841 (S.D.N.Y.)
*Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust, et al. v. J.P. Morgan Acceptance Corporation I, et al.,* No. 08-cv-1713 (E.D.N.Y.)
*In re Satyam Computer Services, Ltd., Securities Litigation,* No. 09-md-2027 (S.D.N.Y.)
*In re Royal Bank of Scotland Group plc Securities Litigation,* No. 09-cv-300 (S.D.N.Y.)
*Public Employees' Retirement System of Mississippi v. Goldman Sachs Group, Inc., et al.,* No. 09-cv-1110 (S.D.N.Y.)
*Pension Trust Fund for Operating Engineers, et al. v. Structured Asset Mortgage Investments II, Inc., et al.,* No. 09-cv-6172 (S.D.N.Y.)
*Hill v. State Street Corporation et al.,* No 09-cv-12146 (D. Mass.)

6.    MPERS has sought to serve as a representative party on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification:

*In re Morgan Stanley Mortgage Pass-Through Certificates Litigation*,
No. 09-cv-2137 (S.D.N.Y.)
*Public Employees' Retirement System of Mississippi v. Merrill Lynch & Co, Inc., et al.*,
No. 09-cv-1392 (S.D.N.Y.)
*In re IndyMac Mortgage-Backed Securities Litigation*, No. 09-cv-04583 (S.D.N.Y.)
*In re Lehman Brothers Security & ERISA Litigation*, No. 08-cv-06762 (S.D.N.Y.)


7.    MPERS has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for lead plaintiff or was not appointed lead plaintiff:

*Freudenberg v. E\*Trade Financial Corporation, et al.*, No. 07-cv-8538 (S.D.N.Y.)
*In re Wachovia Securities Litigation, et al.*, No. 08-cv-6171 (S.D.N.Y.)
*NECA-IBEW Health & Welfare Fund, et al. v. Goldman Sachs & Co., et al.*,
No. 08-cv-10783 (S.D.N.Y.)
*New Orleans Employees' Retirement System v. UBS AG, et al.*, No. 09-cv-893 (S.D.N.Y.)


8.    MPERS will not accept any payment for serving as a representative party on behalf of the Class beyond MPERS' pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _____ day of May, 2010.

George W. Neville
Special Assistant Attorney General
*Legal Counsel to the Public Employees' Retirement System of Mississippi*

Public Employees' Retirement System of Mississippi
Transactions in Wells Fargo Mortgage-Backed Securities

**Wells Fargo Mortgage-Backed Securities 2006-AR16**
Cusip # 94984NAA0

| Transaction | Date | Face Amount | Par Value |
|---|---|---|---|
| Purchase | 1/25/2007 | 3,675,000 | 99.95 |
| Purchase | 5/11/2007 | 1,410,000 | 100.12 |
| Sale | 5/14/2007 | (5,085,000) | 100.08 |

**Wells Fargo Mortgage Backed Securities 2007-AR4**
Cusip # 94986CAA2

| Transaction | Date | Face Amount | Par Value |
|---|---|---|---|
| Purchase | 8/9/2007 | 3,250,000 | 99.52 |
| Sale | 7/30/2008 | (3,250,000) | 78.00 |

**Wells Fargo Mortgage-Backed Securities 2007-10**
Cusip # 949837AA6

| Transaction | Date | Face Amount | Par Value |
|---|---|---|---|
| Purchase | 6/18/2008 | 2,925,000 | 94.73 |
| Sale | 4/22/2009 | (2,509,498) | 73.00 |

**Wells Fargo Mortgage Backed Securities 2006-3 Trust**
Cusip # 94983QAA4

| Transaction | Date | Face Amount | Par Value |
|---|---|---|---|
| Purchase | 5/24/2006 | 3,860,000 | - |
| Sale | 2/5/2009 | (2,477,964) | 78.25 |

**Wells Fargo Mortgage Backed Securities 2006-6 Trust**
Cusip # 94984AAC4

| Transaction | Date | Face Amount | Par Value |
|---|---|---|---|
| Purchase | 6/20/2006 | 3,310,000 | - |
| Sale | 2/5/2009 | (2,198,809) | 79.00 |

**Wells Fargo Mortgage Backed Securities 2006-AR10 Trust**
Cusip # 94983YAK5

| Transaction | Date | Face Amount | Par Value |
|---|---|---|---|
| Purchase | 7/28/2006 | 1,535,000 | 99.36 |
| Sale | 10/30/2006 | (1,535,000) | 100.04 |

