MARC T.G. DWORSKY (SBN 157413)
Marc.Dworsky@mto.com
KATHLEEN M. McDOWELL (SBN 115976)
Kathleen.McDowell@mto.com
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, 35th floor
Los Angeles, CA 90071-1560
Telephone:    (213) 683-9100
Facsimile:    (213) 687-3702

DAVID H. FRY (SBN 189276)
David.Fry@mto.com
CAROLYN V. ZABRYCKI (SBN 263541)
Carolyn.Zabrycki@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th floor
San Francisco, CA 94105-2907
Telephone:    (415) 512-4000
Facsimile:    (415) 512-4077

Attorneys for Defendants
WELLS FARGO DEFENDANTS AND THE
INDIVIDUAL DEFENDANTS

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE WELLS FARGO MORTGAGE-BACKED CERTIFICATES LITIGATION | Civil Action No. 09-01376 (LHK) (PSG)<br><br>**CONSOLIDATED CLASS ACTION ECF**<br><br>**OPPOSITION TO MOTION TO COMPEL PRODUCTION OF DOCUMENTS FROM THE WELLS FARGO DEFENDANTS**<br><br>Judge:    Hon. Paul S. Grewal<br>Date:    March 15, 2011<br>Time:    10:00 a.m.<br>Ctrm:    5 |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................. 1

II.    BACKGROUND FACTS ................................................... 5

    A.    Plaintiffs' Claim in This Case ........................................ 5

        1.    The Certificates ............................................ 5

        2.    The Sole Remaining Theory of Liability .................... 5

        3.    Loan Underwriting ........................................ 5

    B.    Wells Fargo's Document Production .................................. 7

III.    ARGUMENT .............................................................. 9

    A.    Plaintiffs' Request for Loan Origination Budgets, Volumes and Projections Is Not Reasonably Calculated to Lead to the Discovery of Admissible Evidence and Is Unduly Burdensome ...................................... 9

    B.    Plaintiffs' Request for Documents "Commenting On" Underwriting Guidelines Is Absurdly Burdensome and Oppressive ............................ 11

    C.    Plaintiffs Have Access to the Statute-of-Limitations Documents They Seek, and Their Request for Documents Supporting Defendants' Causation Defense Would Impose an Impossible Burden ................................ 13

        1.    Wells Fargo Has Already Advised Plaintiffs What the Publicly Available Documents Supporting the Statute-of-Limitations Defense Are and Where They Can Be Located ...................... 13

        2.    All Documents Supporting Wells Fargo's Causation Defense Would Include Virtually Every Document Addressing Economic Conditions in This Country Over the Last Four Years ............... 14

    D.    Plaintiffs' Demand that Wells Fargo Search the Files of In-House and Outside Lawyers Would Impose a Burden Wholly Out of Proportion to the Amount of Probative Evidence that Might Be Produced ..................... 15

    E.    Plaintiffs' Contention that Wells Fargo Has Refused to Produce Email Is False, and the Type of Search that Plaintiffs Contend Should Be Conducted Would Be Massively Burdensome and Expensive and Serve Little Purpose ....... 18

        1.    Wells Fargo Has Produced Email, But Is Not Searching the Email of the Thousands of Employees Involved in Originating the Tens of Thousands of Loans at Issue in This Case ................................ 18

        2.    Plaintiffs' Argument That Wells Fargo Has Been Less Than Forthcoming About Its Process Is Without Merit ..................... 20

IV.    CONCLUSION ............................................................ 21

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Aikens v. Deluxe Fin. Servs., Inc.*,
    217 F.R.D. 533 (D. Kan. 2003) ........................................................................... 9

*Eureka Financial Corp. v. Hartford Accident and Indem. Co.*,
    136 F.R.D. 179 (E.D. Cal. 1991) ..................................................................... 17

*Green v. Baca*,
    219 F.R.D. 485 (C.D. Cal. 2003) ..................................................................... 17

*Symetra Life Ins. Co. v. Rapid Settlements, Ltd.*,
    2008 WL 597711 (E.D. Pa. Mar. 4, 2008) ........................................................ 9

*Thorogood v. Sears, Roebuck and Co.*,
    624 F.3d 842 (7th Cir. 2010) ........................................................................... 12

*United States v. Goyal*,
    629 F.3d 912 (9th Cir. 2010) ........................................................................... 10

## FEDERAL STATUTES

31 U.S.C. § 5318(g) ................................................................................................ 16

Securities Act of 1933, Section 11 ......................................................................... 5

Securities Act of 1933, Section 12(a)(2) ................................................................ 5

## FEDERAL RULES

Fed. R. Civ. P. 26(b)(2)(C)(i) ........................................................................... 4, 10

## FEDERAL REGULATIONS

12 CFR § 4.37(b) .................................................................................................. 16

31 CFR § 103.18(e) ............................................................................................... 16

## OTHER AUTHORITIES

Manual for Complex Litigation, Fourth, § 11.443 .................................................. 9

1    **I.        INTRODUCTION**

2              Although Plaintiffs' Motion to Compel (Motion or Mot.) contains numerous

3    incorrect statements, none is so misleading as the assertion that their document requests are

4    "narrowly-tailored." Mot. at 4. In fact, Plaintiffs' document requests have been sweeping and

5    remarkably burdensome. In their Motion, Plaintiffs concede that Wells Fargo has already

6    produced more than *3 million* pages of documents (in fact, the number is close to 4 million and

7    grows every week). They fail to mention, however, that Wells Fargo has also made available for

8    inspection approximately *20 million* additional pages of documents—which Plaintiffs have not

9    yet seen fit to review. The burdens associated with Plaintiffs' discovery requests have been

10   massive, and where those requests have wandered too far afield from the single claim remaining

11   in the case, or have threatened to impose additional unreasonable burdens, Wells Fargo has

12   properly objected to them.

