1  MUNGER, TOLLES & OLSON LLP
    Marc T.G. Dworsky (SB# 157413)
2    Kathleen M. McDowell (SB# 115976)
    James C. Rutten (SB# 201791)
3  355 South Grand Avenue, 35th floor
   Los Angeles, California  90071-1560
4  (213) 683-9100; (213) 687-3702 (fax)
   marc.dworsky@mto.com
5  kathleen.mcdowell@mto.com
   james.rutten@mto.com
6
   MUNGER, TOLLES & OLSON LLP
7    David H. Fry (SB# 189276)
    Carolyn V. Zabrycki (SB# 263541)
8  560 Mission Street, 27th floor
   San Francisco, California  94105-2907
9  (415) 512-4000; (415) 512-4077 (fax)
   david.fry@mto.com
10 carolyn.zabrycki@mto.com

11 WELLS FARGO & CO.
    Thomas O. Jacob (SB# 125665)
12 Office of the General Counsel
   MAC A0194-266
13 45 Fremont Street, 26th Floor
   San Francisco, California  94105
14 (415) 396-4425; (415) 975-7864 (fax)
   tojacob@wellsfargo.com
15
   Attorneys for Defendants WELLS FARGO
16 BANK, N.A.; WELLS FARGO ASSET
   SECURITIES CORPORATION;
17 FRANKLIN CODEL; DOUGLAS
   JOHNSON; DAVID MOSKOWITZ; and
18 THOMAS NEARY

PILLSBURY WINTHROP SHAW
PITTMAN LLP
  Bruce A. Ericson (SB# 76342)
  Andrew D. Lanphere (SB# 191479)
50 Fremont Street
Post Office Box 7880
San Francisco, California  94120-7880
(415) 983-1000; (415) 983-1200 (fax)
bruce.ericson@pillsburylaw.com
andrew.lanphere@pillsburylaw.com

FRIED, FRANK, HARRIS, SHRIVER &
JACOBSON LLP
  William G. McGuinness (*pro hac vice*)
  Stephanie J. Goldstein (*pro hac vice*)
One New York Plaza
New York, New York  10004
(212) 859-8000; (212) 859-4000 (fax)
william.mcguinness@friedfrank.com
stephanie.goldstein@friedfrank.com

Attorneys for Defendants DEUTSCHE BANK
SECURITIES, INC.; GOLDMAN SACHS &
CO.; JP MORGAN SECURITIES LLC; BEAR,
STEARNS & CO., INC.; UBS SECURITIES
LLC; CREDIT SUISSE SECURITIES (USA)
LLC; RBS SECURITIES INC.; and CITIGROUP
GLOBAL MARKETS, INC.

19                    UNITED STATES DISTRICT COURT

20         NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

| | |
|---|---|
| 21  IN RE WELLS FARGO MORTGAGE-<br>BACKED CERTIFICATES LITIGATION | CASE NO. 09-01376 (LHK) |
| 22 | CONSOLIDATED CLASS ACTION ECF |
| 23 | **OPPOSITION TO MOTION FOR CLASS CERTIFICATION** |
| 24 | [Declaration of James C. Rutten filed concurrently herewith] |
| 25 | |
| 26 | Date: June 23, 2011<br>Time: 1:30 p.m. |
| 27 | Judge: Honorable Lucy H. Koh<br>Courtroom: 4 |
| 28 | |

**TABLE OF CONTENTS**

I.     INTRODUCTION AND SUMMARY OF ARGUMENT .................................................. 1

II.    BACKGROUND ............................................................................................................ 4

    A.    Each Of The 17 Offerings, 41 Loan Pools, And 438 Tranches Is Unique.............. 4

    B.    Plaintiffs Purchased Certificates From Only 23 Of The 438 Tranches ................. 7

III.    ANALYSIS..................................................................................................................... 8

    A.    Individualized Issues Overwhelm Any Purportedly Common Issues.................... 8

        1.    Individualized Issues Predominate as to § 11's Knowledge Defense......... 8

            a.    Plaintiffs' and their investment advisors' admissions demonstrate that individualized questions of knowledge predominate ................................................................................... 9

            b.    Putative class members' admissions likewise demonstrate that individualized questions of knowledge predominate............. 11

            c.    Other cases against putative class members further demonstrate that individualized questions of knowledge predominate................................................................................... 14

            d.    Changes in available information over time create further individualized questions of knowledge......................................... 15

            e.    Plaintiffs' efforts to sidestep the knowledge issue are meritless ...................................................................................... 16

        2.    Individualized Issues Predominate as to § 11's Reliance Requirement ........................................................................................ 18

        3.    Individualized Issues Predominate as to § 11's Falsity Requirement....... 19

        4.    Individualized Issues Predominate as to § 11's Materiality Requirement ........................................................................................ 21

        5.    Individualized Issues Predominate as to § 11's Damages Requirement ........................................................................................ 23

        6.    Individualized Issues Predominate as to § 11's Causation Requirement ........................................................................................ 24

            a.    Assessing the impact of mortgage defaults, as opposed to other causal factors, will require tranche-by-tranche and investor-by-investor inquiries ...................................................... 25

            b.    Assessing the impact of mortgage defaults caused by alleged departures from underwriting guidelines, as opposed to other factors, will require loan-by-loan and pool-by-pool inquiries...................................................................................... 26

7.   Individualized Questions Predominate as to § 11's Due Diligence Defense ...................................................................................... 27

8.   Individualized Questions Predominate as to the Applicability of the Federal Securities Laws .............................................................. 27

B.   Plaintiffs' Claims Are Not "Typical" Of The Claims Of The Putative Class ....... 28

C.   Plaintiffs Cannot "Adequately" Represent The Putative Class ............................. 28

1.   Plaintiffs Lack Incentives To Litigate Essential Components of the Claims of Other, Differently Situated Investors ......................... 28

2.   Plaintiffs' Interests Conflict with the Interests of Putative Class Members ................................................................................. 29

D.   A Class Action Is Not A "Superior" Way To Adjudicate MBS Claims ............... 32

E.   Splintering The Case Into Subclasses Would Not Cure The Foregoing Infirmities ............................................................................................................... 34

IV.   CONCLUSION ................................................................................................................. 35

1

# TABLE OF AUTHORITIES

2

Page

3

## CASES

4

*Absolute Activist Value Master Fund v. Homm*,
  2010 WL 5415885 (S.D.N.Y. Dec. 22, 2010) ........................................................ 28

5

*Affiliated Ute Citizens v. United States*,
  406 U.S. 128 (1972) ................................................................................................. 19

6

7

*Ambassador Hotel Co. v. Wei-Chuan*,
  189 F.3d 107 (9th Cir. 1999) .................................................................................... 25

8

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) ........................................................................................ 4, 31, 33

9

10

*AT&T Mobility LLC v. Concepcion*,
  _ S. Ct. _, 2011 WL 1561956 (2011) ...................................................................... 35

11

*Ballan v. Upjohn Co.*,
  159 F.R.D. 473 (W.D. Mich. 1994) .......................................................................... 32

12

13

*Barnes v. Am. Tobacco Co.*,
  161 F.3d 127 (3d Cir. 1998) ..................................................................................... 18

14

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ............................................................................................ 19, 21

15

16

*Beecher v. Able*,
  435 F. Supp. 397 (S.D.N.Y. 1975) ........................................................................... 24

17

18

*Betts v. Reliable Collection Agency Ltd.*,
  659 F.2d 1000 (9th Cir. 1981) .................................................................................. 36

19

*Blue Chip Stamps v. Manor Drug Stores*,
  421 U.S. 723 (1975) ................................................................................................. 35

20

21

*Brown v. Ticor Title Ins. Co.*,
  982 F.2d 386 (9th Cir. 1992) .................................................................................... 29

22

23

*Crasto v. Kaskel's Estate*,
  63 F.R.D. 18 (S.D.N.Y. 1974) .................................................................................. 34

24

*Desai v. Deutsche Bank Sec. Ltd.*,
  573 F.3d 931 (9th Cir. 2009) ................................................................................. 2, 19

25

26

*Dukes v. Wal-Mart Stores, Inc.*,
  603 F.3d 571 (9th Cir. 2010) (en banc) ...................................................................... 8

27

28

iii

*Estate of Felts v. Genworth Life Ins. Co.*,
  250 F.R.D. 512 (W.D. Wash. 2008) ................................................................. 34

*Foster v. City of Oakland*,
  2009 WL 88433 (N.D. Cal. Jan. 13, 2009) ......................................................... 35

*Gartin v. S&M Nutec LLC*,
  245 F.R.D. 429 (C.D. Cal. 2007) ........................................................................ 9

*Gen. Tel. Co. v. EEOC*,
  446 U.S. 318 (1980) ........................................................................................... 36

*Gen. Tel. Co. v. Falcon*,
  457 U.S. 147 (1982) ...................................................................................... 8, 28

*Gregurek v. United of Omaha Life Ins. Co.*,
  2009 WL 4723137 (C.D. Cal. Nov. 10, 2009) ................................................... 18

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) ............................................................................ 31

*Hanon v. Dataproducts Corp.*,
  976 F.2d 497 (9th Cir. 1992) .............................................................................. 28

*Harik v. Cal. Teachers Ass'n*,
  326 F.3d 1042 (9th Cir. 2003) ............................................................................ 36

*Hillis v. Equifax Consumer Serv., Inc.*,
  237 F.R.D. 491 (N.D. Ga. 2006) ........................................................................ 28

*Horvath v. Banco Comercial Portugues, S.A.*,
  2011 WL 666410 (S.D.N.Y. Feb. 15, 2011) ...................................................... 28

*In re Ames Dept. Stores, Inc. Note Litig.*,
  991 F.2d 968 (2d Cir. 1993) ............................................................................... 22

*In re Cendant Corp. Sec. Litig.*,
  404 F.3d 173 (3d Cir. 2005) ............................................................................... 36

*In re Constar Int's Sec. Litig.*,
  585 F.3d 774 (3d Cir. 2009) ............................................................................... 19

*In re Graphics Processing Units Antitrust Litig.*,
  253 F.R.D. 478 (N.D. Cal. 2008) ....................................................................... 29

*In re IPO Sec. Litig.*,
  471 F.3d 24 (2d Cir. 2006) ...................................................................... 1, 8, 16

*In re Merrill Lynch & Co. Research Reps. Sec. Litig.*,
  289 F. Supp. 2d 416 (S.D.N.Y. 2003) ......................................................... 25, 26

iv

*In re Monster Worldwide, Inc. Sec. Litig.*,
  251 F.R.D. 132 (S.D.N.Y. 2008) ........................................................................ 18

*In re NCAA I-A Walk-On Football Players Litig.*,
  2006 WL 1207915 (W.D. Wash. May 3, 2006) ...................................................... 31

*In re Prudential-Bache Energy Growth Funds Sec. Litig.*,
  1991 WL 275771 (E.D. La. Dec. 16, 1991) .......................................................... 27

*In re Royal Bank of Scotland PLC Sec. Litig.*,
  _ F. Supp. 2d _, 2011 WL 167749 (S.D.N.Y. Jan. 11, 2011) .............................. 27

*In re Seagate Tech. II Sec. Litig.*,
  843 F. Supp. 1341 (N.D. Cal. 1994) .................................................................... 32

*In re Superior Offshore Int'l, Inc. Sec. Litig.*,
  2010 WL 2305742 (S.D. Tex. June 8, 2010) .......................................................... 8

*In re Wells Fargo Mortgage-Backed Certificates Litig.*,
  2010 WL 5422554 (N.D. Cal. Dec. 27, 2010) ........................................................ 5

*In re Worlds of Wonder Sec. Litig.*,
  35 F.3d 1407 (9th Cir. 1994) ................................................................................ 25

*Kircher v. Putnam Fund Trust*,
  547 U.S. 633 (2006) ............................................................................................ 34

*Klay v. Humana, Inc.*,
  382 F.3d 1241 (11th Cir. 2004) ........................................................................... 23

