1   BERNSTEIN LITOWITZ BERGER
        & GROSSMANN LLP
2   DAVID R. STICKNEY  (Bar No. 188574)
3   TIMOTHY A. DeLANGE  (Bar No. 190768)
    NIKI L. MENDOZA (Bar No. 214646)
4   MATTHEW P. JUBENVILLE (Bar No. 228464)
    JONATHAN D. USLANER (Bar No. 256898)
5   PAUL M. JONNA (Bar No. 265389)
    12481 High Bluff Drive, Suite 300
6   San Diego, CA 92130
7   Tel:    (858) 793-0070
    Fax:    (858) 793-0323
8   davids@blbglaw.com
    timothyd@blbglaw.com
9   nikim@blbglaw.com
    matthewj@blbglaw.com
10  jonathanu@blbglaw.com
    paulj@blbglaw.com
11
12  *Counsel for Lead Plaintiffs Alameda County*
    *Employees' Retirement Association, Government of*
13  *Guam Retirement Fund, New Orleans Employees'*
    *Retirement System, Louisiana Sheriffs' Pension and*
14  *Relief Fund, and the Class, and for additional*
    *Plaintiffs Public Employees' Retirement System*
15  *of Mississippi, and Vermont Pension Investment Committee*

16                  UNITED STATES DISTRICT COURT

17          NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

18  | | |
    |---|---|
19  | IN RE WELLS FARGO MORTGAGE-BACKED CERTIFICATES LITIGATION | Case No. 09-CV-1376-LHK (PSG) |
20  | | CONSOLIDATED CLASS ACTION ECF |
21  | | **LEAD PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
22  
23  
24  
25  | | Date:   October 27, 2011 |
    | | Time:  1:30 p.m. |
26  | | Courtroom:     4, 5th Floor |
    | | Judge: Lucy H. Koh |
27

28

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that, pursuant to the Court's Order Preliminarily Approving Settlement, Providing For Notice And Scheduling Hearing ("Preliminary Approval Order," ECF No. 447), on October 27, 2011, at 1:30 p.m., before the Honorable Lucy H. Koh of the United States District Court for the Northern District of California, San Jose, California, Lead Plaintiffs the Alameda County Employees' Retirement Association, Government of Guam Retirement Fund, New Orleans Employees' Retirement System and Louisiana Sheriffs' Pension and Relief Fund ("Lead Plaintiffs") will and hereby do move the Court for an order, pursuant to Fed. R. Civ. P. 23(e), granting final approval of the Settlement in the above-captioned action on the terms set forth in the Stipulation of Settlement dated as of July 5, 2011 (the "Stipulation"),[1] including approving the proposed Plan of Allocation for distribution of the settlement proceedings, and granting final certification of the Class as certified in the Court's Preliminary Approval Order.[2]

This Motion is based on this Notice of Motion, the Memorandum of Points and Authorities in Support Thereof, the Declaration of David R. Stickney in Support of Motion for Final Approval of

---

[1] All capitalized terms that are not defined herein are defined in the Stipulation, which was filed on July 6, 2011.

[2] The Settlement Class, or "Class," as certified in the Court's Preliminary Approval Order, is defined as follows: all persons or entities who purchased or otherwise acquired mortgage pass-through certificates pursuant or traceable to Wells Fargo Asset Securities Corporation's July 29, 2005 Registration Statement, October 20, 2005 Registration Statement, or September 27, 2006 Registration Statement, and the accompanying prospectuses and prospectus supplements in the following 28 offerings and who were damaged thereby: The WFMBS 2006-1 offering, WFMBS 2006-2 offering, WFMBS 2006-3 offering, WFMBS 2006-4 offering, WFMBS 2006-6 offering, WFMBS 2006-AR1 offering, WFMBS 2006-AR2 offering, WFMBS 2006-AR4 offering, WFMBS 2006-AR5 offering, WFMBS 2006-AR6 offering, WFMBS 2006-AR8 offering, WFMBS 2006-AR10 offering, WFMBS 2006-AR11 offering, WFMBS 2006-AR12 offering, WFMBS 2006-AR14 offering, WFMBS 2006-AR17 offering, WFMBS 2007-11 offering, WFMBS 2006-7 offering, WFMBS 2006-10 offering, WFMBS 2006-AR16 offering, WFMBS 2006-18 offering, WFMBS 2006-AR19 offering, WFMBS 2006-20 offering, WFALT 2007-PA1 offering, WFMBS 2007-AR4 offering, WFMBS 2007-10 offering, WFMBS 2007-13 offering, and WFMBS 2006-AR15 offering. Excluded from the Class are Defendants and their respective officers, affiliates and directors at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which any Defendant has or had a controlling interest, except that Investment Vehicles shall not be excluded from the Class. Also excluded from the Class are any persons or entities who exclude themselves by filing a valid request for exclusion in accordance with the requirements set forth in the Notice.

---

1  Settlement and Plan of Allocation, and Motion for Approval of Attorneys' Fees and Expenses

2  ("Stickney Decl."), all pleadings and papers filed herein, arguments of counsel, and any other matters

3  properly before the Court.

4  ### STATEMENT OF ISSUES TO BE DECIDED (Civil L.R. 7-4(a)(3))

5      1.     Whether the $125 million Settlement is fair, reasonable and adequate.

6      2.     Whether the proposed Plan of Allocation is fair and reasonable.

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ................................................................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES .................................................. 1

I.    PROCEDURAL HISTORY ..................................................................................... 3

    A.    Background ..................................................................................................... 3

    B.    The Commencement And Consolidation Of Actions, The Appointment Of
        Lead Plaintiffs, And Defendants' Unsuccessful Motion To Transfer ........................ 4

    C.    Preparation And Filing Of The Consolidated Complaint And Overcoming
        Defendants' Motions To Dismiss ...................................................................... 5

    D.    The Discovery Process .................................................................................... 6

    E.    Experts And Consultants .................................................................................. 7

    F.    Lead Plaintiffs' Motion For Class Certification And Defendants' Motion For
        Judgment On The Pleadings And/Or Partial Summary Judgment .............................. 8

    G.    The Extensive Negotiations Leading To The Settlement ........................................ 8

    H.    Overview of Notice Process ............................................................................. 9

II.   ARGUMENT ...................................................................................................... 10

    A.    The Standards For Judicial Approval Of Class Action Settlements ....................... 10

    B.    The Settlement Meets The Ninth Circuit Standard For Approval ........................... 11

        1.    Lead Plaintiffs' Case Is Strong, But Entails Risks ...................................... 11

        2.    The Expense, Complexity, And Likely Duration Of Further Litigation ........ 14

        3.    The Amount Obtained In Settlement ........................................................ 14

        4.    The Extent Of Discovery Completed And The Stage Of The
            Proceedings ...................................................................................... 16

        5.    The Experience And Views Of Lead Counsel And Lead Plaintiffs .............. 17

        6.    Reaction Of The Class Members To The Proposed Settlement ................... 19

    C.    The Class Received Adequate Notice ............................................................... 19

    D.    The Plan Of Allocation Should Be Approved .................................................... 21

III.  THE CLASS SHOULD BE CERTIFIED FOR SETTLEMENT PURPOSES ................... 23

IV.   CONCLUSION ................................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anixter v. Home-Stake Prod. Co.*,
   77 F.3d 1215 (10th Cir. 1996) ........................................................................13, 14

*In re Apple Computer Sec. Litig.*,
   1991 WL 238298 (N.D. Cal. Sept. 6, 1991) .................................................13

*In re BankAtlantic Bancorp, Inc.*,
   2011 WL 1585605 (S.D. Fla. Apr. 25, 2011) ..............................................13

*Boyd v. Bechtel Corp.*,
   485 F. Supp. 610 (N.D. Cal. 1979) ..............................................................17

*City of Detroit v. Grinnell Corp.*,
   356 F. Supp. 1380 (S.D.N.Y. 1972) .............................................................15

*City of Detroit v. Grinnell Corp.*,
   495 F.2d 448 (2d Cir. 1974)..........................................................................15

*Class Plaintiffs v. Seattle*,
   955 F.2d 1268 (9th Cir. 1992) ......................................................................22

*In re Connetics Sec. Litig.*,
   07-02940 SI (N.D. Cal.)................................................................................18

*In re Crazy Eddie Sec. Litig.*,
   824 F. Supp. 320 (E.D.N.Y. 1993) ...............................................................15

*Ellis v. Naval Air Rework Facility*,
   87 F.R.D. 15 (N.D. Cal. 1980)......................................................................17

*In re First Capital Holdings Corp. Fin. Prods. Sec. Litig.*,
   1992 WL 226321 (C.D. Cal. June 10, 1992) ................................................17

*In re Gemstar-TV Guide Int'l Inc. Sec. Litig.*,
   02-CV-2775-MRP (C.D. Cal.).......................................................................18

