# EXHIBIT 4

**UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549**

**FORM 10-Q**

QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF
THE SECURITIES EXCHANGE ACT OF 1934
For the quarterly period ended June 30, 2011

Commission file number 001-2979

**WELLS FARGO & COMPANY**
(Exact name of registrant as specified in its charter)

| Delaware | No. 41-0449260 |
|---|---|
| (State of incorporation) | (I.R.S. Employer Identification No.) |

420 Montgomery Street, San Francisco, California 94163
(Address of principal executive offices)  (Zip Code)

Registrant's telephone number, including area code: 1-866-249-3302

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

Yes ☑    No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).

Yes ☑    No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer   ☑         Accelerated filer   ☐

Non-accelerated filer   ☐ (Do not check if a smaller reporting company)    Smaller reporting company   ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).

Yes ☐    No ☑

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date.

| | Shares Outstanding<br>July 29, 2011 |
|---|---|
| Common stock, $1-2/3 par value | 5,279,840,998 |

## Risk Management – Credit Risk Management *(continued)*

**LIABILITY FOR MORTGAGE LOAN REPURCHASE LOSSES** We sell residential mortgage loans to various parties, including (1) government-sponsored entities Freddie Mac and Fannie Mae (GSEs) who include the mortgage loans in GSE-guaranteed mortgage securitizations, (2) special purpose entities (SPEs) that issue private label mortgage-backed securities (MBS), and (3) other financial institutions that purchase mortgage loans for investment or private label securitization. In addition, we pool FHA-insured and VA-guaranteed mortgage loans that back securities guaranteed by GNMA. We may be required to repurchase these mortgage loans, indemnify the securitization trust, investor or insurer, or reimburse the securitization trust, investor or insurer for credit losses incurred on loans (collectively "repurchase") in the event of a breach of contractual representations or warranties that is not remedied within a period (usually 90 days or less) after we receive notice of the breach. For additional information see our 2010 Form 10-K.

We have established a mortgage repurchase liability related to various representations and warranties that reflect management's estimate of losses for loans for which we have a repurchase obligation, whether or not we currently service those loans, based on a combination of factors. Our mortgage repurchase liability estimation process also incorporates projected and on hand mortgage insurance rescissions that we deem to be probable to result in a repurchase demand. Currently, repurchase demands primarily relate to 2006 through 2008 vintages and to GSE-guaranteed MBS.

During second quarter 2011, we observed a decline in our level of total repurchases and losses as we continued to work through the remaining risk associated with the 2006 through 2008 vintages. We repurchased or reimbursed investors for incurred losses on mortgage loans with original balances of $598 million. In second quarter 2011, we also negotiated a settlement on a pool of mortgage loans with original sold balances of $302 million. This settlement occurred with a private investor to whom we had sold the loans and settled all future mortgage repurchase requests for this pool of loans with this counterparty. We incurred net losses on repurchased loans, investor reimbursements and loan pool global settlements of $261 million in second quarter 2011.

Table 28 provides the number of unresolved repurchase demands and mortgage insurance rescissions. We do not typically receive repurchase requests from GNMA, FHA/HUD or VA. As an originator of an FHA insured or VA guaranteed loan, we are responsible for obtaining the insurance with FHA or the guarantee with the VA. To the extent we are not able to obtain the insurance or the guarantee we can request to repurchase the loan from the GNMA pool. Such repurchases from GNMA pools typically represent a self-initiated process upon discovery of the uninsurable loan (usually within 180 days from funding of the loan). Alternatively, in lieu of repurchasing loans from GNMA pools, we may be asked by the FHA/HUD or the VA to indemnify loans due to defects found in the Post Endorsement Technical Review process or audits performed by FHA/HUD or the VA. Our liability for mortgage loan repurchase losses incorporates probable losses associated with indemnified loans in GNMA pools and uninsurable loans.