**Wells Fargo Mortgage Backed Securities 2006-AR10 Trust**
Cusip # 94983YAQ2

| Transaction | Date | Face Amount | Par Value |
|---|---|---|---|
| Purchase | 10/30/2006 | 1,535,000 | 99.84 |

**Wells Fargo Mortgage Backed Securities 2006-AR11 Trust**
Cusip # 94984CAF3

| Transaction | Date | Face Amount | Par Value |
|---|---|---|---|
| Purchase | 7/27/2006 | 4,665,000 | 97.79 |
| Sale | 5/5/2009 | (4,665,000) | 54.25 |

**Wells Fargo Mortgage Backed Securities 2006-AR17 Trust**
Cusip # 94984LAA4

| Transaction | Date | Face Amount | Par Value |
|---|---|---|---|
| Purchase | 9/8/2006 | 7,205,000 | 99.21 |
| Sale | 5/14/2007 | (3,857,464) | 99.45 |
| Sale | 12/3/2009 | (1,001,265) | 72.00 |

**Wells Fargo Mortgage Backed Securities 2006-AR2 Trust**
Cusip # 94983KAG4

| Transaction | Date | Face Amount | Par Value |
|---|---|---|---|
| Purchase | 2/9/2006 | 3,460,000 | - |
| Purchase | 3/27/2006 | 2,500,000 | 98.92 |
| Purchase | 6/16/2006 | 1,245,000 | - |
| Sale | 9/8/2006 | (7,205,000) | 98.92 |

# EXHIBIT 3



## CERTIFICATION OF SECURITIES CLASS ACTION
## PURSUANT TO THE FEDERAL SECURITIES LAWS

I, John J. Gallagher, hereby certify that the following is true and correct to the best of my knowledge, information, and belief:

1.       I am the Executive Director of the Policemen's Annuity and Benefit Fund of the City of Chicago ("PABF Chicago").

2.       I have reviewed the Consolidated Amended Class Action Complaint (the "Complaint"), and authorize its filing in this action on behalf of PABF Chicago.

3.       PABF Chicago is willing to serve as a representative party on behalf of the Class (as defined in the Complaint), including providing testimony at deposition and trial, if necessary.

4.       During the Class Period (as defined in the Complaint), PABF Chicago purchased and/or sold the security that is the subject of the Complaint as set forth on the attached Schedule A.

5.       PABF Chicago did not engage in the foregoing transactions at the direction of counsel or in order to participate in any private action arising under the Securities Act of 1933 (the "Securities Act") or the Securities Exchange Act of 1934 (the "Exchange Act").

6.       During the three-year period preceding the date of my signing this Certification, PABF Chicago has served as a representative party on behalf of a class in the following private action(s) arising under the Securities Act or the Exchange Act:

*Eastwood Enterprises, LLC v. Farha, et al.*, 07-cv-01940-VMC-EAJ (M.D. Florida), Appointed Co-Lead Plaintiff
*In re Telik, Inc. Sec. Litig.*, 07-cv-04819-CM (S.D.N.Y.), Appointed Lead Plaintiff
*Boilermakers National Annuity Trust Fund v. WaMu Mortgage Pass-Through Certificates, et al.*, 09-cv-0037-MJP (W.D. Wash.), Appointed Lead Plaintiff
*Rubin v. MF Global, LTD.*, 08-cv-2233 (S.D. N.Y.), Appointed Co-Lead Plaintiff

7.       During the three-year period preceding the date of my signing this Certification, PABF Chicago sought to serve, but was not appointed, as a representative party on behalf of a class in the following private action(s) arising under the Securities Act or the Exchange Act:

*Manson v. Schering-Plough Corp., et al.*, 08-cv-00397-DMC-MF (D. N.J.)
*In re Connetics Corp. Sec. Litig.*, 07-cv-02940-SI (N.D. Cal.)
*Garden City Emplys. Ret. Sys. v. Psychiatric Solutions, Inc., et al.*, 09-cv-882-WJH (M.D. Tenn.)
*New Jersey Carpenters Health Fund v. Structured Asset Mortgage Inv., Inc., et al.*, 08-cv-8093-LTS (S.D.N.Y.)

I declare under penalty of perjury that the foregoing is true and correct.   Executed this 21ᵗʰ day of May, 2010.