13              This case concerns 17 separate offerings of mortgage-backed securities, with each

14   offering in turn consisting of many different securities with different characteristics (the

15   Certificates). The collateral underlying the Certificates consists of distinct pools of prime

16   mortgage loans, totaling 49,939 loans. Plaintiffs' sole remaining claim is that the representation

17   in the offering materials that the loans "generally" complied with Wells Fargo's underwriting

18   guidelines was misleading because Well Fargo and the other originators of those loans allegedly

19   systematically deviated from their guidelines, i.e., that noncompliance was "the norm." Wells

20   Fargo has produced or made available for inspection (where Plaintiffs did not want to share the

21   cost of duplication) all of the loan files for the nearly 50,000 loans. The loan files contain all of

22   the key information concerning the loans, including loan applications, supporting documents,

23   underwriting notes, and appraisals. Wells Fargo has also already produced over 75,000 pages of

24   underwriting guidelines. While the loan files and the underwriting guidelines are the documents

25   necessary to test Plaintiffs' allegation that the guidelines were ignored, Wells Fargo has agreed to

26   produce many other categories of documents of less obvious relevance, including a wide variety

27   of documents relating to the securitization of the loans.

28

Plaintiffs seek to compel production of documents that are either irrelevant to their remaining claim or impose a burden wholly out of proportion to the potential probative value of the evidence that might be gained—or both.

*First*, Plaintiffs seek documents relating to loan origination budgets, volumes and projections, contending that these documents will demonstrate *why* Wells Fargo would have deviated from its guidelines.  That argument fails initially because Plaintiffs contend that liability for a misrepresentation in this case is "virtually absolute, even for innocent misstatements."  Dkt. No. 348 at 9 (internal quotations omitted).  Accordingly, Wells Fargo's state of mind is—in Plaintiffs' view—irrelevant.  Nonetheless, Plaintiffs now claim that the information is relevant to Wells Fargo's affirmative defenses.  This newly crafted contention cannot be reconciled with Plaintiffs' position that liability is absolute.  If lack of knowledge or intent is a defense, then liability is not "absolute."  More importantly, Plaintiffs' argument misconstrues Defendants' affirmative defenses.  Defendants assert that they did not know that these loans allegedly had "systematic" deviations from underwriting guidelines.  Loan origination budgets, volumes or projections will not illuminate that question.  The requested documents are irrelevant to both the claims and defenses asserted in this case and searching for them and producing them will pose an unreasonable burden.

*Second*, Plaintiffs seek documents "concerning" or "commenting on" Wells Fargo's underwriting guidelines.  The scope of this request is difficult to overstate.  As of December 31, 2006 (the offerings were in 2006 and 2007), Wells Fargo employed over 13,000 people working in Fulfillment, which includes underwriting, processing, and closing.  The job functions of essentially all of these people were tied to the underwriting guidelines—either gathering information from borrowers necessary to determine whether they qualified under the guidelines or applying the guidelines to that information.  These employees and countless others—in the wholesale and correspondent origination channels and in credit risk management— would have communicated "concerning" the guidelines constantly.  To locate all documents "concerning" or "commenting on" the underwriting guidelines over a multi-year period would require gathering information from thousands of computers.  Millions and millions of documents

WELLS FARGO'S OPP. TO MOTION
TO COMPEL PRODUCTION
NO. 09-01376-LHK-PSG

would need to be reviewed.  There is no justification for such a burden.  Wells Fargo has agreed to produce the underwriting guidelines—and has produced over 75,000 pages of them so far. Wells Fargo has also produced the loan files for all of the loans at issue, which include underwriting notes concerning the decision making on the loans.  Wells Fargo has also agreed to produce all of the reviews of loans in the pools at issue performed by its CQA group, who were specifically charged with evaluating compliance with credit risk underwriting guidelines.  Under these circumstances, the expenditure of tens of millions of dollars to search for any and all documents "concerning" the underwriting guidelines cannot be justified.

*Third*, Plaintiffs seek documents supporting Wells Fargo's statute of limitations and causation defenses.  With respect to the statute of limitations, Plaintiffs contend that it is improper for Wells Fargo to say that the documents are equally accessible to Plaintiffs when Plaintiffs allegedly do not know what the documents are or where to find them.  Mot. at 11.  In a meet-and-confer letter, however, Wells Fargo told Plaintiffs what the documents were and where they could find them.   Declaration of Jonathan Uslaner ("Uslaner Decl."), Ex. 14 at 2 (Dkt. No. 340-6).

As for causation, Plaintiffs' request is burdensome to the point of being nonsensical.  Plaintiffs ask for all documents supporting Wells Fargo's defense that any decline in the value of Plaintiffs' Certificates was caused by circumstances other than the alleged misrepresentations.  External factors that caused mortgage-backed securities to lose value over the last four years include the credit crisis, the recession, the decline in housing prices, the collapse of several major financial institutions and the threatened collapse of others, and the rise in unemployment, to name just a few.  The variety and number of documents that bear on these issues and would support that defense is nearly boundless and would include, *e.g.*, every newspaper published since mid-2007, every document referencing unemployment rates or housing prices, and every report on economic growth.  The idea of locating all such documents in a *bank* with tens of thousands of employees is absurd on its face.  To the extent that documents that Wells Fargo will actually use to support this defense are not otherwise being produced, they will be produced in connection with expert discovery relating to the causation defense.

*Fourth*, Plaintiffs contend that Wells Fargo must review and collect documents from the files of both its in-house and outside lawyers.  This demand is calculated to generate an immense amount of work and expense, without the prospect of any remotely comparable increase in probative evidence.  Plaintiffs have not pointed to anything they believe the lawyers possess that would be significant to the case (much less anything both important and *non-privileged*).  The vast majority of responsive information these custodians might possess would be subject to the attorney-client privilege, would need to be logged (at significant cost), and would never be produced.  Documents that are not privileged are likely to be produced by Wells Fargo or others, based on the search of and production from non-lawyers' files.  Plaintiffs characterize this objection as a blanket assertion of privilege, but it is not.  The issue is one of undue burden, and the production of the requested documents from sources that are more convenient, less burdensome, or less expensive.  Fed. R. Civ. P. 26(b)(2)(C)(i).

*Last*, Plaintiffs contend that Wells Fargo has refused to produce any email—an assertion that is demonstrably false.  Wells Fargo has already produced email and has agreed to search for additional email that may be responsive.  Wells Fargo has stated, however, that Plaintiffs' requests are unduly burdensome to the extent that what they seek would require widespread searches for email and/or is of dubious relevance to the case.  This case concerns nearly 50,000 loans.  Literally thousands of employees came in contact with those loans and a search of their email for responsive messages would be unfathomably burdensome and unjustified, especially when the key information concerning the loans is maintained in the loan files—which Wells Fargo has either produced or made available for review, and Plaintiffs have largely ignored.  Indeed, in arguing in favor of a very short discovery schedule in the case, Plaintiffs specifically assured Judge Koh that they did not expect Wells Fargo to conduct such a search.  Having gotten the schedule they sought on the basis of that representation, Plaintiffs cannot now backtrack and complain that Wells Fargo is not conducting such a search.