*Lapin v. Goldman Sachs & Co.*,
  254 F.R.D. 168 (S.D.N.Y. 2008) ........................................................................ 18

*Lewis v. NFL*,
  146 F.R.D. 5 (D.D.C. 1992) ................................................................................ 30

*Lozano v. AT&T Wireless Servs., Inc.*,
  504 F.3d 718 (9th Cir. 2007) ................................................................................. 8

*Lyon v. Caterpillar, Inc.*,
  194 F.R.D. 206 (E.D. Pa. 2000) .......................................................................... 33

*Matrixx Initiatives, Inc. v. Siracusano*,
  131 S. Ct. 1309 (2011) .................................................................................... 3, 21

*McFarland v. Memorex Corp.*,
  96 F.R.D. 357 (N.D. Cal. 1982) .......................................................................... 17

*McGonigle v. Combs*,
  968 F.2d 810 (9th Cir. 1992) .............................................................................. 21

v

*Mendoza v. Home Depot USA, Inc.*,
2010 WL 424679 (C.D. Cal. Jan. 21, 2010) ........................................................................ 9

*Miller v. Thane Int'l, Inc.*,
615 F.3d 1095 (9th Cir. 2010) ........................................................................................... 21

*Morrison v. National Australia Bank Ltd.*,
130 S. Ct. 2869 (2010) .............................................................................................. 27, 28

*N.J. Carpenters Health Fund v. Residential Capital LLC*,
272 F.R.D. 160 (S.D.N.Y. Jan. 18, 2011) ..................................................................*passim*

*Olkey v. Hyperion 1999 Term Trust, Inc.*,
98 F.3d 2 (2d Cir. 1996) ................................................................................................... 20

*Perlmutter v. Intuitive Surgical, Inc.*,
2011 WL 566814 (N.D. Cal. Feb. 15, 2011) .................................................................... 29

*Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*,
601 F.3d 1159 (11th Cir. 2010) ........................................................................................ 36

*Shields v. Smith*,
1992 WL 295179 (N.D. Cal. Aug. 14, 1992) .................................................................... 17

*Sprague v. GM Corp.*,
133 F.3d 388 (6th Cir. 1998) .............................................................................................. 3

*Stout v. Byrider*,
228 F.3d 709 (6th Cir. 2000) ............................................................................................ 28

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
2006 WL 2161887 (S.D.N.Y. Aug. 1, 2006) .................................................................... 19

*Valentino v. Carter-Wallace, Inc.*,
97 F.3d 1227 (9th Cir. 1996) ........................................................................................ 9, 33

*Vinole v. Countrywide Home Loans, Inc.*,
571 F.3d 935 (9th Cir. 2009) .............................................................................................. 8

*Weisberg v. APL Corp.*,
76 F.R.D. 233 (E.D.N.Y. 1977) ........................................................................................ 29

*Yeager's Fuel, Inc. v. Pennsylvania Power & Light Co.*,
162 F.R.D. 471 (E.D. Pa. 1995) ....................................................................................... 31

*Zinser v. Accufix Research Institute, Inc.*,
253 F.3d 1180 (9th Cir. 2001) ......................................................................................... 33

1

## STATUTES AND RULES

15 U.S.C. § 77k ................................................................................................ *passim*

15 U.S.C. § 77p ............................................................................................ 4, 34

Fed. R. Civ. P. 23 ............................................................................................ *passim*

## OTHER AUTHORITIES

5 Disclosure & Remedies Under the Securities Laws (2011)................................ 16, 17

OPP'N TO MOT. FOR CLASS CERTIFICATION
CASE NO. 09-1376-LHK

## I.  INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs ask the Court to do what no court has ever done: certify a class of institutional investors that made multi-million dollar purchases of hundreds of different mortgage-backed securities ("MBS") backed by 41 distinct pools of mortgage collateral with different characteristics and disclosures issued in 17 separate offerings.  Plaintiffs' motion reads like a canned brief from a garden-variety stock drop case, complete with endless case cites from that generic context.  They make no serious effort to explain how *MBS* claims possibly could be tried on a classwide basis given the sophisticated institutions that transact in MBS, the individualized knowledge they have in this sector, and the myriad of individualized issues and intra-class conflicts spawned by the tranche-based structure of MBS.  Plaintiffs utterly fail to meet their burden with respect to virtually every requirement of Federal Rule of Civil Procedure 23:

<u>Predominance Is Lacking</u>: Individualized issues overwhelm any purportedly common issues.  *First*, individualized issues predominate as to the *knowledge* defense under § 11 of the Securities Act of 1933 (the "1933 Act").  *See* 15 U.S.C. § 77k(a) (barring recovery if the investor purchased with knowledge of the matters allegedly misrepresented).  Many of the putative class members are sophisticated and experienced players in the MBS sector, who used proprietary research and analytical models in making MBS purchases, conducted extensive due diligence, and even met with mortgage originators *to understand their mortgage origination practices*.  Many are mortgage originators themselves.  Indeed, many are *defendants* in other MBS cases where they are alleged to have concealed systematic departures from underwriting guidelines.

The case law is clear that where § 11's knowledge defense will necessitate individualized inquiries into what a given investor knew and when it knew it, "the predominance requirement is defeated" because "common questions of knowledge do not predominate over individual ones." *In re IPO Sec. Litig.*, 471 F.3d 24, 43 (2d Cir. 2006) (reversing certification in a § 11 case).[1]  In fact, the Honorable Harold Baer of the Southern District of New York recently denied

---

[1] Throughout this brief, any emphasis in quotations is added, and any internal quotation marks, citations, footnotes, brackets, and ellipses are omitted unless otherwise indicated.  All citations to exhibits are to the exhibits attached to the Declaration of James C. Rutten filed concurrently herewith unless otherwise indicated.

OPP'N TO MOT. FOR CLASS CERTIFICATION
CASE NO. 09-1376-LHK

1   certification in two MBS cases under § 11 precisely because trying the dispositive issue of

2   investor knowledge would "require a great deal of individualized evidence." *N.J. Carpenters*

3   *Health Fund v. Residential Capital LLC*, 272 F.R.D. 160, 168 (S.D.N.Y. Jan. 18, 2011) (review

4   granted Apr. 28, 2011). As Judge Baer observed, "many putative class members are sophisticated

5   investors with significant experience in asset-backed securities markets," and "[d]ifferent levels

6   of sophistication indicate different levels of knowledge." *Id.* at 168-69. He noted that some MBS

7   investors' "regular practice [was] to meet with mortgage originators . . . to understand what their

8   underwriting guidelines were . . . [and] whether originators made any exceptions to their

9   underwriting guidelines" – such that those investors "had at least some awareness of the risk or

10  type of conduct that is targeted in this lawsuit." *Id.* at 169. Judge Baer further explained that

11  because some putative class members are defendants in other MBS cases where they are "alleged

12  to have had knowledge regarding originators' systematic disregard of underwriting guidelines,"

13  such investors "to say the least, present unique issues." *Id.* Judge Baer's decision is on point, and

14  the same result should follow here for the same reasons. *See infra* Part III.A.1.

15      *Second*, individualized issues predominate as to § 11's reliance element. Some 2400

16  putative class members purchased more than 12 months after the initial offering and are required

17  by § 11 to prove that they relied on the allegedly false statements. *See* 15 U.S.C. § 77k(a). Such

18  purchasers cannot avail themselves of any presumption of reliance – this is a § 11 case involving

19  privately negotiated transactions, not a § 10(b) case involving an efficient market – so trial

20  necessarily will entail an individualized inquiry into the specific actions and state of mind of each

21  investor. This is dispositive; where "individual issues pertaining to the issue of reliance

22  predominate over common ones," a court should "decline[] to certify [a] class." *Desai v.*

23  *Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 942 (9th Cir. 2009). *See infra* Part III.A.2.

24      *Third*, individualized questions predominate as to § 11's falsity element. There are 17

25  MBS offerings (each with its own prospectus supplement with unique disclosures), 41 separate

26  loan pools, and over 49,000 individual mortgages of various types issued through differing loan

27  programs by more than 650 different mortgage originators pursuant to a vast web of underwriting

28  guidelines that evolved throughout the relevant period. Whatever ultimately is determined about

2

1   whether loans in one loan pool complied with applicable underwriting guidelines will say nothing

2   about any other loan pool.  A class of purchasers across 17 separate MBS offerings and 41 loan

3   pools is not feasible.  *See infra* Part III.A.3.

4        *Fourth*, individualized questions predominate as to § 11's materiality element, because the

5   "total mix of information" changed dramatically over time as Wells Fargo issued performance

6   reports about the certificates, the credit crisis affected their prices, credit rating agencies

7   downgraded MBS, and so forth.  *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1318

8   (2011).  Further, there are 438 separate tranches at issue, and each represents a unique security

9   with a unique risk/return profile.  Each tranche thus requires individualized analysis with respect

10  to whether alleged departures from underwriting guidelines would have been important to

11  reasonable investors in that tranche.  *See infra* Part III.A.4.

12       *Fifth*, individualized questions predominate as to § 11's damages element and negative

13  causation defense.  A myriad of causal forces impacted the value of the certificates (such as the

14  housing meltdown and the doubling of unemployment) in different ways, over time.  Sorting out

15  whether and how alleged departures from underwriting guidelines played into this causal mix will

16  be an investor-by-investor inquiry depending on *when* the investor transacted in the certificates.

17  How these causal factors affected any of the 438 tranches also will be a tranche-by-tranche

18  inquiry given the very different risk/return profile of each tranche.  *See infra* Parts III.A.5, III.A.6.

19       Typicality is Lacking: Plaintiffs' claims are not "typical because each Plaintiff had its own

20  unique knowledge base respecting its investment; each presents unique questions of reliance; and

21  each invested in a particular tranche that presents individualized questions of materiality,

22  causation, etc.  Because virtually nothing about any Plaintiff's claim is typical of the claim of

23  anyone else, it cannot be said that "as goes the claim of the named plaintiff, so go the claims of

24  the class."  *Sprague v. GM Corp.*, 133 F.3d 388, 399 (6th Cir. 1998).  *See infra* Part III.B.

25       Adequacy is Lacking: Because Plaintiffs invested in only a handful of the 438 tranches,

26  they lack the necessary incentives to prosecute the claims of all putative class members – and

27  worse, their interests affirmatively *conflict* with those of investors in other tranches.  For example,

28  Plaintiffs have an incentive to establish materiality with respect to their *own* tranches, but no

OPP'N TO MOT. FOR CLASS CERTIFICATION
CASE NO. 09-1376-LHK

1   incentive whatsoever to wade into the difficult and very different questions of materiality posed

2   by *other* tranches.  Further, Plaintiffs cannot possibly represent investors from all tranches in

3   settlement negotiations; because the claims of each tranche have different strengths and

4   weaknesses, Plaintiffs would be incentivized to argue that the claims of *their* tranches are

5   particularly strong so as to allocate as much of any settlement proceeds as possible to their own

6   tranches – to the detriment of investors in other tranches.  *See infra* Part III.C.

7         Superiority is Lacking: A class action is not a "superior" method of adjudication because

8   this case is about as far afield as a case can get from the "policy at the very core of the class

9   action mechanism," namely, "to overcome the problem that small recoveries do not provide the

10  incentive for any individual to bring a solo action prosecuting his or her rights."  *Amchem Prods.,*

11  *Inc. v. Windsor*, 521 U.S. 591, 617 (1997).  This case involves predominantly institutional

12  investors with the resources and incentives to bring and control their own claims if they believe

13  they have been wronged.  As Judge Baer explained in denying certification in *N.J. Carpenters*,

14  the purpose of the class action device "is not served where, as here, the proposed class consists of

15  large, institutional and sophisticated investors with the financial resources and incentive to pursue

16  their own claims."  *N.J. Carpenters*, 272 F.R.D. at 170.