*Glass v. UBS Fin. Servs., Inc.*,
   2007 WL 221862 (N.D. Cal. Jan. 26, 2007),
   *aff'd*, 331 Fed. Appx. 452 (9th Cir. 2009) ..............................................18, 22

*In re Heritage Bond Litig.*,
   2005 WL 1594403 (C.D. Cal. June 10, 2005) ........................................14, 15, 18

*In re Immune Response Sec. Litig.*,
   497 F. Supp. 2d 1166 (S.D. Cal. 2007).........................................................21

*In re Int'l Rectifier Corp. Sec. Litig.*,
    07-02544-JFW (C.D. Cal.)...................................................................................18

*Lundell v. Dell, Inc.*,
    2006 WL 3507938 (N.D. Cal. Dec. 5, 2006)..............................................18, 19

*Maley v. Del Global Tech. Corp.*,
    186 F. Supp. 2d 358 (S.D.N.Y. 2002).....................................................14

*In re Maxim Integrated Prods., Inc. Sec. Litig.*,
    08-00832-JW (N.D. Cal.).....................................................................18

*In re McKesson HBOC, Inc. Sec. Litig.*,
    99-CV-20743 RMW (N.D. Cal.) ...........................................................18

*In re Mego Fin. Corp. Sec. Litig.*,
    213 F.3d 454 (9th Cir. 2000) ...........................................10, 14, 16, 22

*N.J. Carpenters Health Fund v. Residential Capital, LLC*,
    272 F.R.D. 160 (S.D.N.Y. 2011) .........................................................12

*Nat'l Rural Telecomms. Coop. v. DIRECTV*,
    221 F.R.D. 523 (C.D. Cal. 2004) .........................................................19

*In re New Century*,
    588 F. Supp. 2d 1206 (C.D. Cal. 2008) .........................................11, 18

*Officers for Justice v. Civil Serv. Comm'n*,
    688 F.2d 615 (9th Cir. 1982) .........................................................10, 11, 14

*In re Omnivision Techs., Inc.*,
    559 F. Supp. 2d 1036 (N.D. Cal. 2007) ...............................10, 17, 19, 22

*In re Oracle Sec. Litig.*,
    1994 WL 502054 (N.D. Cal. June 18, 1994)........................................22

*In re Pac. Enters. Sec. Litig.*,
    47 F.3d 373 (9th Cir. 1995) ...............................................................18

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*,
    658 F. Supp. 2d 299 (D. Mass. 2009) .........................................11, 12

*In re Portal Software, Inc. Sec. Litig.*,
    2007 WL 4171201 (N.D. Cal. Nov. 26, 2007) .....................................21

*In re Rambus Inc. Deriv. Litig.*,
    2009 WL 166689 (N.D. Cal. Jan. 20, 2009)...........................10, 16, 18, 19

*Pub. Emps. Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc.*,
    08-cv-10841 (S.D.N.Y. June 16, 2011, and Aug. 22, 2011)..................18

*Robbins v. Koger Props. Inc.*,
    116 F.3d 1441 (11th Cir. 1997) .................................................................13

*Rodriguez v. W. Publ'g Corp.*,
    563 F.3d 948 (9th Cir. 2009) ...................................................................21

*In re Stac Elecs. Sec. Litig.*,
    89 F.3d 1399 (9th Cir. 1996) ...................................................................11

*In re Sumitomo Cooper Litig.*,
    189 F.R.D. 274 (S.D.N.Y. 1999) .............................................................14

*In re Top Tankers, Inc. Sec. Litig.*,
    2008 WL 2944620 (S.D.N.Y. July 31, 2008) ..........................................14

*Torrisi v. Tucson Elec. Power Co.*,
    8 F.3d 1370 (9th Cir. 1993) .....................................................................11

*In re Wash. Pub. Power Supply Sys. Sec. Litig.*,
    720 F. Supp. 1379 (D. Ariz. 1989) ..........................................................10

*Weinberger v. Kendrick*,
    698 F.2d 61 (2d Cir. 1982) ......................................................................11

*In re WorldCom, Inc. Sec. Litig.*,
    388 F. Supp. 2d 319 (S.D.N.Y. 2005) .....................................................22

STATUTES, RULES & REGULATIONS

15 U.S.C. § 77k(e) ............................................................................................11

28 U.S.C. § 1404(a) ............................................................................................5

Federal Rules of Civil Procedure
    Rule 23(e)(1) ...........................................................................................20
    Rule 26(f) ...................................................................................................6
    Rule 54(b) ...................................................................................................6

SECONDARY AUTHORITIES

Elaine Buckberg, et al., "Recent Trends in Shareholder Class Action Litigation: Bear
    Market Cases Bring Big Settlements," (NERA Feb. 2005).....................15

H.R. CONF. REP. 104-369 (1995) ......................................................................19

Laura E. Simmons & Ellen M. Ryan, "Post-Reform Act Securities Settlements, 2005
    Review and Analysis," at 5 (Cornerstone Research 2006) ......................15

MANUAL FOR COMPLEX LITIGATION (THIRD) § 30.44 (1995) .........................19

1

2

Stephanie Plancich and Svetlana Starykh, "Recent Trends in Securities Class Action
    Litigation: 2009 Year-End Update," (NERA Dec. 2009)........................................................16

3

Todd Foster, Ronald I. Miller and Stephanie Plancich, "Recent Trends in Shareholder
    Class Action Litigation: Filings Plummet, Settlements Soar," (NERA Jan. 2007)................15

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

Lead Plaintiffs and Lead Counsel have succeeded in reaching a Settlement for $125 million, plus accrued interest, after more than two years of extensive litigation, document and deposition discovery and arm's-length settlement negotiations overseen by an experienced and highly-respected mediator, the Honorable Layn R. Phillips (Ret.).[3]   The $125 million was deposited into an escrow account on or about August 8, 2011, and has been earning interest for the benefit of the Class.

The Lead Plaintiffs, along with Lead Counsel – based upon their evaluation of the facts and applicable law and their recognition of the risk and expense of continued litigation of this mortgage-backed securities class action – submit that the proposed Settlement is in the best interests of the Class, providing a meaningful recovery for the Class now.   *See* Stickney Decl. ¶81.   If approved, the Settlement will resolve all claims and causes of action of the Class Members against Defendants.

The Settlement was reached at a time when the parties understood the strengths and weaknesses of their claims and defenses.   As set forth in the Declaration of Layn R. Phillips (Former U.S. District Court Judge) in Support of Final Approval of Class Action Settlement (the "Phillips Decl."), attached to the Stickney Declaration as Exhibit A, the settlement negotiations required multiple mediation sessions and careful consideration of complex factual and legal issues.   In advance of the mediation sessions, Lead Plaintiffs prepared and provided Judge Phillips with detailed mediation briefs, including an analysis of estimated damages.   Likewise, Lead Plaintiffs responded to Defendants' written submission setting forth their defenses to liability and damages.   When the parties ultimately reached an impasse, Judge Phillips made a Mediator's recommendation of a settlement of $125 million, which the parties separately considered and accepted.   *See* Phillips Decl. ¶¶4-7; Stickney Decl. ¶76.

Prior to reaching the Settlement, Lead Counsel and Lead Plaintiffs were well informed of the strengths and weaknesses of the claims and defenses.   Lead Counsel reviewed and analyzed over four million pages of documents produced by Wells Fargo, the Underwriter Defendants, and over 35 non-parties; conducted nine depositions of Wells Fargo employees and defense experts; interviewed

---

[3] "Lead Plaintiffs" refers to the Alameda County Employees' Retirement Association, Government of Guam Retirement Fund, New Orleans Employees' Retirement System and Louisiana Sheriffs' Pension and Relief Fund.

numerous confidential witnesses; conferred with their own experts and consultants; and researched and briefed many of the core legal issues in the case. *See* Stickney Decl. ¶¶15-70. Moreover, Lead Plaintiffs were familiar with Defendants' arguments. Among other things, Defendants point to the fact that the securities at issue here were pools of largely "prime" loans, not the subprime products that have been the focus of the majority of government investigations and lawsuits arising out of the financial crisis. Similarly, Defendants argue that the underlying loans at issue have out-performed pools of subprime loans. *Id.* ¶83. In addition, Defendants opposed class certification and had moved for judgment on the pleadings, asserting that certain of Plaintiffs' claims were barred by the statute of repose. Moreover, pursuant to § 11(e) of the Securities Act, defendants would attempt to reduce any damage award by proving that the investors' losses were caused by factors other than the misstatements and omissions, such as the overall financial crisis.

Pursuant to the Court's Preliminary Approval Order, beginning on August 9, 2011, the Court-approved Notice and Proof of Claim and Release Form (the "Claim Form") were mailed to potential Class Members and their nominees.[4] Lead Counsel obtained the available identities of purchasers of the Certificates through third-party subpoenas. The list was supplemented by a proprietary database maintained by the Claims Administrator, containing the names and addresses of the largest and most common U.S. nominees. *See* Keough Decl. ¶¶8-10.