**Table 28: Unresolved Repurchase Demands and Mortgage Insurance Rescissions**

| ($ in millions) | Government sponsored entities (1) | | Private | | Mortgage insurance rescissions with no demand (2) | | Total | |
|---|---|---|---|---|---|---|---|---|
| | Number of loans | Original loan balance (3) | Number of loans | Original loan balance (3) | Number of loans | Original loan balance (3) | Number of loans | Original loan balance (3) |
| **2011** | | | | | | | | |
| **June 30,** | **6,876** $ | **1,565** | **695** $ | **230** | **2,019** $ | **444** | **9,590** $ | **2,239** |
| March 31, | 6,210 | 1,395 | 1,973 | 424 | 2,885 | 674 | 11,068 | 2,493 |
| **2010** | | | | | | | | |
| December 31, | 6,501 | 1,467 | 2,899 | 680 | 3,248 | 801 | 12,648 | 2,948 |
| September 30, | 9,887 | 2,212 | 3,605 | 882 | 3,035 | 748 | 16,527 | 3,842 |
| June 30, | 12,536 | 2,840 | 3,160 | 707 | 2,979 | 760 | 18,675 | 4,307 |
| March 31, | 10,804 | 2,499 | 2,320 | 519 | 2,843 | 737 | 15,967 | 3,755 |

(1) Includes repurchase demands of 892 and $179 million, 685 and $132 million, 1,495 and $291 million, 2,263 and $437 million, 2,141 and $417 million, and 1,824 and $372 million for June 30 and March 31, 2011, and December 31, September 30, June 30, and March 31, 2010, respectively, received from investors on mortgage servicing rights acquired from other originators. We generally have the right of recourse against the seller and may be able to recover losses related to such repurchase demands subject to counterparty risk associated with the seller.

(2) As part of our representations and warranties in our loan sales contracts, we typically represent to GSEs and private investors that certain loans have mortgage insurance to the extent there are loans that have loan to value ratios in excess of 80% which require mortgage insurance. To the extent the mortgage insurance is rescinded by the mortgage insurer, the lack of insurance may result in a repurchase demand from an investor. Similar to repurchase demands, we evaluate mortgage insurance rescission notices for validity and appeal for reinstatement if the rescission was not based on a contractual breach. When investor demands are received due to lack of mortgage insurance, they are reported as unresolved repurchase demands based on the applicable investor category for the loan (GSE or private). Over the last year, approximately 20% of our repurchase demands from GSEs had mortgage insurance rescission as one of the reasons for the repurchase demand. Of all the mortgage insurance rescissions notices received in 2010, approximately 70% have resulted in repurchase demands through June of 2011. Not all mortgage insurance rescissions received in 2010 have been completed through the appeals process with the mortgage insurer and upon successful appeal, we work with the investor to rescind the repurchase demand.

(3) While original loan balance related to these demands is presented above, the establishment of the repurchase liability is based on a combination of factors, such as our appeals success rates, reimbursement by correspondent and other third party originators, and projected loss severity, which is driven by the difference between the current loan balance and the estimated collateral value less costs to sell the property.

The level of repurchase demands outstanding at June 30, 2011, was down from a year ago in both number of outstanding loans and in total dollar balances as we continued to work through the demands. While GSE repurchase demands outstanding have increased from December 31, 2010, due to an acceleration of timing of demand requests, which can fluctuate, we do not expect these demands to remain elevated and we do not believe these demands indicate an increased frequency of demands in the future. Customary with industry practice, we have the right of recourse against correspondent lenders from whom we have purchased loans with respect to representations and warranties. Of the repurchase demands presented in Table 28, approximately 20% relate to loans purchased from correspondent lenders. Due primarily to the financial difficulties of some correspondent lenders, we typically recover on average approximately 50% of losses from these lenders. Historical recovery rates as well as projected lender performance are incorporated in the establishment of our mortgage repurchase liability.

Our liability for repurchases, included in "Accrued expenses and other liabilities" in our consolidated financial statements, was $1.2 billion at June 30 and March 31, 2011. In the quarter ended June 30, 2011, $242 million of additions to the liability were recorded, which reduced net gains on mortgage loan origination/sales activities. Our additions to the repurchase liability in the quarter ended June 30, 2011, reflect updated assumptions about repurchase risk on outstanding demands, particularly on the 2006-2008 vintages.