John J. Gallagher, Jr.
Executive Director
*Policemen's Annuity and Benefit*
*Fund of the City of Chicago*

2

## SCHEDULE A

| Security Description | CUSIP | Transaction Date | Transaction Description | Price | Quantity | Transaction Amount | Aggregate Pay Downs | Net Loss (Gain) |
|---|---|---|---|---|---|---|---|---|
| WFMBS 2007 - 10 | 949837AA6 | 6/18/2008 | Buy | $ 0.9577 | 1,920,451.52 | $ 1,839,120.40 | | |
| WFMBS 2007 - 10 | 949837AA6 | 9/19/2008 | Sell | $ 0.7950 | 1,902,738.16 | $ 1,512,676.84 | $ 17,713.36 | $ 308,730.20 |
| WFMBS 2006 - 10 | 94984EAU6 | 3/3/2008 | Buy | $ 0.8603 | 2,259,025.04 | $ 1,943,461.83 | | |
| WFMBS 2006 - 10 | 94984EAU6 | 9/10/2008 | Sell | $ 0.8100 | 2,186,732.56 | $ 1,771,253.37 | $ 72,292.48 | $ 99,915.98 |
| WFMBS 2006 - 18 | 94985BAD9 | 6/16/2008 | Buy | $ 0.3825 | 987,893.56 | $ 377,869.29 | | |
| WFMBS 2006 - 18 | 94985BAD9 | 9/24/2008 | Sell | $ 0.2053 | 985,829.72 | $ 202,400.70 | $ 2,063.84 | $ 173,404.75 |
| WFMBS 2006 - 20 | 94985EAA9 | 11/28/2006 | Buy | $ 0.9977 | 10,000,000.00 | $ 9,976,500.00 | | |
| WFMBS 2006 - 20 | 94985EAA9 | 10/20/2008 | Sell | $ 0.9277 | 6,391,538.89 | $ 5,929,111.05 | | |
| WFMBS 2006 - 20 | 94985EAA9 | 10/25/2008 | Sell | $ 1.0000 | 39,387.39 | $ 39,386.60 | $ 3,569,073.72 | $4,008,002.35 |
| WFMBS 2007 - AR4 | 94986CAA2 | 8/9/2007 | Buy | $ 0.9952 | 2,550,000.00 | $ 2,537,632.50 | | |
| WFMBS 2007 - AR4 | 94986CAA2 | 7/30/2008 | Sell | $ 0.7800 | 2,195,268.20 | $ 1,712,309.20 | $ 354,731.73 | $ 470,591.57 |

3

# EXHIBIT 4

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, Nicholas J. Staffieri, as General Counsel of the Southeastern Pennsylvania Transportation Authority ("SEPTA"), hereby certifies as follows:

1.      I am fully authorized to enter into and execute this Certification on behalf of SEPTA concerning legal claims asserted in *In Re Wells Fargo Mortgage-Backed Certificates Litigation*, 09-cv-1376-SI (USDC N.D. Cal) ("Action"), involving Wells Fargo and the sale of certain of its Mortgage-Backed Certificates, alleging violations of the federal securities laws.

2.      I understand that SEPTA will be included as a named plaintiff and a proposed class representative in the Action.  I have authorized counsel to file an amended complaint and the papers necessary to include SEPTA as a named plaintiff and a proposed class representative, in this Action.

3.      SEPTA did not purchase or otherwise acquire any Wells Fargo Mortgage-Backed Certificates that are the subject of this action at the direction of counsel or in order to participate in this private action or other litigation arising under the federal securities laws.

4.      SEPTA is willing to serve as a named plaintiff in this matter and as representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

5.      SEPTA purchased WELLS FARGO MTG 07 13 CL A-9 on the dates and at the prices indicated in the table, attached hereto as Exhibit A.

6.      During the three years prior to the date of this certification, SEPTA has sought to serve as a lead plaintiff in the following federal securities class actions:  *Garfield v. Openwave Systems, Inc., et al*, Case No. 1:07-cv-0139(SDNY); *In re Michael Baker Corp. Securities Litigation*, No. 08-cv-370 (W.D. Pa.); *Chamberlain v. Reddy Ice Holdings, Inc.*, No. 08-13451 (E.D. Mich.); *In re Level 3 Communications Inc. Securities Litigation*, Civil Case No. 09-cv-200 (D. Colorado); and *Bozeman v. Colonial BancGroup et al*, 2:09-cv-124 (M.D. Ala).

1

SEPTA is currently serving as a lead plaintiff in the federal securities class action *In re Michael Baker Corp. Securities Litigation*, No. 08-cv-370 (W.D. Pa.)