## II.    BACKGROUND FACTS

### A.    Plaintiffs' Claim in This Case

#### 1.    The Certificates

This case arises under Section 11 of the Securities Act of 1933 ("1933 Act") and concerns mortgage-backed securities ("MBS") issued by Wells Fargo Asset Securities Corporation.  Each Certificate represents a claim on principal and interest payments made by borrowers in a pool of mortgage loans.  Each of the 17 offerings at issue involves a different pool of loans, such that the loans underlying one offering are entirely distinct from the loans underlying the other offerings.  The 17 pools together contain 49,939 mortgage loans, all consisting of prime fixed or adjustable rate loans made by Wells Fargo or other lenders.[1]

#### 2.    The Sole Remaining Theory of Liability

The Court has dismissed all of Plaintiffs' claims under Section 12(a)(2) of the 1933 Act, as well as their claims that the offering materials made misstatements concerning property appraisals, loan-to-value ratios, and the bond ratings assigned to the securities.  Dkt. No. 288 at 4, 7.  The sole remaining claim is that, while the offering materials stated that the loans would "generally" be underwritten in accordance with Wells Fargo's underwriting standards, the lenders for the loans "systematically" deviated from their underwriting guidelines, such that "variance from the stated standards was essentially defendants' norm."  Dkt. No. 203 at ¶¶ 62-63, 66; Dkt. No. 198 at 15.  The loan files themselves, which disprove Plaintiffs' hypothesis, have been made available to Plaintiffs, but they have not yet bothered to review them.

#### 3.    Loan Underwriting

A mortgage loan application typically begins when a customer approaches a Wells Fargo retail loan officer (termed a "Home Mortgage Consultant" or "HMC") or a third-party mortgage broker regarding a loan.  Declaration of Allyson Knudsen ("Knudsen Decl."), ¶ 3.  The

---

[1]  There are no home equity loans in the 17 pools underlying the securities at issue here. Plaintiffs' reliance on Darcy Parmer's hearsay allegation about "fraud" in the making of loans in Wells Fargo's home equity division is thus especially misplaced (even if fraud perpetrated on Wells Fargo equated to noncompliance with underwriting guidelines—which it does not).

1    prospective borrower submits a loan application and various supporting documents.  *Id.*  A

2    package of material, including the application and supporting materials, is then sent (either in

3    paper form or, more recently, electronically) to an underwriter.  *Id.*  Often with the aid of

4    automated decisioning, the underwriter then evaluates the materials to determine whether the

5    borrower qualifies for the loan for which he or she is applying.  *Id.*  Depending on the type of

6    loan and the circumstances of the applicant, additional review or documentation might be needed.

7    *Id.*  If the customer appears to meet the requirements, the loan is processed for approval and

8    closing—which may also entail obtaining additional information or documentation from the

9    customer.  *Id.* ¶ 4.  At the end of 2006, Wells Fargo had over 2000 retail branch offices engaged

10   in mortgage lending and employed more than 13,000 people in Fulfillment, which includes

11   underwriting, processing, and closing.[2]  *Id.* ¶ 6.

12          All of the key information concerning each mortgage loan is compiled and

13   maintained in the loan file.  Knudsen Decl., ¶ 5.  The loan file for a given loan is typically several

14   hundred pages long and contains, *inter alia*, the mortgage application, supporting documents,

15   credit report, appraisal, correspondence with the borrower (including, in some instances, print-

16   outs of email), and print-outs from the bank's database of information concerning the loan

17   application and underwriting process, including underwriting screens/notes, i.e., comments for/by

18   the underwriter.  Declaration of Kathleen M. McDowell ("McDowell Decl."), Ex. A.

19          The guidelines for loan underwriting are extensive—thousands of pages.  Knudsen

20   Decl. ¶ 7.  Some relate to the creditworthiness of the borrower or the collateral and some do not.

21   *Id*.  The credit requirements differ depending on the particular type of loan for which the

22   customer is applying.  *Id.*  There are scores of different types of loans which may have their own

23   requirements, including, *inter alia*:  15- or 30-year fixed loans, adjustable-rate loans with fixed-

24   rate periods of 1, 3, 5, 7 or 10 years, loans with an interest-only period, relocation loans for

25   persons whose employers have a relationship with the bank, loans that qualify under Fannie Mae

26   guidelines, loans for primary residences, loans for investment property, loans to refinance an

27

28   _____
     [2] The offerings at issue were either in 2006 or 2007, hence the selection of year-end 2006 as a
     reference point.

1   existing mortgage with the same lender, and many others.  *Id.*  Moreover, the guidelines change

2   over time to reflect new types of loans, new programs, or changes to existing loan offerings.  *Id.*

3         Any potential change to the guidelines would need to be reviewed by more than a

4   dozen different departments, ranging from multiple groups concerned with risk management (*e.g.*,

5   Credit Risk Management, Collateral Policy) to the mortgage lending business groups (*e.g.*, retail,

6   wholesale, and correspondent origination channels) to groups directed at various kinds of

7   compliance (*e.g.*, GSE Compliance, Legal) to groups tasked with implementing changes (*i.e.*,

8   Decision Technology, Operations, Training).  Knudsen Decl. ¶ 8.  Between 75 and 100 Wells

9   Fargo employees from different functional areas would likely review such a change before it is

10  adopted and, once adopted, thousands of employees in the business line would implement the

11  change.  *Id.*  Between 2002 and 2007, literally thousands of employees involved in the mortgage

12  business might have "commented on" thousands of guidelines in the course of the implementation

13  of hundreds of changes and in the context of particular loans.  *Id.*

14        **B.**    **Wells Fargo's Document Production**

15        Wells Fargo agreed to produce documents to all but one of the 32 requests served

16  by Plaintiffs.  The documents being produced or made available for inspection include:  the loan

17  files for all 49,939 loans; the final "loan tapes" (in both imaged and native format) for each of the

18  17 securitizations; over five years' worth of applicable underwriting guidelines; communications

19  with the underwriters and rating agencies regarding the offerings; drafts and final versions of the

20  offering materials; files concerning due diligence reviews of the loan pools performed by or at the

21  behest of the offering underwriters; documents showing the results of credit quality assurance

22  reviews of specific loans in the pools; documents concerning requests that Wells Fargo

23  repurchase some of the loans from the pools; documents showing the registered owners of the

24  securities; documents concerning the performance of the loans; and numerous other categories of

25  documents that are of marginal relevance (such as record retention schedules, organizational

26  charts, group directories, insurance policies, job aids and checklists).  McDowell Decl. ¶ 3.  To

27  date, Wells Fargo has produced more than *3.8 million pages* of documents.  *Id.* ¶ 4.  In addition,

28

1   as early as December 2010, Wells Fargo offered to make available for inspection all loan files

2   that had not previously been imaged—an estimated *20 million* additional pages.[3]  *Id.* ¶ 5.