17        In fact, several putative class members *are* pursuing their own claims, seeking not just

18  federal remedies, but state law remedies as well – remedies that are not available to them in this

19  putative class action.  *See* 15 U.S.C. § 77p(b).  These putative class members obviously have

20  determined that they do not want to cede control of their claims to Plaintiffs, demonstrating their

21  strong "interests in individually controlling the prosecution" of their own claims and that a class

22  action is not "superior."  Fed. R. Civ. P. 23(b)(3).  *See infra* Part III.D.

23        For these and the other reasons discussed below, Plaintiffs' motion should be denied.

## II.  BACKGROUND

**A.      Each Of The 17 Offerings, 41 Loan Pools, And 438 Tranches Is Unique.**

26        The Court previously recognized in this case: "[E]ach [o]ffering is a separate event, with

27  its own unique set of facts and circumstances, and therefore distinct factual issues.  Thus, there is

28  no reason to assume that . . . rulings made by this Court regarding the Offerings . . . at issue will

1    have implications for [other] Offerings." *In re Wells Fargo Mortgage-Backed Certificates Litig.*,

2    2010 WL 5422554, at *2 (N.D. Cal. Dec. 27, 2010). The Court was clearly correct.

3          The 49,000 loans in the 41 pools are remarkably diverse and were originated pursuant to

4    an array of underwriting guidelines. The loans were originated through various loan programs – a

5    retail channel where Wells Fargo had direct contacts with borrowers; a wholesale channel

6    involving loans to customers referred by mortgage brokers; and a correspondent channel

7    involving loans purchased by Wells Fargo but originated by more than *650 separate companies*.

8    (Expert Rep. of Stephen Prowse ("Prowse") (Ex. 1) at ¶ 27.) Further, even the loans that Wells

9    Fargo originated were subject to very different underwriting criteria. For instance, in Wells

10   Fargo's "full documentation" program, income and assets were verified through significant

11   documentation; in its "asset verification" and "income verification" programs, less was required

12   (for instance, a pay stub or employer statement could suffice to prove income); and in Wells

13   Fargo's "no documentation" program, assets and income were not specifically verified, and thus,

14   Wells Fargo disclosed that those loans "are likely to experience higher rates of delinquency and

15   default." (*Id.*; Prospectus Supp. for 2006-AR10 Offering (Ex. 3) at S-43.)

16         The 17 offerings also are distinct in terms of their loans, loan pools, tranches, and risk

17   disclosures and warnings. For instance, some of the offerings include only fixed-rate loans, while

18   others include adjustable-rate mortgages ("ARMs"); some require only the payment of interest

19   initially, and some require balloon payments; some are purchase-money loans and others are

20   refinances; and some have 30-year terms, while others are for 15 or fewer years. (Prowse ¶¶ 18-

21   19, 27, 30.) Loans were made to borrowers with FICO scores of anywhere from 515 to 825, and

22   they had loan-to-value ratios ("LTVs") ranging from 4.4% to 100%. (*Id.* ¶¶ 30(3), 82.)

23         For example, as disclosed in the prospectus supplement for the 2006-1 Offering, it

24   contained 772 fixed-rate loans, all with terms of 15 or fewer years; half of the loans were "full

25   documentation" loans; 271 had been originated by other companies; and the average LTV was

26   only 61.03%. (Prospectus Supp. for 2006-1 Offering (Ex. 4) at S-1, S-4, S-7, A-1, A-3, A-4, A-

27   5.) The prospectus supplement provided that there was just one loan pool that supported five

28   "senior" or "super-senior" tranches and six subordinated tranches. (*Id.* at S-1, S-4.) This

prospectus supplement, which became effective in February 2006 when real estate was booming, did *not* warn that real estate values had declined or that delinquencies had increased.

In contrast, the prospectus supplement for the 2006-AR10 Offering disclosed that it comprised 5770 loans, all of which were ARMs, the majority of which were interest-only loans, only one-third of which were "full documentation" loans, and only one of which was originated by another company. (Prospectus Supp. for 2006-AR10 Offering (Ex. 3) at S-1, S-20, A-1, A-5, A-8.) It disclosed that the average LTV was 69.07%. (*Id.* at A-1.) It stated that there were 5 loan pools supporting 16 senior or super-senior tranches and 6 subordinated tranches. (*Id.* at S-1, S-6.) In contrast to the 2006-1 Offering, this prospectus supplement warned that "[i]n underwriting an interest only mortgage loan, the ability of the mortgagor to make payments in respect of principal is *not considered*," that "[t]he increase in the mortgagor's monthly payment attributable to principal will occur when the mortgagor's monthly payment may also be increasing as a result of an increase in the mortgage interest rate on the [ARM] adjustment date," and that "[t]his increase . . . may *significantly increase the risk of default*." (*Id.* at S-20.)

In further contrast, the prospectus supplement for the relatively later 2007-11 Offering disclosed that it comprised 6520 loans, nearly half of which were interest-only loans and some of which were balloon loans; less than half were "full documentation" loans; and nearly 3000 had been originated by other companies. (Prospectus Supp. for 2007-11 Offering (Ex. 5) at S-1, S-25, S-26, A-1, A-3, A-5.) It disclosed that the average LTV was an even higher 73.15%. (*Id.* at A-1.) It provided that there was a single loan pool supporting 100 senior or super-senior tranches and six subordinated tranches. (*Id.* at S-1, S-6 – S-10.) This offering, which became effective in July 2007, warned that "the value of mortgaged properties in many states have declined," that "delinquencies and losses with respect to residential mortgage loans generally have increased and may continue to increase," and that this may cause "losses that are higher than you anticipated." (*Id.* at S-25.) Unlike the 2006-1 Offering but like the 2006-AR10 Offering, this prospectus supplement warned of the "higher risk of default" associated with interest-only loans, and unlike both of those other prospectus supplements, warned in detail of the special "risks relating to balloon loans." (*Id.* at S-21, S-25, S-26.)

OPP'N TO MOT. FOR CLASS CERTIFICATION
CASE NO. 09-1376-LHK

Unsurprisingly, the certificates issued in each of the 17 offerings have performed differently.  The 2006-AR10 Offering – which included explicit disclosures of "significantly increase[d] risk of default" – has incurred realized losses of 5.9% of the original principal balance.  (Prowse ¶ 117.)  But the 2007-11 Offering has suffered realized losses of only 1.77%, and the 2006-1 Offering just *0.2%*.  (*Id.* ¶¶ 118-19.)  This stellar performance in the midst of the worst economic downturn since the Great Depression speaks volumes about Plaintiffs' allegations of "systematic departures from underwriting guidelines."

**B.**       **Plaintiffs Purchased Certificates From Only 23 Of The 438 Tranches.**

MBS are complex asset-backed securities that are purchased predominantly by institutions, often acting through the world's most sophisticated investment firms.  The MBS purchases of Plaintiffs, for example, were carried out by the following investment managers: Deutsche Asset Management (an affiliate of German financial giant Deutsche Bank, A.G. with €1.9 trillion in assets), Brandywine Asset Management ("Brandywine") (an affiliate of Legg Mason, Inc. with some $684 billion in assets under management), Aberdeen Asset Management ("Aberdeen") (a British investment firm with some $287 billion in assets under management), Delaware Investments (a member of the Australia-based Macquarie Group with $A317 billion in assets under management), and Logan Circle Partners (an affiliate of Fortress Investment Group with $40 billion in assets under management).

Plaintiffs purchased certificates from 23 tranches beginning in January 2006, and *continued* to purchase as the housing market cooled and eventually collapsed, the market for MBS all but evaporated, and the prices of MBS of every variety from every issuer went into freefall.  They did so because, as one Plaintiff testified, ███████████████████████████████████████████████████████████████████████████████████████████████████████ Plaintiffs thus used the market shock as an opportunity to buy more certificates at deeply discounted prices in August 2007, March 2008, and July 2008.  (Pls.' Resps. to 1st Set of Interrogs. (Ex. 10) at 23, 25,

26.)  Their tactic paid off; prices of the Wells Fargo MBS since have rebounded nearly to par. (Expert Rep. of Bradford Cornell ("Cornell") (Ex. 2) at ¶ 24.)

Against this backdrop, Plaintiffs, professing to have been misled into buying the certificates, ask the Court to certify a single class of everyone who invested in any of the 438 tranches, from any of the 17 offerings, at any time from 2006 through the present day.  Plaintiffs have not remotely shown that this can, or should, be done.

### III.  ANALYSIS

"The party seeking certification bears the burden of demonstrating that [it] has met the requirements of Rule 23[]."  *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 944 n.9 (9th Cir. 2009).  When considering whether a party has met its burden, "district courts are not only at liberty to, but must, perform a rigorous analysis to ensure that the prerequisites of Rule 23 have been satisfied."  *Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571, 594 (9th Cir. 2010) (en banc), *petition for cert. granted*, 113 S. Ct. 795 (2010).  This consideration "will often . . . require looking behind the pleadings to issues overlapping with the merits of the underlying claims."  *Id.*; *accord Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 160 (1982) ("[I]t may be necessary for the court to probe behind the pleadings before coming to rest on the certification question.").  Plaintiffs have not met and cannot meet their burden here.

**A.**    **Individualized Issues Overwhelm Any Purportedly Common Issues.**

**1.**    **Individualized Issues Predominate as to § 11's Knowledge Defense.**

"Plaintiffs must show lack of knowledge to recover on their section 11 claims,"[2] and it is settled that "the predominance requirement is defeated [where] common questions of knowledge do not predominate over individual questions."  *IPO*, 471 F.3d at 43; *accord In re Superior Offshore Int'l, Inc. Sec. Litig.*, 2010 WL 2305742, at *5 (S.D. Tex. June 8, 2010) (denying

---

[2] Some courts characterize lack of knowledge as a defense, but either way, the question is individualized.  *See, e.g.*, *Gartin v. S&M Nutec LLC*, 245 F.R.D. 429, 441 (C.D. Cal. 2007) (because "affirmative defenses . . . turn, in large part, on each class member's knowledge," they would "require an individualized determination for each putative class member"); *Mendoza v. Home Depot USA, Inc.*, 2010 WL 424679, at *10 (C.D. Cal. Jan. 21, 2010) ("[Defendant] has a fundamental due process right to raise affirmative defenses as to individual plaintiffs.  This right . . . makes it difficult to see how class certification would substantially benefit the court.").

OPP'N TO MOT. FOR CLASS CERTIFICATION
CASE NO. 09-1376-LHK

1   certification under § 11 because "Plaintiffs have not satisfied their burden to demonstrate that

2   [common] issues predominate over the knowledge issue – an issue that must be determined on an

3   individualized basis as to each investor").

4          Plaintiffs and their expert are conspicuously silent on how they plan to try the knowledge

5   question across different putative class members.  That Plaintiffs do not even try to meet *their*

6   *burden* on this dispositive question is telling, and by itself requires the denial of their motion.

7   *See, e.g.*, *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) (district court

8   "abused its discretion" in certifying a class where "[t]here has been no showing by Plaintiffs of

9   how the class trial could be conducted").  Further, the evidence is overwhelming that the

10  knowledge question is an individualized one that could only be adjudicated one investor at a time.

11              a.      **Plaintiffs' and their investment advisors' admissions demonstrate that
                        individualized questions of knowledge predominate.**

12

13         Before Plaintiffs bought some of the MBS they now claim they were duped into buying,

14  their counsel literally previewed for them the allegations they later adopted in their Complaint.

15  Plaintiffs' counsel sent them a newsletter in 2007 with an article entitled *Fingerprints of Fraud*,

16  which reported that mortgage "[l]enders made billions by selling ill-suited financial products to

17  over-extended or unworthy borrowers while *subverting – or ignoring altogether – their own*

18  *lending standards*"; that lenders "were incentivized to originate as many loans as possible,

19  regardless of quality"; and that they "*ignore*[*d*] *underwriting standards*" in anticipation of selling

20  off the loans to "third parties" and thereby "shifting the risk of default to . . . investors in MBSs."

21  (Bernstein Litowitz Newsletter for 4th Quarter 2007 (Ex. 13) at 1-2.)[3]  Plaintiffs, having received

22  this advice, nonetheless bought an additional $5 million in Wells Fargo MBS.  (Prowse ¶ 109.)