Over 7,327 Notices have been sent to potential Class Members. *Id.* ¶10. In addition, the Court-approved Summary Notice was published in *Investor's Business Daily* on August 19, 2011. *Id.* ¶11. Information regarding the Settlement, including downloadable copies of the Notice and Claim Form, was posted on the website established by the Claims Administrator specifically for this Settlement, www.wellsfargormbslitigation.com, *id.* ¶13, as well as on Lead Counsel's website, www.blbglaw.com. *See* Stickney Decl. ¶88. Pursuant to the Preliminary Approval Order, the deadline for Class Members

---

[4] *See* Declaration of Jennifer M. Keough Re Notice Dissemination and Publication ("Keough Decl.," Ex. C to Stickney Decl.), ¶8.

1    to file objections to the Settlement, or to seek exclusion from the Class, will expire on October 6,

2    2011.[5]

3    **I.      PROCEDURAL HISTORY**

4           A detailed description of the procedural history of the litigation, the claims asserted, the

5    investigation and discovery undertaken, the negotiation and substance of the Settlement, and the

6    substantial risks and uncertainties of the litigation is contained in the accompanying Stickney

7    Declaration.  A summary description is provided below.

8           **A.      Background**

9           The Action concerns the sale of Wells Fargo mortgage-backed securities ("MBS") pursuant to

10   three registration statements and the accompanying prospectuses and prospectus settlements (the

11   "Offering Documents").  MBS are securities that entitle their holders to income payments from the

12   underlying pools of residential mortgage loans.  Fundamentally, the value of MBS depends on the

13   ability of the borrowers of the pooled mortgage loans to repay the principal and interest on the

14   underlying loans and the adequacy of the collateral in the event of default.

15          As set forth in the operative Amended Consolidated Complaint (the "Complaint"), the Offering

16   Documents represented that the mortgage loans underlying the MBS at issue in the Action "were

17   generally originated in conformity with the underwriting standards described in the prospectus" and

18   that exceptions to the applicable underwriting standard were authorized only "[i]n certain instances."

19   The Offering Documents further represented that Wells Fargo's "underwriting standards [we]re

20   applied by or on behalf of Wells Fargo Bank to evaluate the applicant's credit standing and ability to

21   repay the loan, as well as the value and adequacy of the mortgaged property as collateral."

22          The Complaint alleges that, in contrast to these representations, Wells Fargo and third-party

23   originators: (i) systematically failed to follow Wells Fargo's stated underwriting standards;

24   (ii) allowed pervasive exceptions to the stated underwriting standards; and (iii) disregarded the "credit

25   risk" of the loans and "quality control" in favor of generating loan volume.  The Complaint further

26   ────────────────

27   [5] A list of those seeking exclusion will be included in Ex. 1 attached to the proposed Final Judgment
     and Order of Dismissal with Prejudice that will be submitted to the Court following expiration of the
28   deadline for seeking exclusion.

1   alleges that, as a result of these misrepresentations and omissions, Lead Plaintiffs and the Class

2   purchased MBS that were far riskier than represented.

3         **B.    The Commencement And Consolidation Of**
            **Actions, The Appointment Of Lead Plaintiffs, And**

4         **Defendants' Unsuccessful Motion To Transfer**

5         On January 29, 2009, Boilermaker-Blacksmith National Pension Fund filed an action related to

6   Wells Fargo MBS in federal court in the Southern District of New York (the "Boilermaker Action").[6]

7   Thereafter, on March 27, 2009, plaintiff the General Retirement System of the City of Detroit

8   ("Detroit General") filed a complaint against Wells Fargo and certain other defendants in the United

9   States District Court for the Northern District of California, Case No. 09-CV-01376-SI (N.D. Cal.)

10  (the "Detroit Action").  On March 31, 2009, pursuant to the Private Securities Litigation Reform Act

11  of 1995 (the "PSLRA"), Detroit General published notice of its action, which provided investors a

12  deadline to seek lead plaintiff appointment no later than June 1, 2009.  *See* Stickney Decl. ¶¶15-17.

13        On April 13, 2009, New Orleans ("New Orleans") filed an action in the Northern District of

14  California, Case No. 09-CV-01620 (CRB) (N.D. Cal.) (the "New Orleans Action") and requested that

15  the action be related to, and consolidated with the Detroit Action.  On April 14, 2009, New Orleans

16  published notice of its Action and informed investors of the deadline to file a motion for lead plaintiff

17  appointment.  On June 1, 2009, Lead Plaintiffs filed their motion for appointment and for the approval

18  of Bernstein Litowitz Berger & Grossmann LLP ("Bernstein Litowitz") to serve as lead counsel.

19  [ECF Nos. 52-54.]  Other potential lead plaintiff candidates filed competing motions to be appointed

20  as lead plaintiffs.  [ECF Nos. 43, 47.]

21        On July 16, 2009, the Honorable Susan Illston (to whom the case was originally assigned)

22  entered an Order appointing Lead Plaintiffs and approving their selection of Bernstein Litowitz as

23  Lead Counsel.  In appointing Lead Plaintiffs, the Court observed that they had the largest financial

24  interest of any of the other lead plaintiff candidates and were qualified to serve as lead plaintiffs.

25  [ECF No. 124 at 12.]  The Court also granted Lead Plaintiffs' request to consolidate the Detroit Action

26  with the New Orleans Action.

27  ──────────────

28  [6] The Boilermaker Action was voluntarily dismissed on April 6, 2009 (ECF No. 26).

Defendants moved to transfer the Action pursuant to 28 U.S.C. § 1404(a) to their preferred forum of the Southern District of New York.  After full briefing, the Court denied the motion.  [ECF No. 124.]  In doing so, the Court explained that Lead Plaintiffs' selection of forum was "entitled to considerable deference," that Lead Plaintiff Alameda County Employees' Retirement Association resides in this District and that Defendants failed to satisfy their burden to justify a transfer of the action to the Southern District of New York.  *Id.* at 6.

### C.   Preparation And Filing Of The Consolidated Complaint And Overcoming Defendants' Motions To Dismiss

Lead Counsel undertook an extensive investigation to prepare the complaint, including locating and interviewing percipient witnesses.  On August 31, 2009, Lead Plaintiffs filed the First Consolidated Class Action Complaint (the "First Consolidated Complaint," ECF No. 133), asserting violations of §§ 11, 12(a)(2) and 15 of the Securities Act against the Wells Fargo and Underwriter Defendants, as well as Moody's Corp., McGraw-Hill Companies, and Fitch, Inc. (the "Rating Agency Defendants").  Thereafter, Defendants each filed separate motions to dismiss the First Consolidated Complaint, which Lead Plaintiffs opposed.  [ECF Nos. 156-67, 169-71.]

Following full briefing and the hearing on March 19, 2010, the Court issued an Order (i) denying the Underwriter Defendants' and the Wells Fargo Defendants' motions to dismiss the §§ 11 and 15 claims with respect to the 17 Offerings in which Lead Plaintiffs purchased securities; (ii) granting Lead Plaintiffs leave to amend their claims against the Underwriter Defendants and the Wells Fargo Defendants to name additional plaintiffs that purchased in offerings that Lead Plaintiffs lacked standing;  and (iii) granting the Rating Agency Defendants' motion to dismiss without leave to amend.    [ECF No. 198.]    The Court thereafter denied Defendants' motion for leave for reconsideration.  [ECF No. 202.]

On May 28, 2010, Lead Plaintiffs filed an Amended Consolidated Class Action Complaint (the "Complaint"), which named five additional plaintiffs who purchased Wells Fargo MBS in ten

additional offerings.[7]  Lead Plaintiffs reasserted their Securities Act claims related to 27 Wells Fargo Offerings against the Underwriter and the Wells Fargo Defendants.  [ECF No. 203.]

On June 25, 2010, the Wells Fargo Defendants and the Underwriter Defendants filed separate motions to dismiss the Complaint, which Lead Plaintiffs opposed on July 16, 2010.  [ECF Nos. 212-14, 218, 240-41.]  Following another round of briefing and the hearing on September 7, 2010, the Court entered an Order denying Defendants' motion to dismiss the §§ 11 and 15 claims based on false or misleading statements regarding the underwriting practices of Wells Fargo and the third-party originators who contributed loans to the Offerings.  [ECF No. 288.]  The Court granted Defendants' motion to dismiss the claims based on false or misleading statements concerning appraisals, credit ratings, and LTV ratios.  *Id*.  The Court entered another order on October 19, 2010, dismissing the claims of the Additional Plaintiffs relating to ten Offerings, as untimely.  [ECF No. 299.]  The Court also dismissed on the same grounds the claims pursued by proposed intervenor Detroit General and First Star Bank.[8]

The Court's October 19, 2010 Order dismissed certain claims from the Action.  The Additional Plaintiffs, therefore, moved for entry of a final judgment as to those claims.  Following the Court's granting of Plaintiffs' motion for entry of a final judgment pursuant to Federal Rule of Civil Procedure 54(b), on January 12, 2011, the Additional Plaintiffs filed a Notice of Appeal to the Ninth Circuit.  Appellants filed their opening appellate briefs on April 25, 2011.  *See* Stickney Decl. ¶41.