We believe we have a high quality residential mortgage loan servicing portfolio. Of the $1.8 trillion in the residential mortgage loan servicing portfolio at June 30, 2011, 93% was current, less than 2% was subprime at origination, and approximately 1% was home equity securitizations. Our combined delinquency and foreclosure rate on this portfolio was 7.44% at June 30, 2011, compared with 7.22% at March 31, 2011. In this portfolio 6% are private securitizations where we originated the loan and therefore have some repurchase risk. For this private securitization segment of our residential mortgage loan servicing portfolio, 58% are loans from 2005 vintages or earlier (weighted average age of 69 months); 80% were prime at origination; and approximately 70% are jumbo loans. The weighted-average LTV as of June 30, 2011, for this private securitization segment was 77%. We believe the highest risk segment of these private securitizations is the subprime loans originated in 2006 and 2007. These subprime loans have seller representations and warranties and currently have LTVs close to or exceeding 100%, and represent 8% of the 6% private securitization portion of the residential mortgage servicing portfolio. We had only $72 million of repurchased loans related to private securitizations in second quarter 2011. Of the servicing portfolio, 4% is non-agency acquired servicing and 2% is private whole loan sales. We did not underwrite and securitize the non-agency acquired servicing and therefore we have no obligation on that portion of our servicing portfolio to the investor for any repurchase demands arising from origination practices. For the private whole loan segment, while we do have repurchase risk on these prior loan sales, less than 3% were subprime at origination and loans that were sold and subsequently securitized are included in the private securitization segment discussed above.

Table 29 summarizes the changes in our mortgage repurchase liability.

**Risk Management – Credit Risk Management** *(continued)*

**Table 29: Changes in Mortgage Repurchase Liability**

|  | | Quarter ended | | | | |
|---|---|---|---|---|---|---|
| (in millions) | | **June 30, 2011** | Mar. 31, 2011 | Dec. 31, 2010 | Sept. 30, 2010 | June 30, 2010 |
| Balance, beginning of period | $ | **1,207** | 1,289 | 1,331 | 1,375 | 1,263 |
| Provision for repurchase losses: | | | | | | |
|   Loan sales | | **20** | 35 | 35 | 29 | 36 |
|   Change in estimate - primarily due to credit deterioration | | **222** | 214 | 429 | 341 | 346 |
|     Total additions | | **242** | 249 | 464 | 370 | 382 |
| Losses | | **(261)** | (331) | (506) | (414) | (270) |
| Balance, end of period | $ | **1,188** | 1,207 | 1,289 | 1,331 | 1,375 |

The mortgage repurchase liability of $1.2 billion at June 30, 2011, represents our best estimate of the probable loss that we will incur related to representations and warranties in the contractual provisions of our sales of mortgage loans. Because the level of mortgage loan repurchase losses depends upon economic factors, investor demand strategies and other external conditions that may change over the life of the underlying loans, the level of the liability for mortgage loan repurchase losses is difficult to estimate and requires considerable management judgment. We maintain regular contact with the GSEs and other significant investors to monitor and address their repurchase demand practices and concerns. Because of the uncertainty in the various estimates underlying the mortgage repurchase liability, there is a range of losses in excess of the recorded mortgage repurchase liability that are reasonably possible. The estimate of the range of possible loss for representations and warranties does not represent a probable loss, and is based on currently available information, significant judgment, and a number of assumptions that are subject to change. The high end of this range of reasonably possible losses in excess of our recorded liability was $1.8 billion at June 30, 2011, and was determined based upon modifying the assumptions utilized in our best estimate of probable loss to reflect what we believe to be the high end of reasonably possible adverse assumptions. For additional information on our repurchase liability, see the "Critical Accounting Policies – Liability for Mortgage Loan Repurchase Losses" section in our 2010 Form 10-K and Note 8 (Mortgage Banking Activities) to Financial Statements in this Report.