6.     SEPTA will not accept any payment for serving as a lead plaintiff or representative party on behalf of the class beyond its pro rata share of any recovery, except reimbursement of reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I, Nicholas J. Staffieri, declare under penalty of perjury that the foregoing is true and correct. Executed this 10th day of May_____, 2010.

_____
Nicholas J. Staffieri

2

# EXHIBIT A

| Transaction Type | Transaction Code | Settle Date | Shares |
|---|---|---|---|
| PURCHASE | B | 8/30/2007 | 150,000.0000 |
| PRINCIPAL PAYMENTS | PD | 9/25/2007 | -1,357.3000 |
| PRINCIPAL PAYMENTS | PD | 10/26/2007 | -1,205.2300 |
| PRINCIPAL PAYMENTS | PD | 11/26/2007 | -248.2000 |
| PRINCIPAL PAYMENTS | PD | 12/26/2007 | -422.5100 |
| PRINCIPAL PAYMENTS | PD | 1/25/2008 | -1,050.6100 |
| PRINCIPAL PAYMENTS | PD | 2/25/2008 | -648.5900 |
| PRINCIPAL PAYMENTS | PD | 3/25/2008 | -1,438.1300 |
| PRINCIPAL PAYMENTS | PD | 4/25/2008 | -767.3800 |
| PRINCIPAL PAYMENTS | PD | 5/27/2008 | -1,527.5400 |
| PRINCIPAL PAYMENTS | PD | 6/25/2008 | -1,065.5500 |
| PRINCIPAL PAYMENTS | PD | 7/25/2008 | -1,221.1000 |
| PRINCIPAL PAYMENTS | PD | 8/25/2008 | -899.2700 |
| PRINCIPAL PAYMENTS | PD | 9/25/2008 | -651.1500 |
| PRINCIPAL PAYMENTS | PD | 10/27/2008 | -1,076.4500 |
| PRINCIPAL PAYMENTS | PD | 11/25/2008 | -982.7000 |
| PRINCIPAL PAYMENTS | PD | 12/26/2008 | -354.0100 |
| PRINCIPAL PAYMENTS | PD | 1/26/2009 | -1,107.8300 |
| PRINCIPAL PAYMENTS | PD | 2/25/2009 | -2,525.1300 |
| PRINCIPAL PAYMENTS | PD | 3/25/2009 | -3,428.2900 |
| PRINCIPAL PAYMENTS | PD | 4/27/2009 | -3,819.3900 |
| PRINCIPAL PAYMENTS | PD | 5/28/2009 | -1,950.4600 |
| SALES | S | 5/28/2009 | -122,252.4600 |

# EXHIBIT 5

## CERTIFICATION

I, _____, as _____ of the

Plumbers & Steamfitters Local 60 Pension Plan ("Local 60"), hereby certify as follows:

      1.    I am fully authorized to enter into and execute this Certification on behalf of

Local 60.  I have reviewed a Complaint filed against The Wells Fargo Mortgage Backed Securities

("Wells Fargo MBS")  alleging violations of the federal securities laws;

      2.    Local 60 did not purchase Wells Fargo MBS at the direction of counsel or in

order to participate in any private action under the federal securities laws;

      3.    Local 60 is willing to serve as a lead plaintiff in this matter, including

providing testimony at deposition and trial, if necessary;

      4.    Local 60's transactions in Wells Fargo MBS are reflected in Exhibit A,

attached hereto;

      5.    Local 60 has not sought to serve as a lead plaintiff in a class action under the

federal securities laws during the last three years preceding the date of this certification;

      6.    Beyond its pro rata share of any recovery, Local 60 will not accept payment

for serving as a lead plaintiff on behalf of the class, except the reimbursement of such reasonable

costs and expenses (including lost wages) as ordered or approved by the Court.

      I declare under penalty of perjury, under the laws of the United States, that the

foregoing is true and correct this 5th day of May 2010.

_____
[NAME]
[TITLE]

EXHIBIT A

## TRANSACTIONS IN
## WELLS FARGO MORTGAGE BACKED SECURITIES

WELLS FARGO 07-PA1  6.000%        94984TAD1
3/25/37 DUE 25-FEB-2008
$0.00500/PV ON    67,678.92 PV
DUE 2/25/08

| Transaction | Trade Date | Shares | Price | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 02/28/2007 | 75,000.00 | $      100.38 | $      75,281.25 |