3          Contrary to Plaintiffs' contention, Wells Fargo has produced many pages of email

4   to date—albeit email that was printed and retained in hard copy format.[4]  McDowell Decl. ¶ 6.

5   Many of these emails are in the loan files that were produced—and therefore pertain directly to

6   the loans at issue in the case.  *Id.*, Ex. B.  Others are, for instance, in the deal and due diligence

7   files of the Structured Finance group that put together the securitizations and, therefore, pertain

8   directly to the offerings at issue in the case.  *Id.*, Ex. C.  With respect to email stored

9   electronically, Wells Fargo has agreed to produce and is in the process of identifying, reviewing,

10   and producing responsive email from the Structured Finance group, which dealt with the

11   offerings, and where the number of employees is reasonably limited.  *Id.*, ¶ 6.  Wells Fargo is not,

12   however, searching the email of the thousands of retail lending and underwriting employees who

13   were involved in originating the loans.  Indeed, Plaintiffs expressly confirmed to Judge Koh, in

14   advocating for a short discovery period, that Plaintiffs did not expect Wells Fargo to search the

15   email of these employees.  Uslaner Decl., Ex. 18 at 39 (Plaintiffs' counsel stating that Plaintiffs

16   "don't anticipate there being a search of thousands . . . of Wells Fargo employees' e-mail in this

17   case.").

18          In stark contrast to Wells Fargo's massive production, the four institutional

19   Plaintiffs have collectively produced a grand total of 19,503 pages of documents as of February

20   18.  McDowell Decl. ¶ 7.  The Louisiana Sheriff's Pension and Relief Fund has produced only

21   302 pages of documents.  *Id.*  Among the four Plaintiffs, it appears they have produced *not a*

22   *single email.  Id.*

23

24

25   [3] Wells Fargo offered to scan and produce these documents if Plaintiffs would split the cost of
doing so.  McDowell Decl. ¶ 5.  Plaintiffs declined this offer and elected to inspect the documents

26   instead.  *Id.*  Wells Fargo advised Plaintiffs that these documents could be available for inspection
beginning the week of December 20, 2010.  *Id.*  Plaintiffs have not yet begun to inspect them.  *Id.*

27   [4] This is only one example of the many misstatements and factual errors in Plaintiffs' motion.
The most egregious ones are refuted in the accompanying McDowell Declaration.  McDowell

28   Decl., ¶ 9.

1   **III.   ARGUMENT**

2           Plaintiffs' decision to ignore the documents that go to the core of the case (the loan

3   files) while simultaneously demanding that Wells Fargo engage in ever-expanding searches for

4   documents throughout the company having little or no bearing on the issues in dispute, reveals

5   this motion for what it is: an attempt to impose massive expense on Wells Fargo for no reason

6   other than, evidently, to wage a war of attrition.  Wells Fargo has produced voluminous

7   documentation (in addition to the loan files) covering numerous areas of inquiry – many with

8   little or no bearing on the case.  And, it has agreed to produce, and is making efforts to produce,

9   yet more before the June 15, 2011 date set by Judge Koh for substantial completion of document

10  production.  The requests that are the subject of this motion, however, are simply too broad and

11  burdensome and further responses and production should be denied.

12          **A.      Plaintiffs' Request for Loan Origination Budgets, Volumes and Projections Is
13                    Not Reasonably Calculated to Lead to the Discovery of Admissible Evidence
                      and Is Unduly Burdensome.**

14          Plaintiffs first contend that Wells Fargo should be required to produce "All

15  DOCUMENTS CONCERNING loan origination budgets, volumes and projections."  Mot. at 6.

16  As an initial matter, this request imposes an unreasonable burden by going beyond the actual

17  budgets, volumes and projections and reaching "all" documents "concerning" those broad topics.

18  That construction renders the request vastly overbroad and unduly burdensome.  *Symetra Life Ins.*

19  *Co. v. Rapid Settlements, Ltd.*, 2008 WL 597711, at *5-6 (E.D. Pa. Mar. 4, 2008) (holding that the

20  defendant's request for all communications by intervenors "concerning" the defendant was

21  overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of

22  admissible evidence because the defendant's name may have appeared in "routine documents,"

23  and the defendant had not shown how communications "merely mentioning" its name were

24  relevant); *Aikens v. Deluxe Fin. Servs., Inc.*, 217 F.R.D. 533, 538 (D. Kan. 2003) (holding that the

25  terms "relating to" and "regarding" which modified very general categories of documents,

26  rendered document requests "so broad and open-ended that Defendant could not possible [sic]

27  fully determine—without undue burden—which documents would be responsive"); Manual for

28

1   Complex Litigation (Fourth) § 11.443 ("In overseeing document production, the court should . . .

2   prevent indiscriminate, overly broad, or unduly burdensome demands—in general, forbid

3   sweeping requests, such as those for 'all documents relating or referring to' an issue, party, or

4   claim . . . ."). At a company in which more than 13,000 people are employed to make mortgage

5   loans, the number of documents "concerning" loan volumes, for instance, will be enormous,

6   spread among thousands of people, and almost entirely routine and uninformative. Searching for

7   such documents would take many months and be enormously expensive.