23         Plaintiffs' counsel were not alone in their admonitions.  ACERA purchased its Wells

24  Fargo MBS through Brandywine, which ███████████████████████████████████████

25  ████████████████████████████████████████████████████████████████████████

26  ───────────────────

27  [3] *See also* ████████████████████████████████████████████████████████

28  ███████████████████████████████████████████████████

OPP'N TO MOT. FOR CLASS CERTIFICATION
CASE NO. 09-1376-LHK

1

2          ACERA was told by Brandywine again

3 in August 2007 that "[t]he complex models built to value [MBS] assumed certain default rates –

4 assumptions which, *due to lax underwriting standards*, turned out to be far too low."

5 (Brandywine Aug. 2007 White Paper (Ex. 15) at 1.)  ACERA was told yet again in September

6 2007 that

7

8

9

10       Similarly, ACERA's Board of Directors was given a presentation in October 2007 by

11 Trust Company of the West ("TCW"), which boasts of its "proprietary trade secret software

12 systems and programs" that "allow[] TCW to query data concerning approximately *20 million*

13 *mortgages* in the United States"; its "proprietary research into mortgage delinquency and default

14 trends"; and its prescience in predicting as early as 2006 that there would be widespread

15 downgrades in MBS ratings and corresponding price declines.  (Compl. filed in *TCW v. Gundlach*

16 (Ex. 32) at ¶¶ 30, 33; TCW Conf. Call Tr. (Ex. 33) at 2-3.)  ACERA's Board was told that "[t]he

17 mortgage and credit side of the [financial] crisis is largely the result of . . . broken risk models in

18 the home loan industry caused by *the loosening of underwriting standards* as companies

19 competed for the mortgage business."  (Oct. 25, 2007 ACERA Bd. Minutes (Ex. 19) at 2.)

20 ACERA was assured, however, that "this is not all bad news" because it was creating "valuable

21 investment opportunities" due to "inefficiencies in the market."  (*Id.*)  ACERA apparently took

22 this advice to heart, purchasing an additional $4.1 million of Wells Fargo MBS at a steeply

23 discounted price.  (Prowse ¶ 110.)

24       Guam and New Orleans present similarly individualized questions.  Guam and New

25 Orleans invested in Wells Fargo MBS through Aberdeen, which "champion[s] [its] original

26 thinking and knowledge," its "specialist investment teams [that] are key to predicting valuations,"

27 and that its "investment decisions are based *only on our own research*."[4]  As Guam's documents

28 ─────────────────────
[4] Aberdeen's descriptions of its "Investment Expertise" and "Fixed Income Investment

state, █████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████ Aberdeen shared with Guam and

New Orleans its conclusion that "too much money was lent *on too-lax terms*," that "[o]ur own

awareness of the problem is well documented," and that "we have been *communicating the risks*

*to our clients*."  (Aberdeen's Dec. 31, 2007 & June 30, 2007 Inv. Reps. to Guam (Exs. 25, 21) and

New Orleans (Exs. 26, 22) at 2.)  As Aberdeen put it, the financial crisis "felt like being hit . . . by

a train *we saw coming from a mile away*."  (Aberdeen's Sept. 30, 2007 Inv. Reps. to Guam (Ex.

23) and New Orleans (Ex. 24) at 2.)

Simply put, if one wants to know whether individualized inquiries would be necessary to

determine whether any given investor possessed knowledge sufficient to defeat a § 11 claim, one

need look no further than Plaintiffs and their own investment advisors.

      **b.**      **Putative class members' admissions likewise demonstrate that**
                    **individualized questions of knowledge predominate.**

The putative class includes some of the most sophisticated financial institutions in the

world, including fixed-income money managers, hedge funds, and "vulture funds" that had teams

of personnel conducting extensive due diligence into MBS and mortgage origination practices.

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████ (Prowse ¶ 116.)

WAMCO bills itself as "one of the world's leading fixed-income managers"[5] with "in-house

quantitative research from *loan level* data to project mortgage pool cash flows . . . and *assess the*

*risk in its []MBS positions*."[6]

---

Philosophy" are available online at www.aberdeen-asset.co.th/aam.nsf/AboutUs/business and
www.aberdeen-asset.us/aam.nsf/usProfessional/fixedPhilosophy (last visited May 1, 2011).

[5] http://www.westernasset.com/us/en/about/ (last visited May 4, 2011).

[6] http://www.westernasset.com/au/qe/pdfs/ppip/Western_Asset_Structured_Products.pdf (last
visited May 4, 2011).

      OPP'N TO MOT. FOR CLASS CERTIFICATION
                    CASE NO. 09-1376-LHK

1    WAMCO testified in *N.J. Carpenters* that, when purchasing MBS, it did not content itself

2    with what the offering documents said, but rather conducted behind-the-scenes due diligence –

3    including "meeting[] [with loan originators] to 'understand what their underwriting guidelines

4    were'" and "whether originators made 'any *exceptions to their underwriting guidelines*.'"  *N.J.*

5    *Carpenters*, 272 F.R.D. at 169.  Similarly, WAMCO testified in another MBS case that it went to

6    great lengths to "get comfort and understanding . . . before we invested" concerning "the way that

7    loans were underwritten."  (Dep. Tr. of WAMCO (Ex. 34) at 146-47; *see also id.* at 228

8    ("Certainly there were discussions, continued discussions along the way with originators about

9    their underwriting guidelines and policies.").)  WAMCO explained that these efforts included

10   "speaking directly with originators, going to their office, [and] talking with their underwriting

11   teams"; as WAMCO put it, there were "a number of different ways we were trying to *ascertain*

12   *exactly how underwriting was being done* for different types of loans."  (*Id.* at 146-47.)

13       Based on WAMCO's testimony and documents, Judge Baer singled it out as the sort of

14   sophisticated investor that presents individualized questions precluding certification:

15   > WAMCO . . . had at least *some awareness of the risk or type of conduct that is*
     > *targeted in this lawsuit*.  [WAMCO's investor reports stated:] "[WAMCO] has
16   > *closely followed* the subprime market since its inception and has *been concerned*
     > *about the deteriorating underwriting standards* over the past few years. . . .
17   > [M]any lenders, especially subprime lenders, began expanding their underwriting
     > guidelines to relax down payment and income requirements.  As an active
18   > participant in the residential mortgage market for more than 25 years, *[WAMCO]*
     > *was aware of these trends through our frequent dialogue with loan brokers,*
19   > *lenders, and other industry professionals*."

20   *N.J. Carpenters*, 272 F.R.D. at 169.[7]

21   ████████████████████████████████████████████████████████████████

22   "belie[f] that many securities that currently appear to be priced for calamity present attractive

23   investment opportunities" and "some of the most compelling investment opportunities lie

24   precisely in real estate related paper."  (*Why We're Buying Mtgs.*, Sep. 2007 (Ex. 37) at 1.)  After

25   issuing this report, ██████████████████████████████████████  (Prowse ¶ 116.)

26

27   _____
     [7] Copies of the WAMCO reports cited in the *N.J. Carpenters* decision are attached to the Rutten
28   Declaration as Exhibits 35 and 36.

OPP'N TO MOT. FOR CLASS CERTIFICATION
CASE NO. 09-1376-LHK

1    Similarly, global investment giant Pacific Income Management Company ("PIMCO"),

2  which bills itself as "one of the largest and most experienced managers of mortgage-backed

3  securities in the world,"[8] ████████████████████  A PIMCO managing director testified

4  to the Financial Crisis Inquiry Commission that PIMCO did not just rely on MBS offering

5  documents, but "literally got on the ground and observed" what he called "the outright

6  degradation of underwriting standards" at some mortgage lenders:

7        Doing your homework is not outsourcing your credit research to the rating
         agencies, but actually *doing it yourself.* . . . We sent out credit analyst[s] to 20
8        different cities to do some old-fashioned shoe leather research.  Literally, 20 cities
         around the country, getting on the ground, *speaking with real estate brokers,*
9        *mortgage brokers, and players in the real estate market* in each local area in order
         to determine just what was going on in the markets, including this degradation,
10       the *outright degradation of underwriting standards.  So we literally got on the*
         *ground and observed it.*

11
12  (May 6, 2010 Tr. of Test. to FCIC (Ex. 38) at 249-50.)  After PIMCO undertook this due

    diligence in 2005 and 2006 (*id.* at 249), ████████████████████████████████
13
    ████████████████████████  (Prowse ¶ 115.)
14
15       Additionally, the Federal Home Loan Mortgage Corporation ("Freddie Mac") is among

16  the most sophisticated players in all aspects of the MBS sector ████████████████

    ████████████████  (*Id.* ¶ 111.)  Freddie Mac was singled out by Judge Baer as an
17
    example of an investor presenting individualized questions of knowledge that preclude
18
    certification: "Freddie and Fannie issued *trillions* of dollars of residential mortgage backed
19
    securities and this gives rise to a reasonably reliable inference that they possessed at least some
20
    knowledge of underwriting practices."  *N.J. Carpenters*, 272 F.R.D. at 169.
21
         Further, numerous other mortgage originators ████████████████████████
22
    ████████████████████████████████████████████████████████████████
23
    ████████████████████████  (Prowse ¶ 112.)  Obviously, these originators
24
    would have had particularly keen insights into mortgage origination practices in the industry, and
25
    present particularly acute individualized questions of knowledge.
26

27  _____

28  [8] http://www2.pimco.com/pim/pdf/product_profiles/gnma.pdf (last visited May 4, 2011).

OPP'N TO MOT. FOR CLASS CERTIFICATION
                                                                  CASE NO. 09-1376-LHK

The Prowse Report contains additional information about the sophistication and knowledge of putative class members, and further demonstrates that adjudicating the knowledge issue can only be done one investor at a time.  (Prowse ¶¶ 52-70 & Ex. 19 thereto.)

### c.     Other cases against putative class members further demonstrate that individualized questions of knowledge predominate.

Numerous putative class members here are defendants in other MBS-related cases – including cases brought by these Plaintiffs and their lawyers.  Those entities are alleged to have concealed "systematic departures from underwriting guidelines," which obviously presents acutely individualized questions of knowledge that would have to be explored in the instant case.

For example, Louisiana, represented by the Bernstein Litowitz firm, sued scores of defendants in *In re Citigroup Bond Litigation*, S.D.N.Y. No. 08-CV-9522 – ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 39; Prowse ¶ 120 & Ex. 24 thereto.) Louisiana's amended complaint alleges that the defendants made misrepresentations about "toxic securities linked to residential mortgages," that lax "mortgage underwriting standards . . . were putting everyone at risk," and that "underwriting was so deficient that . . . lawsuits [were] brought against more than 20 . . . [of the pertinent] lenders."  (Ex. 39 ¶¶ 1, 163, 226.)  Similarly, Louisiana, again represented by the Bernstein Litowitz firm, sued scores of defendants in *In re Wachovia Preferred Securities & Bond/Notes Litigation*, S.D.N.Y. No. 09-CV-6351 – ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 40; Prowse ¶ 120 & Ex. 24 thereto.)  Louisiana alleged that the defendants concealed "lax loan underwriting" and that "underwriting guidelines were being blissfully ignored."  (Ex. 40 ¶ 1 & p.85.)

Additionally, both ACERA and Guam, initially represented by the Bernstein Litowitz firm, sued scores of defendants in *In re Lehman Brothers Securities & ERISA Litigation*, S.D.N.Y. No. 09-MD-2017 – ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮e. (Ex. 41; Prowse ¶ 120 & Ex. 24 thereto.)  Their third amended complaint in that case alleges that the defendants failed to disclose, among other things, that although "loans . . . were supposed to meet underwriting guidelines," there were "hundreds and hundreds of exceptions in order to get the loans through."  (Ex. 41 at 212, App. C, ¶ 6.)