### D.   **The Discovery Process**

As part of the ongoing litigation, Lead Counsel met and conferred with counsel for Defendants pursuant to Federal Rule of Civil Procedure 26(f) and submitted multiple joint case management statements.  Stickney Decl. ¶¶48-50.  The parties agreed on certain case management proposals, but disagreed on others, such as the duration of the pretrial schedule.  At the October 20, 2010 case

---

[7]  The "Additional Plaintiffs" are Vermont Pension Investment Committee ("Vermont"), Public Employees' Retirement System of Mississippi ("MissPERS"), Policemen's Annuity & Benefit Fund of the City of Chicago, Southeastern Pennsylvania Transportation Authority, and Plumbers & Steamfitters Local 60 Pension Plan.

[8]  First Star Bank filed a separate class action based on its purchases of Certificates in the 2006-AR15 Offering.

1  management conference, the Court entered a pretrial schedule, including dates for resolution of Lead

2  Plaintiffs' motion for class certification, the date for substantial completion of document production,

3  deadlines for fact and expert discovery and a trial date of August 27, 2012.  [ECF No. 300.]

4      Promptly following that conference, Lead Plaintiffs propounded discovery and pursued their

5  claims in accordance with the pre-trial schedule.  Lead Counsel pursued extensive document and

6  deposition discovery from Defendants and non-parties.  For example, Lead Counsel and Lead

7  Plaintiffs:  (i) prepared and served Defendants with three sets of requests for documents; (ii) responded

8  to Defendants' 77 document requests; (iii) prepared and served Defendants with three sets of

9  interrogatories, and responded to Defendants' three sets of interrogatories; (iv) prepared and served

10  Defendants with two sets of requests for admissions; (v) prepared and issued 35 document subpoenas

11  to non-parties; and (vi) conducted nine depositions of fact and expert witnesses prior to the parties'

12  agreement to settle, and prepared for and participated in six depositions of Lead Plaintiffs' designees

13  on 22 topics.  *See* Stickney Decl. ¶¶53-56, 61.

14      Throughout the litigation, the parties had countless disagreements regarding the scope of

15  discovery and timing of productions, which required meet-and-confer sessions and motion practice,

16  including two motions to compel filed by Lead Plaintiffs, and one motion to compel filed by

17  Defendants.  The motions remained under submission when the parties reached an agreement to settle

18  the Action.  *Id.*  ¶¶54, 62.

19      Lead Counsel obtained and analyzed over four million pages of documents, using a

20  sophisticated electronic document management system.  Lead Counsel organized the voluminous

21  production by issue, prepared witness files, and identified evidence to support their claims and for

22  further analysis by their experts.  *Id.* ¶55.

23      **E.      Experts And Consultants**

24      In prosecuting the claims, Lead Counsel worked extensively with experts and consultants at the

25  different stages of the litigation.  Consultants were utilized to prepare the complaints, craft discovery

26  requests, analyze documents, prepare the mediation briefs, analyze estimated damages, review

27  Defendants' affirmative defenses, and prepare for trial.  Lead Counsel retained consultants in the

28  complex and specialized areas of residential mortgage loan underwriting, the MBS industry, statistical

1   sampling, and damages.  One of the retained consultants, a statistician, developed a representative

2   sample of residential mortgage loans within the Offerings.  Other consultants, trained forensic loan

3   underwriters, reviewed and re-underwrote loan files to determine whether the loans complied with the

4   underwriting standards stated in the Offering Documents.  Another consultant assisted in estimating

5   damages.  Lead Plaintiffs also retained Dr. Joseph Mason on issues particular to class certification.

6   Dr. Mason submitted an expert report and deposition testimony in support of Lead Plaintiffs' motion

7   for class certification.  In both his expert report and sworn testimony, Dr. Mason described the MBS

8   industry and the common issues and interconnectedness within the Offerings.  *See* Stickney Decl.

9   ¶¶59, 64.

10          **F.      Lead Plaintiffs' Motion For Class Certification**
                     **And Defendants' Motion For Judgment On The**
11                   **Pleadings And/Or Partial Summary Judgment**

12          At the time of the Settlement, there were two pending motions (in addition to the discovery

13   motions): (i) Lead Plaintiffs' Motion for Class Certification [ECF No. 348]; and (ii) Defendants'

14   Motion for Judgment on the Pleadings and/or Partial Summary Judgment [ECF No. 402].   Both

15   motions were fully briefed when the parties entered into the Settlement Agreement.  *See* Stickney

16   Decl. ¶¶63-70.

17          **G.      The Extensive Negotiations Leading To The Settlement**

18          As detailed in the Phillips and Stickney Declarations, the $125 million Settlement is the result

19   of thorough, arm's-length negotiations.  On May 13, 2011, the parties participated in an in-person

20   mediation session before Judge Phillips, during which the parties presented their respective views on

21   the merits of the Action, the evidence, pending motions, and the estimated damages.  After a full day

22   session, the parties remained far apart, and the mediation was suspended while the litigation continued.

23          Negotiations and discussions continued thereafter telephonically.  The parties participated in a

24   second in-person mediation session on May 27, 2011, at which time the parties were unable to reach a

25   resolution.   With the parties at an impasse, Judge Phillips ultimately made a mediator's

26   recommendation to resolve the action for $125 million based on his assessment of the claims and

27   defenses in this mortgage-backed securities class action, review of the mediation statements, the

28

---

1  supporting evidence, the applicable law, and the pending motions.  The parties independently accepted

2  the mediator's recommendation on June 1, 2011.  *See* Phillips Decl. ¶¶4-7; Stickney Decl. ¶¶74-76.

3      The parties thereafter executed a Confidential Term Sheet.  The detailed Stipulation of

4  Settlement was filed with the Court on July 6, 2011.  Counsel for the parties appeared for the hearing

5  on preliminary approval on July 21, 2011.  Following this Court's granting of preliminary approval of

6  the Settlement, the parties filed a joint motion with the Ninth Circuit Court of Appeals to stay the

7  consolidated appeals so that the parties could pursue approval of the Settlement before this Court.  On

8  June 21, 2011, the Ninth Circuit granted the stay motion, and on August 9, 2011, the Ninth Circuit

9  granted the parties' joint motion for a limited remand in light of the proposed Settlement.[9]

10     **H.    Overview of Notice Process**

11     Beginning on August 9, 2011, a copy of the Notice was mailed to potential Class Members.

12  Lead Counsel had obtained the identity of certain known holders of the mortgage pass-through

13  Certificates, and had researched the contact information for the investors of the approximately 3,200

14  known accounts.  Stickney Decl. ¶86.  Lead Counsel forwarded to the Claims Administrator a total of

15  1,637 names and addresses of known holders of the Certificates, which was supplemented by a

16  proprietary database maintained by the Claims Administrator, containing the names and addresses of

17  2,268 of the largest and most common U.S. nominees (*i.e.,* brokerage firms, banks, and institutions who

18  hold securities in the name of the nominee, on behalf of the beneficial purchasers).  *See* Keough Decl.,

19  Ex. C to Stickney Decl., ¶¶3-5.  In addition, a Summary Notice was published in the *Investor's*

20  *Business Daily* on August 19, 2011.  Stickney Decl. ¶88.  Information regarding the Settlement,

21  including downloadable copies of the Notice and Claim Form, was posted on the website established by

22  the Claims Administrator specifically for this Settlement, www.wellsfargormbslitigation.com, as well

23  as on Lead Counsel's website, www.blbglaw.com.  *Id.*

24

25

26  [9]  The Ninth Circuit's August 9, 2011 Order, attached to the Stickney Decl. as Ex. G, orders that the
27  limited remand remains in effect until October 8, 2011, at which time the parties may move to
   continue the limited remand.  In advance of the final approval hearing, the parties will request a
28  continuance of the limited remand.

## II.   ARGUMENT

### A.   The Standards For Judicial Approval Of Class Action Settlements

It is well established in the Ninth Circuit that "voluntary conciliation and settlement are the preferred means of dispute resolution," especially in class actions.[10]  Under Rule 23(e) of the Federal Rules of Civil Procedure, a class action may be settled upon notice of the proposed settlement to class members, and a court finding, after a hearing, that it is fair, reasonable and adequate.  On a motion for final approval of a class action settlement, "the Court must determine whether the interests of the [class] will be better served by resolution of the litigation than by continuation of it."  *See In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 720 F. Supp. 1379, 1387 (D. Ariz. 1989).