To the extent that economic conditions and the housing market do not recover or future investor repurchase demands and appeals success rates differ from past experience, we could continue to have increased demands and increased loss severity on repurchases, causing future additions to the repurchase liability. However, some of the underwriting standards that were permitted by the GSEs for conforming loans in the 2006 through 2008 vintages, which significantly contributed to recent levels of repurchase demands, were tightened starting in mid to late 2008. Accordingly, we do not expect a similar rate of repurchase requests from the 2009 and prospective vintages, absent deterioration in economic conditions or changes in investor behavior.

**RISKS RELATING TO SERVICING ACTIVITIES** In addition to servicing loans in our portfolio, we act as servicer and/or master servicer of residential mortgage loans included in GSE-guaranteed mortgage securitizations, GNMA-guaranteed mortgage securitizations and private label mortgage securitizations, as well as for unsecuritized loans owned by institutional investors. The loans we service were originated by us or by other mortgage loan originators. As servicer, our primary duties are typically to (1) collect payment due from borrowers, (2) advance certain delinquent payments of principal and interest, (3) maintain and administer any hazard, title or primary mortgage insurance policies relating to the mortgage loans, (4) maintain any required escrow accounts for payment of taxes and insurance and administer escrow payments, and (5) foreclose on defaulted mortgage loans or, to the extent consistent with the documents governing a securitization, consider alternatives to foreclosure, such as loan modifications or short sales. As master servicer, our primary duties are typically to (1) supervise, monitor and oversee the servicing of the mortgage loans by the servicer, (2) consult with each servicer and use reasonable efforts to cause the servicer to observe its servicing obligations, (3) prepare monthly distribution statements to security holders and, if required by the securitization documents, certain periodic reports required to be filed with the Securities and Exchange Commission (SEC), (4) if required by the securitization documents, calculate distributions and loss allocations on the mortgage-backed securities, (5) prepare tax and information returns of the securitization trust, and (6) advance amounts required by non-affiliated servicers who fail to perform their advancing obligations.

Each agreement under which we act as servicer or master servicer generally specifies a standard of responsibility for actions we take in such capacity and provides protection against expenses and liabilities we incur when acting in compliance with the specified standard. For example, most private label securitization agreements under which we act as servicer or master servicer typically provide that the servicer and the master servicer are entitled to indemnification by the securitization trust for taking action or refraining from taking action in good faith or for errors in judgment. However, we are not indemnified, but rather are required to indemnify the securitization trustee, against any failure by us, as servicer or master servicer, to perform our servicing obligations or any of our acts or omissions that involve wilful misfeasance, bad faith

or gross negligence in the performance of, or reckless disregard of, our duties. In addition, if we commit a material breach of our obligations as servicer or master servicer, we may be subject to termination if the breach is not cured within a specified period following notice, which can generally be given by the securitization trustee or a specified percentage of security holders. Whole loan sale contracts under which we act as servicer generally include similar provisions with respect to our actions as servicer. The standards governing servicing in GSE-guaranteed securitizations, and the possible remedies for violations of such standards, vary, and those standards and remedies are determined by servicing guides maintained by the GSEs, contracts between the GSEs and individual servicers and topical guides published by the GSEs from time to time. Such remedies could include indemnification or repurchase of an affected mortgage loan.

For additional information regarding risks relating to our servicing activities, see pages 75-76 in our 2010 Form 10-K.

The FRB and OCC completed a joint interagency horizontal examination of foreclosure processing at large mortgage servicers, including Wells Fargo, to evaluate the adequacy of their controls and governance over bank foreclosure processes, including compliance with applicable federal and state law. The OCC and other federal banking regulators published this review on April 13, 2011. We have entered into consent orders with the OCC and FRB, both of which were made public on April 13, 2011. These orders incorporate remedial requirements for identified deficiencies; however, civil money penalties have not been assessed at this time. We have been working with our regulators for an extended period on servicing improvements and have already instituted enhancements. For additional information, see the discussion of mortgage related regulatory investigations in Note 11 (Legal Actions) to Financial Statements in this Report. Changes in servicing and foreclosure practices will increase the Company's costs of servicing mortgage loans. As part of our quarterly MSR valuation process, we assess changes in expected future servicing and foreclosure costs, which in the first half of 2011, includes the estimated impact from the regulatory consent orders.