8       Even if Plaintiffs' request were construed to be limited to actual company-wide

9   budgets and documents sufficient to show company-wide loan volumes and/or projections, it

10  would still impose an undue burden because the information sought is not pertinent to the claim

11  Plaintiffs are pursuing. Fed. R. Civ. P. 26(b)(2)(C)(iii) (factors considered in assessing undue

12  burden include "the importance of the discovery in resolving the issues"). Plaintiffs assert that

13  their theory is that Wells Fargo ignored its underwriting guidelines in a mad rush to maximize

14  loan volume. Mot. at 6. It has always been Plaintiffs' position, however, that the only question is

15  whether the statements made in the offering materials are untrue—and not Wells Fargo's state of

16  mind. *See*, *e.g.*, Dkt. No. 169 at 7 (asserting that Section 11 imposes "strict liability" and liability

17  is "virtually absolute"); Dkt. No. 218 at 12 (claims are for "strict liability," no allegations of

18  scienter are required). If that is correct, then Plaintiffs' theory for *why* Wells Fargo would

19  supposedly have ignored its underwriting guidelines is irrelevant and the discovery imposes a

20  burden with no point.

21      Plaintiffs respond by stating that the discovery is relevant to Defendants'

22  affirmative defenses. Mot. at 7. Of course, if Plaintiffs were correct that liability is "strict" and

23  "absolute," then those would not be valid defenses at all. Plaintiffs are seeking to have their cake

24  and eat it, too. More importantly, the information sought by these requests is irrelevant to the

25  affirmative defenses that Defendants are actually pursuing. As a matter of law, evidence that

26  Wells Fargo had loan budgets or goals and was trying to meet them could not provide the basis to

27  infer an intent to deceive. *United States v. Goyal*, 629 F.3d 912, 919 (9th Cir. 2010) (jury could

28  not properly infer intent to deceive based on desire to meet business goals). Every business is

WELLS FARGO'S OPP. TO MOTION
TO COMPEL PRODUCTION
NO. 09-01376-LHK-PSG

1    seeking to succeed—that is not evidence they are trying to mislead anyone.  Plaintiffs' sole

2    remaining misrepresentation claim is that underwriting guidelines were systematically

3    disregarded.  Defendants are asserting that, *if* the underwriting guidelines were systematically

4    disregarded (and they were not), Defendants had no knowledge of *that* fact.  Loan volumes,

5    budgets and projections do not bear on that question.  Documents concerning compliance with

6    credit risk underwriting guidelines do and Wells Fargo is producing massive volumes of

7    documents on that subject, including the loan files themselves, the results of quality assurance

8    analysis of the loans, and the due diligence files for the deals.

9            Plaintiffs' request for loan origination budgets, volumes and projections is far from

10   relevant to the affirmative defenses and Plaintiffs' sole remaining claim in this case, and is thus

11   unduly burdensome, oppressive, and harassing.

12       **B.      Plaintiffs' Request for Documents "Commenting On" Underwriting
13               Guidelines Is Absurdly Burdensome and Oppressive.**

14           Plaintiffs served a broad request seeking not only all underwriting guidelines and

15   revisions thereto (which Wells Fargo is producing to the extent they relate to the types of loans

16   and time period at issue in this case), but also all documents "concerning" or "comment[ing]" on

17   those guidelines.  Mot. at 8.  On its face, this request is absurdly overbroad, in part because

18   "comments" on the underwriting guidelines are not reasonably calculated to lead to the discovery

19   of admissible evidence, but also because the 13,000-plus employees tasked with processing loans,

20   along with thousands of other employees in credit risk management and other departments who

21   developed and implemented changes in the guidelines, would likely have "commented" on and

22   sent emails "concerning" the guidelines on a daily basis in the course of their work.  Searching

23   for and producing all such documents would take an exceedingly long time, cost untold tens of

24   millions of dollars, and would produce almost exclusively irrelevant material.

25           Plaintiffs assert that this case is "largely about Wells Fargo's underwriting

26   guidelines" (Mot. at 9), but that assertion overstates the issue.  This case is *not* about whether the

27   guidelines were good or bad, effective or ineffective, strict or loose, or something else.  This case

28   is about whether the particular loans in the pools in which Plaintiffs invested generally complied

WELLS FARGO'S OPP. TO  MOTION
TO COMPEL PRODUCTION
NO. 09-01376-LHK-PSG

1   with the underwriting guidelines Wells Fargo had or whether, as Plaintiffs allege, Wells Fargo

2   systematically ignored these credit risk guidelines.  So that Plaintiffs can test their claim, Wells

3   Fargo is producing the guidelines and vast quantities of information concerning the loans at issue,

4   as well as documents that might themselves discuss whether those loans complied with credit risk

5   underwriting guidelines, such as the CQA analyses and the due diligence files for the offerings.

6   Producing those documents is very expensive and burdensome in its own right.  What Plaintiffs

7   are seeking would dramatically increase that cost and burden and is, at best, tangentially related to

8   the questions that are at issue in the case.[5]

9           While contending that Wells Fargo should be ordered to produce *all* documents

10  "concerning" its guidelines, Plaintiffs identify a few specific categories of documents that they

11  assert Wells Fargo is "withholding."  They claim that Wells Fargo is withholding documents

12  discussing whether Wells Fargo was complying with its underwriting guidelines.  Mot. at 8.  That

13  is not correct.  Wells Fargo is producing the CQA analyses, for example, addressing whether it

14  complied with its credit risk underwriting guidelines for each loan tested from the 49,939 loans

15  comprising the 17 pools underlying the securities at issue.  McDowell Decl. ¶ 3.  Wells Fargo is

16  not producing documents concerning the millions of loans that it originated during this period

17  *that were not packaged in these securities*.  Plaintiffs did not invest in those loans, they are

18  irrelevant to the claims asserted here, and producing documents relating to them would unfairly

19  multiply what is already an enormously burdensome document production.

20

21

22  _____

[5] As is often the case with class actions, the discovery burdens in the case are asymmetrical and
Plaintiffs have no incentive to be reasonable in their document demands—indeed, their incentive
is to make litigation as burdensome and expensive for defendants as possible.  As Judge Posner

23  recently explained, "[o]ne purpose of discovery—improper and rarely acknowledged but
pervasive—is: 'it makes one's opponent spend money.'  In most class action suits, including this

24  one, there is far more evidence that plaintiffs may be able to discover in defendants' records
(including emails, the vast and ever-expanding volume of which has made the cost of discovery

25  soar) than vice versa."  *Thorogood v. Sears, Roebuck & Co.*, 624 F.3d 842, 849 (7th Cir. 2010)
(internal citation omitted) (quoting Brian Anderson & Andrew Trask, *The Class Action Playbook*

26  § 4.5, pp. 115-16 (2010)).  It is telling that Plaintiffs here are themselves unwilling to pay even
half the cost simply to *scan* the loan files for the particular loans at issue—documents that are

27  unquestionably of central significance to the case, and yet they contend that Wells Fargo has "no
legitimate reason" for objecting to spending tens of millions of dollars collecting, reviewing, and

28  producing millions of documents that are of dubious probative value.