OPP'N TO MOT. FOR CLASS CERTIFICATION
CASE NO. 09-1376-LHK

Judge Baer found it significant that a putative class member in the *N.J. Carpenters* case was "alleged to have had knowledge regarding originators' systematic disregard of underwriting guidelines in another lawsuit." *N.J. Carpenters*, 272 F.R.D. at 169.  As Judge Baer put it, "[f]or Plaintiffs to take the position in this litigation that [that investor] had no such knowledge would, to say the least, present unique issues." *Id.*  Judge Baer's conclusion applies with even greater force here given the far greater number of putative class members implicated.  This highly individualized issue further shows that individualized questions of knowledge predominate.

> **d.**     **Changes in available information over time create further individualized questions of knowledge.**

Plaintiffs cannot seriously dispute that changing information over time spawns further individualized questions of knowledge.  In fact, Plaintiffs have staked out a position in this case that necessarily concedes that the passage of time creates such individualized questions.

Plaintiffs' proposed class contains no end date – it includes purchasers in 2006 before the credit crisis; purchasers in 2007 and 2008 as the economy collapsed, the certificates were downgraded, and mounting information was widely available about mortgage originations and securitizations (*see* Wells Fargo's Mot. to Dismiss filed Oct. 30, 2009 (Dkt. #162) at 18-23); and purchasers in 2009 even after this lawsuit was filed.  Plaintiffs, in response to an interrogatory, first stated that investors "could not have been sufficiently suspicious [about allegedly false statements in the offering documents] until, at the earliest, *May 20, 2008*, when the Certificates . . . *were first downgraded* to below investment grade." (Ex. 11 at 3-4.)  Plaintiffs then amended their response to state that  "purchasers of the Certificates . . . first became aware of falsities and omissions in offering documents . . . on or around *February 3, 2009*," a month before this suit was filed.  (Ex. 12 at 4.)

Plaintiffs thus have admitted that the knowledge question is individualized from at least February 3, 2009 forward, for "widespread knowledge" of pertinent matters necessarily "precipitate[s] individual inquiries as to the knowledge of each member of the class." *IPO*, 471 F.3d at 44.  Indeed, when Plaintiffs were asked by an interrogatory to state when *they* became aware of the alleged falsity of the offering materials, each gave a different answer: New Orleans

OPP'N TO MOT. FOR CLASS CERTIFICATION
CASE NO. 09-1376-LHK

said March 18, Louisiana said March 19, Guam said March 20, and ACERA said not until April 8. (Ex. 11 at 4-5.) Plaintiffs thus cannot dispute that, at least for a substantial portion of the period at issue, individualized questions of knowledge predominate.

Again, Judge Baer found it significant that "putative class members have different levels of knowledge because they purchased the . . . certificates at *different times*, and thus had the benefit of *different levels of information* about the lending practices relevant to investment in [MBS]." *N.J. Carpenters*, 272 F.R.D. at 169. Judge Baer stated: "[L]ater purchasers would have been privy to information about increasing delinquency and foreclosure rates, as well as key ratings downgrades," which "cast increasing levels of doubt on whether the loans comprising mortgage backed securities were originated in conformity with appropriate guidelines and risk analyses." *Id.* at 169-70. Judge Baer's decision applies with equal force here; changing information over time exacerbates the individualized nature of the knowledge inquiry.

### e.  Plaintiffs' efforts to sidestep the knowledge issue are meritless.

Because Plaintiffs have no plan for trying the knowledge issue on a classwide basis, they dismiss the issue in a footnote. They first argue that "the affirmative defense of actual knowledge only applies when the plaintiff actually knew of the untrue statement." (Mot. for Class Cert. ("Mot.") at 21 n.17.) Plaintiffs' own cited authority provides otherwise,[9] but in any event, they miss the point. The question on class certification is not whether a given investor's knowledge defeats its claims on the merits, but *how* the knowledge question will be tried – whether it is a classwide question susceptible to common proof, or an individualized question.

Plaintiffs next suggest that knowledge is not an issue because "Defendants deny the existence of any untrue statement and admit never disclosing the falsities." (Mot. at 21 n.17.) But Plaintiffs *do* contend that there were untrue statements, and if Plaintiffs persuade the jury of that, then the jury will have to decide whether particular investors had knowledge defeating their claims.

---

[9] *See* 5 Disclosure & Remedies Under the Securities Laws § 3:46 (2011) (cited in Mot. at 21 n.17) ("A plaintiff should be deemed to have *constructive knowledge* of public data for Section 11 purposes; such data therefore should stop a Section 11 claim. . . . Permitting publicly available information to defeat a Section 11 claim is consistent with the Supreme Court's decision[s] ... .").

1   Plaintiffs, citing *McFarland v. Memorex Corp.*, 96 F.R.D. 357 (N.D. Cal. 1982), next

2   argue that "questions relating to Defendants' Section 11 knowledge defense raise common (not

3   individualized) questions about what information was available in the market place." (Mot. at 21

4   n.17.) But *McFarland* was a garden-variety stock drop case involving an efficient market and the

5   fraud-on-the-market presumption of reliance, *see id.* at 361-62; it has no application here, where

6   (a) the putative class includes sophisticated financial institutions that conducted extensive,

7   behind-the-scenes due diligence; and (ii) Plaintiffs do not contend that the market was efficient.

8   Plaintiffs also cite 5 Disclosure & Remedies Under the Securities Laws § 3:46 (2011), which is

9   curious, because that treatise states that knowledge "should be measured by a *subjective standard*

10  *(focusing on the plaintiff and his naiveté or sophistication*) rather than by an objective standard."

11  Plaintiffs next argue that the knowledge issue "cannot create individualized issues where

12  . . . the issuer has not issued a curative statement that specifically addressed the misstatements in

13  the Offering Documents." (Mot. at 21 n.17.) Plaintiffs' argument makes no sense; regardless of

14  whether a defendant confesses to wrongdoing, if an investor purchased with knowledge of the

15  matter at issue, then by the express terms of § 11, its claim fails. 15 U.S.C. § 77k(a). The cases

16  Plaintiffs cite – all of which involved § 10(b) fraud-on-the-market claims, not § 11 claims – are

17  not to the contrary. In *Shields v. Smith*, 1992 WL 295179, at *5 (N.D. Cal. Aug. 14, 1992), the

18  pertinent debate was over the typicality requirement (not predominance), and appeared to center

19  around whether curative disclosures had removed the inflation from the stock by the time of the

20  plaintiff's purchase. *In re Monster Worldwide, Inc. Sec. Litig.*, 251 F.R.D. 132, 137-38 (S.D.N.Y.

21  2008), and *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 184 (S.D.N.Y. 2008), likewise

22  concerned not the knowledge defense under § 11, but whether the fraud-on-the-market

23  presumption of reliance applied under § 10(b).

24  Plaintiffs' final plea is that "slight differences in class members' positions" should not

25  preclude certification. (Mot. at 21 n.17.) But potential differences on the dispositive question of

26  knowledge are not "slight" – and can only be explored through individualized testimony about,

27  among other things, the models individual investors used, the due diligence they undertook, and

28  the conversations they had with mortgage underwriters.

17

* * * * *

Simply put, there can be no serious question that "many putative class members are sophisticated investors with significant experience in asset-backed securities markets," that "different putative class members have different levels of knowledge regarding the underwriting guidelines and practices based on their respective levels of sophistication and time of purchase," and that "in this case those issues predominate." *N.J. Carpenters*, 272 F.R.D. at 168-70.[10]

### 2. Individualized Issues Predominate as to § 11's Reliance Requirement.

As explained in Defendants' Motion for Judgment on the Pleadings filed on May 5, 2011 (incorporated here by reference), § 11 explicitly requires an investor to prove reliance on the allegedly false statements to the extent the investor purchased "after the issuer has made generally available to its security holders an earning statement covering a period of at least twelve months beginning after the effective date of the registration statement."  15 U.S.C. § 77k.  Here, more than 2400 putative class members made more than 6700 separate purchases after Wells Fargo made available more than 12 months of reports detailing distribution and pool performance for each of the 17 offerings.  (Prowse ¶ 70.)  Those 2400 investors thus must prove actual reliance, which is an inherently individualized question.  *See Basic Inc. v. Levinson,* 485 U.S. 224, 242 (1988) ("Requiring proof of individualized reliance from each member of the proposed plaintiff class effectively would have prevented [them] from proceeding with a class action, since individual issues then would have overwhelmed the common ones."); *Desai*, 573 F.3d at 942 (where "individual issues pertaining to the issue of reliance predominate over common ones," a court may "decline[] to certify the class").

---

[10] "[D]etermining whether each class member's claim is barred by the statute of limitations raises individual issues that prevent class certification" for the many of the reasons discussed above. *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 149 (3d Cir. 1998).  Even putting aside notions of inquiry notice based on publicly available information, given the sophistication of many putative class members and the individualized due diligence many of them undertook, when any given investor acquired *actual* notice of its purported claims necessarily will be an individualized inquiry.  Because the "statute of limitations [issue] will require individualized findings specific to each class member, [it] is not amenable to collective resolution."  *Gregurek v. United of Omaha Life Ins. Co.*, 2009 WL 4723137, at *8 (C.D. Cal. Nov. 10, 2009).

18

Plaintiffs, quoting *In re Constar International Securities Litigation*, 585 F.3d 774 (3d Cir. 2009), assert that "[s]ince reliance is irrelevant in a § 11 case, a § 11 case will never demand individualized proof as to an investor's reliance or knowledge. . . ." (Mot. at 19 (ellipsis inserted by Plaintiffs).)  Plaintiff's strategic placement of the ellipsis omits that the *Constar* court immediately added: "*except where more than twelve months have passed since the registration statement became effective.*"  *Constar*, 585 F.3d at 784.

Moreover, Plaintiffs do not and cannot contend that investors that purchased more than 12 months after the offerings can invoke any presumption of reliance that would negate the individualized nature of the inquiry.  They do not claim (with argument or evidence) that the fraud-on-the-market presumption, which "depends upon the efficiency of the market in which the security trades," is available here.  *Desai*, 573 F.3d at 942.  Indeed, ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ Plaintiffs likewise cannot invoke the presumption of reliance afforded by *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), for all the reasons discussed in Defendants' Motion for Judgment on the Pleadings.

Because reliance cannot possibly be established on a classwide basis, individualized issues predominate and a class cannot be certified.  *See Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.,* 2006 WL 2161887, at *9-12 (S.D.N.Y. Aug. 1, 2006) (denying certification of a class of MBS investors, and finding that the MBS market was not efficient, that *Affiliated Ute* did not apply, and that individualized questions of reliance therefore overwhelmed any common issues), *aff'd*, 546 F.3d 196 (2d Cir. 2008).

### 3.    Individualized Issues Predominate as to § 11's Falsity Requirement.

Whether any of the offering documents was false by virtue of representing that Wells Fargo generally complied with its underwriting guidelines is not subject to common proof across 17 offerings and 41 loan pools.

*First*, the pertinent representations are different across the 17 offerings because each offering had a different prospectus supplement containing distinct disclosures that were tailored to the unique collateral pool in the specific trust.  (Prowse ¶¶ 21-25.)  Because each "prospectus[] [supplement] must be read as a whole," it is not possible to determine on a classwide basis

19

1   whether "defendants' representations, taken together and in context, would have misled a

2   reasonable investor about the nature of the securities." *Olkey v. Hyperion 1999 Term Trust, Inc.*,

3   98 F.3d 2, 5 (2d Cir. 1996) (affirming dismissal of MBS case).