A court's role in settlement approval is essentially twofold, determining whether the settlement: (i) is tainted by fraud or collusion; and (ii) is fair, reasonable and adequate.  *See Officers for Justice*, 688 F.2d at 625.  In exercising its discretion to approve the settlement of a class action, a court should consider the following factors:  (1) "the strength of the plaintiff's case"; (2) "the risk, expense, complexity, and likely duration of further litigation"; (3) "the risk of maintaining a class action throughout the trial"; (4) "the amount offered in settlement"; (5) "the extent of discovery completed and the stage of the proceedings"; (6) "the experience and views of counsel"; and (7) "the reaction of the class members."  *In re Rambus Inc. Deriv. Litig.*, 2009 WL 166689, at *2 (N.D. Cal. Jan. 20, 2009) (citing *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000)).  "The relative degree of importance to be attached to any particular factor will depend upon and be dictated by the nature of the claim(s) advanced, the type(s) of relief sought, and the unique facts and circumstances presented by each individual case."  *Officers for Justice*, 688 F.2d at 625.

In exercising its sound discretion, a district court should not adjudicate the merits of the case. As the Ninth Circuit has noted:

> [T]he settlement or fairness hearing is not to be turned into a trial or rehearsal for trial on the merits.  Neither the trial court nor this court is to reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, for it is the

---

[10] *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982); *see also In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1041 (N.D. Cal. 2007) ("[T]he court must also be mindful of the Ninth Circuit's policy favoring settlement, particularly in class action law suits.").

very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements.  The proposed settlement is not to be judged against a hypothetical or speculative measure of what ***might*** have been achieved by the negotiators.[11]

Here, the Settlement is the product of extensive arm's-length negotiations presided over by an experienced mediator.  It is the considered judgment of the Mediator, Lead Counsel, and the four Lead Plaintiffs that the Settlement represents a fair, reasonable, and adequate resolution of the litigation and warrants this Court's approval.  *See* Phillips Decl. ¶¶2, 8; Stickney Decl. ¶71.

### B.    The Settlement Meets The Ninth Circuit Standard For Approval

#### 1.    Lead Plaintiffs' Case Is Strong, But Entails Risks

Courts evaluating proposed class action settlements consider the risks faced by plaintiffs in further litigation.  *See, e.g., Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993). While Lead Plaintiffs believe that all of the claims asserted against Defendants have merit, they also recognize that there were risks of no recovery.  For example, to prevail on their § 11(a) claims, Lead Plaintiffs would have the burden of establishing that (1) the Offering Documents contained an omission or misrepresentation, and (2) the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment.  *See In re New Century*, 588 F. Supp. 2d 1206, 1238 (C.D. Cal. 2008) (citing *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1403-04 (9th Cir. 1996)).  If successful, Lead Plaintiffs still faced affirmative defenses, such as the affirmative defense of "negative causation," *i.e.*, that the alleged misrepresentation did not cause Lead Plaintiffs' claimed losses.  *See New Century*, 588 F. Supp. 2d at 1238 (citing 15 U.S.C. § 77k(e)).

From the outset, Lead Counsel and Lead Plaintiffs appreciated the unique and significant risks inherent in the litigation.  The Action involved structured securities purchased primarily by sophisticated institutional investors pursuant to Offering Documents that, Defendants argue, contain adequate risk disclosures.  At the time of the initial filing, there was little established precedent for MBS litigation, and no court had sustained claims under the federal securities laws for purchasers of MBS securities.  *See Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance*

---

[11] *Officers for Justice*, 688 F.2d at 625 (emphasis added); *see also Weinberger v. Kendrick*, 698 F.2d 61, 74 (2d Cir. 1982) ("in order to avoid a trial, the judge must [not] in effect conduct one").

1    *Corp.*, 658 F. Supp. 2d 299 (D. Mass. 2009) ("*Nomura*") (dismissing claims).  Likewise, no court at

2    that time had certified an MBS class or accepted plaintiffs' damages theories arising from such claims.

3    *See N.J. Carpenters Health Fund v. Residential Capital, LLC*, 272 F.R.D. 160 (S.D.N.Y. 2011)

4    (denying class certification).  While Lead Plaintiffs believe their claims are strong, they were aware of

5    the limited precedent that existed for MBS-specific class litigation and that would influence the

6    inevitable motions for summary judgment, not to mention at trial and on appeal.  *See* Stickney Decl.

7    ¶109.

8        Indeed, in their motions to dismiss, Defendants relied extensively on *Nomura*, the first

9    published decision to address a motion to dismiss claims brought by investors in MBS.  According to

10   Defendants, *Nomura* involved "[v]irtually identical allegations" and contained similar cautionary

11   language warning of market risks.  [*See, e.g.*, ECF No. 162 at 17.]  Defendants further claimed that

12   this litigation was time-barred because the Rating Agencies began downgrading the Wells Fargo MBS

13   in December 2007.  *Id*. at 18.

14       In opposing Defendants' motions to dismiss, Lead Plaintiffs distinguished *Nomura* because,

15   among other things, the "cautionary language" in the Offering Documents in this Action are more

16   generalized.  [ECF No. 169 at 14-15.]  In addition, Lead Plaintiffs argued that the claims were timely

17   because the Rating Agencies did not downgrade the Certificates to below investment-grade until May

18   2008, at the earliest.

19       Following oral argument, the Court issued an Order denying the Underwriter Defendants' and

20   the Wells Fargo Defendants' motions to dismiss the §§ 11 and 15 claims with respect to the 17

21   Offerings in which Lead Plaintiffs purchased securities.  [ECF No. 198.]  While courts throughout the

22   country have since sustained claims arising from purchases of MBS pursuant to allegedly misleading

23   offering documents, the Court's April 22, 2010 Order was the first decision issued by any court in the

24   Ninth Circuit, and one of the first in the country, to sustain Securities Act claims based on

25   misstatements in offering documents relating to underwriting standards for MBS.

26       Lead Plaintiffs knew that to avoid summary judgment and prevail at trial, they would need to

27   present evidence that the Offering Documents contained an untrue statement or omission.  Defendants

28   asserted throughout the litigation that the Offering Documents did not contain untrue statements or

1    omissions because (i) the Offering Documents contained numerous risk disclosures; and (ii) the loans

2    underlying the securities were largely "prime" loans, and of a higher quality than the subprime loans

3    that have been the focus of governmental investigations and public scrutiny.  *See* Stickney Decl. ¶83.

4         Even assuming that Lead Plaintiffs prevailed in establishing false and misleading statements in

5    the Offering Documents, Defendants would still have the opportunity to persuade the Court, or the jury,

6    that the statutory damages pursuant to § 11 should be reduced or eliminated because a portion or all of

7    the losses are attributable to causes other than the misstatements or omissions.   Throughout the

8    litigation, Defendants claimed that the overall economic downturn, housing price declines and reduced

9    liquidity were the causes for some, if not all, of the decline in the value of the MBS at issue in this case.

10   *See* Stickney Decl. ¶83.

11        Lead Plaintiffs faced additional affirmative defenses, including statute of limitations and

12   statute of repose, "knowledge," and lack of materiality.  Defendants filed a motion for judgment on the

13   pleadings asserting that Lead Plaintiffs' claims for certain offerings were barred by the Securities

14   Act's statute of repose.  Defendants also claimed that investors who purchased their securities more

15   than twelve months after the date of each of the Offerings must plead and prove reliance.  Finally,

16   Defendants argued that the Class should be limited to only those investors in the particular tranches

17   purchased by Lead Plaintiffs.  *See* Stickney Decl. ¶83.  If completely successful, Defendants' motion

18   would have reduced the scope of the case.  Although Lead Plaintiffs are confident in their case, there

19   was a risk that Defendants would prevail on one or more of these defenses at summary judgment or

20   trial, thus reducing, or eliminating, the Class Members' recovery.

21        Lead Plaintiffs further considered that certain contested issues would have been decided by a

22   jury in the event of a trial, including whether the alleged misrepresentations were false and material to

23   investors, whether all of the Class Members' losses were caused by the alleged misrepresentations, and

24   the amount of damages.  Even a meritorious case can be lost at trial, or later on appeal.[12]

25   _____

26   [12] *See In re BankAtlantic Bancorp, Inc.*, 2011 WL 1585605 (S.D. Fla. Apr. 25, 2011) (granting
     defendants' judgment as a matter of law following plaintiff verdict); *In re Apple Computer Sec. Litig.*,

27   1991 WL 238298 (N.D. Cal. Sept. 6, 1991) (after the jury rendered a verdict for plaintiffs after an
     extended trial, the court overturned the verdict); *Robbins v. Koger Props. Inc.*, 116 F.3d 1441 (11th Cir.