1    Similarly, Plaintiffs contend that Wells Fargo is not producing documents

2 concerning other originators' compliance with underwriting guidelines.  Mot. at 9.  Again, that is

3 untrue.  Wells Fargo is producing documents concerning whether the loans originated by other

4 banks that are included in the pools in this case complied with underwriting guidelines.

5 McDowell Decl. ¶ 3.  Producing documents concerning the much larger number of loans that are

6 not part of this case would pose a significant burden without producing probative evidence.

7    Plaintiffs also assert that Wells Fargo, in addition to producing documents

8 showing changes to its underwriting guidelines, should produce all documents explaining the

9 reasons for any changes.  The potential volume of documents on that subject is vast.  The

10 underwriting guidelines consist of tens of thousands of pages.  Knudsen Decl. ¶ 7.  During the

11 years at issue, there were scores of changes to the guidelines and each change required

12 consideration and comment by more than a dozen different business groups.  *Id.* ¶ 8.  Even if the

13 request were limited to those people who participated in the process of approving the guideline

14 changes, locating all such documents would involve seeking out documents from up to 100

15 custodians, at a minimum, and would not necessarily reflect the reasons for the changes.  *Id.*

16    Finally, Plaintiffs suggest that their request would uncover documents concerning

17 "flaws in Wells Fargo's approach to underwriting."  Mot. at 9.  To the extent that phrase means

18 anything other than a failure to follow the guidelines that were in place, the documents would be

19 irrelevant to this case.  Plaintiffs' claim is that Wells Fargo did not apply its guidelines—not that

20 the guidelines could have been improved upon.

21    **C.    Plaintiffs Have Access to the Statute-of-Limitations Documents They Seek,**
22 **and Their Request for Documents Supporting Defendants' Causation Defense**
**Would Impose an Impossible Burden.**

23    **1.    Wells Fargo Has Already Advised Plaintiffs What the Publicly**
24 **Available Documents Supporting the Statute-of-Limitations Defense**
**Are and Where They Can Be Located.**

25    Plaintiffs contend that it is improper for Wells Fargo to assert that documents

26 supporting Wells Fargo's statute-of-limitations defenses are equally available to Plaintiffs

27 because, according to Plaintiffs, they do not know the identity and location of the documents at

28

1    issue.  Mot. at 11.  To the contrary, Wells Fargo specifically advised Plaintiffs of the identity and

2    whereabouts of these documents in a letter dated February 4, 2011, which stated that the

3    documents in question are "SEC filings, which you can obtain from the SEC's website, and

4    Remittance Reports, which you can obtain from the SecuritiesLink website."[6]  Uslaner Decl., Ex.

5    14 at 2.  Wells Fargo also directed the Plaintiffs to the voluminous documents that had been filed

6    in connection with its motions to dismiss on statute of limitations grounds.  Mot. at 10.

7                    **2.       All Documents Supporting Wells Fargo's Causation Defense Would
                            Include Virtually Every Document Addressing Economic Conditions
8                            in This Country Over the Last Four Years.**

9                    Plaintiffs also request that Wells Fargo produce all documents supporting its

10   defense that any claimed decline in the value of Plaintiffs' Certificates was caused by

11   circumstances other than the alleged misrepresentation.  This request, like the request for

12   documents "concerning" the underwriting guidelines, is irrationally overbroad and unduly

13   burdensome.

14                   Since these securities were issued in 2006-2007, the United States has experienced

15   its most severe economic decline since the Great Depression.  Unemployment rose to more than

16   10% and still hovers close to that level.  Housing prices have dropped by more than a third in

17   most major markets.  It does not require an advanced degree in economics to realize that an

18   investment in home mortgages might be adversely affected by those economic conditions.[7]  All

19   documents supporting Wells Fargo's causation defense therefore encompass every document

20   evidencing those conditions—which would mean essentially every newspaper printed in the last

21   four years, every report on economic conditions, home prices, or unemployment, and many other

22   kinds of documents.  Wells Fargo said exactly this to Plaintiffs in a letter dated February 4, 2011.

23

24   ───────────────
     [6] The SecuritiesLink website (www.securieslink.com) is a source of extensive and detailed
25   information concerning MBS issued by Wells Fargo.  It can be accessed by any member of the
     public after registering (for free) and obtaining a password.

26   [7] *See* http://homeguides.sfgate.com/value-mortgage-backed-securities-6611.html (San Francisco
     Chronicle website noting that mortgage-backed securities "perform best in a strong domestic
27   economy and stable interest rate environment. At that time, homeowners are most likely to stay
     current on their mortgage payments. In recession, distressed homeowners increasingly fall behind
28   on their mortgages and are foreclosed upon.").

                                              - 14 -

1   Uslaner Decl., Ex. 14.  Plaintiffs have not responded to that letter and their brief does not even

2   acknowledge the issue.

3           Plaintiffs accuse Wells Fargo of trying to "sandbag[]" them.[8]  Mot. at 11.  That is

4   untenable.  If Plaintiffs are unfamiliar with the economic conditions that have affected the value

5   of mortgage-backed securities over the last several years, they are not awake.  If they have any

6   trouble finding documents that would support the contention that unemployment has risen

7   dramatically or that people who lose their jobs often cannot pay their mortgages, then they are not

8   reading the newspapers.  The fact is that this request, under the circumstances of this case, would

9   impose a burden that is not simply vast, but illogical.  It will be absolutely meaningless for Wells

10  Fargo to produce piles of documents evidencing housing prices, foreclosure rates, or

11  unemployment figures for the last several years.

12          More fundamentally, Wells Fargo has said that the causation defense will be the

13  subject of expert testimony and, to the extent documents Wells Fargo will rely upon have not

14  already been produced, they will be produced as part of expert discovery.  Mot. at 10.  Wells

15  Fargo cannot produce the documents an expert will rely upon when the expert has not yet done

16  his or her work.  Given the particular circumstances of this case, producing "all documents" that

17  support the causation defense, but that will not be used by Wells Fargo to support its causation

18  defense, would pose a truly ridiculous burden and serve no end.