4       *Second*, the universe of underwriting guidelines applicable to the loans differs from pool

5   to pool.  Identifying the applicable guidelines is the first essential step in determining whether

6   Wells Fargo and the other more than 650 other originators complied with them.  Which

7   guidelines applied turns on numerous different factors that are specific to the individual loans in

8   an individual pool, such as who originated the loan, when it was originated, what loan program

9   was involved, whether it was a fixed-rate loan or an ARM, etc.  (Prowse ¶¶ 42-51 & Exs. 17-18

10  thereto.)  Identifying and analyzing the applicable guidelines will be difficult enough for the jury

11  with respect to just one loan pool; trying to do it for 41 loan pools would be absurdly

12  unmanageable.  (*Id.*)

13      *Third*, once the universe of guidelines for a given pool is identified, the loans in the pool

14  would have to be re-underwritten by experts to determine whether they complied with the

15  guidelines or with *exceptions* to the guidelines.  As the offering documents disclosed, "[i]n certain

16  instances, *exceptions* to the Underwriting Standards may have been granted" (*e.g.*, "Wells Fargo

17  permits debt-to-income ratios to exceed guidelines when the applicant has documented

18  compensating factors").  (Prospectus Supp. for 2006-AR10 Offering (Ex. 3) at S-45; Prospectus

19  for 2006-AR10 Offering (Ex. 3) at 34.)  Any conclusions reached as to any particular pool could

20  not possibly be transposed to any of the other pools containing different loans, issued by different

21  originators, at different times, pursuant to different guidelines.  Thus, ▮▮▮▮▮▮▮▮▮▮▮▮

22  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24      There simply is no manageable way to assess the fundamental question of falsity across

25  17 offerings and 41 separate loan pools containing very different groups of mortgages.

26      **4.**    **Individualized Issues Predominate as to § 11's Materiality Requirement.**

27      Materiality is a "fact-specific" inquiry, *Matrixx*, 131 S. Ct. at 1318, into "whether a

28  reasonable investor would consider a particular misstatement important."  *Miller v. Thane Int'l,*

OPP'N TO MOT. FOR CLASS CERTIFICATION
CASE NO. 09-1376-LHK

1   *Inc.*, 615 F.3d 1095, 1101 (9th Cir. 2010).  Because materiality requires assessing the "total mix

2   of information made available," *Basic*, 485 U.S. at 232, it cannot be assessed classwide where, as

3   here, that information changed over time such that putative class members that bought after the

4   offerings – in many cases years after – had an entirely different quantum of information.  For

5   example, Wells Fargo issued monthly performance reports for the certificates, the rating agencies

6   downgraded them following the credit crisis, and vast quantities of information entered the

7   market concerning origination practices.  (Prowse ¶¶ 52-70.)  Thus, materiality will be a different

8   inquiry for, say, an investor in early 2006 in an initial offering, than for an investor in 2009 after

9   years of performance reports and ratings downgrades.  *See McGonigle v. Combs*, 968 F.2d 810,

10  817 (9th Cir. 1992) (materiality lacking given the plaintiff's sophistication and knowledge).

11          Further, materiality will require not just investor-by-investor inquiries based on changes to

12  the "total mix" of information, but also pool-by-pool and tranche-by-tranche inquiries, for several

13  reasons.  *First*, if any noncompliant loans are identified during the re-underwriting process, the

14  *nature* of the noncompliance will have to be assessed because some types of noncompliance

15  cannot realistically create an expectation of mortgage defaults and thus cannot possibly be

16  material.  For example, a loan file that merely suffers from a technical defect (*e.g.*, a borrower's

17  initials are missing from some routine form) cannot realistically create an expectation of a

18  mortgage default.  Each loan pool will have to be separately assessed in this regard; whatever

19  might be true of one loan pool cannot be transposed to another.

20          *Second*, if Plaintiffs somehow manage to show "systematic" departures from underwriting

21  guidelines in a given pool, whether an investor would consider such departures important will

22  vary by tranche.  *See In re Ames Dept. Stores, Inc. Note Litig.*, 991 F.2d 968, 977, 980 (2d Cir.

23  1993) (investors in different securities from the same issuer "have different concerns," even when

24  "rel[ying] on essentially the same documents").  An investor in a junior tranche presumably will

25  argue that such departures are material because junior investors are directly exposed to losses

26

27

28

OPP'N TO MOT. FOR CLASS CERTIFICATION
CASE NO. 09-1376-LHK

1   resulting from mortgage defaults – whereas those defaults may be irrelevant to an investor in a

2   senior or super-senior tranche that is protected from loss by the junior securities.[11]

3          Plaintiffs' own documents recognize that the materiality inquiry will vary by tranche.  For

4   instance, Guam and New Orleans were advised by Aberdeen that they need not worry about their

5   MBS investments because Aberdeen had "insisted on buying only super-senior AAA bonds

6   which have twice the credit enhancement of the standard AAA."  (Aberdeen's Mar. 31, 2008 Inv.

7   Reps. to Guam (Ex. 27) and New Orleans (Ex. 28) at 3.)  Plaintiffs were told: "In hindsight, that

8   risk management decision was a prescient one.  After draconian stress testing . . . we remain

9   confident that *these super-senior AAA bonds will survive even a potentially severe prime*

10  *mortgage default experience over the next few years*."  (*Id.*)

11

12

13

14

15

16

17         Plaintiffs' own expert admits that "securities that have more credit enhancement (*i.e.*, are

18  more insulated from losses due to default) will be less affected" by the potential for mortgage

19  defaults.  (Rep. of Joseph Mason ("Mason") at ¶ 68.)  His opinion that they will be "affected

20  directionally the same way as those securities that have less credit enhancement" is irrelevant.

21  (*Id.*)

22                                                                        Further, the question on class

23  certification is not whether all tranches will be able to prove materiality on the merits, but *how*

24  they plan to do so – and Plaintiffs have offered no plan for proving materiality across multiple

25  tranches with very different risk/return profiles.

26  _____

[11] An investor in a senior or super-senior tranche may argue that departures from underwriting
27  guidelines are material because when the junior tranches take losses, the credit support for the
    more senior tranches is eroded – but that highly debatable argument would require the parties to
28  present the jury with very different facts, evidence, and expert analyses.

OPP'N TO MOT. FOR CLASS CERTIFICATION
CASE NO. 09-1376-LHK

### 5.    Individualized Issues Predominate as to § 11's Damages Requirement.

Section 11 prescribes three damages measures: (a) if the investor still holds the security, damages are purchase price minus "value" on the date of suit; (b) if the investor sold before suit, damages are purchase price minus sale price; and (c) if the investor sold after suit, damages are purchase price minus *either* "value" on the date of suit *or* sale price, whichever results in lower damages.  15 U.S.C. § 77k(e).[12]  Section 11 thus makes it critical to establish "value" on the date of suit – and Plaintiffs have not met their burden of showing how that possibly could be done on a common basis across 438 separate securities.

This case is unusual in that damages cannot be established "according to some formula, statistical analysis, or other easy or essentially mechanical methods" – the usual situation in which the need for individualized damages determinations does not preclude certification.  *Klay v. Humana, Inc.*, 382 F.3d 1241, 1259-60 (11th Cir. 2004).  Because this case involves an illiquid market and a lack of ready valuation data, it will require fact-intensive, laborious, and time-consuming expert analyses of complex market data and other information to come up with individual "values" for 438 different securities with different performance histories.  There is no feasible way to undertake this exercise in a single trial in front of a single jury.

As Dr. Bradford Cornell explains in his expert report submitted herewith (Ex. 2), ascertaining a "value" for any of the certificates will involve cobbling together various data points (*e.g.*, actual transaction prices, indicative bids (price quotes), values investors assigned to the certificates on their books for accounting purposes, and estimates derived from fundamental valuation techniques such as risk-adjusted cash-flow analyses), and then wrapping subjective judgment around this information.  (Cornell ¶ 20.)  As Dr. Cornell explains, once this is done for a given certificate (tranche), the analysis will have to be performed from scratch for the next

---

[12] Defendants believe that these damages measures logically cannot apply to MBS, which unlike stocks, are not purchased in the hope that they will increase in value such that they can be sold at a profit, but are bought in the hope of earning an income stream as homeowners make their mortgage payments.  Defendants nevertheless assume for present purposes that these damages measures apply, given that that is the position Plaintiffs have taken in this lawsuit.

OPP'N TO MOT. FOR CLASS CERTIFICATION
CASE NO. 09-1376-LHK

certificate, and the next, and so on for all 438 certificates that Plaintiffs seek to combine into a

single class – because each certificate is a separate security with a unique risk/return profile.  (*Id.*)

Plaintiffs' expert

Plaintiffs' expert nonetheless asserts

that "[i]ndependent third parties, such as Interactive Data Corporation ("IDC"), regularly keep

track of and model prices of securities like those in the Offerings.  (Mason Rep. ¶ 99.)  But IDC

data, which is based on internal undisclosed methodologies, is incomplete.  Indeed, IDC lacks *any*

pricing information for nearly 20% of the tranches at issue in this case.  (Cornell ¶ 18.)

Likewise, Plaintiffs' expert ignores that "values" and prices sharply *diverged* once the

credit crisis hit.  (*Id.* ¶ 16.)  Indeed,

Aberdeen's Mar. 31,

2008 Inv. Reps. to Guam (Ex. 27) and New Orleans (Ex. 28) at 3; Mar. 24, 2010 Guam

Performance Meeting Minutes (Ex. 31) at G00002018; Aberdeen's Dec. 31, 2008 Inv. Rep. to

New Orleans (Ex. 29) at 3.)  *See Beecher v. Able*, 435 F. Supp. 397, 405-06 (S.D.N.Y. 1975)

(where market price at the time of suit was influenced by "panic selling" it was not a reliable

indicator of "value" for § 11 purposes).  How Plaintiffs can suggest against this backdrop that

"value" can be assessed in some "formulaic manner" is a mystery.

**6.      Individualized Issues Predominate as to § 11's Causation Requirement.**

Under § 11, a plaintiff cannot recover for any decline in value or price caused by factors

other than the alleged misrepresentations.  15 U.S.C. § 77k(e); *In re Worlds of Wonder Sec. Litig.*,

35 F.3d 1407, 1422 (9th Cir. 1994).  Section 11's causation requirement will necessitate at least two related inquiries in this case: (a) determining the *relative* impact on the value or sale price of a particular certificate at a particular point in time of, on the one hand, mortgage defaults or expected defaults, and on the other hand, non-actionable causal forces such as the credit crisis and MBS market dislocations; and (b) once the impact of mortgage defaults or expected defaults is isolated, determining the extent to which such defaults are attributable to alleged systematic departures from underwriting guidelines, as opposed to non-actionable declines in real estate values, borrowers losing their jobs, etc.  *See, e.g.*, *Ambassador Hotel Co. v. Wei-Chuan*, 189 F.3d 1017, 1028 (9th Cir. 1999) ("When factors other than the defendant's fraud are an intervening direct cause of a plaintiff's injury, that same injury cannot be said to have occurred by reason of the defendant's actions."); *In re Merrill Lynch & Co. Research Reps. Sec. Litig.*, 289 F. Supp. 2d 416, 419 (S.D.N.Y. 2003) ("The burst of the bubble and the attendant market chaos are . . . intervening causes for which defendants are not responsible in the sequence of responsible causation.").  Neither of these inquiries could be performed classwide.

### a. Assessing the impact of mortgage defaults, as opposed to other causal factors, will require tranche-by-tranche and investor-by-investor inquiries.

Assessing the price impact of mortgage defaults or expected defaults, as opposed to market factors such as the credit crisis, will require a separate inquiry for each of the 438 tranches because of the different risk/return profile of each tranche.  (Cornell ¶¶ 27-31.)  For example, assessing the extent to which defaults, as opposed to exogenous market forces, caused the prices of senior or super-senior tranches to decline will be wholly different from assessing how these factors caused the prices of junior tranches to decline, because the former tranches are insulated from mortgage defaults while the latter are not.  (*Id.* ¶¶ 28-29.)

Further, assessing how defaults or expected defaults, as opposed to market forces, impacted prices will be a separate inquiry for each investor because they sold at different times and the various factors depressing prices operated differently at different times.  (*Id.* ¶¶ 32-33.)  For example, with the market depressed in February 2009, ███████ sold certificates from Tranche ████ of the ████ Offering for ████████████████████ whereas in May

1   2010, as the market was recovering, the ▮▮▮▮▮▮▮ firm sold certificates from the same

2   tranche for ▮▮▮▮▮▮▮▮; and in September 2010, ▮▮▮ sold certificates from the same

3   tranche for ▮▮▮▮▮▮▮.  (*Id.* ¶ 33.)  Assessing the impact of market forces thus will

4   require an investor-by-investor inquiry, depending on when the investor sold.  (*Id.* ¶¶ 32-33.)