28   1997) (jury verdict of $81 million for plaintiffs against an accounting firm reversed on appeal); *Anixter*

2.      **The Expense, Complexity, And**
        **Likely Duration Of Further Litigation**

The certainty of an immediate recovery for Class Members strongly weighs in favor of settlement given the costs, delays, risks of losing entirely and the uncertain possibility of achieving a larger recovery at some point far in the future.  *See, e.g., Officers for Justice,* 688 F.2d at 626.  The established policy favoring settlement of disputed claims is even stronger for class actions due to the associated expense, complexity, and delays.  *See In re Top Tankers, Inc. Sec. Litig.*, 2008 WL 2944620, at *3 (S.D.N.Y. July 31, 2008).  Indeed, "[c]lass action suits readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation."  *Id.*  Courts recognize that securities class actions are generally complex and expensive to prosecute.  *See, e.g., In re Heritage Bond Litig.*, 2005 WL 1594403, at *6 (C.D. Cal. June 10, 2005) (citing *Maley v. Del Global Tech. Corp.*, 186 F. Supp. 2d 358, 364 (S.D.N.Y. 2002); *In re Sumitomo Cooper Litig.*, 189 F.R.D. 274, 281 (S.D.N.Y. 1999)).

There is no doubt that this mortgage-backed securities class action involves complex factual and legal issues for which there is little or no precedent.  If the Settlement here had not been achieved, the Action would likely have continued for years.  Instead of the lengthy, costly, and uncertain course of further litigation, the Settlement provides an immediate and certain recovery for the Class.

3.      **The Amount Obtained In Settlement**

The determination of a "reasonable" settlement is not susceptible to a mathematical equation yielding a particularized sum.  In fact, a settlement may be acceptable even if it amounts to only a fraction of the potential recovery that might be available at trial.  *See Mego Fin.*, 213 F.3d at 458.

Here, the Settlement provides for the recovery of $125 million in cash, plus interest.  The Settlement was reached pursuant to the Mediator's recommendation based on his assessment of the claims and defenses in this MBS class action, estimated damages, review of the mediation statements, the supporting evidence, the applicable law, and the motions that were pending at the time.  *See* Phillips Decl. ¶6.

---

*v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning securities class action jury verdict for plaintiffs in case filed in 1973 and tried in 1988).

1        The $125 million Settlement was obtained in the face of numerous obstacles.  Lead Plaintiffs

2 took into account the fact that the claims had already been significantly narrowed, and could have been

3 further narrowed, or eliminated altogether, as a result of continued proceedings.

4        In addition, Lead Counsel engaged a consultant to assist in estimating potentially recoverable

5 damages using the statutory measure under §11.  Such estimate, before taking into account causation or

6 other defenses to damages, amounts to billions of dollars in the aggregate based on certain

7 assumptions.  Defendants, however, have contended throughout the litigation that any losses were

8 caused in whole or substantial part by factors other than untrue statements in the Offering Documents,

9 such as the economic downturn and illiquidity in the market.  If Defendants were successful in

10 establishing their negative causation defense, it is anticipated that Defendants would argue that

11 estimated damages ranged between zero and approximately $700 million, depending on the

12 assumptions used.  *See* Stickney Decl. ¶82.

13        In sum, the $125 million Settlement presents a reasonable resolution of this Action and

14 eliminates the risk that the Class might recover far less, or nothing at all, especially when compared to

15 the percentages of recovery in other class action settlements.[13]

16

---

17 [13] *See, e.g., City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 (2d Cir. 1974) (affirming approval of

18 settlement that was between 3.2% and 12% of recoverable damages; "[i]n fact there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part

19 of a single percent of the potential recovery") (affirming in part *City of Detroit v. Grinnell Corp.*, 356 F. Supp. 1380, 1386 (S.D.N.Y. 1972) (approving settlement valued at 3.2% to 3.7% as "'well within

20 the ball park'")); *In re Crazy Eddie Sec. Litig.*, 824 F. Supp. 320 (E.D.N.Y. 1993) (settlement of

21 between 6% and 10% of damages); *see also* Laura E. Simmons & Ellen M. Ryan, "Post-Reform Act Securities Settlements, 2005 Review and Analysis," at 5 (Cornerstone Research 2006)

22 (www.cornerstone.com) (finding that, in 2005, settlements were approximately 3% of plaintiffs' estimated damages); *cf. Heritage Bond Litig.*, 2005 WL 1594389, at *8 (C.D. Cal. June 10, 2005)

23 (citing "Recent Trends in Securities Class Action Litigation:  2003 Early Update" 1430 PLI/Corp. 429,

24 440, 437 (May 20-21, 2004) ("In 2003, the median percentage of investor losses paid in settlement remained near its all-time low at 2.8%, up from 2.7% in 2002") and Elaine Buckberg, *et al.*, "Recent

25 Trends in Shareholder Class Action Litigation:  Bear Market Cases Bring Big Settlements," at 8 (NERA Feb. 2005) (www.nera.com) ("In 2004, the median percentage of investors losses paid in

26 settlement reached a new low of 2.3% . . . .")); Todd Foster, Ronald I. Miller and Stephanie Plancich,

27 "Recent Trends in Shareholder Class Action Litigation:  Filings Plummet, Settlements Soar," at 9 (NERA Jan. 2007) (www.nera.com) (finding that, in 2006, median recoveries were just 2.2% of losses);

28 Stephanie Plancich and Svetlana Starykh, "Recent Trends in Securities Class Action Litigation:  2009 Year-End Update," at 20 (NERA Dec. 2009), available at www.nera.com (finding that the ratio of

---

4.      **The Extent Of Discovery Completed And The Stage Of The Proceedings**

The stage of the proceedings and the amount of information available to the parties to assess the strengths and weaknesses of their case is another factor that courts consider in determining the fairness, reasonableness, and adequacy of a settlement.  *See Mego Fin.*, 213 F.3d at 459; *Rambus*, 2009 WL 166689, at *2.

As detailed in the Stickney Declaration, the litigation continued for well over two years and involved substantial motion practice and extensive fact discovery.  For example, in preparing the First Consolidated Complaint, Lead Counsel engaged in a thorough investigation to satisfy the heightened pleading standards imposed by the PSLRA, including, among other things, locating and interviewing former Wells Fargo employees with first-hand knowledge of the events alleged; an in-depth review and analysis of the Offering Documents; and a careful analysis of other court filings, media reports, congressional testimony, SEC filings, press releases, and public statements made by Wells Fargo and the Underwriter Defendants.  *See* Stickney Decl. ¶24.

Following Lead Plaintiffs' filing of the First Consolidated Complaint, the parties extensively briefed myriad complex and novel issues involved in this MBS class action, including issues of standing, *American Pipe* tolling, the relation-back doctrine, and the pleading requirements for §§ 11 and 15 claims involving MBS.  When these issues were litigated in this Action, many of them had not been addressed by any court in this Circuit and, in some instances, by any court in the country.  *Id.* ¶30.

Following resolution of the pleadings after two rounds of motions to dismiss and multiple hearings, the parties continued to brief complicated legal and factual issues up through the Settlement.  For example, Lead Plaintiffs moved for class certification and the parties engaged in extensive discovery regarding class certification, including depositions of each of the Lead Plaintiffs.  Lead Plaintiffs' motion for class certification was fully briefed at the time of the Settlement.  In addition, the Additional Plaintiffs filed an opening appellant brief in the Ninth Circuit, and the parties had fully

---

settlements to investor losses has been between 2% and 3% of investor losses from 2002 onward, and that over the past few years, this ratio has stayed at approximately 2.5%).

1  briefed Defendants' motion for judgment on the pleadings and/or partial summary judgment.  *Id.* ¶¶46,

2  63-70.

3       Lead Plaintiffs actively pursued discovery against Defendants and third parties.  For example,

4  Lead Plaintiffs and Lead Counsel:  (i) prepared and served Defendants with 3 sets of requests for

5  documents; (ii) responded to Defendants' 77 document requests; (iii) prepared and served Defendants

6  with 3 sets of interrogatories, and responded to Defendants' 3 sets of interrogatories; (iv) prepared and

7  served Defendants with 2 sets of requests for admissions; (v) prepared and issued 35 document

8  subpoenas to non-parties; and (vi) conducted 9 depositions of fact and expert witnesses prior to the

9  parties' agreement to settle, and prepared for and participated in 6 depositions of Lead Plaintiffs'

10 designees that were noticed by Defendants on 22 topics.  *Id.* ¶¶53-56, 61.  Lead Counsel also filed 2

11 motions to compel, and responded to Defendants' motion to compel.  Lead Counsel ultimately obtained

12 and analyzed over 4 million pages of documents.  *Id.* ¶55.

13      In sum, Lead Plaintiffs actively prosecuted this case for the benefit of the Class for more than

14 two years.  The parties reached an agreement to settle at a point when they were well informed as to the

15 facts, legal issues, and risks of the Action.