19      **D.    Plaintiffs' Demand That Wells Fargo Search the Files of In-House and
            Outside Lawyers Would Impose a Burden Wholly Out of Proportion to the
20          Amount of Probative Evidence That Might Be Produced.**

21          Yet another area in which Plaintiffs seek to impose a burden on Wells Fargo that

22  makes no sense concerns the files of in-house and outside counsel.  Mot. at 12.  In doing so,

23  Plaintiffs misrepresent Wells Fargo's position and mischaracterize the issue.

24          Plaintiffs assert that Wells Fargo is making a blanket assertion of privilege.  Mot.

25  at 12-13.  That is false.  Wells Fargo is asserting that searching the lawyers' files will pose a

26  ────────────────────

[8] This accusation is particularly ironic given Plaintiffs' failure to respond to Wells Fargo's point
27  that this request seeks vast quantities of documents concerning general economic conditions.
    Because Wells Fargo previewed this issue in its meet-and-confer letter, Plaintiffs are presumably
28  holding back whatever response they have, if any, for their reply brief.

1   burden that cannot be justified.  Wells Fargo has made the inarguable observation that most of the

2   material in the lawyers' possession will be privileged attorney-client communications.  The point

3   of that observation is not to claim privilege without providing a privilege log, but to demonstrate

4   that the burden of searching these particular files cannot be justified by the minimal probative

5   value of the evidence that would result.  Privileged documents will not be evidence and so

6   provide zero probative value, but impose a significant burden on the responding party in having

7   to review them and create a privilege log.

8           That burden cannot be justified here.  As an initial matter, there are a variety of

9   other sources from which Plaintiffs are likely to get the same non-privileged documents.  In

10  scraping to come up with categories of non-privileged document the lawyers might possess, for

11  instance, Plaintiffs suggest that communications with the Underwriters and Rating Agencies

12  would not be privileged.  Mot. at 13.  But Plaintiffs have served document requests on the

13  Underwriters and subpoenas on the Rating Agencies seeking those documents.  McDowell Decl.

14  ¶ 8.  Plaintiffs hypothesize communications between the lawyers and the SEC, Congress or other

15  government bodies (Mot. at 13), but provide no basis to believe there are any such

16  communications concerning any subject relevant to this case.  Indeed, they do not even identify a

17  document request to which such documents would be responsive.[9]  They also suggest there may

18  be non-privileged communications on non-legal, business matters (Mot. at 13), but they do not

19  suggest what those matters would be or how they would be relevant to this case.  More

20  importantly, such communications—if they were responsive—would likely show up in the files

21  of the non-legal business people with whom the communications occurred and so would be

22  produced anyway.

23

24  _____

[9] Plaintiffs have served one document request seeking any documents provided or received in
25  connection with governmental investigations concerning a wide range of subject matters, almost
    entirely unrelated to the subject matter of this case.  Uslaner Decl., Ex. 10 at 12, Dkt. No. 340-4.
26  Wells Fargo has responded that it is unaware of any investigation of Wells Fargo concerning the
    credit risk underwriting of loans originated or acquired by Wells Fargo.  *Id.*  Wells Fargo's
27  response specifically excepted any routine investigation by bank regulators because banks are
    barred by law from revealing such information.  *See*, *e.g.*, 31 U.S.C. § 5318(g); 31 CFR
28  § 103.18(e); 12 CFR § 4.37(b).

1          The authorities cited by Plaintiff are inapposite.  In Judge Morrow's *Green v. Baca*

2    case, the Magistrate Judge had narrowed a broad document request to a very limited selection of

3    documents.  219 F.R.D. 485, 490 (C.D. Cal. 2003).  With respect to lawyers' files, the Magistrate

4    Judge had ordered the production of only the back-up documents for one aspect of a report that

5    had been issued by an attorney on the very subject of the litigation (whether the Sheriff's

6    Department had a policy or practice of improperly detaining people after they had been ordered

7    released).  *Id.* at 487-88.  The defendants in *Green* argued that most of the documents in that

8    narrow category were privileged and that *the creation of the log* of those documents would pose

9    an undue burden.  *Id.* at 491-92.  Judge Morrow rejected that contention and concluded that they

10   needed to make a more specific showing of privilege.  *Id.*

11         In sharp contrast to *Green*, Plaintiffs here have not identified a specific group of

12   highly relevant documents uniquely in the possession of Wells Fargo's lawyers.  Rather, they

13   seek to have Wells Fargo wade through the lawyers' files looking for anything responsive to

14   sweeping document requests on the off chance there will be documents that are responsive, not

15   privileged, and not found in and being produced from other sources.  Wells Fargo is not arguing

16   that the mere requirement of a privilege log would impose an undue burden if it were applied to a

17   reasonable group of documents—indeed, Wells Fargo will produce a privilege log for privileged

18   documents identified in the files of its business people.  The point here is that, without some

19   reason to believe there is probative, non-privileged evidence in the possession of the lawyers that

20   will not be produced from other, more convenient sources, the exercise of searching, reviewing

21   and logging would be an unwarranted burden.[10]

22         Wells Fargo is not contending that it should be permitted to make a blanket

23   assertion of the privilege, but rather that the determination whether particular discovery steps

24   pose an undue burden should take into account that the burden of searching lawyers' files will

25

26   _____
     [10] *Eureka Financial Corp. v. Hartford Accident and Indemnity Co.*, 136 F.R.D. 179 (E.D. Cal.
27   1991), cited by Plaintiffs, is even further removed from this situation.  There, the defendant was
     not making a burden argument at all—it simply asserted that the documents in question were
28   privileged without providing any information supporting the assertion of the privilege.  *Id.* at 181-
     83.

include preparation of an extensive privilege log and that the incremental addition to the

probative evidence produced in the case will be small by comparison because so few documents

will be non-privileged.  Obviously, the burdens of searching a lawyer's files may be warranted in

a case, such as *Green*, where the lawyer is expected to possess specific, highly pertinent

information that is not otherwise available, but that is not the situation here.