5           **b.**     **Assessing the impact of mortgage defaults caused by alleged**

6   **departures from underwriting guidelines, as opposed to other factors, will require loan-by-loan and pool-by-pool inquiries.**

7          Filtering out the price impact of market forces, and isolating the price impact of mortgage

8   defaults or expected defaults, would only *begin* the analysis.  One then would have to determine

9   the extent to which those defaults or expected defaults are attributable to allegedly systematic

10  failures to follow underwriting guidelines as opposed to other factors.

11         To illustrate, every pool will have some defaults caused by, among other things,

12  (a) declines in real estate values that lead to borrowers being unable to refinance, or being

13  underwater and strategically walking away from their mortgages; (b) rising unemployment that

14  leads to borrowers losing their jobs; and (c) illnesses, deaths, and other life events.  Further, pools

15  that included ARMs, interest-only loans, or balloon loans will have defaults caused by the

16  inability of some borrowers to make their payments once their interest rates reset, once they were

17  required to start paying principal, or once they were required to make balloon payments.

18  Accordingly, each of the 41 loan pools would have to be analyzed separately to determine the

19  extent to which defaults occurred or are likely to occur as a result of these sorts of non-actionable

20  factors, as opposed to allegedly systematic departures from underwriting guidelines.

21         Once a given pool is analyzed in this regard, any conclusions drawn about why loans *in*

22  *that pool* defaulted could not be transposed to any other pool.  Each of the 41 loan pools has its

23  own unique characteristics, its own level of defaults, and its own individualized reasons for those

24  defaults – making it impossible to make any findings that apply across pools.

25         Simply put, the causation analysis will require tranche-by-tranche, investor-by-investor,

26  and pool-by-pool inquiries.  There is no way to address this critical issue on a classwide basis.

27

28

**7.      Individualized Questions Predominate as to § 11's Due Diligence Defense.**

Individualized issues on the due diligence defense of the Underwriter Defendants also preclude certification.  *See* 15 U.S.C. §§ 77k(b). There were different underwriters for the different offerings.  The determination of whether one underwriter adequately performed due diligence on a given offering could not be carried over to the same underwriter on a different offering, or to another underwriter on any offering.  These individualized issues of due diligence also preclude certification.  *See In re Prudential-Bache Energy Growth Funds Sec. Litig.*, 1991 WL 275771, at *5 (E.D. La. Dec. 16, 1991) (denying certification because of individualized issues relating to the due diligence defense).

**8.      Individualized Questions Predominate as to The Applicability of the Federal Securities Laws.**

The Supreme Court held in *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869, 2884-85 (2010), that an investor cannot avail itself of the federal securities laws unless (a) the transaction at issue took place on a domestic securities exchange, or (b) the transaction otherwise took place in the United States.  Although the Court's decision involved the Securities Exchange Act of 1934, the Court made clear that "[t]he same focus on domestic transactions is evident in the Securities Act of 1933," *id.* at 2885, and lower courts have held that "[u]nder *Morrison,* the Securities Act, like the Exchange Act, does not have extraterritorial reach."  *In re Royal Bank of Scotland PLC Sec. Litig.*, _ F. Supp. 2d _, 2011 WL 167749, at *9 (S.D.N.Y. Jan. 11, 2011).

Plaintiffs' proposed class includes many foreign investors that will have to prove that their individual purchases took place in the United States (Prowse ¶ 114) – which will necessitate individualized inquiries because the securities changed hands in privately negotiated transactions, not through an exchange.  *See, e.g.*, *Horvath v. Banco Comercial Portugues, S.A.*, 2011 WL 666410, at *3 (S.D.N.Y. Feb. 15, 2011) (under *Morrison*, purchases of securities by a "Portuguese bank" through "Luxembourg and Island of Jersey entities" "fall outside of the scope" of the securities laws); *Absolute Activist Value Master Fund Ltd. v. Homm*, 2010 WL 5415885, at *5 (S.D.N.Y. Dec. 22, 2010) (*Morrison* precludes "foreign investors [from] suing . . . domestic

OPP'N TO MOT. FOR CLASS CERTIFICATION
CASE NO. 09-1376-LHK

1    defendants regarding private transactions in securities that were not listed on a United States

2    domestic exchange").  Plaintiffs cannot try this issue on a classwide basis.

3    **B.      Plaintiffs' Claims Are Not "Typical" Of The Claims Of The Putative Class.**

4            Typicality ensures that the premise of the class action device is fulfilled: that "as goes the

5    claim of the named plaintiff, so go the claims of the class." *Stout v. Byrider*, 228 F.3d 709, 717

6    (6th Cir. 2000).  Typicality is lacking for the same reasons predominance is lacking.  Plaintiffs'

7    claims are unique, and it cannot be said that "the interests of the absent parties are fairly

8    encompassed within the named plaintiffs' claim." *Falcon*, 457 U.S. at 160; *accord Hillis v.*

9    *Equifax Consumer Servs., Inc*., 237 F.R.D. 491, 499 (N.D. Ga. 2006) ("Typicality cannot be

10   satisfied when a named plaintiff who proved his own claim would not necessarily have proved

11   anybody else's claim.").  Further, Plaintiffs' claims and the individualized defenses applicable

12   thereto will distract from the trial of the claims of other investors, which further demonstrates that

13   Plaintiffs fail the typicality requirement.  *See Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508

14   (9th Cir. 1992) ("[C]lass certification is inappropriate where a putative class representative is

15   subject to unique defenses which threaten to become the focus of the litigation.").

16   **C.      Plaintiffs Cannot "Adequately" Represent The Putative Class.**

17           "The test for adequacy asks whether . . . the class representative and his counsel will

18   prosecute the action vigorously on behalf of the class," and "whether the class representative and

19   his counsel have any conflicts of interest with other class members." *Perlmutter v. Intuitive*

20   *Surgical, Inc.*, 2011 WL 566814, at *13 (N.D. Cal. Feb. 15, 2011) (Koh, J.); *accord Brown v.*

21   *Ticor Title Ins. Co.*, 982 F.2d 386, 390 (9th Cir. 1992).  Adequacy is lacking here on both counts.

22           **1.      Plaintiffs Lack Incentives To Litigate Essential Components of the Claims of**
                        **Other, Differently Situated Investors.**

23           Plaintiffs lack incentives to prosecute the claims of differently situated putative class

24   members.  For example, they have incentives to contend that *their* knowledge did not rise to a

25   level sufficient to defeat their claims – but no incentive to litigate what knowledge any other

26   investor possessed, much less whether it defeats that investor's claim.  Similarly, Plaintiffs have

27

28

1    incentives to prove that *they* subjectively relied on the statements they claim were false – but no

2    incentive to litigate whether any other investor even read, much less relied on, the statements.

3           Further, Plaintiffs have an incentive to argue that materiality is satisfied as to their

4    tranches because of whatever exposure their tranches had to losses stemming from mortgage

5    defaults – but no incentive to make the much more difficult argument that materiality is satisfied

6    for more senior tranches, which have less exposure to such losses.  For example, Louisiana

7    invested in "super-senior *support*" tranches in three separate offerings – meaning that its tranches

8    provide support for the super-senior tranches and take losses before those tranches.  (Prowse

9    ¶ 34.)  Louisiana presumably will argue that materiality is easily satisfied for its support tranches,

10   but has no incentive to litigate the even more debatable question of whether materiality is

11   satisfied for the much safer super-senior tranches.  *See Weisberg v. APL Corp.*, 76 F.R.D. 233,

12   238 (E.D.N.Y. 1977) (holding that the plaintiff "as a common stockholder is in no position to

13   represent non-common stock sellers" whose damages were "much more tenuous and remote and

14   difficult" to prove; the plaintiff "would have no real incentive to delve into these complications

15   when the determination of damages to the common stock . . . is so much easier").

16          "It does not suffice that . . . counsel have an incentive to prove the [putative class

17   members'] claims"; "the *named plaintiffs* [must] have incentives that align with those of absent

18   class members."  *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 489-90 (N.D.

19   Cal. 2008).  Plaintiffs lack such incentives, and thus fail the adequacy requirement.

20          **2.      Plaintiffs' Interests Conflict with the Interests of Putative Class Members.**

21          Plaintiffs' interests also affirmatively *conflict* with the interests of investors in the

22   hundreds of tranches in which Plaintiffs did not invest.  *First*, Plaintiffs' interests in asking the

23   Court to resolve unsettled legal questions in ways that favor MBS plaintiffs conflict with the

24   interests of putative class members that are defendants in other MBS cases; those entities have an

25   interest in asking the Court to resolve unsettled legal questions in ways that favor *defendants*.

26          *Second*, as noted in Part III.A.1.c above, Plaintiffs' conflict is all the more egregious here

27   because they and their lawyers are the ones *suing* some of those putative class members in other

28   MBS-related cases.  Plaintiffs cannot represent those investors in this case while simultaneously

1    suing them in other cases on the theory that they concealed systematic departures from

2    underwriting guidelines.  "[I]f the class is certified, [counsel] would both represent and be

3    adverse to the [numerous] defendants in [other] case[s] who are also class members here," and

4    such "dual representation is . . . a violation of relevant ethical principles."  *Lewis v. NFL*, 146

5    F.R.D. 5, 10 (D.D.C. 1992) (denying certification on adequacy grounds).

6          *Third*, Plaintiffs' interests directly conflict with those of investors in junior tranches on the

7    issue of causation.  Plaintiffs will never concede that the massive decline in real estate values, the

8    doubling of unemployment, and the other economic calamities that have stricken the nation were

9    sufficient, by themselves, to cause the entirety of the price declines that Plaintiffs' tranches have

10   suffered.  Plaintiffs cannot seriously dispute, however, that such exogenous forces *were*

11   sufficient, by themselves, to decimate the more junior tranches.  Thus, for Plaintiffs to maintain

12   any credibility with the jury as to their own individual claims, they will have to throw the junior

13   investors under the bus.  Plaintiffs cannot adequately represent them in such circumstances.  *See,*

14   *e.g.*, *In re NCAA I-A Walk-On Football Players Litig.*, 2006 WL 1207915, at *8 (W.D. Wash.

15   May 3, 2006) (certification denied where "to prove that he is entitled to a particular piece of the

16   damages pie, each class member will have to offer proof that necessarily will involve arguing that

17   a threshold number of other [class members] would *not* have gotten that same . . . money").