16          **5.    The Experience And Views Of
                    Lead Counsel And Lead Plaintiffs**

17

18      Courts recognize that the opinion of experienced counsel supporting the settlement is entitled to

19 considerable weight.[14]  This makes sense, as counsel is "most closely acquainted with the facts of the

20 underlying litigation."[15]  "Parties represented by competent counsel are better positioned than courts to

21

22 [14] *See, e.g., Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15, 18 (N.D. Cal. 1980) ("the fact that
23 experienced counsel involved in the case approved the settlement after hard-fought negotiations is
   entitled to considerable weight"); *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 622 (N.D. Cal. 1979); *see
24 also In re First Capital Holdings Corp. Fin. Prods. Sec. Litig.*, 1992 WL 226321, at *2 (C.D. Cal.
   June 10, 1992) (finding belief of counsel that the proposed settlement represented the most beneficial
25 result for the class to be a compelling factor in approving settlement); *see also Omnivision*, 559 F.
   Supp. 2d at 1043 (citation omitted) ("The recommendations of plaintiffs' counsel should be given a
26 presumption of reasonableness.") (quoting *Boyd*, 485 F. Supp. at 622).

27 [15] *Heritage Bond*, 2005 WL 1594403, at *9 (citations omitted); *Rambus*, 2009 WL 166689, at *3; *Glass
   v. UBS Fin. Servs., Inc.*, 2007 WL 221862, at *5 (N.D. Cal. Jan. 26, 2007), *aff'd*, 331 Fed. Appx. 452
28 (9th Cir. 2009) (unpubl.).

1   produce a settlement that fairly reflects each party's expected outcome in litigation." *In re Pac. Enters.*
2   *Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995).  Thus, "the trial judge, absent fraud, collusion, or the like,
3   should be hesitant to substitute its own judgment for that of counsel."  *Heritage Bond*, 2005 WL
4   1594403, at *9 (internal citation omitted).

5        Here, Lead Counsel Bernstein Litowitz has many years of experience in litigating complex
6   securities actions throughout the country – including within this Circuit, and in MBS litigation, in
7   particular – and in assessing the relevant merits of each side's case.[16]

8        Additionally, throughout the litigation and settlement negotiations, Defendants have been
9   represented by experienced counsel from prominent law firms.[17]  As a result, the parties' negotiations
10  were thorough.  The negotiations required two in-person mediation sessions – conducted under the
11  direction of Judge Phillips, a retired judge and well-regarded mediator with extensive experience in the
12  mediation of complex actions – and extensive negotiations in connection with the mediation sessions,
13  ultimately resulting in the parties accepting the Mediator's recommendation.  *See* Phillips Decl. ¶¶4-7.
14  With this background, the Settlement was clearly reached without collusion and only after good-faith
15  bargaining among the parties.  *See Lundell v. Dell, Inc.*, 2006 WL 3507938, at *3 (N.D. Cal.
16  Dec. 5, 2006) (approving class action settlement that was "the result of intensive, arms'-length
17  negotiations between experienced attorneys familiar with the legal and factual issues of this case").

18       Moreover, under the regime put in place with the enactment of the PSLRA, the Lead Plaintiffs'
19  approval of a settlement should be accorded "special weight because [the Lead Plaintiff] may have a

20  _____

21  [16] *See, e.g., In re McKesson HBOC, Inc. Sec. Litig.*, 99-CV-20743 RMW (N.D. Cal.) (serving as Co-
    Lead Counsel, Bernstein Litowitz successfully recovered over $1.04 billion); *In re Maxim Integrated*
22  *Prods., Inc. Sec. Litig.*, 08-00832-JW (N.D. Cal.) ($173 million); *In re Connetics Sec. Litig.*, 07-02940
    SI (N.D. Cal.) ($12.75 million); *In re New Century*, 07-cv-00931 (FMOx) (C.D. Cal.) ($125 million);
23  *In re Int'l Rectifier Corp. Sec. Litig.*, 07-02544-JFW (C.D. Cal.) ($90 million); *In re Gemstar-TV Guide*
    *Int'l Inc. Sec. Litig.*, 02-CV-2775-MRP (C.D. Cal.) ($92.5 million); *see also Pub. Emps.' Ret. Sys. of*
24  *Miss. v. Merrill Lynch & Co., Inc.*, 08-cv-10841 (S.D.N.Y. June 16, 2011, and Aug. 22, 2011) (serving
    as Lead Counsel, Bernstein Litowitz obtained orders certifying litigation class of MBS investors); *see*
25  *also* Firm Resume of Bernstein Litowitz, attached as Ex. H to the Stickney Decl.

26  [17] At times during the litigation, the Individual Defendants and Wells Fargo were represented by
27  Munger Tolles & Olsen LLP; Cadwalader, Wickersham & Taft LLP; Perkins Coie LLP; Cahill Gordon
    & Reindell LLP; and Klapach & Klapach; the Underwriter Defendants were represented by Fried,
28  Frank, Harris, Shriver & Jacobson LLP and Pillsbury Winthrop Shaw Pittman LLP.

better understanding of the case than most members of the class." *Nat'l Rural Telecomms. Coop. v. DIRECTV*, 221 F.R.D. 523, 528 (C.D. Cal. 2004) (quoting MANUAL FOR COMPLEX LITIGATION (THIRD) § 30.44 (1995)).  Congress enacted the PSLRA in large part to encourage sophisticated institutional investors to take control of securities class actions and "increase the likelihood that parties with significant holdings in issuers, whose interests are more strongly aligned with the class of shareholders, will participate in the litigation and exercise control over the selection and actions of plaintiff's counsel." H.R. CONF. REP. 104-369, at *32 (1995).  Here, each of the Lead Plaintiffs participated throughout the prosecution of this case, including their direct participation in discovery and depositions.  The Lead Plaintiffs' approval of the Settlement is further evidence that the Settlement is fair, reasonable and adequate.

### 6.     Reaction Of The Class Members To The Proposed Settlement

The reaction of the Class to the Settlement is another factor in determining the adequacy of the Settlement. *See Rambus*, 2009 WL 166689, at *3 (citation omitted).  "[T]he absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members." *Omnivision*, 559 F. Supp. 2d at 1043 (citation omitted).  Here, pursuant to the Preliminary Approval Order, the deadline for Class Members to object to the Settlement, the Plan of Allocation or Lead Counsel's fee and expense request will expire on October 6, 2011.  To date, there have been no objections.

### C.     The Class Received Adequate Notice

Beginning on August 9, 2011, Lead Plaintiffs (through the Claims Administrator) notified potential Class Members of the Settlement by mailing a copy of the Notice to potential Class Members. Lead Counsel had obtained the identity of certain known holders of the mortgage pass-through Certificates, and had researched the contact information for the investors of the approximately 3,200 known accounts.  Specifically, to identify potential Class Members, Lead Counsel (i) served subpoenas to dozens of major custodial banks whose internal records reflect holdings and transactions in the MBS at issue, including Bank of America Securities, LLC, Bank of New York Mellon Corporation, Barclays Capital, Inc., Brown Brothers Harriman, Cantor Fitzgerald L.P., Charles Schwab & Co., Inc., ING

1   Bank, F.S.B., Merrill Lynch & Co., Inc., Mesirow Financial, Inc., Morgan Stanley & Co., Inc.,

2   Pershing, LLC, RBC Capital Markets Corporation, State Street Corporation; (ii) obtained transactional

3   information from the Depository Trust & Clearing Corporation ("DTCC"), which provides clearing and

4   settlement information for MBS; and (iii) reviewed the Underwriter Defendants' internal files for

5   information about the initial purchasers of the MBS.[18]

6        In addition, a Summary Notice was published in the *Investor's Business Daily* on

7   August 19, 2011. *Id.* ¶11. Information regarding the Settlement, including downloadable copies of the

8   Notice and Claim Form, was posted on the website established by the Claims Administrator

9   specifically for this Settlement, www.wellsfargormbslitigation.com, *id.* ¶13, as well as on Lead

10  Counsel's website, www.blbglaw.com. This method of giving notice, previously approved by the

11  Court, is appropriate because it directs notice in a "reasonable manner to all class members who would

12  be bound by the propos[ed judgment]." Fed. R. Civ. P. 23(e)(1).

13       The Notice advises Class Members of the essential terms of the Settlement, sets forth the

14  procedure for objecting to the Settlement, and provides specifics on the date, time and place of the

15  final approval hearing. The Notice also contains information regarding Lead Counsel's fee application

16  and the proposed plan of allocating the settlement proceeds among Class Members. Thus, the Notice

17  provides the necessary information for Class Members to make an informed decision regarding the

18  proposed Settlement.

19       The Notice fairly apprises Class Members of their rights with respect to the Settlement and

20  therefore is the best notice practicable under the circumstances and complies with the Court's

21  July 21, 2011 Order Regarding Edits to Proposed Class Notice (ECF No. 445), the Court's July 26,

22

23

---

24  [18]  *See* Stickney Decl. ¶86. Lead Counsel forwarded to the Claims Administrator a total of 1,637
    names and addresses of known holders of the Certificates. The list was supplemented by a proprietary
25  database maintained by the Claims Administrator, containing the names and addresses of 2,268 of the
    largest and most common U.S. nominees (*i.e.,* brokerage firms, banks, and institutions who hold
26  securities in the name of the nominee, on behalf of the beneficial purchasers). The Court-approved
    Notice requires nominees, within 14 days, to either (i) send a copy of the Notice and the Claim Form
27  to the beneficial owner of such certificates, or (ii) provide to the Claims Administrator the names and
    addresses of such persons. *See* Keough Decl. ¶¶3-5.
28

2011 Preliminary Approval Order (ECF No. 447), Federal Rule of Civil Procedure 23, and due process.[19]

### D.    The Plan Of Allocation Should Be Approved

Lead Plaintiffs have proposed a plan to allocate the proceeds of the Settlement among Class Members who submit valid Claim Forms.[20]   The objective of the proposed Plan of Allocation is to equitably distribute the Settlement proceeds to those Class Members who suffered economic losses as a result of the alleged misrepresentations and omissions.  *See* Stickney Decl. ¶91.