**E.**     **Plaintiffs' Contention That Wells Fargo Has Refused to Produce Email Is**
           **False, and the Type of Search that Plaintiffs Contend Should Be Conducted**
           **Would Be Massively Burdensome and Expensive and Serve Little Purpose.**

Plaintiffs' final contention is that Wells Fargo allegedly has failed to produce any

email from people involved in originating the mortgages and has not sufficiently articulated what

it is doing regarding email.  Mot. at 15.  Both of these assertions are false.

**1.**     **Wells Fargo Has Produced Email, But Is Not Searching the Email of**
           **the Thousands of Employees Involved in Originating the Tens of**
           **Thousands of Loans at Issue in This Case.**

Wells Fargo has produced emails from people involved in the origination of the

loans at issue in this case, and those emails can be found in the loan files themselves.  McDowell

Decl., Ex. B (redacted exemplars of such emails).  Those emails have thus been produced or

made available for inspection.

What Wells Fargo is *not* doing is searching electronic stores of email for the

thousands of employees who would have been involved in originating the nearly 50,000 loans at

issue.  Wells Fargo has been up front about this issue—raising it with Judge Koh at the October

20, 2010 Case Management Conference.  Uslaner Decl., Ex. 18 at 32.  As Plaintiffs acknowledge

in their brief (Mot. at 15), they represented to Judge Koh—in seeking a short discovery

schedule—that they "don't anticipate there being a search of thousands . . . of Wells Fargo

employees' e-mail in this case."  Uslaner Decl., Ex. 18 at 39.

Anticipating that they will be held to their representation to the Court—as they

should be—Plaintiffs now contend that Wells Fargo should be searching for emails from

individuals at "supervisor, management, and executive levels."  Mot. at 15.  The universe of

people who fall into the category of supervisors, management and executives still runs into the

1    thousands.  For example, at the end of 2006, Wells Fargo had more than 2000 retail branch

2    offices handling mortgage lending, each with a branch manager.  Knudsen Decl. ¶ 6.  The number

3    of additional supervisors and management personnel in the mortgage business would run into the

4    hundreds.  *Id.*  Moreover, "supervisors, management and executives" is a far broader group than

5    the one Plaintiffs suggested to Judge Koh would be appropriate.  At the October 20, 2010 Case

6    Management Conference, they said they thought email discovery would be limited to "high level

7    individuals."  Uslaner Decl., Ex. 18 at 39 ("I think certainly the individuals, high level individuals

8    who were involved and others, there would be email produced from them.").  However vague

9    Plaintiffs' representation, that statement could not have been understood by the Court to mean

10   hundreds or thousands of supervisors or branch managers.

11           In addition, Plaintiffs' suggestion that Wells Fargo should search the email of

12   supervisors, managers and executives directly conflicts with their demand that Wells Fargo

13   produce email "from individuals involved in the origination and underwriting of the loans."  Mot.

14   at 15.  The people who were primarily involved in origination and underwriting of the loans were

15   lower level employees—loan officers and underwriters.  Knudsen Decl., ¶¶ 3-4.  For a typical

16   loan, even the underwriter's direct supervisor would not have any involvement in connection with

17   the loan.  *Id*.  The further a person is up the organizational chart, therefore, the less likely they are

18   to have any information concerning the origination or underwriting of these loans.  At the level of

19   executives—people who might reasonably be thought to be "high level individuals"—there is no

20   reason to expect they would have any information concerning these particular loans.

21           The group of employees who are manageable in number and who might have

22   email relating to the loans at issue in this case are the people in the Structured Finance group who

23   worked on the securitization of the loans.  Unlike the origination business, where the people who

24   touched these 50,000 loans are many and widespread, the securitization business is where the

25   loans were brought together and a smaller number of people dealt with them in aggregate.  Wells

26   Fargo has agreed to produce responsive and non-privileged emails from specific custodians

27   within this group, to the extent such email can be located after a reasonable search.  McDowell

28   Decl. ¶ 6.

The reality is that any search for email of the people who were actually involved in the origination and underwriting of these loans would be a massive undertaking and makes no sense because the key information regarding the loans is in the loan files, which are being provided.[11]  Plaintiffs, moreover, made a strategic decision to forego pursuing email from those people in arguing for a shorter discovery schedule.  They got the schedule they wanted and they should not now be heard to complain that Wells Fargo is not searching the email of all of those people.

### 2.    Plaintiffs' Argument That Wells Fargo Has Been Less Than Forthcoming About Its Process Is Without Merit.

Plaintiffs' contention that Wells Fargo has not been forthcoming regarding what it is doing with respect to electronic discovery is simply untrue.  Wells Fargo's counsel has spent hours and hours on the telephone with Plaintiffs' counsel conferring about Wells Fargo's document production and has repeatedly written multi-page letters explaining where things stand and what Wells Fargo is doing, including specifically its strategy for searching email.  *See, e.g.*, Uslaner Decl., Exs. 7, 9 (describing Wells Fargo's email search strategy), 12.  Plaintiffs have no ground for complaint.

//
//
//
//
//
//
//

---

[11] Plaintiffs contend that it is an "impossible assumption" that email will not play a meaningful role in this case, but they provide no explanation for that position.  Mot. at 15.  They have not suggested what important information they might expect to find in the email.  Their claim is that the underwriting guidelines were "systematically" ignored with respect to these mortgages.  The important information bearing on that claim is the loan files and the underwriting guidelines.  For Plaintiffs' discovery of Wells Fargo, email really is not where the important information would be located.  By contrast, *Defendants* might find important information in emails showing that Plaintiffs or their investment advisors had specialized knowledge regarding lending practices or were on notice of the claims outside the statute of limitations.

1    IV.    **CONCLUSION**

2              For the foregoing reasons, Plaintiffs' Motion to Compel should be denied.

3    DATED: February 22, 2011              MUNGER, TOLLES & OLSON LLP
                                           MARC T.G.  DWORSKY
4                                          DAVID H.  FRY
                                           KATHLEEN M. MCDOWELL
5                                          CAROLYN V.  ZABRYCKI

6                                          By:       */s/ David. H. Fry*
                                                     DAVID H. FRY
7
                                           Attorneys for Defendants
8                                          WELLS FARGO BANK, N.A., WELLS FARGO
                                           ASSET SECURITIES CORP., DAVID
9                                          MOSKOWITZ, FRANKLIN CODEL, THOMAS
                                           NEARY, and DOUGLAS K. JOHNSON
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28