18         *Fourth*, "[s]ettlement is relevant to a class certification," and where there can be "no

19   structural assurance of fair and adequate representation for . . . diverse groups and individuals" in

20   connection with a "global compromise," certification is inappropriate.  *Amchem*, 521 U.S. at 619,

21   627; *accord Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998) ("heightened

22   scrutiny" is required where "class members may have claims of different strength" and there is

23   "concern over settlement allocation decisions"); *Yeager's Fuel, Inc. v. Pa. Power & Light Co.*,

24   162 F.R.D. 471, 481 (E.D. Pa. 1995) ("To varying degrees, settlement potential is a facet of every

25   case, and is a consideration that often partly controls the conduct and course of litigation.  Thus,

26   [a named plaintiff's] potentially conflicting interests with some members of the proposed class

27   regarding settlement raise serious concern regarding its ability to adequately represent the

28   proposed class for litigation.").  Here, Plaintiffs will be unable to negotiate a settlement in a

1    conflict-free manner because different tranches are differently situated, and investors in each

2    tranche will want to allocate as much of a settlement as possible to their own tranches.  For

3    example, investors in junior tranches that have suffered the largest losses will insist on a

4    correspondingly larger recovery; while investors in senior tranches will say that the junior

5    investors should get a small recovery because the junior investors would have suffered those

6    losses in any event due to macroeconomic factors such as declines in home prices.  This creates

7    not just intra-class conflicts, but actual conflicts on the part of Plaintiffs – which, like everyone

8    else, will want to allocate as much of any settlement to their own tranches as possible.[13]

9         *Fifth*, § 11's damages measure creates intra-class conflicts because the market was illiquid

10   and "value" does not correspond to a readily determinable market price.  To illustrate, both

11   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ and ▓▓▓▓ invested in Tranche ▓▓ of the ▓▓▓▓▓

12   Offering, and both sold post-suit.  (Prowse ¶ 113.)  ▓▓▓▓ sold part of its holdings in September

13   2009 at ▓▓▓▓▓▓▓, and ▓▓▓▓ sold the same security in April 2010 at ▓▓▓

14   ▓▓.  (*Id.*)  ▓▓▓▓ will want Plaintiffs to try to prove that "value" at the time of suit was

15   ▓▓▓▓▓▓▓ because otherwise its presumptive damages will be reduced by § 11's damages

16   formula.  ▓▓▓▓, by contrast, will not want Plaintiffs to make such an aggressive argument

17   (which could cost Plaintiffs credibility), but merely will want Plaintiffs to prove that "value" at

18   the time of suit was ▓▓▓▓▓▓  Plainly, putative class members who sold after suit will have

19   conflicting interests when it comes to these issues, and Plaintiffs cannot possibly represent them

20   in a conflict-free manner.  *See In re Seagate Tech. II Sec. Litig.*, 843 F. Supp. 1341, 1359 (N.D.

21   Cal. 1994) (denying certification because "different plaintiffs have conflicting incentives in

22   shaping the evidence" on damages issues); *see also Ballan v. Upjohn Co*., 159 F.R.D. 473, 485

23   (W.D. Mich. 1994) ("It is reasonable to assume that this case will involve a large number of

24   sellers and buyers whose interests will conflict with respect to proof of price inflation").

25        But the foregoing analysis is too charitable to Plaintiffs, because the reality is that neither

26   ▓▓▓▓▓▓▓▓▓ nor any other investor in ▓▓▓▓▓▓ can count on Plaintiffs to make *any*

27   ────────────────
     [13] The Supreme Court has made clear that the requirement of judicial approval of a settlement
28   does not cure the problem.  *See Amchem*, 521 U.S. at 621.

                                    31                    OPP'N TO MOT. FOR CLASS CERTIFICATION

1    argument concerning that tranche.  Plaintiffs did not invest in that tranche, and thus have no

2    incentive to spend their time, money, and credibility litigating over it.  That Plaintiffs have no

3    incentive to take *any* of the conflicting positions different putative class members will want and

4    need them to take certainly is no virtue, and hardly cures the intra-class conflict.

5    **D.      A Class Action Is Not A "Superior" Way To Adjudicate MBS Claims.**

6             This case flunks the superiority requirement for many reasons.  *First*, "the likely

7    difficulties in managing a class action" are immense in light of the complex issues that could only

8    be tried investor by investor, pool by pool, and tranche by tranche.  Fed. R. Civ. P. 23(b)(3)(D).

9    This precludes certification because "[if] each class member has to litigate numerous and

10   substantial separate issues to establish his or her right to recover individually, a class action is not

11   'superior.'"  *Zinser v. Accufix Research Inst., Inc.,* 253 F.3d 1180, 1192 (9th Cir. 2001).

12            Judge Baer found this to be significant: "[A]ddressing all claims as part of the same class

13   would present obstacles to the management of the litigation.  Were I to certify the proposed

14   classes the Court would have to hear significant individualized evidence on, among other things,

15   each purchaser's knowledge and damages.  The necessity of hearing all this individualized

16   evidence defeats the requisite superiority of class treatment."  *N.J. Carpenters*, 272 F.R.D. at 170;

17   *accord Valentino*, 97 F.3d at 1231 ("[C]lass adjudication would not be superior to individualized

18   litigation [where it] would [not] save time or expense, and [there are significant] management

19   difficulties caused by the complexity and multiplicity of issues . . . .").

20            *Second*, this is not a case where class treatment is needed "to overcome the problem that

21   small recoveries do not provide the incentive for any individual to bring a solo action prosecuting

22   his or her rights."  *Amchem*, 521 U.S. at 617.  This is a case in which putative class members

23   invested as much as $⬛⬛⬛ in the Wells Fargo MBS.  (Prowse ¶ 111.)  As Judge Baer

24   found, the policy of "allow[ing] large groups of claimants to bundle into a single action common

25   claims that are too small to pursue individually" is "not served where, as here, the proposed class

26   consists of large, institutional and sophisticated investors with the financial resources and

27   incentive to pursue their own claims."  *N.J. Carpenters*, 272 F.R.D. at 170-71; *accord Lyon v.*

28

                                                  32                    OPP'N TO MOT. FOR CLASS CERTIFICATION
                                                                        CASE NO. 09-1376-LHK

*Caterpillar, Inc.*, 194 F.R.D. 206, 222 (E.D. Pa. 2000) (class action not superior where claims exceeded $100,000 per person, an amount sufficient to "make individual suits feasible").

     *Third*, individual investors that think they have been wronged unquestionably have strong "interests in individually controlling the prosecution" of their claims rather than ceding control to these Plaintiffs – an especially acute concern for the putative class members that are defendants in other MBS suits.  Fed. R. Civ. P. 23(b)(3)(A).  Again, Judge Baer found this to be significant:

> The putative[] class would include entities that are defendants in [a related MBS] case.  In addition to pension funds, the classes as proposed would include hedge funds and mutual funds, which were deeply involved in and profited from residential mortgage backed securities and other structured-finance products. Given these various levels of involvement and the high stakes in the subject matter of the lawsuit, individual class members would have competing interests in controlling the prosecution of the action, further eroding the superiority of class treatment.

*N.J. Carpenters*, 272 F.R.D. at 171.

     Proving that investors have the ability and incentives to bring their own suits, three putative class members (Union Central Life Insurance Company, Ameritas Life Insurance Company, and Acacia Life Insurance Company) recently opted out and filed their own MBS case against Wells Fargo regarding some of the same offerings at issue here.  (Ex. 42 ¶ 19.)  Similarly, Charles Schwab Corporation has filed two MBS lawsuits, and two Federal Home Loan Banks have filed three MBS lawsuits, against Wells Fargo in state court.  (Exs. 43-43.)  All these plaintiffs seek not just federal remedies, but state law remedies – remedies that are not available to them in this class action.  *See* 15 U.S.C. § 77p(b) (precluding state law securities class actions); *Kircher v. Putnam Funds Trust*, 547 U.S. 633 (2006).

     To the extent investors bring individual claims in state court, it is obviously because they believe their interests are better served by seeking state law remedies in state court.  And to the extent investors bring individual claims in federal court, "[t]he resources of the court can best be utilized by employing the liberal provisions in the Federal Rules of Civil Procedure for multi-party litigation, including permissive joinder, intervention and consolidation."  *Crasto v. Kaskel's Estate*, 63 F.R.D. 18, 25 (S.D.N.Y. 1974) (denying certification).  Coordinating investor claims would retain the efficiencies of a class action without requiring an unworkable common trial of

individual issues, while allowing individual investors to control their own claims.  *See Estate of Felts v. Genworth Life Ins. Co.*, 250 F.R.D. 512, 520 (W.D. Wash. 2008) ("Because each class member has a substantial monetary interest in pursuing relief, joinder is more practical."); 6A Fed. Proc., L. Ed. § 12:240 ("[P]ermissive joinder, intervention, and consolidation may be superior to the class action device where the members of the class have a strong interest in individually controlling the prosecution of their claims.").  Indeed, another investor that sued Wells Fargo, First Star Bank, acknowledged to the Court that separate actions "can proceed on a coordinated basis" and that "[t]he Court can have confidence that plaintiffs' counsel will find means to litigate their separate actions efficiently and without duplication."  (Dkt. #265 at 9.)

Plaintiffs nonetheless argue that negative causation principles threaten to render "the potential recovery . . . too uncertain and small to justify [individual actions]."  (Mot. at 23.)  That Plaintiffs think their claims are weak hardly makes a class action superior; certification would merely create "a settlement value to the plaintiff[s] out of any proportion to [their] prospect of success.  *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 740 (1975); *see also AT&T Mobility LLC v. Concepcion*, _ S. Ct. _, 2011 WL 1561956, at *12 (2011) (noting the risk of "*in terrorem* settlements that class actions entail").  In any event, unless Plaintiffs want to stipulate that causation principles negate the overwhelming majority of the damages they seek, there can be no serious question that investors have both the wherewithal and incentives to bring their own suits if they think they have been wronged – just as several investors already have done.

**E.    Splintering The Case Into Subclasses Would Not Cure The Foregoing Infirmities.**

Tacitly recognizing that the class they propose cannot be certified, Plaintiffs resort to the old standby of, "To . . . ensure that this action is manageable, the Court may create subclasses." (Mot. at 24.)  Subclasses would not fix the foregoing problems because creating subclasses by offering, pool, or tranche would not change the fact that the case cannot possibly be tried on a class basis because of the individualized issues presented by *different investors* regardless of offering, pool, or tranche (*e.g.*, issues of knowledge and reliance).  Further, splintering the case

into 17 subclasses (one for each offering) or 41 subclasses (one for each pool) would not suffice, because of the individualized issues that still would have to be decided tranche by tranche.  There would have to be 438 subclasses – one for each tranche.

Moreover, subclasses – be they 17, 41, or 438 – clearly would not be "superior" to individual suits, for "a class action containing a multitude of subclasses loses many of the benefits of the class action format."  *In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 202 (3d Cir. 2005); *accord Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1176 (11th Cir. 2010) ("[T]he necessity of a large number of subclasses may indicate that common questions do not predominate.").  Further, subclasses for each tranche would not work because Plaintiffs invested in only 23 tranches, and thus could not represent the other 415; it is "a fundamental requirement in the establishment of a subclass that the representative plaintiff must be a member of the class [it] wishes to represent."  *Betts v. Reliable Collection Agency Ltd.*, 659 F.2d 1000, 1005-06 (9th Cir. 1981).  Additionally, Plaintiffs cannot show that numerosity is satisfied for a number of tranches, many of which had fewer than five investors.  For example, dozens of tranches have ███████████████████████ (Prowse ¶¶ 106-08.)  *See Harik v. Cal. Teachers Ass'n*, 326 F.3d 1042, 1051 (9th Cir. 2003) (citing *Gen. Tel. Co. v. EEOC*, 446 U.S. 318, 330 (1980), and noting that "the Supreme Court has held fifteen is too small"); *see also Foster v. City of Oakland*, 2009 WL 88433, at *3 (N.D. Cal. Jan. 13, 2009) ("The court must . . . determine not only whether the numerosity requirement is met for the overall class, but whether each subclass meets the requirement.").

## IV.  CONCLUSION

Because this case is unfit for class treatment on every level, the motion should be denied.

| MUNGER, TOLLES & OLSON LLP | PILLSBURY WINTHROP SHAW PITTMAN LLP |
|---|---|
| | FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP |
| By: _____ /s/ James C. Rutten _____<br>James C. Rutten | By: _____ /s/ Bruce A. Ericson _____<br>Bruce A. Ericson |
| Attorneys for Wells Fargo Defendants | Attorneys for Underwriter Defendants |

OPP'N TO MOT. FOR CLASS CERTIFICATION
CASE NO. 09-1376-LHK

1

## FILER'S ATTESTATION

2        I, James C. Rutten, am the ECF user whose ID and password are being used to file this

3   Opposition to Motion for Class Certification.  In compliance with General Order 45, Paragraph

4   X.B, I hereby attest that the other attorney listed as a signatory above has concurred in this filing.

5

6   DATED: May 5, 2011                    By:_____ /s/ James C. Rutten_____
                                                      James C. Rutten

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OPP'N TO MOT. FOR CLASS CERTIFICATION
CASE NO. 09-1376-LHK