For the purpose of allocation, Lead Plaintiffs engaged Brett Brandenberg, a Director at AlixPartners and a Chartered Financial Analyst, to examine the plan to allocate the Settlement proceeds among claimants in accordance with § 11.  The Plan of Allocation, as set forth in the Notice, is based on the statutory calculation embodied in § 11.  *Id.* ¶93.  Specifically, § 11 provides for calculation of damages as the "difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and the value thereof as of the time such suit was brought . . . ."[21]

_____

[19] *See In re Portal Software, Inc. Sec. Litig.*, 2007 WL 4171201, at *1 (N.D. Cal. Nov. 26, 2007) (approving similar notice regimen); *In re Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1170 (S.D. Cal. 2007); *see also Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 962 (9th Cir. 2009) ("Notice is satisfactory if it 'generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard'") (citations omitted).

[20] The Plan of Allocation and the Court's Preliminary Approval Order require Class Members to submit valid Claim Forms and supporting documentation in order to be potentially eligible to participate in the distribution of the Net Settlement Fund.  Such supporting documentation typically includes brokerage confirmation slips, or other documentation as sufficiently reliable to establish the transactions in the relevant security while preventing acceptance of fraudulent claims.  If/when the Claims Administrator receives Claim Forms without sufficient documentation, the claimant will be advised of the deficiency and the Claims Administrator will attempt to work with the claimant in order for them to remedy the deficiency.  *See* Keough Decl. ¶17.

[21] Securities Act, Sec. 11(e).

The Declaration of Brett Brandenberg, attached to the Stickney Declaration as Ex. F, explains the methods used to determine the Recognized Losses and the basis for the analysis.  As explained more fully in the Notice – including through illustrative examples – and in the Brandenberg Declaration, a "Recognized Loss" will be calculated for each purchase or acquisition of a Certificate.  The calculation of the Recognized Loss or Gain Amount will depend on several factors, including: (i) when the Certificate was purchased or acquired; (ii) whether it was sold, and if so, when it was sold and for how much; and (iii) the value of the Certificate on its applicable Date of First Suit.[22]

Assessment of the adequacy of a plan of allocation in a class action is governed by the same standards of review applicable to the settlement as a whole – the plan needs to be fair, reasonable and adequate.  *See Omnivision*, 559 F. Supp. 2d at 1045; *Class Plaintiffs v. Seattle*, 955 F.2d 1268, 1284-85 (9th Cir. 1992).  "An allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel."  *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 344 (S.D.N.Y. 2005) (citation omitted).  A plan of allocation that allocates settlement funds to class members based on the extent of their injuries or the strengths of their claims is reasonable.  *See Omnivision*, 559 F. Supp. 2d at 1045.

The proposed Plan of Allocation in this case is based on the statutory damages permitted under § 11 of the Securities Act and was explained in the Notice sent to Class Members.  It was prepared in consultation with Lead Plaintiffs' damages consultant, tracks the theory of damages asserted by Lead Plaintiffs and is otherwise fair, reasonable and adequate to the Class as a whole.  Lastly, Counsel for each of the Class Representatives (representing, as a whole, purchasers of securities in each of the 28 Offerings) reviewed and approved the Plan of Allocation.  *See* Stickney Decl. ¶95.

---

[22] As explained in the Notice, if a claimant had a Recognized Gain Amount for a Certificate, the claimant will not receive a recovery in the Settlement for that Certificate.  In addition, as explained in the Notice, the Recognized Loss Amount for purchases or acquisitions of Certificates for which the claims have been dismissed will be discounted by 50% to reflect the lesser likelihood of success on the dismissed claims.  Differences of this nature among class members are common in securities litigation and are commonly addressed by a plan of allocation.  *See Glass,* 331 Fed. Appx. at 455 (affirming plan for distributing settlement proceeds that treats various class members differently based on differences in recoverable damages); *see also In re Oracle Sec. Litig.*, 1994 WL 502054, at *1 (N.D. Cal. June 18, 1994) (finding it is "reasonable to allocate more of the settlement to class members with stronger claims on the merits"); *Omnivision*, 559 F. Supp. 2d at 1045; *Mego Fin.*, 213 F.3d at 461.

1  III.    **THE CLASS SHOULD BE CERTIFIED FOR SETTLEMENT PURPOSES**

2          On July 26, 2011, the Court certified for settlement purposes only, pursuant to Rules 23(a) and

3  23(b)(3) of the Federal Rules of Civil Procedure, a Settlement Class.  [ECF No. 447 at 2.]  The Court

4  should confirm certification of the Class for settlement purposes.

5  IV.    **CONCLUSION**

6          For the foregoing reasons, Lead Plaintiffs respectfully request that the Court grant final

7  approval of the Settlement and Plan of Allocation.

8  Dated:  September 22, 2011              Respectfully submitted,

9                                          BERNSTEIN LITOWITZ BERGER
                                              & GROSSMANN LLP
10

11                                          _____/s/ David R. Stickney_____
                                            DAVID R. STICKNEY
12                                          DAVID R. STICKNEY
                                            TIMOTHY A. DeLANGE
13                                          NIKI L. MENDOZA
                                            MATTHEW P. JUBENVILLE
14                                          JONATHAN D. USLANER
                                            PAUL M. JONNA
15                                          12481 High Bluff Drive, Suite 300
                                            San Diego, CA 92130
16                                          Tel:    (858) 793-0070
                                            Fax:    (858) 793-0323
17
                                            *Counsel for Lead Plaintiffs Alameda County Employees'*
18                                          *Retirement Association, Government of Guam Retirement*
                                            *Fund, New Orleans Employees' Retirement System,*
19                                          *Louisiana Sheriffs' Pension and Relief Fund, and the*
                                            *Class, and for additional Plaintiffs Public Employees'*
20                                          *Retirement System of Mississippi, and Vermont Pension*
                                            *Investment Committee*
21
                                            KLAUSNER & KAUFMAN, P.A.
22                                          ROBERT D. KLAUSNER
                                            STUART A. KAUFMAN
23                                          10059 Northwest 1st Court
                                            Plantation, FL 33324
24                                          Tel:    (954) 916-1202
                                            Fax:    (954) 916-1232
25
                                            *Additional Counsel for Lead Plaintiff Louisiana Sheriffs'*
26                                          *Pension and Relief Fund*

27

28

COHEN MILSTEIN SELLERS & TOLL PLLC
CAROL V. GILDEN
190 South LaSalle Street, Suite 1705
Chicago, IL 60603
Tel:     (312) 357-0370
Fax:     (312) 357-0369
         -and-
STEVEN J. TOLL
1100 New York Avenue, NW
Suite 500 West
Washington, DC 20005
Tel:     (202) 408-4600
Fax:     (202) 408-4699

*Plaintiffs' Counsel to Class Representative the
Policemen's Annuity and Benefit Fund of the City of
Chicago*


CHIMICLES & TIKELLIS LLP
KIMBERLY DONALDSON SMITH
361 West Lancaster Avenue
Haverford, PA  19041
Tel:     (610) 642-8500
Fax:     (610) 649-3633

*Plaintiffs' Counsel to Class Representative Southeastern
Pennsylvania Transportation Authority*


LABATON SUCHAROW LLP
CHRISTOPHER J. KELLER
140 Broadway
New York, NY 10005
Tel:     (212) 907-0700
Fax:     (212) 818-0477

*Plaintiffs' Counsel to Class Representative Plumbers &
Steamfitters Local 60 Pension Plan*


ZWERLING, SCHACHTER & ZWERLING, LLP
ROBIN ZWERLING
JUSTIN M. TARSHIS
41 Madison Avenue, 32nd Floor
New York, NY 10010
Tel: (212) 223-3900
         -and-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DAN DRACHLER
1904 Third Avenue
Seattle, WA 98101
Tel:  (206) 223-2053

*Plaintiffs' Counsel to Class Representative General
Retirement System of the City of Detroit with respect to the
Wells Fargo 2006-AR15 Trust Certificates*

KOHN, SWIFT & GRAF, P.C.
DENIS F. SHEILS
One South Broad Street, Suite 2100
Philadelphia, PA 19107
Tel:  (215) 238-1700

*Additional Counsel to General Retirement System of the
City of Detroit*